1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

WENDY ALICIA HARTE,

                              Plaintiff

                                             Case No. 1:22-cv-03820 JAV JW

                -against

                                             RESPONSE TO SUMMARY
                                             JUDGMENT

PACE UNIVERSITY, BERNADETTE BAUMANN,

SARAH BLACKWOOD, STEPHANIE HSU,

                              Defendants

-Defendants **#1**- Pace University is a nationally-ranked private university with six schools and colleges – College of Health Professions, Dyson College of Arts and Sciences, Elisabeth Haub School of Law, Lubin School of Business, Sands College of Performing Arts, and Seidenberg School of Computer Science and Information Systems. (https://www.pace.edu/about-pace/pacestory).

    **Defendant Pace has a notable, troubling history of accusations made against them of serious acts of retaliation against those, professors and students alike, who make complaints to them of Discrimination at the school, particularly against Black people. In that regard, on May 31, 2020, Defendant Pace released a public statement, which I respectfully ask the court to take judicial notice of, admitting that they had a "***systemic***" issue, "***not just specific or isolated instances***", with racial issues at the school. Defendant Pace went on to state that they were "***committed to making systemic changes***" (Exhibit "A").**

Defendant Pace also has a history of lawsuits, pending claims and/or actual claims to Federal and/or State Commissions against them for either or both Discrimination and Retaliation from both students and faculty members. In my case, Defendant Pace, Defendant Baumann, Defendant Blackwood and Defendant Hsu made efforts at silencing those complaints based on race, and me as the complainant.

Therefore, in Campbell's and Kimura's Summary Judgment, the Defendants were forced to engage in revisionist history, again. Their first attempt at this in this lawsuit was in response to my Second Amended Complaint (ECF --) where they were content to allow the students to be the accused and to be the "*fallguys*" regarding the Spring 2021 semester when they knew that the Defendants had actively pursued, suggested to, and solicited minors, teenagers and/or young adults predisposed to inappropriate conduct such as bullying, and their classmates, to make what they promised them would be unquestioned complaints about me, particularly regarding Discrimination and Harassment. It was the framing and permanent branding of a Black professor as discriminatory, harassing and retaliatory including by encouraging and inducing the students to lie in writing, in person and/or using Zoom and make those very complaints about me, likely unbeknownst to their parents. Defendants hid these activities certainly from me, their intended target, during that semester and following it as they have continued to hide in their current motion to this court.

Hypocrisy and irony exists, then, in the Defendants' attempt to establish themselves as having any moral high ground or authority to speak about school policy, violations, and notably any concerns for the students who they put in legal jeopardy while still now attempting to use those alleged student emails from them as proof against me in a federal lawsuit. Very few other things in a setting involving teenagers could be considered worse. Manipulating, bribing, coerscing, tricking, making suggestions to young adults, teenagers and/or minors stands with the most abhorrent of conduct school officials could engage in.

Additionally, it was dangerous, reckless conduct towards a "*Black woman professor*" whom they knew the students definitively had an issue with and had been engaged in bullying based on race by February 18, 2021 when I reported race-based bullying to Defendants Blackwood and Hsu. But following that report, they redoubled their efforts with the students. It was exploitative and it should be stated that Defendants' behavior of gathering false complaints about me from these students in order to have those lies about me spread everywhere, and be put into my personnel file to "*follow*" me and then offered in this federal lawsuit as they attempt to present them as truth, has serious legal and ethical implications for these students and their parents, for college and university systems and therefore, professors and society itself.

Herein, I provide the context that Defendant Pace et al worked diligently and purposely to omit so as to suggest a completely different and false narrative than what actually occurred, and what primary role they played in it. My Second Amended Complaint

was created when I did not have the facts that I now possess, information that was revealed in the Defendant's Production of documents. It has since been adjusted, within my court filings since Discovery began, to include the information that Defendant Pace et al would now like to pretend had never been revealed. Indeed, they have asked this court and the public at large to not see what can now be discerned from revelations the Defendants made about their written and verbal interactions with students, and their efforts to manipulate, bribe or coerce them into making false statements involving federal civil offenses about me. Because of the secrecy, including in the form of anonymity regarding the students' identities crucially making it impossible to match which statements may be attributed to which individual and to determine how many individual students were involves and the wealth of missing information surrounding alleged discussions the Defendants, in their positions of authority, had with these students, I hereby respectfully ask that my case progress to a trial by jury.

Before the above-described behavior by the Defendants took place, a spate of troubling events occurred in both the English Language Institute ("*ELI*") and the English department ("English") beginning in 2013. Please note that my responses to the Defendants in bold herein are meant to be read as if written all together.

-Defendants #2- Pace University offers bachelor, master, and doctoral degree programs to approximately 13,000 students (approximately 8,000 undergraduates and approximately 5,000 graduates). ([https://www.pace.edu/about-pace/pace-story](https://www.pace.edu/about-pace/pace-story)).

**(2013)**

I am a lawyer by education, a graduate of the University of Southern California Gould School of Law ("*USC*"), a highly ranked top tier law school in Los Angeles, California, who interviewed and was hired in 2013 by Brian Hickey ("Hickey"), Director of ELI". I was to teach in their summer courses program developed specifically for lawyers from other countries, law students  and professionals seeking to enter Defendant Pace's LLM program at the law school. The courses were a "*US Law and Legal Education*" (or "*Introduction to American Law*", as it was sometimes called) *course* and the "*Listening and Speaking Skills for Law*" course. Based on my education and experience, the pay rate Hickey offered was very low, a base rate. However, I accepted that amount at that time. My courses were a tremendous success with strong evaluations.

It is standard for Defendant Pace Directors, Chairpersons, and Supervisors to contact professors if there are current or upcoming classes in need of teachers. If on a semester basis as the English department is, courses are offered before or by the end of the semester.

**(2014)**

In 2014, Hickey did not ask me to return for the summer program.

**(2015)**

**However, in 2015, Hickey contacted me to teach again. Upon receipt of his email asking if I would like to return, I asked for a higher rate. At that time, I was also speaking with both Jason Tannenbaum ("*Tannenbaum*"), supervisor for other ELI programs about teaching his courses in that department and Sid Ray ("*Ray*") from the English Department about teaching there for the first time where I also advocated for a higher rate than what she offered.**

**After a phone discussion on Friday, July 24, 2015, Ray emailed me to state,**

**"***Dear Wendy,*

*Welcome!  It was great speaking with you just now.  As promised, I am following up on our telephone interview to introduce you to the process of working & teaching at Pace, NYC.*

*Carol Dollison, cc'ed here, is our department administrative assistant and will be taking care of your paperwork. Carol:  note that Wendy is working at Pace White Plains this summer and should already be in our HR system.  She will be teaching one of our open CAP sections, CRN to be determined.*

*I have also cc'ed Gerald Greland (Jere), Director of CAP, who will acquaint you with the program and the teaching options.  Jere:  Wendy has kindly signed on for a morning LC section of CAP.  I believe the thematic options are "Matters of Life and Death" (with Philosophy) and "Future Visions: Computers . . . " (with CIS).  I have told Wendy that she can choose which of these to teach.*

*Classes begin on September 2.  I look forward to meeting you in person.  In the meantime, do not hesitate to contact me if you have any further questions.*

*With all best wishes,*

*Sid"* (Exhibit "B")

---

**On Wednesday, July 29, 2015 at 15:49, I emailed Ray to discuss my pay rate. I stated, in part,**

*"Thank you for your offer of $1000/credit.  I appreciate it. Based on my experience, drive and performance in Pace's ELI program and elsewhere, I was expecting, however, to be in the $1,136 range.  Would it be possible to look at a salary of $1,136/credit for this course?*
*Thank you.*
*Best regards,*
*Wendy***" (See Exhibit "B")**

---

**That same day at 16:58 p.m., Ray provided a respond to my email,**

**"***Hi Wendy,*

*If you're already on the books at a certain pay level, the admin will no doubt give you that.  Given your law degree and so forth, I'm sure the range you mention below is do-able or already implemented.  It's just not my call.  We take your materials upstairs and negotiate hard for the very highest amount we can get for you.  The admin. then assigns you a level.  My stock answer for all is $1,000/credit plus or minus depending on advanced degrees and years of experience.*" **(See Exhibit "B")**

_____

**In the middle of the aforementioned discussion with Ray and the English department, I had conversations with Tannenbaum about the classes in his program. This is where he committed the fraud. That is, on Friday, August 14, 2105 at 13:39, when he and I discussed pay rates, Tannenbaum wrote,**

**"…**On August 31*st* we will be launching English Language Institute White Plains 2.0 at the law school. I understand that you will be teaching downtown in the English Dept. on M/W/F.

ELI Westchester is looking for a T/Th Oral Skills (9-10:50am) and Conversation and Listening (11-1pm) for Fall I = 8hrs/week for seven weeks in total.  The starting rate is $40/hr. for ELI courses. We'd be happy to have you join us if you are interested.**" (Exhibit "B")**

_____

**There were several problems with what Tamnenbaum wrote to me. First and foremost, he was never supposed to offer me a new rate to <u>decrease</u> the current rate already determined by Human Resources, offered and accepted by me. I did not know this as Tannenbaum framed the offer as a "*course rate*", a rate, he claimed, based on the type of course I was teaching versus a rate based on a professor's education and experience.**

**Following this, on <u>Tuesday, August 18, 2015 at 17:27</u>, I followed up with Raye regarding the pay rate there. She responded,**

**"**Hi Wendy,

What is your rate with ELI?  We'll try to get you a little more. But it's a Dean's decision and it'll come probably next week.

Best,

Sid**" (See Exhibit "B")**

_____

**Ray then followed this email response on the rate in a second reply to the same email with an urgent offer of more classes. This was the diversion.**

**On August 19, 2015, I replied,**

**"**Hi Sid,

*Thank you for your reply. I appreciate it.*

*The adjunct rate as of the end of the summer program was $62 per hour. The rate that I am asking for now is $71 per hour. For your meeting with the Dean next week, I wanted to share some information that may be relevant to your decision.*

*The first is that the new rate is commensurate with my education and experience. But, maybe more importantly to you and the Dean is that it is based on the results I consistently produce in the classroom. The excellent performance reviews I received from Pace for the winter and summer class sessions I taught are a product of this work.*

*Brian Hickey, the ELI director, added a note to me about my work this summer that I included here, with his permission, for your reference as follows: "I wanted to congratulate you on your outstanding evaluations from your English for Lawyers students. They loved your classes and several of your students say that you empowered them by giving them more confidence in expressing themselves. Great job! I will show you the evaluations the next time I see you." I plan to bring the same enthusiasm and work ethic to my CAP courses.*

*Thank you, Sid. I am looking forward to hearing your decision and meeting you in the near future.*

*Best regards,*

*Wendy***" (See Exhibit "B")**

---

**Ray provided a different response on pay rate that day stating,**

**"***Wendy,*

*We try to offer about $3000 per credit--it's a bit of a different system. I think that gets you around the $71 per hour, if you teach 40 or so hours during the semester. That doesn't factor in grading, but that's the level we pay everybody.*

*Best,*

*Sid*" (**See Exhibit "B"**)

---

**On September 10, 2015, I emailed Ray as I was having an issue with the payroll system which would not allow me to upload paperwork in order to receive paychecks, stating,**

*"Hi Sid,*

*I hope this email finds you well and not too hectic at the beginning of this new semester. I stopped by your office to say hello and missed you but now there is a pressing issue involving payroll that has come up that I wanted to ask you about in the hope of resolving it as quickly as I can. There seems to be an issue uploading my information into Banner for purposes of processing checks for me. I contacted Human Resources and they were unable to pinpoint the problem on their end. I am not sure where to go now for help. Also, Carol Ann asked about my rate for this semester but this is information that I do not have either. Can you please advise me on these two matters?*

*Thank you.*

*Best regards,*

*Wendy"*

_____

**Ray answered that day,**

**"***Hi Wendy,*

*Thanks for reaching out to me.  I'm stumped, though.  This has never happened before; I would follow up with Carol who will probably have the solution.*  *Your rate is as discussed, approx. $1000 per credit.*  *I've cc'ed Carol here and our Dept Chair.  Unless all your paperwork isn't finalized?  Keep me posted.*

*Best,*

*Sid*". (add entire email thread)

_____

Adding to the confusion and lies, at some point in our discussions, Ray informed she could not go higher than the rate from the ELI department *because of the contract.* This also was a lie and was similar to the maneuver Tannenbaum had used of finding something to blame for why she could not change the number. Moreover, I believe the system issue I was having was a message. Therefore, my rate *on the books* ended as being the exact same rate as that of the number in the ELI department, the lowest rate, although it was repeatedly messaged that the departments were separate operating entities, and *except* for Tannenbaum's rate which was even lower.

Based on the problematically shifting email conversation information in all departments (as to who ultimately was making the decision about pay, what numbers were appropriate and how they paid faculty) we had been having, there was confusion, by design. Indeed, had it been appropriate to my experience, teaching performance and education in the English department, the teaching rate for me for all departments would have been much higher.

With regard to Tannenbaum and his August email described above, when he offered me courses to teach in his program, because the number of forty dollars ($40) an hour was exceptionally low, I declined his offer. Unbeknownst to me, the lowest teaching rate to be offered to anyone in the department based on education, performance and experience was forty-five dollars ($45). After I had declined the forty dollars ($40), Tannenbaum "*raised*" the amount to that number. However, when I again took issue with this adjusted rate and then declined it, this is when Tannenbaum stated that the number was a "*course rate*" which all of the professors were receiving for teaching the same courses. Because of this, he stated that it was all he could offer. Though hesitantly but as long as I was not being treated

differently, it was then that I accepted the offer. However, I should have been alert to the glaring problem and fact that Tannenbaum had made two (2) offers before alleging and proffering the forty-five dollar ($45) "*course rate*" explanation for the second of the two low rates. In effect, Tannenbaum lied by conjuring a "*course rate*" excuse in order to induce me to accept it. This is fraud.

Thereafter, I worked so many classes at that time in both Tannenbaum's program and Hickey's program. Whatever they had in terms of courses, I was offered to teach and I did so at the low rates. In that department, I taught many courses and during the week, evenings and Saturday mornings on the weekends. Those classes included "*Business and Professional Communications*".

From the start of teaching ELI classes in 2015, there were issues with my paychecks. As described in ECF 199, Tannenbaum had been doctoring the hours I worked so that it appeared that I was teaching different hours than I was so that it could amount to the same ending pay as if I had worked those hours at forty dollars ($40) an hour. In other words, Tannenbaum shortened my actual hours worked (which are officially listed scheduled class times) and tben multiplied them by the higher rate sixty dollars ($60) rather than multiplying my actual hours by the higher rate printed on my paycheck (the rate listed for Hickey's courses and the English department). This was problematic as it meant that somewhere in accounting, it would still appear as if the actual hours at ($60) were being paid for the officially scheduled and listed course hours when in fact Tannenbaum was paying me less off the books.

Oftentimes, as well, I did not receive paychecks on time or the amount was incorrect because of the strange calculations to make the amount match up properly or Tannenbaum and Hickey "*forgot*" to pay me or pay me fully. At the time, I noted these occurrences and voiced concerns but I was also focused on the building of my brand from scratch in a tough environment to survive, New York's Diamond District.

In September 2015, I asked Hickey for a reference letter because the English department required it. On September 10, 2015, Hickey wrote, "

*Dear Wendy,*

*Absolutely. I would be happy to write a letter of reference for you. I am going out of town tomorrow morning, but I will work on it when I get back next week.*

*I hope your Oral Skills and Conversation/Listening classes in White Plains are going well.*

*Best regards,*

*Brian*
*Brian Hickey*
*Director*

*English Language Institute*
*Pace University*
*163 William Street, 21st Floor*
*New York, NY  10038"*

_____

**The reference letter Hickey wrote is attached herewith as Exhibit "C".**

**Hickey also requested that I teach additional courses and I accepted those courses in his programs within the ELI department during the semester as opposed to teaching only courses in his summer program.**

**However, beginning on October 4, 2015, I began having serious issues with my paychecks starting with the English department, and then repeatedly in the ELI department with both Hickey and Tannenbaum. The emails within the chain that I sent to Suzanne Roberts ("*Roberts*") of payroll on the 4th of October 2015 and Defendant Baumann on the 7th of October 2015 were instructive on the issues of what really was occurring and why.**

**Overall, it was indicative of the mechanics of a scheme, and the lies upfront are usually how they work and are maintained until they can no longer be. (Insert paychecks here). Discovery 655 Exhibit "D"**

**(2016)**

**In June 1, 2016, Tannenbaum sent me an email which exemplifies what was occurring at Defendant Pace in terms of the various rates issue, which I still had not become aware of given Hickey's and Tannenbaum's email and verbal representations. That email read,**

**"***Hi Wendy,*

*Yes, you were paid according to the number of hours that equal your eli rate (vs. your efp rate). Because your set rate in the payment system is set at the higher rate for EFP, I have to pay you fewer hours to equal the pay for 5 hours of ELI course payment.  Here is the calculation I use to pay you. $45(eli rate) X hours worked / $61.95 (efp rate).  So if you worked 5 hours for eli,  $45 (ELI) x 5 (hours worked) /61.95 (efp rate). = 3.65 hours paid.*

*Best,*

*Jason"* (Exhibit "E")

_____

**With this scheme in place, I frequently had difficulty in determining what courses I had been paid for and how much as Hickey and Tannenbaum were combining hours on my checks for the various classes at the various rates, labeling the courses as "*ELI*" and "*EFP*" rates in emails and verbally, a false and contrived distinction between courses in order to maintain the improper fraudulent payment structure.**

There was another issue that arose in 2016. In fact, respectfully, I labeled it as the not so casual or unintentional act of cruelty towards me. That is, early in the Spring 2016 semester, in May, I had inquired of Hickey about contact information for Dr. Janet Jones ("Jones"), a professor whom I knew had worked at/was affiliated with the United Nations for quite some time. I was looking for opportunities, particularly since Hickey, to that point, had not apprised me of any new courses before the Summer Legal Program began in July 2016. Hickey provided me with the email address for Jones

Upon briefly introducing myself via email, on May 16, 2016, in a particularly worded email, Jones replied,

"*Dear Professor Harte,*

*Thank you for reaching out to me about your interest in the United Nations. I have been there in the capacity as an NGO Representative to the United Nations for several years, but I am not a United Nations employee. If you are looking for a position with the United Nations, please go to un.org because all of the job openings are listed there. You might also want to try idealist.org where some NGOs list their job openings that are related to UN work. The United Nations Association and the United Nations Foundation are also good sources. Brian has done work with Friendship Ambassadors and the UN Programs there too. He is the go to person for that.*

*As you probably know, the US is behind in its dues to the UN. Since we have finally pledged to catch up on the payments, the UN is pleased but we have not paid in full. I wonder how that will affect US citizens who apply for jobs at the UN. If you apply to the UN for a position and have a negative response, please remember this major problem – you are applying from a country that has refused to pay its dues for nearly a decade. Additionally, I think they do extensive background and security searches for people who work in this arena so expect detailed searches in New York and California.*

*Thank you for your kind and gracious email. I look forward to meeting you around ELI.*

*Good luck. Janet Jones* **(Exhibit "G" email exchange).**

_____

I had also emailed Hickey around that time in Spring 2016 to state that I would be applying for the New York Police Department's ("*NYPD*") Counterterrorism Unit Summer program. He responded, to my surprise, to say that he hoped I would teach his summer classes, two (2) of them, beginning in May which he, at that moment, had just informed me of. Because of this  new information and what appeared to be a lengthy process at the NYPD, I decided to teach Hickey's new classes instead. Approximately one (1) or two (2) before the classes were to scheduled to begin, Hickey cancelled one of the classes and informed me of it. This meant that one class was still on the schedule.

However, just *the day before* the second class was slated to begin, Hickey also cancelled that one. Therefore, I had no funds. At that time in my professional life, all monies were going towards my personal necessities and the business exclusively. There was no

backup of funds available to me in the event of a cancellation of classes. Therefore, I was simply left stranded.

What I did not know and what Hickey did not notify me of, as he was supposed to, was that in a case of these types of cancellations, so close to the intended start dates of the class, I was entitled to a certain amount of compensation from Defendant Pace. Not knowing this, in a panic, I contacted Defendant Baumann (Exhibit "H"). She informed me of the funds I was supposed to receive but was unclear about how much that amount was supposed to be and under what particular circumstances. In other words, respectfully, based on what had occurred above, was I owed for both classes or just one class? There was no policy that Defendant Baumann or the Union sent me that allowed me to determine this.

Therefore, when I informed Hickey of this, he claimed that he had not remembered this. He stated that he would submit the paperwork when he returned from his trip to Italy, asking me inappropriately if this was "*okay*" with me. Although I acquiesced with Hickey, I contacted Defendant Baumann to ask for another way to receive my funds. When I finally did receive a check for a very small amount of money for the cancellation, however, I had no confirmation that it was correct. Moreover, in retrospect, and as one note, besides what Hickey had claimed in emails about having courses for me in May 2016, there was no confirmation whatsoever that any classes were ever slated to run at all during that time period although Hickey had asked that I teach in place of other work I was researching for myself in that time.

Immediately following this as I still had almost no funds, I applied for unemployment which I had just discovered I was likely entitled to. Upon completion of the paperwork, I filed with the Department of Labor ("*DOL*"). In response, Defendant Pace swiftly denied my application. I then appealed to the DOL Appeals Board. I asked Harvey Mars ("*Mars*"), the attorney for the Union of Adjunct Faculty at Pace's ("*UAFP*") to attend and represent my interests as he had done with other Union member. He refused, telling me that I was a lawyer and that I should do it myself. This was unusual and inappropriate but I did just that. I asked Mars for anything to assist such as case law since he distanced himself from helping altogether. He finally did provide a case from a petitioner to the DOL, Carl Jensen.

At the June 2016 Appeals hearing, I represented myself in person but Defendant Pace did not appear, neither in person or telephonically. Ultimately, I was successful at that hearing and was granted funds due to me. Defendant Pace had wrongfully denied my application. At the present time, I requested a copy of that decision from the DOL and continue to wait for a reply.

**(2017)**

By chance and much to my shock, a non-Black professor in the ELI department informed me that, in fact, the "*course rate*" Tannenbaum had stated was the reason for the

extremely low rate he had offered me to teach did not exist. She remarked that no ELI professors had heard of this and none were receiving "*course rates*".  Between 2015 and 2017, I had worked in the ELI department with Tannenbaum's courses during the day, the evening and weekends at that low rate. Some of those courses included "Conversation and Listening", English Skills", "Oral Skills", "Business and Professional Communication", "Reading and Vocabulary" and "Grammar and Writing". Tannenbaum and Hickey smiled at me every day, presented this friendly exterior, while they were engaging in fraud. Indeed, Hickey had been supporting Tannenbaum and I would discover Hickey's own acts for his programs in late 2017/2018. I felt betrayed by their actions.

I notified Bill Quinlan ("*Quinlan*"), President of the Union of Adjunct Faculty at Pace ("*UAFP*") immediately. Directly, he referred me to Moriah Olsen ("*Olsen*") of New York State United Teachers ("*NYSUT*"), the large Union that is supposed to guide and support, *by request of the Union members based on a Union member vote*, smaller Unions like the UAFP. Olsen immediately contacted Defendant Baumann and Bundor in writing and maintained contact with me on the issue. **(Exhibit J)(Olsen emails)**

-Defendants **#3** – During the Spring 2021 semester, Dr. Stephanie Hsu was an Associate Professor of English, the Chair of the American Studies ("*AMS*") Program, and an Associate Chair in the English Department at Pace University. (Hsu Aff., ¶ 3).

**(2018)**

In the English department and while Olsen and I are questioning what has been occurring, I met Defendant Hsu. By that point, I had taught in the CAP program in the department with Gerald Greland ("*Greland*") as the Director as well as English 101 and 102 (Freshman Composition and Freshman Literature) and "Writing in the Disciplines" in the department. Somehow, we began discussions about teaching a "*Law and Literature*" course which would have been identical in almost every respect to the "*Disciplines*" I had designed for my teaching at Defendant Pace to be a course which explored how legal predicaments were treated in fiction. Authors such as Sophocles, Hermann Melville, and Franz Kafka were covered, debated and professionally explored for themes, conundrums, and issues raised. My students, most often than not, showed admirable grace while analyzing interesting topics and unusual or unexpected circumstances the works, by design, brought up. This class, also, was tremendously fun, interesting and successful where I designed it as a discussion of real world implications the works delved into. As was apparent on evaluations, my rapport and facility communicating with students, as Johnson would remark upon in my only scheduled formal observation at Defendant Pace, was one of my core strengths.

Defendant Hsu and I discussed me potentially teaching another class that I would create that would use literature to create a factual timeline of the racial history of African-

Americans in the United States. Hsu asked me to create a complete syllabus. I did this, with literary works to be used and grouping of dates for specific time periods in American history relating to notable racial events. When I did this, I provided it to Defendant Hsu for which I was supposed to have been compensated. This did not happen. Indeed, Defendant Hsu took my syllabus and said nothing to me about it thereafter.

Defendants **#4** - Dr. Hsu is an individual defendant in this action. (Hsu Aff., ¶1).


At the time of the events detailed herein and when I met her, Defendant Hsu was a "*mandatory reporter*". What this means, respectfully, is that she was required to report instances of discrimination, retaliation, and/or harassment she encounters in any form to the Equal Employment Opportunity Commission ("*EEOC*") investigator at the school.

About the same time as the aforedescribed conversations with Defendant Hsu, I declined further work in Tannenbaum's ELI programs because of what I felt were unsuitable for me working conditions in combination with the sheer number of courses I was teaching for that program. I was working quite a lot alongside pay that was not commensurate with the level of work I produced for the program, including promotional videos and Mail Chimp surveys he requested. Yet, Tannenbaum would not accommodate my requests which I considered unreasonable particularly because of the circumstances. When I informed Tannenbaum of my decision to not return, surprisingly, he behaved as of he had not heard me and scheduled me for a class that started almost immediately. Because of this, I felt obligated to teach it. However, I also immediately sent Tannenbaum an email indicating once again but in writing that I would not be returning so that he could not repeat what he had done.

Following a revealing email communication with Hickey and my discovery that he too was engaging in manipulations with the rate, using the same "course rate" verbiage for his programs as Tannenbaum did, I contacted the Union.

On January 24, 2018, I emailed Quinlan to state,

"*Hi Mr. Quinlan,*

*This is Wendy Harte. I wanted to contact you regarding a problem in the ELI department. What is the best way to discuss the issue with you or a representative from the UAFP?*

*Thank you. look forward to speaking with you.*

*Best regards,*

*Wendy Harte"* **(Discovery 251 Exhibit J)**

_____

14

**On January 29, 2018 at 7:39:46, Harvey Mars ("Mars") sent me the Defendant Pace lie in an email when he said,**

**"***Wendy:*

*Just to answer your question about the part time instructor pay rate, the collective bargaining agreement only have a minimum rate of $55.00. Pace can choose at its own discretion whether it wanted to offer a course above that rate and the amount can vary from course to course.*

*Hope that this answers your question.*

*Harvey S. Mars*

*Law Office of Harvey S. Mars LLC 322 West 48th Street, 6th Floor New York, NY 10036 Phone: (212) 765-4300 'ax: (212) 765-2775*

*hsmlaborlaw@harveymarsattorney.com***" (See Exhibit "J")**

_____

**I responded to this with my own email on that day at 8:58 p.m.**

**Mars replied at 11:52 p.m., now cc'ing or copying Bill Quinlan on the email, to say,**

**"***Wendy:*

*Negotiations are coming up this year. Will make sure that this issue is on the agenda.*

*Harvey S. Mars*

*Law Office of Harvey S. Mars LLC 322 West 48th Street, 6th Floor Office (212) 765-4300 Facsimile (212) 765-2775"* **(See Exhibit "J").**

_____

**Mars' email to me is a lie.**

On April 6, 2018, Olsen contacted Defendant Baumann who referred the issue to Bundor. My concern in my communications with Olsen, Defendant Baumann and Bundor was whether I had been treated differently than other professors. It was a Discrimination inquiry. (Discovery 260, Exhibit "K")

Olsen, Bundor, Defendant Baumann and I met on May 11, 2018. Bundor agreed to create a spreadsheet which spanned the years she asked me to provide. This request was problematic. There was a potential fraud and Discrimination issue spanning years which should have pushed Human Resources to launch a full inquiry into all years I taught. It should also have included the English department to ensure across the board accuracy for my *teaching* rate, as opposed to the non-existent **"*course rate*"**. In place of that, Defendant

Pace began using tactics to limit and then later, to suppress to avoid EEOC and other types of investigation.

Then, once Hickey and the department had been reported, as of August 2018, but for the Summer Lawyer's Program, I was effectively no longer offered any classes in the ELI department. I reported this to Bundor, and followed up on November 11, 2019 in another email regarding what appeared to be retribution for having complained. Communication simply ceased. A new director, James Stakenburg ("*Stakenburg*") had been hired and Hickey "*retired*" as I was told. Bundor did nothing but attempt to confuse the issue when she did follow back up with me on this particular aspect of the unfolding claim. Therefore, but for the remaining Summer ELI Lawyers Program, I was no longer teaching in ELI. This meant for me, in real terms, a loss of income money, a dwindling of my finances, while I was still working to build the dream I had envisioned for myself.

During that period in time in 2018, Stakenburg made a show of visiting my class and requesting my syllabus, which immediately felt to me like an early move towards replacement despite it facially being labeled as normal and procedural. At the same time, Stakenburg commented on my teaching in an email to me (Exhibit "L")(Add ECF 251 Hickey and Mars emails)

On March 11, 2019, Bundor finally created a spreadsheet which, she alleged, was supposed to respond to Olsen's and my inquiry. Within this document, Bundor, in effect, stated that a victim of fraud by both Tannenbaum and Hickey must remain one because she believed the repeated fraudulent statements. Bundor encapsulated this idea in the official Defendant Pace Human Resources spreadsheet, with all its different rates which, on its own, indicated a tremendous problem, but which she tried to proffer as if normal. I believe that Defendant Pace, Bundor and Defendant Baumann thought that if they behaved as if this was normal, I would too and then accept another fraud by doing so. In effect, Defendant Pace compounded the behavior. After multiple questions from Olsen regarding the spreadsheet, Bundor agreed to create a new one. Missing from this estimate was any discussion of the rate in the English department given all of the ELI rates wherein there is only supposed to be one teaching rate for all departments. Bundor stayed quiet.

As what I see now as diversion from the above paragraph, Defendant Pace, Bundor and Defendant Baumann accused me for the first time of receiving additional monies, "*overpayments*" throughout the years which I understood to mean Fraud/Theft. I denied this allegation immediately. They also generously claimed that they would not request any repayment of the funds they had not proved any element of to that point. Making that statement then was, beyond distraction, a sleight of hand tactic, acting as if the lie were true and then building upon it to further attempt to validate, reinforce it. (Add first Bundor spreadsheet here with email).

On the 14th of October 2019, Bundor made the inevitable admission when she wrote to me via email about my claim of fraud and different treatment, "*There seems to have been a*

*miscommunication about how teaching compensation for individual instructors is determined. All instructors are not paid exactly the same rate for teaching a specific course. This is due to a number of factors, including the campus location of the assigned course, length of service/employment and the merit-based rate increases the instructor received while working for the University. The latter is contractually mandated and may differ from year to year…"* **Exhibit M (email thread)**

Regarding Defendant Pace's aforementioned claim, Bundor refused to provide any reliable data in order to prove their allegation. It was just because they said so and Defendant Pace, Bundor and Defendant Baumann would maintain that lie and safeguard it as a weapon to be used against me at any time they wished. It was leverage and it was also a warning to me that "*You too*".

But the claim that I had received and kept overpayments was, in its entirety, a lie and a dangerous one as the start of Defendant Pace saying anything next and then acting as if what they were claiming was true, without proof and/or legitimate proof established through appropriate and untampered with channels.

Moreover, the idea that Defendant Pace was not seeking "*repayment*" was a trick in that I was supposed to react to this statement with concern and then gratitude to the Defendants. This hoped for reaction then would tacitly validate their overpayment claim and the spreadsheet all at once. Neither I nor Olsen reacted in that way to Bundor's and Defendant Baumann's claims, even though Olsen and I had still not fully grasped yet at that time in our review the truly problematic nature of what Defendant Pace, Bundor and Defendant Baumann had done in creating that wholly fictitious (attempt at covering up) spreadsheet by offering its false contents blatantly as truth.

However, the other problem Defendant Pace had was the impending now formal Discrimination, Retaliation and Harassment claims I was going to make likely based on race and gender as I had already made informal claims of unequal treatment, retaliation after reporting and harassment, which, because I am a member of a historically disenfranchised group, created the inference of Racial Discrimination, requiring inquiry and investigation by Defendant Pace upon *any notice* of unequal treatment. To be fair in the process, Olsen and I had requested information from Defendant Baumann and Bundor as to the numbers and their explanation. What they said did not hold water. It was quite the opposite, with the Bundor and Defendant Baumann admission contradicting the proffered spreadsheet.

At the next meeting regarding the spreadsheet, Olsen strongly challenged everything about it, the formula used to create it and the accompanying statement claiming that I had been overpaid (committed fraud/theft myself), amongst other issues. Bundor had difficulty explaining it and then offered to create a new spreadsheet. With the first arriving on March 11, 2019, the new one would not arrive until January 2021, almost two (2) years later, just before my CRES course in the Spring 2021 semester began as will be discussed further in this Defendants #4.

**(2019)**

At some point in 2019, Olsen and the organization she represented, NYSUT, were gone and without any notice to me. Apparently, the UAFP *Board members* had conducted a "*vote*" that none of the Union members realized was a vote because it looked like and had the words "*Take The Survey*" emblazoned on it and within the email asking people to participate in the survey. The "vote" ousted NYSUT and Olsen and the members did not know, only finding out quite a long time after Olsen and NYSUT were gone. That move caused an uproar amongst UAFP members.

As to the fraud and spreadsheet, Quinlan said nothing about it despite being copied on all of the Defendant Pace and Bundor correspondence. I believe this is the reason why Quinlan transferred my case to Olsen in the beginning. If the spreadsheet did not work, Olsen could be fired. The spreadsheet problem and the discrimination and retaliation claims informally complained of could stay indefinitely on hold. For quite some time and because of the quiet way in which NYSUT and Olsen were removed, I did not realize that no one was addressing my concerns once they were gone. Quinlan is represented by Defendants and Bond, Schoeneck & King in this matter.

**(2020)**

Prior to this year, Defendant Baumann was a mandatory reporter and the EEOC investigator. But then, Baumann switched her role away/was switched from being that investigator in 2020, which followed my initial report to her about Hickey and Tannenbaum and my concern of unequal treatment. I, therefore, had already filed a discrimination claim when I sent her my email on September 30, 2019 and various other times but she pretended that I had not.

Additionally, in Summer 2020, a spate of issues arose in the ELI Lawyer's program, in June and August. They continued into Spring 2021, just before the CRES class began that Defendants wrote exclusively about in their Summary Judgment.

First, without discussing any alternative, ELI's new coordinator Sarah Brubaker ("*Brubaker*") informed me that I would be required to teach the book-intensive "*Introduction to American Law*" course without the course textbook. Covid lockdown had begun some months earlier and the ELI office staff were at home. When she told me of this not long before the class started, I offered to arrange to pick up the book from campus myself. Brubaker stated that I was required to seek Bundor's permission. I wrote to Bundor and made the request, which she approved. I then drove to the Defendant Pace Law School during the lockdown and retrieved the book from the security guard stationed there. My actions were an indication of the book's importance to the course and to me as the professor who wanted the course to be taught properly. The class went on with no other issues until the end of the course arrived.

In July 2020, at the same time during that summer when the aforementioned American Law class began in July, Defendant Hsu emailed me suddenly to ask me if I could teach a new class in Fall 2020. I had never taught it before. It was AMS 200, the Critical Race and Ethnicity course ("*CRES*") (Hsu Email to me dated July 15, 2020). I accepted the class offer for the Fall 2020 semester. This was during the heart of Covid, when everyone, students and professors were all on Zoom and all classes were remote. Almost everything was closed in the country except jobs considered necessary ("*essential worker*" jobs) and, to my delight, some of my jewelry manufacturers in the Diamond District. Therefore, I also continued working outdoors, driving to New York City to work on my jewelry brand when the city was an eerie ghost town, as I tried to maintain a sense of normalcy amidst the crisis unfolding in the world.

However, in August 2020 in the ELI department, after the program had ended, and it was time for me to enter student grades, for some reason, Defendant Pace's computer grading system blocked me from doing so. I repeatedly tried inputting them but the grading issue went on for months. I contacted Brubaker immediately and, at some point during that time but early on, I requested assistance from Defendant Pace's Helpdesk or Information Technology ("*IT*").

I did the aforementioned work of trying to fix the issue and submit grades into and for almost the entirety of the Fall 2020 semester while teaching the new CRES course at the same time that Defendant Hsu had offered as that Fall semester had now begun. Therefore, I was teaching online during Covid (one of the most difficult experiences for everyone, professors and students alike) and trying to identify a problem not of my own creation and not in my control. Defendant Pace's IT repeatedly claimed that they could not identify the issue. Their communication with me was sporadic and elusive.

At a certain point when this situation continued seemingly indefinitely, concerned, I sent Brubaker all of the student grades with the hope that she would input them in for me so the students would have their grades. It was my reason for sending them to her. This action should have resolved that issue as she, Brubaker, actually had the ability to input grades into Defendant Pace's grading system. Yet, despite this, I still attempted to determine what the issue was and have it fixed by maintaining contact with Defendant Pace's IT department.

In October 2020, the ELI grades had still not been entered as the grading system issue had still not been fixed by IT and I was still blocked from doing so. Brubaker, shockingly, did not submit the grades either although she could have. In a twist, however, three (*3*) grades for my class mysteriously had somehow been entered onto the system. During this time, Bundor was still working on the new spreadsheet Olsen and I had requested, following my report of being treated differently than other professors and being denied further classes in Hickey's programs. At the time, I also had not realized that the low

pay rate and unequal treatment problems likely extended to the English department. I believe that Baumann and Bundor were acutely aware of this, however.

On October 15, 2020, Brubaker sent me an email "*disinviting*" me from teaching ever again in those last courses I had remaining in the ELI department, the Summer Lawyer's program, as I had not been offered any other courses after I complained of pay rate problems in Hickey's and Tannenbaum's programs. In effect, Brubaker fired me with a contrived issue which I had no control over but that she and others at Defendant Pace did. Her letter to me regarding this, however, framed the issue as if the problems were all my fault ("*Students being able to access their final grades is a vital part of our program and* <u>*instructors*</u> <u>*submitting their final grades on time*</u> *is a key expectation. Unfortunately, we will not be offering you any of the English for Lawyer's courses in the future*"). (Put email from Brubaker here) Exhibit "N".

Stunned and upset by this turn of events, I contacted Quinlan, the Union's President. I also contacted Defendant Baumann on November 30, 2020 via email.and requested a Human Resources Appeals hearing.

Defendant Baumann, however, did not reply. She apparently precipitated a transfer of my email addressed to her to Bundor, who then responded to me on December 1, 2020 with Defendant Baumann cc'd or copied on the communication (Put my December 21, 2020 email to Bundor here).

In my response to Bundor, I discussed Brubaker's aforementioned letter informing me that I was not going to be invited back to the program because of the grades and what she had claimed were "*communication*" issues, despite the fact that she still had the grades for my class which I had sent her of my own accord that she could have entered into the system but would not. That email reply to Bundor ultimately linked the removal or firing of me from the Summer Lawyer's program with my earlier reported ELI fraud, pay rate complaints and unequal treatment claims to the teaching opportunities no longer being offered to me in the department as a result. (My December 21, 2020 letter to Bundor here). EXHIBIT "O".

A hearing was scheduled in December 2020 with Bundor, Quinlan, Brubaker and me on the aforementioned matter. However, due to proximity to the Christmas holidays, that date was rescheduled to a date in early January 2021.

Also in December 2020, I discovered that someone had committed unemployment fraud using my identity. I reported it to Detective John Jackson during the week of December 24, 2020 and emailed him with the evidence of illegal payments sent to someone on December 28, 2020 at 15:11 p.m. (Insert email thread to and from Jackson here). EXHIBIT "P"

(2021)

In January 2021, preceding by a few weeks the start of the Spring 2021 semester focused on by Defendant Pace in their motion, the aforementioned ELI hearing with Bundor, Quinlan,

Brubaker and me, the Appeal of the firing of me from the remaining ELI program took place. It was a contentious one as there had been various inexplicable events which had occurred. *First*, Defendant Pace's Bundor could not explain why their system was all of a sudden not allowing me to enter grades for students, and for approximately four entire (*4*) months. I was never allowed to enter grades in fact.

*Second*, because of this issue, when, early on, I had sent the grades to the coordinator, Brubaker, so that she would enter the grades in my stead *as her system was working*, she would not do so and for months until 2021. Therefore, student grades sat in her email while she demanded that I figure out the issue and input the grades when I literally could not. Defendant Pace's *Help Desk* allegedly could not do so in all of that time either. Yet, Brubaker made sure to emphatically blame me.

During the hearing, Bundor and Brubaker defended the removal of me, their "*cause*", by claiming that I had not done enough to work with their own IT department to fix the problem. They presented, then, documentation which they claimed demonstrated this. However, not only was this a clear attempt to inappropriately and unfairly place blame on me for something, but there was a great deal of information missing of the *extra* work that I had done while, at the same time, I had been teaching other courses in Fall 2020, including the new CRES course Defendant Hsu had offered.

Therefore, either Defendant Pace did not have this information but should have, did not try to determine whether more information existed from their own IT department but should have, or Defendant Pace was in possession of all of the information but pretended that they had not had it during the hearing. What became clear is that I had the evidence, which seemed to come as a surprise to them when I provided it but may not have been. When asked at the hearing why Brubaker had not entered the student grades that I had sent her so that the students would not have to suffer the alleged system's issue, Brubaker claimed that she had felt uncomfortable inputting the grades and that because I had created them, she wanted me to enter them into the system.

Defendant Pace and Brubaker reinstated me following that hearing all while *still* trying to wrongfully blame me for something in order to refuse accepting any responsibility (blame shifting) for either what they intentionally did or for what had been their sole responsibility to fix and notify me of. That is, Brubaker focused on the general trumped up "*issue*" of "*communication*". This is despite Brubaker, as coordinator, receiving the grades from me early on when I encountered the issue. Therefore, as with the fraud and my "*agreement*" to the fraudulent inducement because I believed the false claims by Tannenbaum and Hickey, Defendant Pace's modus operandi is to construct all end results as being about me doing or not doing something which implicates me fully (and is determinative of the issue) and exonerates them fully (however false) while they attempt to sound as authoritative, thereby "*official*" as well, as they can muster.

In this way and using this method, I would carry the label at Defendant Pace as problematic for "*concerns*" which could and would become the criticism to which Defendant Pace could return at any time later as proof of a problematic "*history*" whenever they needed to justify any fault they labeled me with, however false.

Thus far then, Defendant Pace had not taken responsibility for the ELI Hickey and Tannenbaum fraud (choosing to falsely "*blame me back*" in Bundor and Defendant Baumann's initial spreadsheet. They would stay silent on what they knew about the English department and the rate issue there. Defendant Pace would thereafter not take responsibility for (or admit to) the Brubaker ELI blocked grading event in what looked to be a manufactured incident. The blame they placed on me, which was always supposed to be placed on me then, was also necessary and predictable. (Brubaker January 8 2021 letter). EXHIBIT "P"

However, planted in Brubaker's email in the first paragraph was something peculiar and was likely intended to be preparatory. In the aforementioned letter that had an incorrect date of the hearing which had taken place in *January 2021* just before the Spring 2021 semester commenced, Brubaker included an entire paragraph of her letter about the Collective Bargaining Agreement ("*CBA*") and "*semesters*" which is not only contradicted by other sections of that document, even if correct, was inapplicable in this Summer program situation. It was however there in a January 2021 communication, just before the Spring 2021 semester

After this difficult incident which made me feel evermore vulnerable to Defendant Pace's whims, which I felt was related to my fraud/different treatment complaint to Bundor, I asked Quinlan to file a harassment complaint against Defendant Pace. I stated that I believed that Defendant Pace would try again. Quinlan replied that, since I was reinstated, I had no reason to file a claim. There were several problems with his arguments and their implications. *First*, Quinlan never once stated that he could not file a Harassment complaint as it was not within the Union's purview. He just argued instead for me not to do so. Also, *second*, Quinlan implied directly that it was acceptable for me to be in the constant position of being falsely accused of wrongdoing, removed/fired, and/or harassed if I just repeatedly filed appeals, keeping every piece of evidence associated with the event, in the likely circumstance that Defendant Pace would claim not to possess that exonerating proof. That was an untenable stance, one wholly supportive of Defendant Pace, which is strange behavior for a Union President.

On January 22, 2021, Defendant Hsu sent an email to various professors, including me, about the semester. It stated,

"*Hi Minnie, Wendy, Ty, and Denolyn!*

*Thank you all for teaching in AMS another semester - with full enrollments in your classl - under these continually trying circumstances. Our first days of class are next week, and we're officially remote until at least February 8.*

*You'll also see that Blackboard is gone, and were using a new platform called Brightspace accessible at classes.pace.edu. Please know that everybody is struggling with this mid-year change, and there are tutorials online as well as an in-person session below, which I will try to have recorded in case you can't make it and would like a crash course or refresher. If you have any questions, don't hesitate to send them my Way!*

*Brightspace mini-training today at 2:30pm, led by Brian Evans (School of Education)…***" (Harte Discovery #118).**

On January 29 2021, the Spring 2021 semester began. The school was transitioning to a new teaching platform as indicated in Defendant Hsu's email (while still in Covid lockdown with all classes still being taught remotely), which all the professors were required to be knowledgeable about. I took an online course which Defendant Pace had provided for that purpose.

Six (*6*) days into that semester where I was teaching three (*3*) English courses, Bundor and Defendant Baumann finally responded to me with their alleged readjusted spreadsheet after an <u>inordinately lengthy one (*1*) year and ten (*10*) months span of time, almost two (2) entire years.</u> (See Spreadsheet and email thread)

In that spreadsheet, Bundor and Defendant Baumann still attempted to divert away from Tannenbaum's and Hickey's fraud with "*agreement*" to the fraud/theft, still accused me subtly of fraud by saying I received overpayments in my paychecks. Still Bundor and Defendant Baumann still had not provided the information required to support Defendant Pace's allegations when I and Olsen had provided the proof to support our claims of fraud, and requests for backpay, and proper present and future pay. What they did not say was that because there was a rate from Hickey in the system already, Tannenbaum was *not supposed to have offered me anything in terms of a lower rate* as those pay rates were based on education, performance and experience. Indeed, even as regards Hickey's offered rate, it was low itself from the beginning. The spreadsheet and narrative then were problematic still.

But, at the time when Bundor sent the second version of the spreadsheet, as previously stated, Olsen was no longer a Union representative. The Union spread the false rumor that she was "*incompetent*". Quinlan still refused to say anything on the matter. Indeed, even though Olsen had been scrupulous about documenting her correspondence with Defendant Pace's Bundor and Defendant Baumann, Quinlan, would not put anything in writing regarding me. Here, therefore, Quinlan did not question the spreadsheets or the narrative that Bundor and Defendant Baumann conjured to go with them, or Defendant Pace's unproved claims, in effect allowing them to falsely claim that a Union member had taken overpayments/engaged in fraud/theft by allegedly keeping monies, and never pursuing the monies I was actually due.  (Add Bundor January 29 2021 email + new spreadsheet here).

**Not surprisingly but glaringly absent from Bundor's "*assessment*" of the situation with alleged mathematical spreadsheet was the reason "*why*" Tannenbaum repeatedly "*misspoke*" verbally and in writing for years (and then went on to doctor official payroll documents for all that time), which is what Bundor called what he did in engaging in what I had labeled fraud with Hickey's knowledge, approval and help, and as I had requested a response to in my complaint to her.**

Defendants #5 – During the Spring 2021 semester, Dr. Sarah Blackwood was a Professor of English and Interim Chair of the English Department at Pace University. (Blackwood Aff., ¶3)

**Less than one (1) week later from the events detailed above and receipt of spreadsheet, in Feb 2021, troubling issues began in my Critical Race and Ethnicity Class of twenty-four (*24*) students. Defendant Blackwood was the Interim Chairperson for English Department at the time.**

Defendants #6 – Dr. Blackwood is an individual defendant in this action. (Blackwood Aff., ¶1)

**In her role as Interim Chairperson, Defendant Blackwood was a mandatory reporter.**

Defendants #7 – During the Spring 2021 semester, Bernadette Baumann was the Senior Director Employee & Labor Relations/Title IX Investigator in the Human Resources Department at Pace University. (Baumann Aff., ¶ 3).

**Defendant Baumann was a mandatory reporter and former Equal Employment Opportunity Commission investigator <u>as of 2020</u>. I had reported to her and Bundor in 2018 unequal treatment in the ELI department but neither did anything with this information such as launch an EEOC investigation, or provide me with the link to the complaint form or suggest and then walk over to Bernard Dufresne with me, whom I did not know existed at that time.**

Defendants #8 - Ms. Baumann is an individual defendant in this action. (Baumann Aff., ¶ 1).

**Defendants Blackwood and Hsu reported to Defendant Baumann, who reported to Matt Renna ("*Renna*") and Krislov (from 2017). She was actively involved in every aspect of what occurred in Spring 2021 with my CRES, and prior to it with the ELI spreadsheet as described previously herein.**

**Throughout Spring 2021 as in prior semesters, I was trying as best as I could as one person against the  coordinated group of Defendants that I encountered at Defendant Pace to navigate through and past the actions taken by the Defendants which had oftentimes, if not entirely, been deceitful, full of trickery and wordplay meant to confuse and delay, threaten and divert attention away from. Defendants have repeatedly worked to negatively frame my responses and reactions to the confusion which they repeatedly sowed, the lies they repeatedly told, and the issue the warnings, messages and thinly veiled threats which they repeatedly conveyed to me.**

In that semester in my CRES class, I encountered a problem where students were bullying me to the point where everything I stated and attempted to teach was a target including the following:

a) Some of the students, the dominant and vocal ones which crossed into bullying, took issue with my usage of the word "*tribe*". These students had been so focused on engaging in hateful vitriol about White people, here in the context of the Scottish and British who had come to America to settle and had taken Indigenous land, and how they hated people of color that I tried to broaden their perspective by detailing that all over the world, tribes of every race fought with each other for land and access to survival necessities, including White people (or tribes of people) against other White people (or tribes). Indeed, I pointed in the reading (which the dominant students had not read but would not allow me to properly teach) to the fact that the British and Scottish were doing the same thing to the Irish (warring over land) as to the Indigenous at the same time. In this way, I attempted to engage in a larger, more informed and nuanced discussion about Indigenous people that moved past common tropes to delve into a more complete discussion. The description using the word "tribe" was intended to help them process the situation in another way and create the atmosphere for more nuanced discussion. Therefore, I referred to White settlers in America as a tribe of people, like any other. This should not have been problematic but those students behaved so badly about this as one of many things including by insisting the word was "*harmful*" and demanding I stop using it which I would not do. I discovered later on that Defendant Hsu used the word several times when she took over the class and encountered no issues.

b) In the Roxanne Dunbar Ortiz reading, I tried discussing the concept of truth about the Indigenous within a landscape where they are commonly portrayed in false and negative ways by those who conquered or defeated them in war, White people. This was one of the main themes, if not the primary concept of the essay. Student "R" asked, upon raising his hand, if "*good people can do bad things?*" I asked what he meant. He then stated that the truth does not work against White people so violence against them was needed. He stated that truth didn't work with Martin Luther King, Jr.. He claimed the "*Dems were weak…*" As I was attempting to warn Student "R" against the use of violence, analogizing to January 6th (also known as The Attack on the Capitol" which also happened to be another example of violence amongst White people) only in the sense of violence having occurred most recently at that time and then arrests having been made for it, conversation about violence against White people occurred in the Zoom chat. Another student was agreeing with Student "R", stating enthusiastically that violence would be a good way to "*start a conversation*". I was alarmed. The vitriol escalated when I asked for students to end conversations about violence and to not use the chat for such purposes since I could not regulate or moderate it while

teaching. Student "R" began yelling at me and waving books at the camera when I asked him to provide sources to support his claim that truth does not work. I asked him to put the source for the information he was citing *in the chat* but Student "P" jumped in to say to me belligerently that if Student "R" was not allowed to use the chat to discuss violence, he would not use it to provide me with anything. This is a student talking to a professor in this manner. Student "R" then told me that I should not ask him for sources on anything he said because that is what the "*Holocaust Deniers*" did to prove the Holocaust did not happen (they asked for proof but, he claimed, when it could not be provided because everything was destroyed, those people claimed it did not happen). This was a harrowing episode in the classroom and I asked Student "R" to stop yelling at me and reiterated that idea in a BrightSpace announcement. Had we been in a physical classroom when Student "R" and Student "P" were behaving in this manner, I would have had the right to ask them to leave, which Cooper stated to me.

Regarding this conversation on common narratives about the Indigenous and portrayals of them, I posted a supplemental video on the teaching platforms' "Discussion Board" for the students (as well as other information on the slave trade as historical details), analogizing to the same concept of negative portrayals of Black people pushed by the mainstream (referred to by many as White culture) which Dunbar Ortiz wrote of, and the commencement speech made by Chadwick Bosman at Howard University, now deceased star of the movie "*Black Panther*", where he discussed refusing to accept roles (acting) where he would be portraying Black people in a negative light.

There were attacks on me about the group "Antifa" where, in mentioning a video I saw about them, Student "P" felt that I was incorrect in how I described them and that what I had hears about them was "*propaganda*", which she conveyed belligerently. In fact, she was mistaken and I had to return to class with additional evidence to support a correct original assertion because of her chosen style of behavior which had been attacking, repeatedly accusatory and brash.

c) The Weeknd began the confrontations in the classroom where, on the second day, as I normally begin a class by asking students if they wanted to chat about what, if anything, they encountered in the world related to class. A student brought that they felt the singer The Weeknd should make a statement against the war in Ethiopia. It was his duty to do so because he had a "*platform*" after I asked why they felt that he was obligated, and if he did not, he should be boycotted. That is when these same dominant students became angry that I asked this and had stated that it was a "*slippery slope*" to believe that anyone should force a pop star or anyone else to say anything that they do not want to say. What would be next that the pop star would be forced to do? There was additional discussion where I was supported by another student who suggested that maybe

he was embarrassed to speak up while I had suggested that perhaps his music label contract prevented him from speaking. The students did not like this, being challenged by me, asked to analyze their views or consider those perspectives of others whereby one student felt the need to step in and tell me, actually, that, as I was entitled to my perspective, they were entitled to theirs. However, asking a student to explain their reasoning in a college environment is not the same as telling them not to have that view. The students were too angry towards me constantly to understand this, seemingly.

d) There was also the colonizer/settler issue where I, again, tried broadening the perspective of the students to help them find empowering ways to have conversations on these issues in place of engaging in disempowering hateful vitriol about White people, which I was uncomfortable with and that only fed common narratives of who the victims are and who the powerful are.

e) There were issues with my discussions of the Indigenous and concepts about land (the students falsely believed that they did not believe in ownership of land or territories that were considered theirs), the invention of corn and other Indigenous contributions to the world. I was repeatedly interrupted by particular students who wanted to argue everything so much so that we could not move through work in a timely manner. The students wanted the Indigenous portrayed as peace-loving, unsophisticated peoples where I tried introducing the idea that Indigenous tribes fought other Indigenous tribes as every tribe on this earth has, be it Viking, African, Mongolian. They all had concepts of land/territory. They had slaves and built empires and pyramids using captured people (I posted an article on the African slave trade and how Africans came to be sold by other Africans to White merchants). All of this was problematic for these particular students and the cutting me off/rudely interrupting me persisted.

f) As part of my practice of applying the work to real world circumstances, I asked how we could use truth about Indigenous people from Dunbar Ortiz against someone like Richard Spencer ("*Spencer*") (a self-proclaimed White Supremacist who travels to college campuses throughout the country in order to debate college students) and his lies about people of color, including Black people and Jewish people who he referenced in the video I posted about him. I told the students that I had been studying and reviewing Spencers' deceptive tactics and analogies as a grown man facing young adults and teenagers and/or minors in college auditoriums. I found that students could not successfully combat him because, in part, they were not equipped with the truth and did not know how to weaponize that truth we, as a class, were learning about. This is where the class was headed when Defendant Hsu jumped in to stop a strong and interesting educational approach. Indeed, mine was the useful, working, modern application of knowledge, which is a hallmark in my teaching. In that vein and to that end, I posted comments on Discussion Board, asking students to review a Spencer

interview video with a reporter who also was incapable of combatting basic lies and maneuvers Spencer employed (after providing trigger warnings), and to indicate what they noticed about what Spencer claimed and how he did it. Defendant Hsu informed me in a rush on February 16, 2021 that students had allegedly forwarded her the video and did not want to discuss it. This is despite a student, one who later had reached out to me to see if I was okay after one particularly harrowing class, who commented on the video and said he found it interesting.

Student "R", the one who yelled and waved books at me, expressed particular frustration about social media, the algorithm, and the ability to be seen and heard against someone like Spencer who I had told the class used "memes" on social media platforms to become famous while spreading his messages of hate. Although I tried to share with him that, with knowledge on how to so it, anyone can use memes to spread messages but of truth and not hate. Student "R" argued from his position of not knowing and what I felt was a hopelessness he shared with the other bullying students.

g) The students took issue with me asking them to not say that all white judges are white supremacists.

h) Student "T" called them "*ignorant*". I heard parent in the background wondering if the bullying students had not understood the point they were bullying me about likely because of the intensity of the behavior they were displaying.

One of the aforementioned classes extended thirty (30) minutes after class with students attacking me which caused me to have a panic attack and cry following it. The situation of being constantly exposed to hateful rhetoric (which continued after the silencing was imposed upon me with a student describing how she did not want the "*White tears*" of her White friend who was dismayed at learning that she had been unwittingly racist (or so the student believed) towards her Black friend) and being bullied for something I felt was personal at the time in a lockdown Covid situation was a lot to handle.

I received three (3) student emails from students concerned about me and concerned about the bullies speaking for them as they made comments about me and my fitness to teach.

On February 9, 2021 at 11:53 a.m., Defendant Hsu allegedly had been contacted by Student "C". If true and the email is valid, Defendant Hsu never informed me of it at the time up to Discovery when it was produced. That student allegedly claimed that he was concerned. Defendant Hsu allegedly responded to Student "C" on February 11, 2021 at 8:40 a.m. with email verbiage that was strange. First, she repeated the student and then escalated and/or added to the level of the students' issue by suggesting another feeling ("*This sounds concerning and also painful*"). Put Alex email here Exhibit P).

In the aforementioned email, Defendant Hsu also allegedly made a comment to Student "C" about "*trying to line up a couple of other conversations that needed to happen*", which, respectfully, would require clarification at a trial as to whom she meant and for what reason. That is, this email was sent before Defendant Hsu and I spoke on that day by phone where she made no mention whatsoever of either of the two (2) alleged emails she had received, one of which she solicited, as "*feedback*". I did not know they existed. When I spoke to Defendant Hsu, after having attempted reaching her on both February 10, 2021 and February 11, 2021, by phone and text, indicating an urgency in needing to speak with her, in order to share with her what had been happening in my Zoom classroom and request her assistance, it was as a bullied person seeking help. I ask the court to note, respectfully, that It has not been verified as to whether this meeting of the alleged student and Defendant Hsu actually took place since not only are names redacted but Campbell and Kimura provided no documentation or notes memorializing the contents of that alleged meeting/s, scheduled allegedly to occur on Friday, the 12th of February at 9:30 a.m.

On February 11, 2021 at 11:56 a.m., when Defendant Hsu and I finally had a telephone conversation, I described what had been occurring with my students. I told her that the students were upset about everything. In the one hour (1) and thirty-four (34) minute conversation we had, I shared that I asked the students to question their assumptions or beliefs in discussion with me and each other as part of analyzing and discussing the essays Defendant Hsu had provided to me accompanying her syllabus, which she had stated that I could modify. I told Defendant Hsu that the students were attacking me on everything I said and that I believed their animus was "*personal*".

Defendant Hsu stated that perhaps the classroom discourse was too intellectual. I did not believe that this was the issue but also informed her of my belief that the students would benefit from a history course as a prerequisite before taking the CRES class. Beyond the fact that other students expressed that they were enjoying the class, what was being discussed in class was appropriate subject matter, brought to life and discussed as part of the real world, an approach that students, in my experience, like, appreciate and engage with the most.

I described everything previously detailed herein and that I had sent one of my announcements to the class that weighed in on every issue going on in the class, as one of a series of announcements I sent in order to address the behavior and return some normalcy to class interactions. As this was not effective, I told Defendant Hsu that it was my reason for coming to her. My initial request of her was for her to speak with the students. I told Defendant Hsu that I wanted the students to feel seen and heard and that she had a demeanor I thought would be conducive to those conversations since I could not say anything (no matter what type of demeanor I presented to them) without particular students reacting in a way that was disruptive (ultimately interfering with the progression of class and the work), and disrespectful. Defendant Hsu did not want to meet with the students

initially. She claimed, among other things, that she hated people and, in general, avoided speaking to them.

However, because of the behavior of the students that was escalating (and culminated in the after class thirty (*30*) minutes which caused me to suffer an anxiety/panic attack), which I had made clear to Defendant Hsu had been harrowing, I asked Defendant Hsu several times to involve herself in some way to help, which after refusing as previously described herein, she then finally did agree to speak, which I wanted now to make clear here.

As part of that agreement, I stated that I would send an email to the particular students but request that she review the email first to ensure the most effective tone for the best, most positive, result. It was the equivalent of another set of eyes reviewing my work. It is to be noted here, respectfully, that I did not ask Defendant Hsu *whether* I could send out an email (this or any other), or announcement to my students, as this is part and parcel of teaching, particularly online teaching. I was asking for help with the problem, if she wanted to assist. I believed and understood that Defendant Hsu grasped the gravity of the issue and would respond appropriately as time was of the essence.

Again, respectfully, within the aforementioned conversation, Defendant Hsu never mentioned any prior alleged complaints by any students or student who made any ludicrous claims that I asked any student about "*race-specific*" experiences as an Asian person in my first class discussion or any class interaction. Yet, Campbell and Kimura claimed that Defendant Hsu received such an email before I spoke with her by telephone that day. Even Campbell and Kimura do not allege, however, that Defendant Hsu ever asked me about that alleged email which she should have thought was the opportunity to do so.

Therefore, in never asking me about that alleged email, Defendant Hsu acted as if the comments were true (which is bizarre unless she wanted them to be true) with no follow up with me or corroboration of such a claim. In this way, I was not allowed to deny the accusation or ask for details of how that particular discussion took place and what language had been used in making such a request of a student. All the necessaries were prevented thereby with her silence and clear refusal to investigate. At trial, I believe Defendant Hsu should now speak in place of alleged emails. That is, this alleged student email noticeably mixes something that I would say or could have said like the CRES class is not designed to "*bash white people*" with egregious lies such as me asking a student race-specific questions. Respectfully, to discern the real from the fake, Defendant Hsu should be the one to speak (as well as the student), not unsigned alleged electronic paper sent as "*Discovery*" as "*student complaints*" comprise a significant portion of their alleged "*concerns*" within their Summary Judgment.

Following the phone meeting with Defendant Hsu, when I sent her a short email I had written for her review, it was with the goal of introducing the students to her. I wrote,

"*Hi "Student C" and "Student E",*

*After yesterday's class, I wanted to connect you both with Stephanie Hsu, Director of AMS. I am asking that you both meet with her. This is required before being able to return to my class.*

*I have thought about your comments in class and shared my thoughts on them with Dr. Hsu. This is your opportunity to share your thoughts with her as well. Dr. Hsu is a wonderful person to talk to. I believe that sharing your feelings with her will help you feel better in general. This will help so that we all can reset and come back together better in class.*

*Thank you.*".

_____

Defendant Hsu did not respond to he aforementioned draft email within a reasonable time given the urgency of the circumstances described to her. I then, on February 12, 2021, as the professor of my CRES class who was seeking to *reset interactions* in my classroom, which is a different goal than the draft, sent certain students, five (*5*) of them, individual emails with thoughts I wished to communicate to them, and then I sent an announcement to the entire class. This step was completely appropriate. Moreover, I was nervous and worried about the situation and wanted to give the students enough time to process my communications before the next class meeting.

Notably, which Campbell and Kimura did not mention, those five (5) emails removed the requirement that had been in the draft version sent to Defendant Hsu that those students be required meet with her before returning to class, making it optional. Therefore, those emails were more lenient than the draft. Yet, Campbell's and Kimura's discussion of this email and the draft in their Summary Judgment attempt to leave the impression that my emails were problematic, that protecting myself and the class from bullying is problematic. In fact, those emails were part of a suite of e-messages I had sent trying as best I could to calm the students using different approaches such as and including my "*Pep Talk*" announcement and others.

As the moment had approached to be firm, unequivocal and forthright about what had been occurring towards me and in the class, I was those things. I sought respect in my classroom, discipline and control after one student who had actually been trying to comment on the work in class declared in front of what sounded like his parent on Zoom and the rest of the class, in the moment of the bullies attacking me, that the group was acting "*ignorant*".

Therefore, I had tried everything more than once including listening to the students after class. In speaking frankly to them, which is necessary at times, about their behavior and their options, I described and included the normal option of transferring to another class if mine (with its truth and critical analysis approach) was not what those students

wanted in a professor and/or adhering to standards of etiquette and decorum in a classroom environment led by me is not what they wanted to conform their behavior to.

Those students I had emailed individually seemingly and allegedly contacted Defendant Hsu on that day almost immediately. It was actually *Defendant Hsu's* multiple replies to be discussed further later herein, and which became known to me only through Discovery in 2025, that were eyebrow-raising. That is, Defendants Hsu and then Blackwood and Baumann used their positions of authority to make suggestions to young adults, teenagers and/or minors while encouraging them to spread those suggestions to the rest of the class. This is not the first or only time this has happened. Defendants' behavior is analogous to that of Gerald Greland ("*Greland*"), Director of both the "CAP" program and of the student advisors, who approached students wanting to know why my students were so complimentary about my class. He asked them if it was because I was "*easy*". Offended by this, my students returned to class and reported back to me, about what he had stated along with their reply that my class was not as Greland attempted to describe it. However, Greland's behavior was instructive here as I believe Defendant Pace used the students' advisors to suggest things about professors to drop suggestions to students as Greland did through his question. In other words, respectfully, he could have asked the "*why*" I was so liked without the additional subtle commentary.

To the aforementioned point, Johnson is the only Chairperson or Peer observation I had ever received, which I had to request, until Defendant Blackwood's "*observation*". Following the observation, Johnson asked me not to give the students as many papers as they were being assigned (which I had been marking each week). That is, students had a paper assignment a week and they flourished because of it. They also had school trips with me, as many as we could reasonably include. It was yet another highlight of my teaching freshman and upper classmen alike.

Regarding the aforementioned student emails Defendant Hsu allegedly received on February 12, 2021, emails from those students to whom I had sent the aforementioned forthright five (5) emails, Campbell and Kimura never indicated and no item of Discovery provided information claiming that Defendant Hsu had spoken to them previously. Therefore, if only to understand what was occurring and why regarding these unexpected student emails I had sent (given that Defendant Hsu had yet to respond to the draft I sent her), Defendant Hsu did not email me or place a phone call to ask questions. In their emails to Defendant Hsu where the students provided innocuous explanations for their contact with her, where some had attached my email, they asked to meet with her.

On February 13, 2021, Student "B" contacted me asking for a Zoom meeting. She stated,

"*Hi Professor Harte!*

*I was wondering if there was any way that we can have a zoom meeting before the next class? I have something that I would like to bring to your attention concerning the events that occurred during our last class that I'm not sure you have been aware of yet.*

*Student "B"""*

---

**When I saw that email on that day, I responded,**

**"***Hi Student "B",*

*Yes, sure. I am available between tomorrow and Wednesday. I haven't announced it yet but you will have Monday off. Please let me know when you would like to talk.*

*Best,*

*Professor Harte***"**

---

**On the following day, the 14ᵗʰ of February, Student "B"  emailed,**

*"Is Monday at 2 pm a good time?"*

---

**I replied on that day,**

**"***Hi Student "B",*

*Sure. I'll send you a link. Talk to you then.*

*Professor Harte***"**

---

**On the 15ᵗʰ of February, 2021, Student "B", following up with me to ensure that we were going to meet via Zoom on Monday 15, 2021, emailed me to ask,**

**"***Hi Professor Harte,*

*Are we still having our meeting today***?**

---

**To this point, I had no idea about what Student "B" wanted to discuss but we met on Zoom. Because her emails came across as persistent, I wanted to make sure to follow through with meeting, however.**

**The conversation with Student "B" is when I learned of the race problem and other commente made by the bullying students. Student "B", I learned, actually and valiantly**

spent a great deal of time and effort trying to convince the student bullies to stop, <u>including with the writing of lengthy messages, "*paragraphs*" as she stated, in the group chat</u>. This was and is evidence Defendants could have reviewed. Campbell and Kimura did not produce these communications or ever indicated that Defendants ever requested them.

Student "B" also stated that she felt as if she had been sitting in a different classroom from them or having a completely different experience from them and tried to explain to them where or why they were, as she felt, wrong. They stated to her that while they respected her opinion, they were going to continue the bullying conduct. They committed to doing so and had made written and/or verbal statements about me being "*Insecure about her ("my") Blackness which is why she teaches ("I teach") at a "PWI" or "predominantly White Institution*" as they claimed Defendant Pace to be, and that I was a "*Black Conservative*". One stated that she was "*disappointed in her ("my") West Indian heritage*". My California license status was discussed negatively as they had apparently researched me on the internet (where the information is always true), which is a bizarre thing for students to do which to me demonstrates a certain level of animus.

Following the meeting and what I could discern from our conversation, because of how upset she was following her unsuccessful efforts to convince the bullies herself which is why, feeling helpless, she turned to me to report it as her next option, on that day, I emailed Student "B" and stated,

"*Hi Student "B",*

*I wanted to thank you for talking with me today.*

*I was thinking about our conversation. First, it was nice of you that you wanted me to know. It's one of the marks of a good person. It was also courageous of you to have shared it with me.*

*What worries me is that you sounded like you felt frustrated? Helpless a bit with what's going on?*

*If yes, please don't worry. Everything will be okay. I want you to have an amazing college experience. So, enjoy your time. I will be okay. Thank you again for thinking of me! See you in class.*

*Best regards,*

*Professor Harte*"

---

Student "B" replied,

"*Hi Professor Hart,*

*I definitely felt a bit frustrated about the situation just because it happened so unexpectedly and I expected more out of my classmates, but I do feel better after our conversation! I just wanted to let you know what was going on because I*

*know that if the roles were reversed I would want someone to tell me too. I really enjoy your class so far and I can't wait to see what else I can learn throughout this semester. See you in class!*

*Student "B"'* **" (See Exhibit --(Plaintiff's Discovery #173)).**

_____

      **Based on what I was experiencing in the classroom, observing her demeanor and listening to what she stated, I believed Student "B" and wanted an investigation by Defendant Pace into race-based bullying. This is why I would then report it in the following days of that week to Defendant Blackwood.**

      **On Monday, February 15, 2021, at 2:11 p.m., regarding the aforementioned emails from those students whom I had emailed, Defendant Hsu wrote what I have described as eyebrow-raising emails in response. Therein she encouraged young adults, teenagers and/or minors who typically would rely on adults in positions of authority such as the Defendants, whom I had introduced to them to Defendant Hsu via email as such, to lie about me and particularly on federal civil issues. She did this by engaging heavily in suggestion (and comparison to herself) as to "***distress***" which she had "***no doubt***" that the students were feeling based *on her own alleged* "***traumatic***" experience in her alleged "***Black Studies***" class although the class she asked me to teach both times was a "***Race and Critical Studies***" course. She then lied to the student again, implying that whatever "***pervasive***" "*problem***" that she was referring to I was in agreement with and so much as to have decided to change or "***shift***" my class structure. Defendant Hsu introduced the idea of "***antiracist***" course offerings at Defendant Pace before she launched into accusations targeted directly at me when she claimed that, beyond alleged "***misunderstandings***" which she implied that I apparently had, I was also engaged in the "***misuse of power***" to "***deform what should be an antiracist space***". Defendant Hsu then "***sympathized***" with the student, overly so, by analogizing to "***my own***" as in her own "***college Black studies class***", which she inappropriately brought up yet again to now suggest that the "***Black woman professor***" mistreated her in being "***shouted down***" for inquiring about "***Aunt Jemima***" (a term commonly regarded as a slur, and offensive caricature of Black women as subservient, obedient and loyal, contented servants) and seeing nothing problematic about the Aunt Jemima "***image***", while describing herself as "***leading class discussion***" as was a part of my class structure.**

      **Defendant Hsu also used an array of manipulative as friendly language directed at this (and other) young adult/teenager or possibly minor to seemingly and troublingly convey what was actually false sympathy with verbiage such as "***thank you***", *forgive me***", "***I'm sorry***", "***I'm grateful***", "***share with me***", "***I believe you in advance***", "***what's happening is terrible***", "***my request of you is to share the difficult work…with me***", "***It also means being open to the metacritical lessons that we can we learn…***", "***…for you and me to talk after Wednesday's class, so we can…***", "***I hope my tone makes you feel free to email back…***" where she appeared also to be simultaneously asking the students for something that she was suggesting. Regarding this, Defendant Hsu stated, "***What I'm asking***

*you to share with me, therefore, is the metacritical problem that I know is evident: when misunderstandings and even misuse of power deform what should be an antiracist space*.

Throughout these analogies to a "*Black woman professor*" and a limited in scope "*Black Studies class*", Defendant Hsu refers to me disrespectfully for the circumstances and in context as "*Prof. Harte*" but refers to herself as a "*critical race/ethnicity studies scholar and activist*" (suggesting expertise and experience) in close proximity to which she also used the correct name of the class for the first time, and intentionally. She then signed this heavily suggestive and manipulative email with "*Stephanie*". (INSERT AUNT JEMIMA Email HERE). Exhibit –

What was as troubling as well for me was the false insinuation, if not direct statement, that I had agreed with the contents of the very email she was writing to the student ("*I've had earlier conversations with Prof. Harte and other folks in your class, so I know that the problem has been pervasive. Prof. Harte really wants to turn around the dynamic, and she believes that shifting to a discussion-based class mode as soon as possible…*"). Therefore, Hsu repurposed my phone call to her asking for help into one in which I was somehow reprimanded and had agreed to alter my class so that she could state the lies that she did to students *while* seeking false complaints about me.

Indeed, Defendant Hsu knew that we had met due to urgent conditions to speak about student bullying, which there is never an excuse for as students have options including withdrawing from a class if they do not want a Black professor who to them is "*insecure about her Blackness*", for example. Moreover, Defendant Hsu indicated within her email that she had *spoken to other folks in the class*. To date, the Defendants have not identified to whom she was referring.

Notably, the aforementioned email was a communication which Defendant Hsu never once shared with me at any point in time. Indeed, Campbell and Kimura, in their response to my Second Amended Complaint, never mentioned these crucial emails. They were only revealed during production in this matter in 2025. In their Summary Judgment, Defendants again have tried to erase them or pretend it was not created and disseminated by Defendant Hsu with the knowledge and consent of Defendant Blackwood, waiting perhaps to see if I would include them, as I have.

The aforementioned emails were sent to students before Defendant Hsu sent me an email approximately thirty-two (32) hours later, the next evening at 9:52 p.m. on Tuesday, February 16, 2021. That email was a display of tactics but started with her fully approving of the aforementioned draft. Indeed, Defendant Hsu stated, "Hi Wendy! I thought this draft was great…" While she had been sending out the suggestive emails to students asking for what would be uncorroborated Discrimination, and Harassment complaints (the "*shouted down*" analogy) against me, Defendant Hsu sent me her insincere apology for not responding to that draft for almost six (6) days (" *I apologize for not sending that support right away! I know that another email ultimately went out, which I appreciate for its honesty...*") Exhibit ---.

Defendant Hsu launched into a series of uncorroborated and general statements which suggested urgency and seriousness which she then coupled with her dramatic change to my class format whereby and so that I was silenced ("*However, I've been contacted at this point by 8 students, and I just wanted to emphasize that I think a discussion-based class format is the way to go immediately*" "*and if the class dynamic is flipped in terms of who is doing the talking, then I think they'll begin to let down their resistance. If you can assume the role of a listener in tomorrow's class, then I think you'll hear an opening for change.*")

Following this, Defendant Hsu wrote a complete lie which, in order to pretend as if to substantiate it and receive agreement, she used the "*as discussed*" as preface. She wrote, "*As we talked about on the phone, too, your critical thinking provocations can be softened a bit…*" Therefore, at the same time that she falsely reframed the tenor and meaning of aspects of our telephone conversations (shifting verbiage from "*too intellectual*" to "*critical thinking provocations*"), she was also subtly accusing me of provoking the students. This implied that I was the problem and was experiencing the results of that alleged behavior. Defendant Hsu was reshaping conversations to fit a particular narrative.

Several other disingenuous statements made to me by Defendant Hsu after her "*Aunt Jemima*" "*Black woman professor*" "*Black Studies class*" "*shouted down by the Black Woman professor*" emails to students included "*if you can find a way to feel safe around them again and then project that safety, and even offer it especially to those you've warned*" and "*I'm still making appointments…and asking them to invest in a discussion-based class format…*", and "*Thank you for being willing to try something new (again).*") However, by this time, Defendant Hsu already had informed students that I had agreed to switch my class.

Defendant Hsu made certain to include within her email to me that she was changing my class and silencing me as "*our last chance to keep this class intact as it is.*" This sentence was the attempt to provide the pretext in writing as Defendant Hsu strategically worked to have me acquiesce to my own suppression. Yet, Defendant Hsu behaved as if the students had not engaged in the bullying which had caused me to send them emails but focused on whatever alleged response they had to being reprimanded, if any, while she deftly switched the narrative to student "*grievances*" against me exclusively. Campbell and Kimura have not argued that this "*reason*" Defendant Hsu provided in this paragraph was the same one for why she sent the "*Aunt Jemima*" to students in order to procure uncorroborated and/or false complaints.

On February 16, 2021 at 11:59 p.m., I responded to Defendant Hsu's email where I spoke frankly to her about what her email contained. Notably, I did four (4) things: -I brought up the subject of students who had been upset at what had been going on, students who enjoyed my class, -I brought up the student who informed me of the race-based nature of the student bullying, -I raised the violence (against White people) discussion issue, and -I asked for a meeting with other people ("*I would like to request another meeting with you (should there be other people there via Zoom?) to discuss moving forward in this class*"). Therefore, not only had I decided

that Defendant Hsu's email was a problem but I had asked for others to be there, also because I had intended to raise the anti-Black race-based bullying issue ("*She was upset. What they were saying was pretty vicious, if what she related was accurate.*"). I was planning on asking for an investigation but, at that moment, Defendant Hsu appeared to me to be an inappropriate person to speak with given her email with its lying and its silencing of me.

On February 17, 2021 at 10:55 a.m., in her reply, Defendant Hsu ignored the various crucial elements of my lengthy email to her as described above, labeling it all-encompassingly and generally as an "*update*". However, she began responding to details in it. That is, what became clear later, upon review of this communication during this litigation process, was Defendant Hsu's obvious concern that I was going to make a Discrimination complaint in the next meeting with her and others (Defendant Blackwood is who Defendant Hsu chose) by alleging that she had spoken to the students *already* regarding "*anti-Black racism*". This part of her email stated, "*I've definitely broached the subject of anti-Black racism with the students I've talked to, and I believe that they're aware of the potential impact on you, and there's a lot of distress about it. In practical terms, we need to deescalate the tension, and I think that allowing them to control more of the discussion topics in class -- reducing the professor v. student opposition -- is the way to do that.*" Because I had not brought up racism to her during any of our telephone conversations, and had not noticed it at the time she sent this email, when I did first see it, my first thought was that Defendant Hsu in fact had detected racial animus in her communications with students. This may be true but what I know for certain is that she also encouraged, amongst the students, animus, including of the racial type. More than this, however, she was attempting in that email on February 16, 2021, to shut me down, and shut me up as she had anticipated a race or Discrimination claim on the horizon.

It is noticeable then, in that aforementioned email paragraph by Defendant Hsu, when she protected herself from having to prove her allegation of having spoken to students by saying that these supposed anti-racism conversations took place <u>in person or on Zoom</u>, making it about her credibility. This would also mean that there is no written proof that conversations of this nature occurred except to have students make appearances as witnesses in this case, which they have blocked. Campbell and Kimura did not produce or identify either, to my knowledge, any emails, letters, notes, Zoom or phone logs with, to, or from students reflecting Defendant Hsu's alleged conversations on anti-Black racism and their "*distress*" in that regard.

However, finally, and importantly as part of a pattern of behavior spanning departments at Defendant Pace, making it thereby systemic, Defendant Hsu hastened in the next sentence following her alleged "*anti-Black racism*" efforts to link *management* of it with the silencing of me. <u>Given that Defendant Hsu in all likelihood was lying, this was the equivalent of asking me to agree, or attempting to trick me into agreeing, to my own suppression and based on that lie.</u> **(Put whole February 16-17 email thread here where I talked about other students/Kimberly) Exhibit –**

On February 17, 2021, Defendant Hsu asked to observe my class. She asked me not to discuss Spencer as she alleged that he was distressing to the students. Although I agreed not to do so (made this concession) to maintain a positive relationship with the English department coordinator with whom I had been having written disagreements that day and who had taken a forceful position in silencing me, I note here that what Spencer had stated repugnantly about Jewish and Black people in his videos was no more vitriolic than what the *students* were saying openly in class about White people *with* their peers, White students, in the room. In fact, Spencer did not advocate for violence in any video I showed but the students did this against White people. Regarding that, I would not allow it and regarding Spencer, as the professor, I was teaching students how to *counter* his falsehoods with the facts we were gleaning from the assigned readings. Yet, the students allegedly complained about Spencer. Defendant Hsu then made him the issue and thereby my choice of materials as professor which Campbell and Kimura decided they wanted to push as the narrative in their Summary Judgment as "*controversial*". I would state here that Defendant Hsu's Aunt Jemima email and conversations more appropriately fit that label.

During that class Defendant Hsu observed, without my consent, she first unmuted her microphone and responded to a question which happened to be from one of the leaders of the race-based bullying. I was appalled. Defendant Hsu then went further and took the wholly violative, intrusive, and disrespectful step of texting me on my personal cell phone number twice, while I was managing my class, to tell me to stop talking to the students. That is, at 14:05 p.m., Defendant Hsu sent me a text which stated, *"Hi! I encourage you to set up right now a dynamic where you don't speak for the rest of the class and let them lead themselves."*

She sent another text on my phone at 14:16 p.m. which stated, *"Great. Don't respond and ask for other students to respond"*.

I was upset by Defendant Hsu's degrading and unauthorized outreach to me, and misuse of my personal information. Defendant Hsu did not have my consent to use my phone number to text me teaching instructions ever. I certainly did not ask her to do this and she did not request permission to do such a thing while, at the same time, she deployed the "*Hi*" with exclamation point to denote friendliness and divert from the offensiveness of what she was actually doing. I never responded to Defendant Hsu with agreement or anything else, which was my signal to her indicating my feelings about what she had done and what boundaries she had crossed. I realize now this behavior was likely planned.

Moreover, Defendant Hsu was a coordinator in the department and was aware of boundaries, appropriateness in her dealings with professors. Therefore, what these messages truly likely represented then, beyond suppression, was desperation so as to prevent exposure of the contents of the emails that she had just sent to the students asking for complaints (and for them to spread the word) which she told them she would never challenge for accuracy or truthfulness. Indeed, Defendant Hsu knew of the propensity of certain students to become aggressive or belligerent and the possibility not only that it could

happen again in the first class since I had sent my emails to individuals and class announcement, but that it could very easily occur right in front of her, in her presence, thereby potentially revealing her inducements to them. By that time, students had been asked by her to lie, in effect, about me and spy on me for the duration, and create alleged false and malicious federal civil rights complaints against me by feeding them ideas of that nature.

Also notable was the alleged student emails that Defendant Hsu initially had received that went from innocuous in the beginning to venomous over time under Defendant Hsu, Defendant Blackwood and Defendant Baumann's tutelage and coaching. Given the circumstances described herein thus far, to discern what are real emails from what might be or are fake communications, I respectfully ask for a trial where everyone can testify, and the reasoning for actions can be detailed. Moreover, as I did not have the opportunity to question Defendants Hsu, Blackwood and Baumann about the foregoing as they were all working in concert. Their in-person explanations for the email in her own words and the entirety of the above-mentioned details are worthy of a trial.

Indeed, what I would later discover is that students had recorded my classes and that Defendant Baumann, among other Defendants and individuals, had received them. It is not known whether these recordings were audio or video recordings or both, or how many students did this. However, given what Defendant Hsu asked of them already by February 18, 2021, it is a likelihood that she asked students to record the class as well and/or knew from the time when they began recording that students were doing this. Certainly, the Defendants accepted student recordings but provided no discovery of those recordings or the emails where they told students not to do this which is something an administrator would put in writing given the seriousness of what they were doing.

To my point about Defendant Hsu's likely concerns about exposure, on February 17, 2021, immediately after the class which Defendant Hsu observed, she met with me on Zoom in what was a contentious meeting. I stated that the unguided student conversations were not intellectual particularly and including their conversation about forty-fourth (44th) President of the United States Barack Obama ("*Obama*") and former candidate for President of the United States Kamala Harris ("*Harris*") as "*sellouts*" who never did anything for Black people. I told Defendant Hsu that I felt the students, the same bullying students, were making reference to me with those comments, which Defendant Hsu vehemently denied. I was not aware of her Aunt Jemima email at the time.

In that meeting, I also shared that I felt the conversation was so unacademic, problematic and substantively lacking that I accidentally revealed that inner thought by mistakenly ending the class twenty minutes early. Campbell and Kimura have made a grand show of this although it is a normal part of teaching. They chose to focus on this in order to divert from what is clear Defendant Hsu was actually trying to do that day by sending those texts, avoid exposure. by sending those texts.

Finally I repeated my request to speak with Defendant Blackwood about the class, the bullying occurring against me, and the new class structure Defendant Hsu, and Defendant Blackwood, had imposed on a trial basis.

In response, Defendant Hsu told me, unequivocally, to drop my complaint of student bullying, and that I was the problem. Even though her statement was quite literally true in terms of the issue being my race, Defendant Hsu made sure to clarify that element of her comment by stating to me, "*It's you. <u>You asked them for their opinion</u>. It's too much.*" Notably, this is not what she claimed to students in her emails to them.

Defendant Hsu continued by stating to me in the aforementioned meeting that it was also the atmosphere or "*energy*" that I had created in the class that was being reflected back to me by the students. Therefore, according to Defendant Hsu, everything was my fault. I was taken aback and I disagreed. I did not believe that I, or my teaching in general, was the issue, or that it was the issue during the February 17, 2021 class day that she observed, as I had said almost nothing to the students per Defendant Hsu's, Defendant Blackwood's, and Defendant Baumann's specific classroom "*suggestion*". I also refused to drop my complaint, and insisted on keeping the meeting with Blackwood, which Hsu continued to attempt to push me to cancel. The possibility or probability that I was planning to report conduct that would have needed to be investigated as racism or Discrimination under the EEOC was also a reason for the Defendants to wish to avoid a Defendant Blackwood meeting, attempt to force me to drop it via threat of losing my job.

When I refused the second time that Defendant Hsu told me to drop the complaint, she threatened me that if I did not drop it, there would be consequences. Defendant Hsu stated, "*Drop the complaint or students will boycott and teachers will be expelled…but we haven't gotten there yet*".

Stunned, I was told, in effect, to shut up, endure racism, and call that teaching at Defendant Pace…or else be expelled by Hsu who not only knew about the racism going on but was instrumental in encouraging it. She had every reason to threaten me, which the Defendants also erased from their Summary Judgment after trying to explain it unsuccessfully in an early court filing. She was trying to prevent me from the Discrimination report she believed that I was going to file. However, to be clear, I would not cancel the meeting.

On February 18, 2021, I met with Defendants Hsu and Blackwood on Zoom. At the meeting, I spike first and shared with both Defendants that there was race-based, anti-Black bullying occurring towards me. I provided the details of what had been occurring. I informed Defendant Blackwood, and Defendant Hsu, that a group of CRES students, led by the leaders, had been meeting outside of class, and had been making race-based, anti-Black statements about me. I stated that this was behind the in-class bullying. I also stated that I had learned this information from a student on February 15, 2021 who had been present when the statements were made against me and I repeated the statements made to Student

"T" by the bullying students. More than this, Student "T" had written proof in the form of chat messages between her and the bullying students. Through all of this, those students had committed to her that they would continue to bully me.

Defendants Blackwood and Hsu, noticeably, did not ever ask me for the student's identity, and therefore did not contact that student as part of any measures to discover more than what they already knew, or investigate. Student "T" confirmed to me in the year 2023 that no one from Defendant Pace had ever discovered her identity through any conversation with the other students in the class or contacted her as part of any investigation (which Defendant Baumann later on March 19, 2021, in what appears to be a staged email, had expressed that they *wanted* to do). Indeed, Defendant Blackwood and Defendant Hsu showed no surprise, no dismay, no emotion whatsoever at what I had informed them of. In fact, they acted as if I had not said anything.

Defendant Hsu did not repeat what she had stated in her February 16, 2021 email to me about "*race-based, anti-Black*" bullying that she allegedly talked to students about. Defendant Hsu did not make any statements with regard to race and me.

Defendant Blackwood, as to her, ignored my complaint of race discrimination in the February 18, 2021 meeting. What she did however do was to begin talking about what she labeled "*breakdowns*", and she tried not to stop. Defendant Blackwood did this while behaving as if everything she had stated regarding my class having a breakdown was true and correct, to which I did not agree. Crucially, while doing this, Defendant Blackwood seamlessly *increased the amount of time I would be silenced in the classroom to the entire semester*.

About this silencing, to make it appear to be a good thing, Defendant Blackwood stated that not speaking is what she, and Defendant Hsu, did (voluntarily) in their classes when there was a "*breakdown*". I, however, voiced my concerns about her entire description, including regarding student evaluations at the end of the semester.

Therefore, in that meeting, one thing I did was ask Defendant Blackwood about recording my classes, which I asked if I could conduct two (2) more of in light of the now permanent silencing requirement and my concern for the students I felt were affected by all that had already transpired. I indicated that I would record my lectures on each day of those upcoming days that I had planned to teach in the class. There would be no interaction with students during those lectures, although my standard approach would have been to engage in conversations with them. I would record the classes for my safety (because of the race-based bullying taking place). I would then allow students to have no contact with me and speak amongst themselves about the work on the next day following each of those two (2) lectures. Defendant Blackwood agreed to this request although she would state falsely later that, somehow, in the middle of silencing me, she was the one who suggested that I conduct two more lectures and that I should record them.

However, once those two (2) lectures ended, and the twenty-four (24) individual student facilitations (interactive class presentations on and analysis of an essay I assigned) began, I was not to have any substantive interaction, dialogue, or engagement with the students for the remainder of the semester, pursuant to Defendant Blackwood's requirement to not speak to the students.

The only clue that I, at the time, believed that Defendant Blackwood had given that she understood my claim of racism was her statement to me that I would be introduced to Tiffany Hamilton, ("*Hamilton*"), through Defendant Hsu. But, Hamilton, for her part, was only Defendant Pace's "Chief Diversity Coordinator" and "Associate VP for Diversity and Inclusion". She had been hired just five (5) months prior to any of the events detailed in this federal complaint and was not the EEOC investigator. In other words, respectfully, because they could not prevent me from having the meeting and reporting the race-based bullying problem, Defendant Blackwood was prepared to divert me and only make it appear as if she was addressing my race-based bullying report.

For her part in the meeting on the other troubling issues and her alleged student meetings, Defendant Hsu confirmed that conversations between students about engaging in violence towards White people had taken place in the classroom, and stated that the student who initiated the comment admitted to it. Although I had expressed an overall alarm about these comments, Defendant Hsu took the view that she did not believe that "*the school was in any danger*" from the student. However, with that response, I noticed that she did not seem concerned about the racist discourse in the classroom about White people in front of not just White people but other racial groups and others who would be adversely affected by such negative vitriol, or the potential of harm to White people outside of the school from a student, or any others in agreement with him, advocating for violence against them. Defendant Hsu's approach was cavalier and reckless. Moreover, she did not indicate ever that she told him of the inappropriateness and danger of what he was advocating for.

Defendant Hsu also claimed that the first three (3) students who contacted her for meetings after my aforementioned February 12, 2021 emails to individuals and the class announcement were the ones I had identified as the race-based bullying students who both spoke for the class as they claimed, and encouraged the rest of the class to join them using the group chat, as they had attempted to do there with Student "B".

At some point during this time following the February 18, 2021 meeting, the Defendants, but Defendant Baumann received video recordings. Kimura and Campbell tried diverting attention from this receipt of recordings issue as a means to harass in order to focus on the alleged *necessity* of students receiving my recordings for studying and review purposes. There are several issues with this. First, I began recording as a means to *protect myself* from race-based bullying. The leaders of the bullying, with the explicit help, I believe, of the Defendants (or vice-versa), tried to distort and diminish that goal by turning around and demanding those very recordings, as though they were not the individuals

whom I was protecting myself from with them. By Campbell and Kimura questioning me in the deposition in the manner they did, they showed themselves, in a classic example, to be happy to turn victim into villain and vice versa.

Moreover, because there are no tests, or quizzes, the students did not need to record, and specifically, *without my knowledge and consent*. Finally, if needing a recording (it has not yet been revealed whether the Defendants received audio or video recordings or both) was for studying or reviewing purposes as Campbell tried to push, the question is why the students were disseminating these videos they recorded to Defendant Baumann and others at Defendant Pace. Defendant Baumann directly stated to Smith-Bergollo in writing that she was in possession of student videos. (put email here). Exhibit –

Defendants, as the adults and officials in the administration, never informed me that students, teenagers and young adults who can take these videos and use them for any purpose, including posting them online, dispersing them, manipulating them, and myriad other things, were recording. They never identified who had recorded videos, when, why and what became of them, particularly given that I was being summarily and repeatedly bullied by one particular student for *my* recordings. That student also happened to be one of the leaders of the race-based bullying and the person Defendant Hsu would physically accompany to the EEOC office to complain that I had discriminated and retaliated against her, and on whose account Defendant Blackwood, unbeknownst to me at the time, would send an email to the EEOC investigator claiming I was engaging in retaliation. Apparently then, in receiving videos, spying using teenagers and/or young adults, Defendants were seeking evidence against me to fit a narrative. I ask now if the videos Defendant Baumann received corroborated the claims of yelling and mistreatment found in the student complaints they had been receiving at the same time.

Campbell and Kimura have been emphatic in claiming in their Summary Judgment that I did not report the race-based bullying. I ask the court to deny their motion so that, also, Defendant Blackwood can provide her reason for the increase in the silencing of me during that February 18, 2021 meeting after she, through Defendant Hsu, had only temporarily silenced me just the day before.

Defendants #9 - During the Spring 2021 semester, Tiffany Hamilton was the Chief Diversity Officer and Associate Vice President of Diversity & Inclusion at Pace University. (Hamilton Aff., ¶ 1).

As previously mentioned herein, Defendant Blackwood referred me to Hamilton. Defendant Blackwood indicated to me that she would have *Defendant Hsu* connect me to her . This was strange in hindsight as Defendant Blackwood could just as easily have sent me the email herself or just provided me with Hamilton's name, email and number in the Zoom meeting. But Defendant Blackwood's referral was planned and this email specifically to be sent to me from *Defendant Hsu* was for a reason

That is, unbeknownst to me, the Defendants were engaged in creating dual or multiple scenarios using vague language in emails meant to look like one thing to one person and yet another thing which the Defendants could say that it meant. It was deception, one of various maneuvers, which allowed the Defendants to control the narrative of the email and thereby attempt to control the narrative surrounding the February 18, 2021 meeting. The email, which she sent to me on February 19, 2021, noticeably left out explicit race-based bullying language and the complaint which I made (Add email here).

The use of Defendant Hsu by Defendant Blackwood to send the email (wherein she labeled the issue as a "*dynamic*") was pivotal because of the specific context, particularly the situation I was in at Defendant Pace. That is, Defendant Hsu and I just had a contentious meeting the day before and email and phone discussion where she had silenced me over my disagreement the same day, texted me inappropriately and without my consent on my phone in that day, claimed I was the cause of everything concerning the student bullying, and most crucially, threatened me to drop my complaint and cancel the March 18, 2021 meeting or face expulsion at the end of that day. In place of dropping it, I had insisted upon the meeting with Defendant Blackwood and despite that threat so that I could report the race-based bullying. Prior to all of this was as explained in October 2020 through January 2021 whereby I lost the remaining classes I had in the ELI department for speaking up and reporting being treated differently than other professors. Defendant Blackwood too had silenced me for the entire semester after I had reported the race-based bullying to her. Therefore, I was legitimately feeling as if I was walking on eggshells at Defendant Pace. So much for me was at stake while at the same time I attempted to advocate for myself, just as those brave students in my CRES had done for me already.

Additionally, when Defendant Hsu sent me this "*referral*" email for my "*approval*", it was a strange act particularly because Defendant Hsu had literally been forcing every situation regarding me to bend to her will up to that point, as seen in her February 16, 2021 emails to me, which I had to accept with the exception to this being my insistence on the February 18, 2021 meeting. Also, Defendant Hsu had been secretly encouraging students to make complaints about me which they planned to use as weapons against me. Therefore, the Defendants knew everything that had transpired up to that point and what they were building and they were leveraging it so that they could do exactly what they have done in this case, use those students again to distract and divert away from efforts to avoid a Discrimination report and their actions towards me following that report.

The Defendants predicted then that, if written in a certain way and *sent by Defendant Hsu*, I would capitulate to avoid another conflict with her as the Coordinator, which I did. Moreover, upon reviewing it and noticing the strange "*dynamic*" language, I chose intentionally not to parse words since I believed I was getting help for the race-based bullying (since I was referred to Hamilton) after all that had occurred with the students to that point. It can be seen by my reply email that I am overly nice and overly thankful and that was my reason why. I was choosing my battles with my bosses, negotiating the terrain

amidst the pressure occurring with both Defendants and the students. In light of Campbell and Kimura leaning heavily on that particular event, it is critical to say that the circumstances under which agreement is given indeed matter.

This aforementioned pattern of lying, or engaging in deception to secure agreement and if neither works, then forcing it while looking for ways to be able to proclaim that agreement had been willingly given and with full knowledge is a recurring one at Defendant Pace which has had serious consequences for victims of it as I would continue the weighing and balancing of my interests, ever more so after February 18, 2021.

As to the word "*dynamic*, in fact, Defendant Hsu had been employing that particular word, dynamic, to make it mean different things in various scenarios. She used that word in her first written reply to students on February 15, 2021, according to Defendants, in a sentence where she was lying to the student about a problem with me ("*Prof. Harte really wants to turn around the dynamic, and she believes that shifting to a discussion-based class mode…*"). In this context, she employed that word in reference to me being problematic in troubling ways, about which she implied falsely that I had agreed.

Defendant Hsu used that word again in her email to me on February 16, 2021 to say, "*They seem extremely engaged and opinionated, and if the class dynamic is flipped in terms of who is doing the talking, then I think they'll begin to let down their resistance. If you can assume the role of a listener in tomorrow's class, then I think you'll hear an opening for change.*" This contradicts her prior usage of the word in context.

With Hamilton and in the email to her, Defendant Hsu used the word intentionally ambiguously so that I could not discern the other way in which she had used it and would later use it. Indeed, in addition to the February 16, 2021 email, Defendant Hsu had used it innocuously within the February 17, 2021 as previously detailed herein.

However, when she employed in a March 4, 2021 email to a student. There she wrote, "*I apologize again for the undue stress to you and everyone in the class…but the faculty and admin who are now involved are learning a lot about how to name, identify, and prevent this kind of dynamic, especially in classes offering an antiracist curriculum.*" This response by Defendant Hsu and usage of the word was to an alleged email by a student accusing me of unfairness, discrimination and retaliation.

What Defendant Hsu then did, with maximum amounts of deceit, was two things: 1) she had suggested to the student in that email, not only that I had been sent to Hamilton because of this "*dynamic*" as punishment but 2) in asking and receiving my "approval" to the letter that had the word "dynamic" in it, she turned the meeting she threatened me to cancel or else be expelled about (where I had planned to report anti-Black race-based bullying) into a censure or reprimand meeting where I had approved of language that she had been using to signify that I was discriminatory, harassing and retaliatory as a professor and had agreed to this characterization and method of resolution.

It appears that Defendants Blackwood and Hsu had been prepared then with this "referral" using Defendant Hsu if I did make a race-based or Discrimination claim. "*Approval*" was important because they had planned to and fashioned an email that could look like it was not about the race-based bullying I had reported and thought I was receiving "*support*" on, a word Defendant Blackwood strategically employed at the meeting and in Defendant Hsu's email. The final thing the email did was ensure that I meet with Hamilton so that it could be spun later to students (and to this court) as me having been sent to her or someone in administration because I was a problem in terms of Discrimination and Harassment towards students, particularly, while still appearing to me as help for the race-based bullying. To this point, in the aforementioned email, Defendant Hsu wrote to a student, "*At the same time, I know that the Chief Diversity Officer for the university, Tiffany Hamilton, has been looped in and has held a meeting with Prof. Harte, so the situation is still evolving – and getting close to resolution*". This is the level of the deceit deployed by Plaintiffs and the mechanics of it. (Defe ndants D00000176).

Following the March 18, 2021, Defendant Blackwood did not follow up with me in any way or send one email communication. She was completely silent.

After several email communications between me and Hamilton to arrange a date and time to meet, I met with her via Zoom on February 25, 2021.

In the aforementioned meeting, I explained to Hamilton that the "*dynamic*" to which Defendant Hsu referred in her email to her was race-based, anti-black bullying by students against me because this is what I reported to her and Defendant Blackwood. This is why I believed I had been sent. Then, I described the particulars of what had been taking place. Hamilton expressed consternation, shock, and concern about what she heard me detail about the students' behavior towards me. She then stated that the students needed to be spoken with ("*Oh no. The students need to be talked to*"). We agreed to discuss the issue further at a later date when she would contact me.

However, after my conversation with her, I attempted to reach Hamilton by email several times for approximately nine (9) days to follow up. When Hamilton finally responded, she apologized for the delay, and ultimately *suggested* that I establish a "*Community Agreement*" with the students, a document which she then sent to me via email. This was a toned down, a different and muted response, compared to Hamilton's original reaction, and I was surprised.

After reading the document, I declined to participate. The "*Agreement*" did not address race-based, anti-Black bullying specifically, appeared to place professor and student on equal footing, and seem to place me, in this case, in a position of responsibility for the students' conduct. Given my documented efforts to calm the behavior of a subset of students who had been attempting to dominate, interfere with and disrupt an entire class because of my Blackness, this was untenable.  Therefore, I stated to Hamilton that the students would benefit from such an agreement amongst themselves. As far as I could

determine, that was a start. I also stated that I would bring it to the attention of the students, which I did in the following class session. However, I was looking to make a formal Discrimination complaint and have it addressed.

The second and next suggestion by Hamilton was for her, and other University officials, to have a meeting with the students to establish a "*Community Agreement*", or a guide regarding student conduct. Although not directly addressing racism, this suggestion would have been a better step in the right direction. This meeting, however, never took place. Respectfully, Campbell and Kimura made an issue of my refusal to participate in a suggestion but have not addressed why Hamilton, with Denise Santiago, did not have the meeting as the suggestion I did agree to. I request that Hamilton be required to testify as to the reason for this.

On March 3, 2021, after yet another disturbing incident with Student **"M"** occurred in my class (of that student taking advantage of an offer I made for her to use Brightspace functionality only I had access to for her presentation which she never used but ended my class session early), which I reported to Hamilton as being part of the race,-based bullying, she abruptly, and to my surprise, claimed that she could not assist me further. This is because I should never have been sent to her as this was never her job. Hamilton referred me to Dean Todd Smith-Bergollo ("*Smith-Bergollo*"), the interim Senior Associate Dean for Students at Defendant Pace although she should have sent me to Dufresne, the secret everyone was keeping.

Hamilton provided no reason or explanation for her actions. Similar to how I was given the order to be silent by the Defendants and make no complaint about what was happening to me by Defendant Hsu directly, Hamilton, even though upset, dropped it. She had also spoken with Denise Santiago, Director of the Multicultural Affairs office, and Rachel Carpenter, Interim University Dean for Students, two other Pace administration members.

Notably, during the time that Hamilton and I had been in contact, she told me that, at some point after I met with her via Zoom but before she referred me to Smith-Bergollo, she had spoken with *Defendant Hsu* at least twice. I did not know why Defendant Hsu was having conversations with Hamilton when I had been referred to her. If Defendant Hsu was doing the same thing with Hamilton that she was doing with the students, creating and spreading falsehoods surrounding Discrimination and Retaliation, I respectfully ask that she be made to testify about that and all else discussed with Hamilton.

In fact, I would learn through Discovery that Defendant Hsu was arranging meetings between her, students and Hamilton over claims that I had been discriminating and retaliating against the students during the same time I had been in discussion with Hamilton. <u>Those students were then directed by Hamilton to the EEOC investigator while I was sent to Smith-Bergollo.</u> I was being diverted again then. In fact, Defendant Hsu was instrumental in arranging meetings with a student and Hamilton and then the student (and

her friends in the class) and Bernard Dufresne, accompanying her to the eventual meeting with him about me allegedly to discuss allegations of me discriminating against her, with Defendant Blackwood's knowledge and consent based on her own subsequent email to Dufresne regarding me. Defendant Hsu had been spreading the lie that I was sent to Hamilton because I was racist also with Defendant Blackwood's knowledge and consent, if not at her behest.

To this point, during all of those maneuverings behind the scenes to frame me, there had been no email or other contact that Defendants Hsu or Blackwood had with me. I believe they did not want to risk me putting the race-based bullying report in writing to them, which would have been more than a possibility.

*Defendants #10 -*  During the Spring 2021 semester, Todd Smith-Bergollo was the Associate Dean for Students at Pace University. (Smith-Bergollo Aff., ¶ 3)

On March 3, 2021, I contacted Smith-Bergollo's office via email, based on Hamilton's referral. I communicated with Edith Arenas-Rivera (**"Arenas-Rivera"**). She asked me via email to inform her of what the issues were so that she could share them with Smith-Bergollo. In an email on March 4, 2021, I detailed the events which had occurred during that semester, information which included the race-based, anti-Black bullying, and hostile work environment I had described to Defendants Hsu and Blackwood and Hamilton (**"***She said Student "P" stated in a group chat that I was "insecure about my blackness which is why I was teaching at a predominantly white institution", that I was a "black conservative", that she was "disappointed in my Guyanese heritage" because of what she believes are my views***) (ATTACH LONG EMAIL THREAD HERE).**

I asked Smith-Bergollo to help me with Student **"P"**, in particular. She was the oldest of the group of bullies I believed who had been attempting to convince the other students, the entire class, to engage in the bullying of me based on my race. She made repeated statements to me in front of the class and in emails to me that when she made statements, complaints, was speaking for the class, and/or claimed that her classmates would agree with her.

Smith-Bergollo, a mandatory reporter, never reported my race bullying claims to Bernard Dufresne, as he was required to do and though my email was clearly written as I had been vocalizing my complaint before this. In fact, he, like Defendants Blackwood and Hsu to whom I had reported before him, pretended that I had not said them. He did not ask me about it or inquire as to whether I had spoken with Dufresne. Instead, he asked what *I wanted him to do* regarding the email at large that I had sent. What he does not ask is whether I would like to file a formal complaint with Dufresne. He should have provided me with Dufresne's contact details in addition to his reporting of it.

One notable action Smith-Bergollo took, however, was to forward my email to Defendant Baumann.

The third response Smith-Bergollo had was to agree that Student "P's" conduct warranted intervention from his office. He not only stated to me via email that he would speak with her, but he apologized to me for what had been happening. He made no issue of me asking Student "P" to speak with him before returning to class. As the court may recall, Defendant Hsu found no issue with this action either in the draft letter she thought was "*great*" on February 16, 2021. Smith-Bergollo asked, and I, agreed to meet via Zoom before he met with her. However, one comment he made that I did not understand was the statement that what I described as well as the problem itself had "*layers*".

What shed light on the aforementioned comment by Smith-Bergollo is when I learned through Discovery that both Defendant Baumann and Defendant Hsu had been in contact with Smith-Bergollo about me at or before the time Hamilton referred me to him. Smith-Bergollo did not mention this in our conversations. Exhibit --

Smith-Bergollo stated he would meet Student "P" but stated he would "await Student P's outreach". He also stated that he was unable to meet her before the next class but did not state that her missing a class would be problematic. I also did not believe this was a concern as students are permitted three (3) absences in a class which also has no exams.

In reply to Smith-Bergollo as well, I stated that I did not believe Student P would contact him as she had not responded to me in any way. I asked him if he could instead connect with her. I had wanted to figure a way so that Student P would not feel attacked since her previous reactions seemed to me to be disproportionate and angry. This display in 2021 of concern for Student "P" despite her behavior is inconsistent with Campbell and Kimura's narrative regarding Student "P" and the other students. (Put Emails between Rivera, Smith-Bergollo and me here). Exhibit –

On March 5, 2021 at 4:30 p.m., I emailed Defendant Blackwood to update her that I had contacted the Dean, Smith-Bergollo, regarding the latest in the behavior of Student "P". In this email, I referred indirectly to Defendant Hsu's threat by referencing Defendant Hsu's language on "boycotting" used in that threat ("*Drop the complaint or students will boycott and teachers will be expelled, but we're not there yet*"), which I brought up as the concern I had with Defendant Hsu contacting Hamilton without my knowledge and for some unknown reason. (Put email here).

Later on March 5, 2021 at 5:57 p.m., Defendant Blackwood replied to me to state, in vague language regarding what I had stated about Student "P", that "*you cannot ask a student not to attend class*". To be clear, not only had Defendant Hsu already found that language of asking a student to speak to someone before returning to class, but Smith-Bergollo had identified no issue with my request given her behavior. To be sure, I had not asked for Student "P" to be *removed* from the class, or to not attend, but to be *spoken* to before the next class, as part of urgent efforts to address her inappropriate, race-based bullying behavior. I immediately made that clear to Blackwood via email, to correct this piece of narrative that made up part of the game that Defendant Blackwood started playing with me the moment she commenced any communications with me, after the February 18, 2021 meeting where I reported the race-based bullying, of distorting my words as a means to discredit me or create an issue. Campbell and Kimura have not produced one email sent

from Defendant Blackwood to me after I complained in February 2021 until this email in March 2021.

However, it should be noted that removing a student who is openly and admittedly harassing a professor for being Black, and recruiting other students, the class, to do the same, is absolutely grounds for removal. It is grounds for suspension and/or expulsion. Defendants never once discussed this aspect with me but turned the situation around on me immediately beginning with Defendant Hsu's February 15, 2021 email to students.

Defendant Blackwood did not address Student "P"'s behavior, again, but focused on heightening her efforts against me, in preparation for Defendants' next and planned move, the threat of an upcoming meeting using self-protective but inappropriate verbiage (given Smith-Bergollo's response and Defendant Hsu's previous statements) such as "*cause*" ("*We may have cause for further meetings next week after you get a chance to meet with the Dean for Students office*"). This was further retribution for my insistence on the February 18, 2021 meeting by, again, blaming me, turning the tables, as Defendant Hsu had been attempting to do.

After having asked the advice of a personal source om the matter almost immediately that day who had indicated that she would not have asked the student to miss a class, but having forgotten that Defendant Hsu had already given her approval on this type of step in her February 16, 2021 email and Smith-Bergollo had found no issue with it, I stated to Defendant Blackwood on March 5, 2021 at 6:12 p.m. that I understood that I "*cannot ask a student not to attend class before speaking to an advisor or Dean. I also understand that I have other options but these I do not want to avail myself of. I would rather (which is why I was in a hurry) have Amanda speak with someone before Monday's class so that there is an understanding before she attends class that day as to conduct. It seems that Todd is not available to speak with Amanda before our meeting on Tuesday*."

I said this despite the lack of issue taken about my detailed request about Student P potentially missing a class from Smith-Bergollo but also from Defendant Baumann whom the Dean of Students had forwarded my email to. In fact, a professor can ask a student who had engaged in the behavior Student P had demonstrated to speak with their advisor or the Dean to set the parameters for the treatment of me, especially in light of her comments on my race. Respectfully, Defendant Blackwood should be required to explain, testify as to why she made the inaccurate statement that she did, which formed the basis of her "*cause*" remark in her email. I can say here that this Defendant Blackwood example of trying to sound official and right in their criticism of appropriate behavior defines the case Defendants have attempted to build against me in this case, have proffered to this court, as seen in their Summary Judgment.

Unbeknownst to me and immediately following the aforementioned email communication, Defendant Blackwood took one shocking action as follows: -On March 5, 2021 at 5:03 p.m. thirty-three (33) minutes after receiving my email, she forwarded it to Dufresne, whom she had never met if the contents of that correspondence are to be considered truthful, seeking apparently a federal claim of Retaliation against me. In her narrative seeking that charge, she claimed that my email did not "*make sense*" but apparently it was intelligible enough for her to believe a student was being retaliated against and then to seek that charge.

In retrospect, Defendant Blackwood's silencing of me would have been inconsistent with sending me to anyone for help including the EEOC investigator to report anything.

Dufresne, who I did not know existed or and had not been referred to although I had made various reports of Discrimination to all the Defendants at various times responded to Defendant Blackwood on March 5, 2021 at 5:12 p.m. and left Defendant Blackwood with her "*instinct*" that I had targeted Student P unlike what he likely would have determined about the students and the Defendants had he conducted a legitimate Discrimination and Harassment investigation into the race-based bullying, as I had reported the issue to Defendants Blackwood and Hsu.

Indeed, on the other hand, of note, *had* Dufresne in fact determined that an investigation was necessary based on a student complaint, it would have required that he contact *me*, thereby revealing his existence, which would have allowed me to file the federal civil rights claims I had sought to file since 2018 by reporting the multiple instances of behavior described herein. Defendants had been trying to prevent this. What this all indicates to me is that this suite of email communications between Defendant Blackwood and Dufresne, as I have suspected about many other emails which Campbell and Kimura produced amongst the Defendants (or those between them which have emails from me or between me and students forwarded with them) were staged for court viewing. Defendant Blackwood's "*concern*" about me was staged. The conversation between her and Dufresne was likely staged. What adds to this idea is how quickly Defendant Blackwood dropped her claim about me once Dufresne responded to her, despite likely having received or seen the full version of events that I had sent to Smith-Bergollo who had forwarded it to Defendant Baumann which she could have sent to Dufresne at some point thereafter. Either it was staged or Defendant Blackwood was being duplicitous with Dufresne about what she knew or had access to about the situation. Her behavior was made worse by the behind the scenes complaints Defendants had been actively soliciting from the students, especially Student "P". She was engaging in a double effort using both the students in their voices as if the complaints were independent of her when they were not, and she was using herself as Chairperson as if a neutral authority figure.

As to what specifically Defendant Blackwood claimed not to understand regarding the event with Student "P", she, the student who had been engaged in bullying me and speaking for the class, encouraging and advocating for it in group chats with her classmates, had engaged in yet another bullying act. To explain, despite her pattern of conduct towards me, I had offered Student "P" the ability to use Brightspace to enhance her facilitation with a presentation component, if she wanted. It was a gesture of kindness towards her, which I constantly state as the counter to Defendants' habitual and compulsive framing of everything I have done towards the students, and Student "P" and the other leaders particularly, as bad and intentionally malicious.

To my offer, Student "P" responded that she wanted to have that Brightspace host functionality. I then allowed her to be host. Student "P" never used the presentation function but, instead, ended the class before my class session and work had been completed for that day as I had announced at the beginning of the class that I was also meeting with a student after class. During this time was normally when students asked me questions. But Student P knocked everyone from the site, even though I had requested and reminded her

several times to return me to host and she made a movement, on screen, as if she had done so. I emailed Student "P" immediately, asking for an explanation and her advisor's information so that we could all sit down and talk but Student "P" never responded at all ever to say anything about what she did. I am certain, however, that she contacted the Defendants although they produced no email that I have seen indicating this. All of the foregoing, Blackwood claimed she did not understand in her email to Dufresne where she also pretended she did not know.

Instead of asking me for details if she allegedly did not have enough information or the minutiae as presented herein as I had sent her a summary version, Blackwood emailed the EEOC investigator to seek a finding of Retaliation against me, using the summary version of my email. It was a bizarre act particularly since either she likely knew, as stated herein or could have known what had occurred by contacting me directly or Smith-Bergollo. Before she emailed Dufresne, it is not known whether she had spoken to Smith-Bergollo to ascertain what he knew that made him believe that Student "P" indeed needed to be spoken to. Finally, was it fair to ask a student to be spoken to by the school who had been disrespectful, angry and belligerent towards me, defending another students' call to use violence against White people by being disrespectful towards me as the professor, spreading hate about me as Black person and recruiting others to do the same but stating that she was speaking for the class in any event, repeatedly bullying and badgering me about receiving the class recordings I was forced to make of myself in the classroom because of her and others' antagonistic behavior and falsehoods about me transmitted to the school (but then claiming she wanted the recordings of me for schoolwork), I believe it was, even if Defendant Blackwood, with her conflict of interest, claimed that it was not.

Two (2) days later on Sunday, March 7, 2021 at 11:03 a.m., as described in ECF 199, Defendant Blackwood sent me an email with very particular wording from the start forcing her way into my classroom. She invoked Cooper, who was supposed to be in the role of my Union advocate but who could never speak for me) to say that I had "*agreed*" to her being in my classroom as an "*observer*". She also proffered her alleged reason why. She wrote,

"*Dear Wendy,*

*Since what's not working in the classroom is going to take more time than we have to fix prior to Monday, and we don't have grounds to remove the student, we need to implement steps that are fair to you and the class. This Monday, I will add myself as an observer to your Zoom class. I will moderate the presentations scheduled for Monday, in order to avoid any IT/logistical issues and be an observer in the class moving forward…*

*Bernadette from Employee Relations spoke with Varise yesterday, and it's our understanding that this is mutually agreeable solution. Varise also added that you would be in agreement with teaching the class from a laptop or desktop, so that the Zoom/IT suggestions he made can be implemented.*"

_____

First, as to this email, not only had I not asked for the student to be removed but, from this email, it seems Defendant Blackwood had discovered what had actually occurred with Student "P" or should have at this point. She did not return to Dufresne with my full email explanation to Smith-Bergollo which included the race-based bullying claim.within it. Moreover, next to the lie was the subtle point of blame (for using my phone for class

because my working computer was not cooperating during that time) along with the computer loan offer, which Defendants could have made well before since all meetings I had with them had been via cellphone.

Because of the lies by Defendant Blackwood and the phrasing she employed which concerned me, I was again walking on eggshells, attempting to balance standing up for myself/protecting myself with giving as much grace as possible to the Chairperson to attempt to maintain a positive relationship. The Defendants understand very clearly this point because they have been intentionally leveraging their positions towards me and the students from the beginning using specific wording choices in emails to me and in meetings.

Therefore, when I responded to Defendant Blackwood, to deny her claims and ultimately state that I did require an observer, I began with friendlier language to start as she had employed and I did so with some language that was not completely accurate, which the Defendants know, but Campbell and Kimura chose to pounce on to demonstrate something. Specifically, when I stated, "*You and I agreed during our meeting that you would observe a class in the future. Now would be about the time you thought observing would be useful. I agreed with you that this would be a good and welcome approach.*", both Defendant Blackwood and I knew that this was not the case. That is, Defendant Blackwood was supposed to, on her own, check in on the class two (2) weeks after the February 18, 2021 meeting where I reported the race-based issue and she silenced me more. She never did this. She stayed completely silent. Almost three (3) weeks later, and after she had attempted to seek a Retaliation claim against me with Dufresne, she responded on a Sunday to an email I had sent to her, apprising her about the Student "P" and Smith-Bergollo situation, to now insist upon observing my class, using agreement she alleged I gave to Cooper. It appeared, then, that not even she believed she was checking in. As stated, however, I was trying to show her grace as someone fighting in all of these ways to save my job which, important as it was for various reasons, I could see was in jeopardy.

When I sent this email where I had disagreed with the permanent observation component ("*However, there was never a discussion about permanent observation of my class that I have had with anyone*"), among others, it was Defendant Baumann who jumped into the conversation to flank me with lies that attempted to heighten the issue for purposes which included pressuring me and forcing the obseevations. She claimed, "*While I absolutely respect your experience of the class, I believe, based on my conversations with Sarah and Stephanie, that there are students who continue to have issues in the class.   I also understand that you have asked very recently to have a student removed from the class…*"

She also did something else notable. She repeated the Cooper lie even though I had just denied it and then forced the situation using her position in Human Resources. Defendant Baumann stated, "*My understanding when I spoke with Varise (and I apologize sincerely to you and Varise if I misunderstood)  was that an observer would be fine with you.    If that is not the case, or I misunderstood, I suggest having Sarah sit in as an interim measure…*"

Even though I responded to Defendant Baumann's email in a lengthy reply to continue the conversation and dispute the various false claims she made including the permanent observing, Defendant Blackwood attended class to observe on March 8, 2021,

which corrects the date listed in ECF 199. I sent her the Zoom link to attend. In that class, Student "P", one of the leaders just happened to be finishing her facilitation, which she did. Also, two (2) of the leaders of the bullying called out in class to accuse me of never answering their emails. First, one student made the false accusation and then the other student jumped in to say to me that "*Yeah. She's not answering our emails. It's disrespectful. Someone has to say something about it*". I denied these allegations on the spot, requesting that the student resend the email if I did not see it. The student did, in fact, send the email and when I responded to her hat I had replied and she then sarcastically agreed, I asked why she had stated what she had (the lie) in front of Defendant Blackwood. She did not reply. (Exhibit---). I had also emailed Defendant Blackwood to state that I felt the students were being performative because she was there.

On the next class day, March 10, 2021, I was surprised to see Defendant Blackwood in my Zoom classroom again as I had not sent her the link. I do not know how she received that Zoom link for that day's class. When she, as the rest of the class, arrived, the chat *between themselves* was muted which meant the students could use the chat but only to speak with me, and the audio was muted so that I could have a talk with them uninterrupted. I spoke for about five (5) to seven (6) minutes and shared with them that I was a proponent of free speech and that I wanted them to express themselves but that they could not engage in bullying me any longer. I also tried to discuss some concerning things I heard in Student "P" facilitation about White people "*Barbara Ann from Kentucky*" and "*Sarah*" comments from Student "P" meant to signify *Whiteness*). This is when Defendant Blackwood furiously began sending me chat messages which I detailed in ECF 199. In that document, I detail my response that a White student ("Student "B") had been upset and did not want to speak in class because of Student P and the negative offensive White people vitriol. I stated that I was offended as well. Student "P" had also made stereotypical comments regarding "*Jose*" "*picking strawberries*" too. Defendant Blackwood accused me, in essence, in her chat messages however of Retaliation while telling me to send Student "B" to her or Defendant Hsu to essentially change her mind. That comment was extremely concerning to me. (Exhibit Discovery Chat messages).

As a note here, Campbell and Kimura have made a different suggestion regarding that one instance of muting the chat which also appeared in both or either the Removal letter and the evaluation by Defendant Blackwood I refused to sign. Additionally, Cooper, the Union representative who the Defendants through Bond, Schoeneck & King represented and/or still represent in this litigation, told me to mute the chat to "*take back control of the class*". He also told me to record as a protection strategy.

Following the aforedescribed March 10, 2021 class session, I emailed Defendant Blackwood asking about her presence in my Zoom class. She replied that she thought I had agreed. But, in fact, I had not done so, explicitly. I had sent an email back to Defendant Baumann which she chose to ignore, even though I had not realized this is what she had done, despite my understanding that the professor must ask for an observer and give permission (which is why the Defendants both used Cooper for "agreement"), Defendant Baumann had chosen not to respond to me or to defend what were false statements, but to procure somehow the Zoom link only I can create and disseminate in order for Defendant Blackwood to "*observe*". In effect, as one note here, Defendants Blackwood and Baumann, by invoking Cooper repeatedly, were *telling* me that I had agreed.

During this time, Defendant Blackwood accused me falsely via email about "changing" the very basic facilitation assignment following the four (4) students who had already facilitated a discussion of an essay after they analyzed it for main points and themes. "Complaints" like these were apparently coming from the same complaining students who I had initially reported for race-based bullying. They claimed that I had never informed them about what the facilitation entailed. Then, after I provided it as the more detailed writing on Brightspace, they claimed to me and then Defendant Blackwood that I had changed it. So the students knew what I stated initially as the first lie and then they lied as Defendants Hsu, Blackwood and Baumann had asked for and coached them to do. This issue landed on either or both the Removal letter and evaluation.

Also back on March 7, 2021, at 11:52 p.m., Smith-Bergollo indicated that he had asked for Defendant Baumann to attend our meeting, as he had stated that he had "*checked in*" with her earlier, because I had asked for Cooper's attendance at the meeting. However, Defendant Baumann could or would not meet until Thursday, March 11, 2021, which meant that, if Student P was not to attend class before speaking to Smith-Bergollo, she would have missed two (2) classes based on my Defendant Baumann's inability to meet sooner.

On March 11, 2021, I met with Smith-Bergollo, Defendant Baumann, and Cooper. I related all of the details contained herein to this point including the race-based bullying for which I was seeking an investigation. I complained that Defendants Hsu and Blackwood were treating me differently than other professors including herself. In that regard, I described the content in her class materials which she provided to me to use as containing pornographic content unsuitable for young students. I reported Defendant Hsu's threat, and the initial and subsequently more severe Defendant Blackwood silencing of me following my report to her of the race-based bullying.

At this meeting, Smith-Bergollo, who had agreed to meet with Student "P", now decided he wanted to receive video evidence of bullying. He did not ask nor had I remembered to mention the emails from students asking if I was okay. This information Defendants should have had at that point from any true investigation and interviewing of the class. Defendant Baumann deceitfully asked me at one point if I considered Defendant Hsu's words ("Drop the complaint or…teachers will be expelled…") a threat, words which I had already labeled as a threat.

The meeting ended where Smith-Bergollo now was not going to speak to Student "P", not even to ascertain facts about the issue from her point of view, unless and until he received video evidence from me of bullying. Defendant Baumann made no further comments in that meeting.

Almost immediately on March 12, 2021, Defendant Blackwood sent me an email requiring me to attend a meeting where she stated, "*We will be meeting to discuss ongoing student complaints, your complaints regarding students, grading issues, classroom management and pedagogy. Please note that this meeting may lead to disciplinary action.*"

The aforementioned email was a part of the culmination of the efforts of the Defendants the entire time. It also appeared to be a reaction to the meeting, where I had

reported the race-based bullying again but now with the preface to that report (Defendant Hsu's silencing, observation, accusations and threat) and the aftermath in terms of Defendant Blackwood's permanent silencing. I also had complained that the Defendants, among other things, were treating me differently than other professors, including themselves.

On March 18, 2021 Defendant Blackwood, Defendant Hsu, Defendant Baumann, Cooper and I met on Zoom for the meeting. A portion of the meeting in transcript form is as follows:

**20:59 Defendant Blackwood**: *"Um, one other, I forgot to mention it in going through the supports, um, was that we also, I can't, I don't think I mentioned this but, um, after the meeting between Wendy, Stephanie and I, we connected her with Tiffany Hamilton, um, as another form of support that we, that we provided, um, because we thought that that office, um, you know, if, if, the meeting with us didn't, you know, feel like, if she didn't feel like that addressed concerns, we wanted to make sure that, that, um, it was clear that, that, there were multiple kind of offices that are available at Pace for support, for different, for different aspects of teaching and employment."*

**21:41 Defendant Hsu: "***And then I met with Tiffany and Denise Santiago and OLMA, um, to hear their recommendations and what they conveyed to me was that they wanted to lead a Community Guidelines session, um, in the class, in, in Professor Harte's class. Then, when I followed up with them, they had postponed that, and deferred that act, action, so I did also follow up on that administrative level of support...from the, from the Chief Diversity Officer who is, as we all know, parallel to the Provost.***"**

**22:19 Defendant Baumann: "***Varise, I just wanted to interject in...cause, I think when I spoke to you, it was probably late at night, when we were first, we were both being informed about these things. I thought that a meeting with the class and Tiffany had happened. I just want to verify that didn't happen. Oh, you're on mute.***"**

**22:35 Cooper: "***I muted myself to sneeze. Yes, I'm clear on the order. I know that it didn't happen***."**

**22:42 Defendant Baumann: "***Okay***."**

**22:43 Defendant Hsu:** *Also, just, uh, in all of my student communications and conversations, and the first time I talked to a student, I have acknowledged that it is our job to really think about what anti-racist action means in the context of this class, and I specifically mentioned anti-black racism, and all of us being very vigilant about it. So, I, I, do believe that I asked the students to really think about their comportment in that framework. So, um, I also believed that I didn't pull punches with them, in other words, about what was going on*.

Later in the meeting, in speaking to Defendant Baumann, I stated:

**Me**: *Well, I mean, in that meeting with, with you and Todd, I was asked to send you the information, and within less than 24 hours, I received an email from Sarah saying that everyone wanted to come, uh, and talk with me, uh, and that, about all these concerns, and that, um, you know, disciplinary action might be, uh, warranted. Um, less than 24 hours, I don't consider that reasonable, uh, to... So, so, I, I, so, in other words, I didn't understand how there could be even a discussion about disciplinary action, disciplinary action, when you had not seen any of the evidence from, from my side, any of the supporting emails or documents from my side...*

**Cooper***: Um, I'll answer that. I'll answer that. The language on disciplinary action is, it's normal. That has to go out to every, every communication that comes from HR. So it wasn't aimed directly towards you, Wendy. Um..*

**Me***: I think that, I think that's a hard thing to, to, to hear, you know, uh, in the moment of these things happening. But, I certainly think that..*

**Cooper***: I didn't, I didn't say anything because it's regular. So, I didn't, I'll take responsibility for that. If you had*
brought it up, I would've told you that's normal language for correspondence from the HR department in this situation (Second admission about Defendant Blackwood email).*

**Me***: Right, but they wanted to, they wanted to address concerns without having heard anything that I said less than 24 hours later. That was problematic for me.*

**Defendant Baumann***: So, I don't think that Todd put a deadline on when you could send him any follow up information. So, in my mind, you're still free to send him anything you want him to independently review. That's (Me: Mmm hmm.) fine. This meeting today does not preclude you from sending anything to Todd.*

**Me***: Right. I guess what I'm saying is that there was no information that you had had from your side before sending the email to me about concerns that you had about changing syllabi and, you know, all these other issues.*

**Defendant Baumann***: Well, that's what this meeting is for (Me: Right but I guess I'm saying is that...) is to discuss those issues. It's, it's not to begin, you know, an email exchange where we, you know, all five of us debated over email. It's to set up a meeting to discuss the topics at hand."*

**EXHIBIT provide videos and links ).**

On March 29, 2021, Defendant Blackwood sent me the Removal letter removing me from teaching my course using the baseless complaints and allegations the Defendants had been attempting to gather during the semester. Defendant Blackwood, Defendant Baumann, and Human Resources invoked the "CBA" and included language telling me that I could not challenge their removal in any way. I was thereby removed from teaching my class and replaced by Defendant Hsu who had threatened me on February 17, 2021.

I began experiencing anaphylaxic shock reactions to foods I was eating, with spices in particular causing my throat to close. I was aware of the stress I had been under and was in a state of panic. To that point, leading up to this reaction, I had been having other symptoms for which I visited a dermatologist and Ear, Nose and Throat ("ENT") doctors. These doctors had been pointing me to stress as the cause of the various issues I was experiencing. They told I had to reduce it. To that end and in a panic, I began therapy with Board Certified psychologist Dr. Melissa Kresch who ultimately diagnosed me with Adjustment Disorder with mixed anxiety, and depression.

In April 2021, there was something unusual regarding Brightspace. Once and although Defendant Hsu began teaching my class, I still had access to the course for some reason on Brightspace. This was not supposed to be possible. With that access maintained, which I happened to discover at some point before the semester ended, I saw videos

Defendant Hsu took of the remaining classes. Defendant Hsu discussed me and made highly inappropriate statements. She lied about evaluations, guiding the students to not write anything about her since, as she claimed, She told students that the evaluations that they wrote about her would not affect her salary because she had tenure but the ones written about me would go in my file and "*follow*" me. I continue to maintain the question as to whether Defendants can alter evaluations or even create evaluations from scratch as well.

The first half of her statement was not only false but prohibited as against Defendant Pace policy to sway evaluations. She stated to them that she wanted them to know where "*your (their) labor is going to have its impact*". Predictably, one student simply wrote the word "*racist*" on a student evaluation. These evaluations also came after Defendant Hsu referred to the "*meta*" nature of the students' experience in my CRES class.

With regard to the aforementioned conversation referred to above between Defendant Hsu and the class, which occurred on the last day of class for the semester, April 26, 2021, during the first six minutes, Defendant Hsu said, "*Our class experience together, I really think, you know, your class experience this, and I'll say it again, it's been a real world learning experience. Um, everything you all felt and heard this semester is part of how we all are going to transform and do differently and, um, hopefully preventatively, to really keep our community together, um such as it is here at Pace but I want to, you know affirm that this whole, this is really meta for you all this semester and so thank you for continuing the conversation.*

*Um, I want us also to be able to bring in examples of "blackfishing" you want to talk about today, and I also have another little bit of evidence to show, um, about, um, a tenured professor who also had been called out for pos--, for, for letting people assume that she's black. So, what this is about today, I think, is I would like us to start with watching come clips, really acknowledging our feelings and the, and the impact of um, these sorts of racial identities and performances in the public space and then we can complicate with the reading. So, I really want you to, you know, trust your emotions the way you have all, you know, all along, and use that as the seed for knowledge. So, where do we go, how do you make sense of the truth that you feel*".

During the last two (2) minutes of that same final class, Defendant Hsu, in wrapping up the class, stated, "*I appreciate. You all have made this semester possible. And you've done something, and created something unforgettable together. So, thank you for persevering and everybody stay in touch*". During this statement, she intertwined, clasped her fingers, to suggest union and/or togetherness.

At this, Student P, one of the leaders of the race-based bullying I had identified, standing, offered to the class, "*If anybody needs me and they want to fight some more racist professors at Pace, I'm graduating but y'all all have mu number. I will be contactable*".

Within one (1) or two (2) seconds, Defendant Hsu, who was in a mask but appeared to be smiling, waved happily and close up into the camera. (Exhibit (Add class video snippet here under seal.

During her time after having taken over my class, Defendant Hsu discussed with the students that I had been paid fully for the semester, which was absolutely none of their business and was unethical, but did indicate the cloaeness of the interactions that she had been engaging in with the students to have said such a thing publicly, easily, and nonchalantly, about another professor. She also indicated that, given that I had been paid by Defendant Pace, "*at least fiscally, there's not inequity*", alluding to, as an admission, statement of

hubris and follow through of her promise if I did not drop the complaint, the treatment that I had received at her hands and that of the other Defendants.

Approximately fifteen (15) minutes into this last class, however, was a particularly troubling, revelatory discussion of "Blackness". That is, as part of a discussion on "Blackfishing" ("*the act of someone who is not Black pretending to be Black*"), a dubious concept that I do not subscribe to, and after watching a Rachel Dolezal Netflix trailer (Ms. Dolezal is the White woman working at the NAACP who identifies as Black, one student, "Student T" commented, "*I didn't hear what she explained. Wasn't she like, "Oh, I was born white but, like I was around, basically, born white but I was around literally Black people. I feel like I Am Black*." Student "P" then stated, "*You know what irks me, like fucking Awkwafina adopting her blaccent to get popular and then dropping it.* [Another student, "*The Asian woman*"] *She's an Asian film star….*"

Student T replied, "*She adopted a blaccent?*"

Student P replied, "*Yeah, then she dropped it. She was like, "Oh, I'm from Queens. Of course I have an accent…" But she's from like Flushing. Where is she picking up that fucking accent?*"

For the court's reference, a "blaccent" is defined variously as "*a distinctive manner of speech, pitch or tone, particular to African American urban inner city youth*", "*A manner of speaking indicative of the stereotypical African American (or someone trying to sound as such)*, "*Accent for White people who sound like Black people*". It is described by some as a "*performance (of Blackness) that can be flipped to off like a switch*".

Defendant Hsu also made a hand gesture of intertwining her fingers together, clasping them as if symbolizing union as she thanked students for what they had "*created*" together. She discussed the importance of staying together.

In my initial complaint, I stated my belief that Defendants had been aiding and abetting the students. I had been also concerned about the type of language and communication in the classes which Defendant Hsu taught as it all seemed unusually familiar, inappropriately so. What I learned from Discovery including the Aunt Jemima email confirmed that belief and was far worse than I could have imagined. A trial and witness testimony is crucial given the nature of the verbal communications Defendants Hsu, Baumann, and Blackwood had with the students, what they were asked to do and what they were promised in return, what they were rewarded with. Regarding this, the class was changed entirely and made only one day a week instead of two, students had stopped coming to class or doing any work and Defendant Hsu submitted all high grades.

On May 1, 2021, the semester ended at Defendant Pace after I completed teaching the other two (2) courses I had been assigned. No Defendant was ever in touch with me or made an offer to me for the next semester. I had been fired, increasing my angst and stress.

On June 7, 2021, in applying to the DOL, unusually, I was sent to a company called "ID.me", as I had been "*flagged*". This meant I could not apply for unemployment unless and until I registered with them. I could not reach ID.me for months, until October 2021.

On June 9, 2021 at 5:06 p.m., I sent a follow up request to Bundor requesting the relevant additional information needed in order to interpret and verify her spreadsheets. I required all of the official course sections I taught including with actual scheduled hours taught, actual scheduled start and end times. She did not immediately respond.

On June 11, 2021 at 7:39 p.m., Defendant Blackwood sent me a published negative teaching evaluation. Please note that the UAFP's CBA with Defendant Pace indicated that any negative evaluation gave the school the right to refuse to offer a professor any future work ("*Reappointments may be terminated at any time based on an evaluation(s) as per Article XIII of less than satisfactory*). Quinlan had also informed me in a phone discussion that any negative evaluation of a professor, a "two" (2) or under out of "five" (5), signified that the professor had been fired by the school.

Defendant Blackwood's published evaluation of me consisted almost entirely of intentionally false statements by her, with a one "1" out of a possible five "5" rating for my teaching from her. This negative evaluation, my first one (1) ever, came at a time, and in a semester, when I had made my first complaint ever about bullying and race-based, anti-Black racism at Pace, and to Blackwood, and Hsu, in the English department, and was openly threatened. This all immediately followed my discovery and the complaint of fraud, retaliation, and different treatment with request for restitution from the ELI department. All of these departments were run and managed tightly by Defendant Pace's Human Resources.

In previous semesters, I received excellent evaluations, including a "5" out of a possible "5" in one semester, which the past chairperson, Johnson, described as "*stellar*", and "*rare*". Johnson, who was the only person to observe me ever, once, during one (1) semester, in the entire time that I had been teaching at Defendant Pace, described her review of my class in absolutely glowing terms as she stated, among other things, that I "*was doing the work of the University.*" Because of the circumstances under which Defendant Blackwood observed and her motivation for doing, I do not consider her visits to be an official, true formal observation.

Also, Defendant Blackwood used knowingly false CRES student evaluations, and knowing false student complaints, which she helped them manufacture, in order to fill out her negative evaluation of me. Notably, one of the students in the CRES class labeled me as "*racist*", as previously noted herein. Defendant Blackwood read this statement and made no mention of it in her own evaluation of me, even though such a statement would have mandated that an investigation was conducted into the reason for such a statement by a student. It is, in fact, telling that Defendant Blackwood said nothing on this, and she made no mention of it anywhere in writing to me. This is because Defendant Blackwood knew it to be a lie, along with everything else that the anti-Black CRES students in the class stated or surmised about me under her and Defendant Hsu's guidance and suggestion.

Upon receiving the June 2021 evaluation email, there was admittedly a tussle with Defendant Blackwood via email. I was stressed and I knew and she knew that she was lying, making provably false statements which changes from things like "*class started late*" as she claimed in emails, which can be proved as false as Zoom has timestamps, to "*class facilitations started late and because the students were very confused*". In her emails, Defendant Blackwood lied as

well about giving me any guidance throughout the semester for "issues" she claimed I had. She claimed on the evaluation that I did not use Brightspace except Defendants have proffered to this court so many which Defendant Hsu stated in an email amounted to more than twenty (20). She claimed I did not email to students and it was a lie. Defendants proffered those as well in their exhibits. Whether they liked or not how I chose to deal with a student who apologized after being openly and proudly belligerent in multiple classes before and after her apology email and then proceeded to inform me that I could not tell the class "no" is simply their issue but not one that is used to remove or fire a professor in the context of this semester or any other. Defendant Blackwood took issue with me not completing an *optional* self-evaluation but used it against me on the observation as if it were mandatory.

Indeed, Defendant Blackwood wrote an evaluation for the year when Defendant Pace had previously announced that they were not including the year 2020 because it was the first semester everyone was in quarantine because of Covid-19 for a first full semester. The students were having a terrible time adapting and it was tremendously difficult for everyone but Defendant Blackwood counted that semester and the student evaluations against me but not other professors.

Defendant Blackwood's evaluation was never meant to be true. It was meant to demonstrate to me what the Defendant Pace could do, as with the reverse fraud. They could fire me and then blatantly lie to defend that firing. That combined with the fraud and Defendant Blackwood's "instincts" on allegedly targeting a student for retaliation, rumors of me being racist and discriminatory created and spread by the Defendants and then the students all together tell a false story of Defendants' making.

When I would not sign the evaluatiom, Defendant Baumann sent out a department or university-wide announcement saying that signing evaluations was just an acknowledgement of receipt. My experience was that signing an evaluation was agreement. Therefore, I still would not sign it.

On June 11, 2021 at 9:58, I sent another email reminder to Bundor about critical data I requested to verify her spreadsheets.

On June 12, 2021 at 11:07, ELI's Brubaker contacted me to cancel one (1) of two (2) classes I was to teach in the Summer Lawyer's Program "*due to low enrollment*", the first time since 2015, which I informed her of. In that case and because of my suspicions about the cancellation, and what it meant, at some point before the course began, I informed her that I would not accept it. Brubaker never contacted since then.

On June 14, 2021 at 3:14,  Bundor responded to my June 11 email to indicate that she received it and would provide an update.

On June 16, 2021 at 4:06, Bundor sent a document that would not allow transparency in calculating her spreadsheet.

At 10:32 a.m. on the 30th of June, Bundor denied ultimately my requests for complete and full information so as to verify her claims that I had kept alleged overpayments. I did

not know then that, even on its face, the spreadsheet, with all of the different rates for courses (instead of one teaching rate) in both Hickey's and Tannenbaum's classes was problematic. Bundor did not indicate that she knew this about her and Defendant Baumann's spreadsheets. Missing also was the issue now visible with the English department rate which they were scrupulous in not bringing to my attention either.

In August 2021, Defendant Blackwood contacted me with what they labeled an "*offer*". After the firing, however, although it was an attempted rehire, it was also something else untenable, the radical change in terms and conditions and it was a form of coercion and bribe. Defendant Pace was sending a message about who they wanted me to know had power and control. At that time, no mention had been made about Dufresne for this reason. It was not an offer in the traditional and legal sense of the word. Knowing what it would mean without the formal filing, I did not respond to it. Most blatantly, I could not make requests for Discrimination, Harassment, and/or Retaliation. It was an open secret now that I would not be allowed to make those claims. Indeed, hanging over my head, and what would "follow" me was the removal, the evaluation, the claims by students of racism and retaliation. Indeed, there was no mention by Defendant Blackwood of Dufresne after my report to her, Defendant Hsu, Hamilton, Defendant Baumann, and Smith-Bergollo, including in writing.  There was no discussion of a teaching rate commensurate with experience, like other professors. In fact, while they could not decrease the rate, the number of classes was to inform me that I was starting over at Defendant Pace and should accept that. I was not constructively fired, which I stated in error. The blatantly false evaluation *after firing* was to inform me of the *reason* for the firing which they had orchestrated the entire time, including by using young adults, teenagers and/or minors.

After firing, there were new terms and conditions, a new understanding, students can be used against me as evaluations could be. The branding of me was important because I could not work with this new reputation and record.

Also, accepting the job offer after firing was securing agreement for Defendant Pace that everything that happened was okay.

Defendants #11 - During the Spring 2021 semester, Bernard Dufresne was the Executive Director of The Office of Institutional Equity/Title IX Compliance at Pace University. (Dufresne Aff., ¶ 3).

In August 2021, I contacted the federal Equal Employment Opportunity Commission in order to file a complaint against Defendant Pace. I filled out the intake form and submitted it.

The electronic system notified me within a few days that I needed to schedule an appointment, which I then did. The earliest appointment the system could provide was December 21, 2021.

On the aforementioned date, I spoke by phone with investigator Krista Jolivette. I reported much of what is in this filing regarding the Spring 2021 semester because she asked me only for the latest occurrence. The next day, she asked me to sign the Charge she had written.

**Please note that**, since my filing of the form to the court which the EEOC had represented was, in fact, the original one I submitted, in 2025, the EEOC, much to my surprise, forwarded me two different (2) Intake forms, claiming to be the form that I had submitted to them originally. That was problematic and the EEOC could provide no legitimate reason for this.

When the EEOC contacted Defendant Pace in December 2021, Defendant Baumann was the EEOC contact. Upon receiving notice, Dufresne became the new contact in her place.

When I finally met Dufresne, he sent me a link that would not work. He then sent me another where I was able to submit the complaint form. Following this, I spent time emailing him and meeting him over Zoom twice for a lengthy amount of time so as to explain what had occurred. However, after months, Dufresne still pretended that he dis not understand the above details I have provided herein for both ELI and the English department. But, he was actually doing something else (as I believe he already knew about it). First and foremost, Dufresne was directly informing me, via "*confusion*", that the ELI matter was to be considered separate from the English department matter (and that the departments were separate). This indicates that he likely knew that the events likely had some relationship, if not being totally connected.

Moreover, Dufresne, a lawyer, then admitted that he understood both claims - treating me differently than other professors who are non-Black/White, which raised inference of classic race discrimination) regarding pay rates, using multiple pay rates, and - treating me differently, discriminating, retaliating, harassment to do first with the race-based bullying claim.

Second, in his confusion, Dufresne happened to write a rendition of events and a timeline which happened to remove the damaging aspects, the liability by Defendant Pace, from my claim and reordered events to protect Defendant Pace. It may have been suggestion, particularly since it was clear that all Defendants did everything they could to keep me from meeting him. In asking me to review his timeline, I chose to provide him with a writing in my own words that I wrote that reached to the heart of my claims.

Moreover, it is true that I was very stressed and anxious by the time I reached Dufresne, particularly with all of the other strange occurrences taking place during that time as well (Plaintiff's Discovery #115).

Dufresne could have investigated and gotten all of the information that I had in terms of emails to and from students, to and from the Defendants but he chose to pretend and produced nothing, incredibly, while asking for additional meetings.

Defendants #12 - During the Spring 2021 semester, Varise Cooper was the Vice President of the Union of which Plaintiff was part of and was Plaintiff's Union representative. (Kimura Dec., Ex. A at 146:24-147:12).

**Cooper was represented by the Defendants in this litigation, by Campbell and Kimura, Bond, Schoeneck & King.**

Defendants #13 - Prior to working at Pace University, Plaintiff worked at Borough of Manhattan Community College ("BMCC") for approximately one year. (Kimura Dec., Ex. A at 24:4-12; 25:13-15; 25:19-26:13).

**This statement is irrelevant to the issues raised by Defendants behavior in this case including in light of my claims of unequal treatment, Discrimination, Retaliation and Harassment, their history of systemic racism and admission thereof, and my eight (8) years of employment at Defendant Pace until being fired in May 2021.**

Defendants #14 - At BMCC, Plaintiff was paid by the semester. (Kimura Dec., Ex. A at 25:7-8).

**This statement is irrelevant to the issues raised by Defendants behavior in this case including in light of my claims of unequal treatment, Discrimination, Retaliation and Harassment, their history of systemic racism and admission thereof, and my eight (8) years of employment at Defendant Pace until being fired in May 2021.**

Defendants #15 - Plaintiff left BMCC at the end of 2012 after she was not offered another semester. (Kimura Dec., Ex. A at 26:3-19).

**This statement is irrelevant to the issues raised by Defendants behavior in this case including in light of my claims of unequal treatment, Discrimination, Retaliation and Harassment, their history of systemic racism and admission thereof, and my eight (8) years of employment at Defendant Pace until being fired in May 2021.**

Defendants #16 - Pace University hired Plaintiff Wendy Harte ("Plaintiff") on or around July 23, 2013 as a Part-time Staff Instructor for their English Language Institute ("ELI"), a summer Program. (Kimura Dec., Ex. C; Kimura Dec., Ex. A at 28:10-22).

**This is correct.**

**Defendants #17.** Plaintiff's initial pay was $60.00 per hour. (Kimura Dec., Ex. C).

**Please see Defendants # 3.**

**Defendants #18** - As part of her hiring, Plaintiff signed an acknowledgment confirming her receipt of Pace University's Employee Handbook and confirmed that she understood it was her responsibility to read the contents of the handbook and become familiar with the policies and procedures of Pace University. (Kimura Dec., Ex. D, Kimura Dec., Ex. A at 33:17-34:15).

**Please see Defendants #1 to #8.**

**Defendants #19** - Plaintiff initially taught one or two summers in Pace University's ELI program, and then was hired to teach in Pace University's English department during the school year. (Kimura Dec., Ex. A at 34:16-35:22).

**Please see Defendants #1 to #8.**

**Defendants #20** - During the Fall 2018 semester, Plaintiff taught two sections of English 110 – Composition in the English Department. (Kimura Dec., Ex. E).

**Please see Defendants #1 to #8.**

Defendants #21 - In their review of Plaintiff's Fall 2018 English 110 courses, some students noted that Plaintiff was disorganized and unclear with instructions and assignments. (Id.)

**First, I request that the Defendants indicate whether they can adjust, modify, add, delete or in any way edit or tamper with the anonymous student evaluations which are the core and foundation of their process of evaluating professors and which they are using substantially herein as proof. As previously indicated, prior to what Defendant Blackwood would allege was an observation, I had only received one (1) which I had to request in six (6) years in the English Department. The ELI department never provided any peer reviews in seven (7) years.  Defendants have notice through their system that I have never reviewed student evaluations. That is because I have believed them to be inappropriate indicators of the professors' teaching ability. That is, if you are a thorough and hard working professor, good evaluations are difficult to receive. This has caused professors to not give a lot of intensive work for fear of the bad student review/evaluation, which determines if they work again and how much they work. Therefore, you can trust the good ones. Defendants have no interest in adding those. Indeed, the Defendants included none of these comments in their Summary Judgment although I have received a "3" or above out of "5" consistently and the elusive "5" out of "5" once .**

**"Bad" comments are easier to get and the bad ones are the ones Defendants have interest in using as a means to control.  Still, in a system that relies on "*anonymity*" that Defendant Pace ultimately controls and can manipulate, those must be verified as real. Defendant Pace has not done that here.**

**Indeed, students, in the form of affidavits also, noticeably are not available. Their identities have not been available either. Yet, they are the lifeblood of their case, as can be seen in this Summary Judgment. I would like to subpoena those whose alleged emails and alleged verbal statements the Defendants have relied on and put forth and use to engage in smears of me.**

**(As to complaints that the Defendants offered to this court as evidence in dramatic fashion, as I have maintained throughout this litigation, I have never seen these alleged student complaints before and the Defendants have never stated that they showed them to me or asked me about them. Indeed, the allegations contained within them were, in my view,**

**serious. From my experience as a professor, I would think that complaints of this nature would have been sent to me immediately to allow me to respond to admit or refute the statements, particularly since the student dropped the class because of it. Defendant Hsu stated in the March 18 meeting that part of her purpose was to keep the teenagers and young adults in the class. She went as far as to send apology emails asking those to return whose departure she and they self-servingly attributed to me. Yet, an email of the kind referenced herein was received by her and she did nothing. Another student made a similar accusation, a student she apparently had coached, and Defendant Hsu still did not notify me of it and request comment and/or clarification. I question the authenticity of both complaints and call upon the Defendants to contact these students' parents and inform them that Defendant Pace will be releasing their children's names in order to substantiate fully their assertions to me and this court.**

**Moreover, Defendants have demonstrated more than a propensity but a full disposition whereby they will lie about pay rates to induce a prospective employee/applicant to accept less pay than others based on protected characteristics, will manipulate work hours on official timesheets to hide the lie for years, will attempt to brand me a fraudster, will take advantage of their position of authority to manipulate teenagers, some possibly children, lie to them and ask those teenagers for lies so as to railroad and find cause to not only fire a professor but to brand her as racist and retaliatory (shutting down her ability to work anywhere else) and use those anonymous complaints and later requests for evaluations (which they were told disingenuously they did not have to spend their "labor" on) to put in het file and "follow" her. This modus operandi has been in operation for years. With this as the context, I question Defendants' evaluations which, at best, are convenient using anonymity as the shielding device from true scrutiny and investigation.)**

Defendants #22 - Another student noted that no syllabus was provided. (Id.).

**This is false. Please see Defendants #21 herein.**

Defendants #23 - During the Spring 2019 semester, Plaintiff taught only one course in the English Department, English 120 – Critical Writing. (Kimura Dec., Ex. F; Blackwood Aff., ¶ 56).

**This is correct.**

Defendants #24 - During the Fall 2019 semester, Plaintiff taught two sections of English 201 – Writing in the Disciplines and one section of English 110 – Composition. (Kimura Dec., Ex. G).

**This is correct.**

Defendants #25 - During the Fall 2019 semester, on November 8, 2019, a student in one of Plaintiff's Classes complained to Dr. Erica Johnson, Professor and Chair of the English Department at Pace University about Plaintiff's teaching. (Kimura Dec., Ex. H).

**Respectfully, this may be true. However, Johnson never showed me a written complaint. Campbell and Kimura do not claim that anyone did.**

Defendants #26 - The student complained that Plaintiff was "often completely disorganized and unprepared for class," that "[Plaintiff's] requests for assignments are incredibly vague," that "[Plaintiff] is often late to class," that "[Plaintiff] never utilizes blackboard," among other complaints of Plaintiff. (Id.).

**This may be true. Students complain all the time for reasons that are legitimate and for reasons that are completely untrue. This is well-known in education. Complaints must be verified, including with the professor, to parse if some or any of it is valid.**

Defendants #27 - On December 4, 2019, this student also complained to President Krislov regarding issues students had with Plaintiff. (Id.).

**I was never told about this alleged communication but I would like to state that Defendants alleged in one of their documents when Defendants were tasked with answering what Krislov did know and when he did know it regarding the fraud by Defendants and then their boomerang fraud/theft claim against me, the Bundor and Defendant Baumann spreadsheets, my claims of unequal treatment, the events of the Spring 2021 semester and thereafter including the use of teenagers and young adults to falsely claim Discrimination and Harassment, my report to the EEOC and Dufresne, and this lawsuit, Defendants gamely contended that Krislov did not "*even know m*e". This was a lie, one of many.**

**Respectfully, the court may recall that Campbell and Kimura did not produce any discovery from Krislov, the Board of Trustees or unprivileged communications from Stephen Brodsky ("*Brodsky*"), general counsel at Defendant Pace at the time, despite all of my federal civil filings to present. They did not produce any phone logs with regard to any aspect of this case or the events detailed herein beginning in 2013 from the time Krislov and/or any member of the Board began their employment at Defendant Pace to present.**

**Defendants #28** - Plaintiff met with Dr. Johnson regarding the student's complaint. (Id., Kimura Dec., Ex. A at 54:11-56:15).

**In my years at Defendant Pace, I have taught upwards of five hundred and five (505) students in the English Department. The number of students increases greatly with the addition of the ELI department.**

**In my meeting with Johnson, <u>she never showed me the alleged written complaint from the student.</u> However, this student was angry in class, I acknowledged. Once Johnson asked about this student and then listened to my explanation of what had been occurring with the student in class, she alleged that she had spoken to the student as well about the tenor of that student's email about me to Johnson which Johnson had found to be troubling and disrespectful towards me.**

**Defendants #29** - Plaintiff testified that she told Dr. Johnson that the student was belligerent and difficult to speak to. (Kimura Dec., Ex. A at 56:16-22).

**This is true. Her classmates attempted to regulate her behavior at one point as well as they felt her to be, at times, unfair to me as well as disruptive. Please see Defendants #28 herein.**

**Defendants #30** - Plaintiff testified that the student's behavior in class was angry and belligerent, explaining that one time when Plaintiff was talking to the class, the student wanted to know why Plaintiff was talking about a particular topic and wanted the class to move on. (Kimura Dec., Ex. A at 56:23-57:11).

**This is an example of behavior that her classmates tried regulating in their way as I did in mine. The student calmed. Sessions resumed normally with good conversation. She received a good grade because she did strong work.**

**Defendants, for effect, have now spent four (4) statements of fact, including this one, describing one alleged student complaint, which I had never seen. The student never spoke to me following my conversation with Johnson about ever having filed a written (or verbal) complaint about me although I saw her in class twice a week thereafter and believe that she would have done so.**

**Defendants #31** - In Plaintiff's English 110 course for the Fall 2019 semester, students noted that they "did not find value in [Plaintiff's] organizational skills," that Plaintiff "[n]eeded to be more clear in terms of tasks," and that "[t]here were some classes where [Plaintiff] wasn't prepare for her class and had no idea what she assigned us." (Kimura Dec., Ex. G).

**Defendants never questioned me about these alleged student evaluation comments. I had never seen them as I do not typically review student evaluations. Students complain about professors and they complain about each other sometimes unfairly as happened in one particularly mean incident with a male student. I had to speak with the class about it.**

**Everything must be verified, investigated if necessary. I consider peer observations to be a starting point, and those must also too be recorded for accuracy in reporting by the observer, which conclusion I came to especially in December 2021. Therefore, unless I am contacted by the school about an issue on my evaluations or receive a low rating which is brought to my attention, I do not engage with them. Defendant Pace's system for retrieving evaluations will show that I retrieved perhaps one from their system. When I attempted to procure all of them in 2021, the system blocked me from doing so.**

**Defendants #32** - In Plaintiff's English 201 sections for the Fall 2019 semester, when students were asked what they found valuable about Plaintiff's teaching, multiple students responded "Nothing" Or "None" and that "This class was not valuable." (Id.).

**Defendants were allegedly in receipt of these alleged evaluation comments in 2019. Presumably they read them at that time or sometime very shortly thereafter. However, I was**

**never asked about them and Defendants seemingly never followed up with that class to determine what they meant by what they said. If they did, I would have wanted to learn from what those students allegedly wrote as described by Defendants herein. Defendants have chosen to input them here despite that, asking the court to believe them and legitimize a system that relies exclusively on unverified student comments.**

**Defendants #33** - In their review of Plaintiff's English 201 section for the Fall 2019 semester, one student noted: Plaintiff "is extremely unprepared, always late, no true course objectives, forgetful, controversial, and should not be teaching." (Id.).

**Please see Defendants #32 herein. I also would ask Defendants for the response they had to what this student allegedly suggests. What I mean is that Defendants never brought this to my attention. Does this mean that, of various potentialities, they did not believe the claims but use them now self-servingly?**

**Defendants #34** - Another student noted in their review of Plaintiff's English 201 section for the Fall 2019 semester: "[Plaintiff] is constantly unorganized, her assignments are completely vague and misleading, she often tells us things she wishes to see on our assignments after we have turned them in, she is often late to class, she rarely utilizes blackboard, she rarely checks her email, she has been known to misplace students graded assignments, she is extremely biased in her grading…" (Id.).

**Defendants have determined that repetition of alleged and unverified student complaints throughout their "Statement of Facts" is the way to shore up what Defendants Hsu, Blackwood and Baumann stated or repeated in 2021 and what was done before this and after this time. I must comment on the tenor of these alleged complaints as very noticeable.**

**Defendants #35** - Yet another student noted in their review of Plaintiff's English 201 section for the Fall 2019 semester: "[Plaintiff] is fairly disorganized and a flawed communicator. She encourages students to reach out to her via email, but whenever we do we are either met with a very late response or no response at all…" (Id.).

**Please see Defendants #31 to #34.**

**Defendants #36.** - Other students noted in their review of Plaintiff's English 201 section for the Fall 2019 semester: "She was very unorganized," "She is disorganized, unprofessional, and frankly rude," "Lack of consistency when it came to deadlines," "Very unclear when giving directions and when discussing course materials," and "[Plaintiff] would often disagree with students in a degrading way." (Id.).

**Please see Defendants #31 to #35.**

**Defendants #37.** During the Spring 2020 semester, Plaintiff taught two sections of English 120 - Critical Writing. (Kimura Dec., Ex. I).

This is correct.

**Defendants #38.** In the student reviews of Plaintiff's Spring 2020 courses, a student noted: "[Plaintiff] wasted class time every single day because she did not know how to teach the Course…[Plaintiff] is extremely rude and does not know how to teach…" (Id.).

**Please see Defendants #31 to #34.**

**Defendants #39.** Other students noted in their review of Plaintiff's Spring 2020 courses: "Very unclear with assignments and grades, not great communication," "often disorganized…does not effectively use Zoom…does not respond to emailed communication," "[Plaintiff] was disrespectful to students and if you disagree with her she will either stop class early or turn the class into a lecture about how her politics or opinions are right," "[Plaintiff's] very close minded and believes she can be the only one that is right and everyone else's opinion is valid," and "[Plaintiff] was often unorganized and not helpful with assignments. [Plaintiff] was unclear about how to go about assignments and did not seem knowledgeable on the subject." (Id.).

**Please see Defendants #31 to #34.**

Defendants #40. During the Fall 2020 semester, Plaintiff taught two sections of English 201 – Writing in the Disciplines, and one section of American Studies 200 ("AMS") – Introduction to Critical Race & Ethnicity. (Kimura Dec., Ex. J; Kimura Dec., Ex. A at 35:23-36:10).

This is correct.

Defendants #41. During the Fall 2020 semester, on November 17, 2020, a student complained to Associate Dean Dr. Bette Kirschstein regarding Plaintiff's ENG 201 course. (Kimura Dec., Ex. K).

**I was never told about this alleged communication.**

Defendants #42. The student relayed that they had been "disappointed" by Plaintiff's approach to the class and believed Plaintiff had been "negligent" in preparing for class. (Kimura Dec., Ex. K).

**Please see Defendants #31 to #34.**

Defendants #43. The student also noted in their complaint that Plaintiff would arrive to class 10-15 minutes late and often without a plan and that Plaintiff refused to create rubrics or provide written guidelines on any projects. (Kimura Dec., Ex. K).

**This is obviously false but also, please see Defendants #31 to #34.**

Defendants #44. In reviewing Plaintiff's Fall 2020 AMS 200 course, a student noted: "[Plaintiff] did not appear to be qualified to teach a class on this subject. The organization of assignments was very poor and confusing. She did not seem to be knowledgeable on the readings and the subject matter…She would interrupt/talk over students as they tried to make points." (Kimura Dec., Ex. J).

**Please see Defendants #31 to #34.**

Defendants #45. In reviewing Plaintiff's Fall 2020 AMS 200 course, another student noted: "Everything else was all over the place, and we never had a true aim or clear idea of what to do. It was more frustrating than education." (Id.).

**Please see Defendants #31 to #34. I also wonder how some knew and others somehow did not know what to do. Grades were high in that class for those who did the work.**

Defendants #46. In reviewing Plaintiff's Fall 2020 AMS 200 course, another student noted: "At times it was very unclear what the assignments were, how to do them, and what we were being graded on." (Id.).

**Please see Defendants #31 to #34.**

Defendants #47. Fall 2020 was the first time Plaintiff taught the AMS 200 course at Pace University. (Hsu Aff. ¶ 5; Kimura Dec., Ex. A at 53:22-54:3).

**This is true.**

Defendants #48. Dr. Stephanie Hsu reassigned Plaintiff to teach AMS 200 for the Spring 2021 Semester based on Plaintiff's representation that the AMS 200 class for Fall 2020 had gone great and that she loved it. (Hsu Aff. ¶ 6)

**Please see Defendants #31 to #34.**

Defendant Hsu is making a claim of dereliction of her duties, if this was actually the case (and the complaints verified as real). That would not be my fault. However, what Campbell and Kimura here are really attempting to establish is an issue with me *prior* to the conduct that Defendants engaged in after receiving innocuous emails from bullying students as seemingly to override her "*Aunt Jemima, Black Woman Professor, Black Studies class, Misuse of Power to Deform, I'm asking You To Share…*" email to young adults, teenagers and/or minors, encouraging them to make complaints (and bring their friends in the class to meetings about me) of a federal civil rights nature with the assurance that they would not be corroborated because Defendant Hsu already "*believed*" them.

Defendants #49. Dr. Hsu assigned Plaintiff to teach AMS 200 for the Spring 2021 semester prior to Receipt of the student evaluations on this course for the Fall 2020 semester. (Hsu Aff. ¶ 6)

**Please see Defendants #31 to #34 and #48.**

Defendants #50. During the Spring 2021 semester, Plaintiff taught three courses in the English Department: AMS 200 – Introduction to Critical Race & Ethnicity, English 110 – Composition, And English 120 – Critical Writing. (Kimura Dec., Ex. A at 38:10-23, 51:24-52:3; Plaintiff's dep At p. 38: 10-23; 51:24-52:3; Hsu Aff ¶ 4; Blackwood Aff. ¶ 4).

**This is correct.**

Defendants #51. Plaintiff taught all three courses via Zoom on her cell phone. (Kimura Dec., Ex. A At 51:13-19; Blackwood Aff. ¶ 6; Baumann Aff. ¶¶ 7-8; Baumann Aff., Ex. C).

This is correct, and also discussed in the narrative in #10 herein.

Defendants #52. Plaintiff's AMS 200 course during the Spring 2021 semester met on Mondays and Wednesdays from 1:20-2:45 p.m. (Kimura Dec., Ex. A at 335:4-336:8; Kimura Dec., Ex. L; Hsu Aff. ¶ 7; Blackwood Aff. ¶ 5).

**This is true.**

Defendants #53. There were 27 students originally enrolled in Plaintiff's AMS 200 course, however several withdrew from the class before the end of the semester. (Kimura Dec., Ex. A at 98:9-99:11).

**This is correct.**

Defendants #54. Plaintiff used the same AMS 200 template syllabus that she used for the semester before but adjusted it for the Spring 2021 semester. (Kimura Dec. Ex. A at 58:13-59:3).

I believe this was true.

Defendants #55. Plaintiff did not provide the students with a copy of the syllabus during the first week of classes. (Kimura Dec., Ex. A at 59:4-10).

**The <u>first day of class</u>, I did an indepth <u>review</u> of the syllabus with the students for the entire class session, explaining and describing everything including class format and assignments (both facilitations (analyzing an essay I assign to them for themes and main points before engaging in discussion with classmates) and their case study (finding some aspect of any of the essays or discussions we had in class that interested them in order to do a ten (10) minute research project about it. For example, a student could have taken a Spencer or Charlie Kirk college debate and thoroughly analyzed critiques, or reviewed mainstream media for the ways the Indigenous are portrayed today and whether it is accurate, or a study of Rachel Dolezal about whom some in the class were incredibly judgmental). This is all they had to do for work in five (5) months of a semester.**

**Moreover, if we had not done the case study, the students would have received full credit in any event.**

**Regarding the syllabus, the students were informed that I was still in the process of adjusting it. Defendants have not denied that what I just described is what occurred on the first day of class. On week two (2) in a semester which had just begun, they received a physical copy of the syllabus. Moreover, if no syllabus had ever been provided or if I had not reviewed its contents with them on the first day, that would be a different matter altogether, I believe. However, that was not this situation.**

**Defendants have also complained that a second syllabus was posted for students which adjusted the first. They have not stated what the issue they have with this is.**

**It should be noted that syllabi may be adjusted for issues or challenges that may arise, which I did and posted for the students. Indeed, they should be adjusted if circumstances**

require. **Defendant Hsu posted that notice on her syllabus. The teaching platform and in-person classes are where that occurs versus constantly adjusting syllabi unless it is, for example, a grading percentage adjustment. This is common practice, at Defendant Pace and industry-wide. Defendants cannot now vilify or villainize typical conduct in their effort to create line items on a removal letter, evaluation and Summary Judgment.**

**Finally, removals are not retroactive, so to speak. That is, when Defendant Hsu was contacted, the students had their syllabus. Removals are for urgent, exigent circumstances as part of a procedure which Campbell and Kimura have still not explained, including the circumstances when removals have occurred previously.**

Defendants #56. The syllabus ultimately provided to students had an error in it, as the requirements for the class facilitation day indicated that it consisted of a "ten-minute case study," which was not accurate. (Kimura Dec., Ex. A at 62:10-64:23; Kimura Dec., Ex. L).

**There can be error on syllabi. It is not unusual. However, this was unintended. Moreover, Defendant Blackwood is and was tasked with collecting syllabi at the beginning of the semester in order to check for errors because they happen all the time. She then is supposed to approve them. She did not do this, or she did not do this for me.**

Defendants #57. Amendments to the syllabus were provided to students throughout the semester via Brightspace, an online teaching platform utilized by Pace University. (Kimura Dec., Ex. A at 59:11-20).

**I continued to provide information to the class throughout the semester in class verbally and via Brightspace.**

Defendants #58. Brightspace is utilized for professors to communicate with their students, class announcements, homework assignments, posting grades, etc. (Kimura Dec., Ex. A at 194:6-20).

Defendants have correctly described Brightspace.

Defendants #59. Plaintiff testified that throughout the semester, there were constant changes to the Syllabus. (Kimura Dec., Ex. A at 59:21-60:6).

**It is normal to make adjustments, which every professor does. Moreover, I was met with challenges in the Spring 2021 semester, including changes by Defendant Hsu and the students, which required those adjustments. Defendants can indicate in their response, which they will create for this court, the normal amount of times a syllabus is adjusted and what the normal reasons are.**

Defendants #60. Plaintiff also provided a second syllabus to students at some point during the Semester. (Kimura Dec. Ex. A at 65:24-66:10; 143:10-144:4).

**This is correct.**

Defendants #61. The first class of the AMS 200 course for the Spring 2021 semester was held on Monday, January 25, 2021. (Kimura Dec., Ex. L).

**Classes started that day at Defendant Pace.**

Defendants #62. Plaintiff testified that nothing out of the ordinary occurred during the first class. (Kimura Dec., Ex. A at 78:3-15).

**Please see Defendants #55. I reviewed the syllabus with the class and responded to questions on the first day. Defendant Hsu made claims of having received an email from a student making grossly false claims that I asked students targeted race-based questions. I respectfully ask that this student be called to provide witness testimony at a trial on this matter.**

Defendants #63. After the second class, on Wednesday, January 27, 2021, a student in Plaintiff's AMS 200 course copied Dr. Hsu on an email requesting to be switched from Plaintiff's section to that of another professor's AMS 200 course, as Plaintiff's class was not working for them and their "mental health." (Hsu Aff., Ex. A; Hsu Aff., ¶¶ 9-13).

**This is an allegation that Defendants have not substantiated other than an alleged chain of redacted emails from an alleged student produced in 2025 and shown to me then for the first time.**

Defendants #64. The student was successfully switched to another professor's section of the AMS 200 course. (Id.).

**Defendants have provided no proof of this beyond redacted documents which appear to be emails by an alleged student.**

Defendants #65. Dr. Hsu told the student that if they had concerns about Plaintiff's AMS course or suggestions for improvement, the student could relay those to Dr. Hsu. (Id.).

**Defendants have provided no proof of this beyond redacted documents which appear to be emails from Defendant Hsu to an alleged student.**

Defendants #66. The student relayed that Plaintiff had made them feel "ungrounded and uncomfortable" in class. (Id.).

**Campbell and Kimura have spent much space in their request for Summary Judgment on alleged and redacted student complaints which, crucially, I have never seen before now.**

**Moreover, transferring, the add or drop process, is a normal one. Crucially, however, students do not need to ask the administrator to drop a class during this period. They can just do so. Therefore, given that Defendants are relying heavily on claims with unusual circumstances, I ask for their Summary Judgment to be denied and a trial be held to illuminate the facts in full, rather than taking any of it at the word of Defendants' counsel.**

Defendants #67. The student explained that Plaintiff asked multiple students of color how they specifically and personally experience discrimination and put them on the spot to share with the class. (Id.).

**Campbell and Kimura here contend that the student "*explained*" her claim to add validity to what is just an allegation that requires investigation as any other of this nature. Defendant Hsu never spoke to me about this allegation ever although she had the opportunity on February 11, 2021. I respectfully ask that, she, herself, be required to answer in court as to the reason why she did not.**

**Defendants #68.** As this student was one of two Asian students in the class, Plaintiff had singled her out to answer specific Asian-specific questions. (Id.).

**This is false but, now, Defendants have made an allegation of troubling conduct as if it were true. But, what is the context of this alleged occurrence? What did I say? What did the alleged student say? Did she provide a response to my alleged question? There are more questions I would like to ask to illuminate this claim as, stating that it allegedly happened is, respectfully, not enough. Moreover, Defendant Hsu and the other Defendants felt concern or they did not but however they felt at this alleged email, they, strangely, did not approach me about it. What they have done is display it now, for the first time ever in court, as very serious.**

**Since the Defendants insist upon allowing or proffering lies in court documents to divert attention from Defendants #1 to #12 herein, respectfully, this alleged student, whose name the Defendants know and redacted, must testify in open court to such racial allegations and smears, and Defendant Hsu must provide the questions she asked that student about the alleged incident and the responses she received. She must also respond to my query as to why she never said anything to me.**

**Defendants #69.** At this point, there had only been two sessions of the AMS 200 course. (Id.).

**The Defendants appear to be challenging something based on an email that they have not proved to be legitimate. It is therefore and as is their pattern, intentionally skipping steps in order to presume legitimacy.**

70. Plaintiff testified that there was an issue in the January 27, 2021 class where the students believed "The Weeknd," a pop singer, needed to be using his platform and Plaintiff questioned the students' belief. (Kimura Dec., Ex. A at 78:16-80:4).

The students were asked questions as to the viewpoint they expressed about The Weeknd, an Ethiopian Music Artist, which they had shared voluntarily in class when I asked students if there was anything they wanted to share. They were queried and reasonably asked to explain and support their perspective. This approach is normal.

Defendants #71. Plaintiff believed that three to four students were "hostile" during the January 27, 2021 class. (Kimura Dec., Ex. A at 81:9-18).

**Please see Defendants #4 herein.**

Defendants #72. Plaintiff did not speak with anyone at Pace University about the January 27, 2021 class. (Kimura Dec., Ex. A at 81:19-82:15).

**Please see Defendants #4 herein.**

Defendants #73. The next AMS 200 class occurred on February 1, 2021. (Kimura Dec., Ex. A at 82:17-83:11; Kimura Dec., Ex. L).

**Please see Defendants #4 herein.**

Defendants #74. In this class, Plaintiff used certain words that the students found offensive, such as "tribe," "settler," and "colonizer." (Kimura Dec., Ex. A at 83:12-84:3).

**Please see Defendants #4 herein.**

**Also, this assertion raises questions as it is worded to be vague. That is, Campbell and Kimura do not say how many students found words used in common parlance and in class essays, readings gathered by Defendant Hsu, in a Race and Ethnicity class offensive, words such as those listed herein. Moreover, when Defendant Hsu used the word "tribe", she met with no problems from any student about it. Were the students who had issues, then, the race-based bullies whose behavior the Defendants have attempted to legitimize through language that they were "offended"?**

Defendants #75. There was also a complaint made by students about Plaintiff's discussion of Richard Spencer. (Kimura Dec., Ex. A at 85:21-25).

**Defendant Hsu related the alleged complaint she received from an anonymous student whom she alleged she had either spoken to in person, on Zoom or via email.**

**Please see Defendants #4 and #74 herein.**

Defendants #76. Richard Spencer is a controversial figure and a white supremacist. (Kimura Dec., Ex. A at 192:4-19).

**Please see Defendants #4 herein.**

Defendants #77. Plaintiff testified that in this class, approximately three to five students became "hostile." (Kimura Dec., Ex. A at 84:4-15).

**Please see Defendants #4.**

Defendants #78. Plaintiff testified that a student waved a book on zoom and said something like "It's in the book" or "It's right here in the book." (Kimura Dec., Ex. A at 86:2-87:22).

**Please see Defendants #4 herein.**

Defendants #79. On February 8, 2021, Plaintiff sent a message to her AMS 200 class wanting to give a "pep talk." (Kimura Dec., Ex. M).

**Please see Defendants #4.**

Defendants #80. Plaintiff stated to students that they did not have to accept what she said, but that they won't regret hearing it, and then stated that she would be sharing a Richard Spencer video with the class. (Id.).

**Please see the information listed in Defendants #4 herein which provides the proper context for what Campbell and Kimura attempt here to contort into something.**

Defendants #81. The February 8, 2021 message was the first time Plaintiff felt that it was necessary to make a statement to the class about issues that had occurred. (Kimura Dec., Ex. A at 185:25-186:13).

**Please see Defendants #4 herein.**

Defendants #82. On February 9, 2021, a student emailed Dr. Hsu and relayed that they had concerns regarding Plaintiff's AMS 200 course. (Hsu Aff., ¶14; Hsu Aff., Ex. B).

**Please see Defendants #4 herein. The email is redacted and therefore not verified.**

Defendants #83. The student explained: "in the past two weeks I have had minor issues with comments and questions [Plaintiff] was asking in class, but yesterday was particularly troubling." The student asked to meet with Dr. Hsu about this. (Id.).

**In fact, allegedly, Defendant Hsu, as the alleged email communications stated, asked the student to meet on Zoom or by phone, notably with no upfront documentation from that student as in the alleged first student's case. As previously detailed herein, Kimura and Campbell did not produce any notes made by Defendant Hsu from that alleged meeting.**

**Please see Defendants #4 herein.**

Defendants #84. This was the second complaint about Plaintiff's AMS 200 class after five class Sessions. (Id.; Kimura Dec., Ex. A at 202:8-12).

**Please see Defendants #4 herein. This again is an allegation not proved to be true.**

Defendants #85. On February 10, 2021 at 9:10 p.m., after Dr. Hsu had already received complaints from two students about Plaintiff's AMS 200 class, Plaintiff emailed Dr. Hsu "about a serious situation" in her AMS 200 class. (Hsu Aff. ¶ 15; Hsu Aff., Ex. C).

**These are allegations made by Defendants who have a history as seen in Spring 2021 itself of conjuring or attempting to create facts. Even if true that students complained, their allegations were never verified as being genuine. When do unverified and unquestioned student allegations become facts used by a school to smear a professor who Defendant Hsu would shortly thereafter label by association as a "*Black Woman Professor*" to students with**

**whom she came into contact ? I respectfully ask that these students, as has been alleged by Campbell and Kimura, be required to appear in court to validate, or not, what the Defendants now claim as I only became aware of these alleged student complaints based on Campbell and Kimura's Production in 2025.**

Defendants #86. This was the first time Plaintiff contacted anyone at Pace University about her AMS 200 class during the Spring 2021 semester. (Kimura Dec., Ex. A at 92:15-24, 193:4-14).

**Please see Defendants #4.**

Defendants #87. On February 11, 2021 in the morning, Dr. Hsu responded to Plaintiff's email and asked if there was any time that day that Plaintiff was available to discuss. (Kimura Dec., Ex. N).

**Please see Defendants #4 herein.**

Defendants #88. On February 11, 2021, Dr. Hsu and Plaintiff connected by phone for approximately 1.5 hours. (Hsu Aff. ¶ 16; Kimura Dec., Ex. A at 195:15-196:11; Kimura Dec., Ex. O).

**I spoke with Defendant Hsu on the telephone for one (1) hour and thirty-four (34) minutes and as described herein in Defendants #4.**

Defendants #89. While Plaintiff complained of the power dynamic in her classroom, Plaintiff did not complain of race-based bullying during this conversation. (Hsu Aff. ¶ 16)

**This is false. Unfortunately, deposing Defendant Hsu was not possible for me under the circumstances in 2024 although, if it had been, I would have done so to ask her about this description.**

Defendants #90. Dr. Hsu advised Plaintiff to allow for student-led discussion and for Plaintiff to soften her critical thinking provocations. (Id.).

**Defendant Hsu sent me an email on February 16, 2021 after a series of troubling behaviors and emails were sent by Defendant Hsu to teenagers and/or young adults. For the full context, respectfully, please see Defendants #4 herein.**

**Additionally, I responded to Defendant Hsu's particular choice of language including her use of the word "*provocations*" in her <u>email</u>.**

Defendants #91. Plaintiff asked Dr. Hsu if she would review a proposed email to send to the students, which Dr. Hsu agreed to do. (Id.; Kimura Dec., Ex. A at 196:20-197:14).

Please see Defendants #4.

Defendants #92. On February 11, 2021, Plaintiff sent a message to her AMS 200 class apologizing for what occurred during the February 10, 2021 class. (Kimura Dec., Ex. P).

**For the context, respectfully, please see Defendants #4.**

Defendants #93. Plaintiff stated in the February 11, 2021 email that what happened was "appalling, unacceptable, and impermissible." (Id.).

**In order to ascertain the context, please refer to Defendants #4.**

Defendants #94. Plaintiff also informed the students in the February 11, 2021, that her "time as chief facilitator of essay analysis and conversations is coming to a close" and provided that the students, with Plaintiff's guidance, would now be leading classes from now on "as we planned and discussed at the beginning of the semester." (Id.; Kimura Dec., Ex. A at 214:7-20).

**Facilitations were demonstrated by me for the students for weeks (hence the language of "Chief Facilitator") and explained to students as analyzing an essay's major themes and components, paragraph by paragraph if necessary, before launching into discussion or questions from the class. This is what was occurring when the bullying was happening, explaining and modeling/demonstrating. Also, please see Defendants #4.**

Defendants #95. The student facilitations were supposed to last five to forty-five minutes each. (Kimura Dec., Ex. A at 215:12-15).

**This is correct. However, one student insisted, and kept doing so, that I stated that one student could present for two (2) class sessions. This was Student "P".**

Defendants #96. There would ideally be two to three student facilitations per class with each facilitation lasting five to forty-five minutes. (Kimura Dec., Ex. A at 218:7-17).

**This is correct.**

Defendants #97. On February 11, 2021, Plaintiff sent another message to her AMS 200 class and stated that she believed there was a "misunderstanding" in her last message. (Kimura Dec., Ex. Q).

**To this point, Campbell and Kimura have detailed various BrightSpace messages to the students in my CRES class. However, Defendant Blackwood would later state on her evaluation of me that I never used BrightSpace, which contributed to the "1" out of "5" she assigned to that evaluation of my teaching, which she witnessed only after the silencing she imposed after I reported student race-based bullying. I had not been aware of Defendant Hsu's emails to the students at that point.**

Defendants #98. Plaintiff explained in her second message that class facilitation was always part of the course and was not a change in the course. (Id.).

**Please see Defendants #4.**

Defendants #99. On February 11, 2021 at 9:06 p.m., Plaintiff sent an email to Dr. Hsu that included a draft of an email that Plaintiff intended to send to some of her AMS 200 students. (Hsu Aff. ¶ 17; Hsu Aff., Ex. D)

Defendants #100. The draft stated:

After yesterday's class, I wanted to connect you both with Stephanie Hsu, Director of AMS. I am asking that you both meet with her. This is required before being able to return to my class. I have thought about your comments in class and shared my thoughts on them with Dr. Hsu. This is your opportunity to share your thoughts with her as well. Dr. Hsu is a wonderful person to talk to. I believe that sharing your feelings with her will help you feel better in general. This will help so that we can all reset and come back together better in class. (Id.).

**This is correct.**

Defendants #101. Before Dr. Hsu had a chance to respond to Plaintiff's draft email, on February 12, 2021, Plaintiff sent an email to particular AMS 200 students on Brightspace with an entirely different message and tone than her draft:

"I am writing to you with regard to what occurred in class on Wednesday. I am sure that it has become clear, at least in hindsight, that what happened was beyond anything that should have ever occurred in a college classroom or any classroom. It is not an overstatement to say that your behavior, as a leader, was, at the very least, disrespectful and needlessly rancorous.

There is something more that troubled me about how you specifically have conducted yourself over the past two classes, []. You seem to believe that it is okay to discuss the use of violence, which I do not condone, in my classroom and in the chat towards people you feel are not hearing you, without respecting the guidelines I put in place for having those types of discussions.

Moreover, you seem to believe that it is okay to yell and keep yelling at a professor and wave books at her on camera, no matter her (my) continued requests for you to control your emotions.

You can't.

I have spoken with the director of AMS, Dr. Hsu, about the situation. For the health and safety of my class and me, I have decided that, as per protocol in these types of situations, you would not be allowed back in my classroom until and unless you met with her.

However, I have also decided to suspend that decision and issue a warning to you instead regarding class conduct and conduct toward me. If my class is disrupted in any way again or if any behavior resembles in the slightest Wednesday's conduct, the first step will be to reinstate my decision and require you to meet with Dr. Hsu, if you wish to continue in my class. The final step in this process if the behavior remains unchanged would be removal from my class on a permanent basis and a referral to the Dean's office, which would become a part of your permanent record.

The Dean has other options at their disposal which carry more penalties. These are serious consequences for you to consider. I personally do not want to see any of this occur.

You have decision to make, [], and I respect your right to make the choice that is best for you, including withdrawal from my class if you deem that appropriate. You are welcome in my classes at any time under the condition that your conduct conform to what is commonly held to be

appropriate and respectful. (Hsu Aff. ¶ 17; Hsu Aff., Ex. E; Kimura Dec., Ex. A at 224:25-225:17; 236:3-7).

**This is also correct. Please see Defendants #4 as well.**

Defendants #102. On February 12, 2021, Plaintiff also sent a message to her entire AMS 200 class. (Kimura Dec., Ex. R).

**I sent a Brightspace announcement on that day.**

Defendants #103. This time, Plaintiff accused the class of engaging in a form of "group bullying." Plaintiff provided the students with next steps if they were to engage in similar behavior. (Id.).

**This statement seemingly imperceptibly twists situations to fit a deceitful narrative. That is, I spoke to the class to acknowledge what we all witnessed but I experienced directed at me. The verb Campbell and Kimura employed implies wrongfulness in circumstances where even the students identified would not disagree. The student group chat, which Defendants did not produce, might illuminate their actions more fully.**

**An incident described herein as well whereby two of the leaders of the race-based bullying told falsehoods and were disrespectful to me in class (as they claimed that I was disrespectful ("*and someone has to say something about it*") for not responding to their emails) in front of Defendant Blackwood and for her, but which one of them inadvertently admitted to in a later email to be a lie (and the other had never sent me emails to that point)also indicates the same behavior Campbell and Kimura believe is accusatory. This is found in my Second Amended Complaint.**

Defendants #104. Plaintiff testified that the bullying involved yelling and waving books at the camera. (Kimura Dec., Ex. A at 222:10-17).

**This is correct.**

Defendants #105. On February 12, 2021, several students reached out to Dr. Hsu and asked to meet with her regarding Plaintiff's AMS 200 class and messages they had received. (Hsu Aff. ¶ 18; Hsu Aff., Ex. F).

This is true.

Defendants #106. Dr. Hsu subsequently met with these students who expressed their concerns regarding Plaintiff's AMS 200 class. The students relayed to Dr. Hsu that Plaintiff made inappropriate comments in class and that she would rudely shut down or argue with students. Students also stated that they believed Plaintiff was demeaning and inequitable in her treatment of them. (Hsu Aff. ¶ 19).

**The Defendants allege this against the background of emails they sent to those students and conversations they had.**

Defendants #107. On February 15, 2021, another student complained to Dr Hsu regarding Plaintiff's AMS 200 class. (Hsu Aff. ¶ 20; Hsu Aff., Ex. G).

**The Defendants allege this against the background of emails they sent to those students and conversations they had.**

Defendants #108. The student complained about certain issues with how Plaintiff conducted class, including Plaintiff's apparent disbelief that the student had experienced anti-Semitism, Plaintiff not providing a syllabus until the end of week 2, and Plaintiff only giving reading assignments the night before and expecting the students to have them done for class. (Id.).

**The Defendants have not indicated here whether they asked questions and whether they believed this alleged claim was credible. In fact, in their filings since production began, the Defendants have floated inflammatory, false, unverified to date ideas or suggestions, using others but especially students, that they either know unequivocally to be false, believe or suspect are false or know that there is a high likelihood they are fals,e all while presenting them in that student's name as factual. This circumstance is particularly heightened if Defendants were the ones who persuaded and/or manipulated or coerced the students into these ideas.**

Defendants #109. However, this student also complained that Plaintiff would yell at students, not allow them to talk, and used extremely manipulative language which made the student scared to speak in class. (Id.).

**Please see Defendnats #108.**

Defendants #110. The student stated that she did not believe Plaintiff was qualified to teach the class. (Id.).

**Please see Defendnats #108.**

Defendants #111. On February 15, 2021, Dr. Hsu received another complaint from a student. (Hsu Aff. ¶ 21; Hsu Aff., Ex. H).

**This is alleged.**

Defendants #112. The student stated that there was discord in the class as a result of inappropriate comments made by Plaintiff, "as well as [Plaintiff's] defensive and dismissive response when students called for these comments to be addressed." (Id.).

**Defendants are proffering unverified allegations.**

Defendants #113. The student believed that Plaintiff "came to these discussions inadequately informed, and rudely shut down or argued with students who expressed that in the way in which she was handling these topics was at best confusing and at worst incredibly harmful." (Id.).

**Please see Defendants #4.**

Defendants #114. The student also felt that Plaintiff had "been demeaning and inequitable" in her treatment of other students. (Id.).

**Defendants are proffering unverified allegations. Please see the narrative in #4 herein.**

Defendants #115. On February 16, 2021, Plaintiff messaged her AMS 200 class and noted that she had received "some questions regarding the case study requirements and the discussion board." (Kimura Dec., Ex. S).

**Defendants are proffering unverified allegations. Please see the narrative in #4 herein.**

Defendants #116. Instead of providing the information about the case study requirements in the message, Plaintiff stated that she would provide the students with the information the next day. (Kimura Dec., Ex. S).

**Defendants have not stated that they know why I made that statement. Also, verbal and written communication are legitimate in a classroom.**

Defendants #117. On February 16, 2021, Dr. Hsu emailed Plaintiff and informed her that Dr. Hsu had been contacted, at this point, by eight (8) students and that Dr. Hsu was still meeting with students who had requested to meet. (Hsu Aff. ¶ 22; Hsu Aff., Ex. D).

**This is true.**

Defendants #118. Dr. Hsu also informed Plaintiff that a "discussion-based class format is the way to Go immediately." (Id.).

**Correct, she did email this.**

Defendants #119. Plaintiff testified that the only reason she doubted the accuracy that Dr. Hsu was contacted by eight students was that Dr. Hsu did not specifically name the eight students in her email. (Kimura Dec., Ex. A at 242:16-243:22).

**This is one of the reasons.**

Defendants #120. On February 17, 2021, Dr Hsu emailed Plaintiff to schedule a meeting with them and Dr. Sarah Blackwood, Chair of the English Department. (Hsu Aff. ¶ 23; Hsu Aff., Ex. I).

**This is true.**

Defendants #121. Dr. Hsu also suggested to Plaintiff a plan for her class later that day where Dr. Hsu would sit in on the class and for Plaintiff to not present material on Richard Spencer. (Id.; Kimura Dec., Ex. A at 278:11-281:16).

**Please see #4 herein.**

Defendants #122. On February 17, 2021, Plaintiff responded: "I am absolutely open to that. I think It's a great idea." (Id.).

**This is true. Also, please see #4 herein for the decision to balance interests.**

Defendants #123. Plaintiff testified that she did not find it inappropriate for Dr. Hsu to sit in on her Class and thought it was going to be helpful. (Kimura Dec., Ex. A at 278:19-279:21).

**This is correct.**

Defendants #124. Dr. Hsu observed Plaintiff's AMS 200 course on February 17, 2021. (Hsu Aff., ¶ 24; Kimura Dec., Ex. A at 280:20-22).

**This happened as stated here.**

Defendants #125. During that day, Plaintiff began class 10-15 minutes late and attempted to end the class approximately 25 minutes early until a student alerted her to the time. Plaintiff also did not heed Dr. Hsu's advice to allow for student-centered discussion. (Hsu Aff. ¶¶ 24-25).

**Please see Defendants #4. It is very false.**

**Defendants purposely do not define what they mean by "*late*". Moreover, they have attempted to create new rules to impose "*discipline*" using them as here and in the March 18, 2021 meeting and then again in Defendant Blackwood's evaluation and email where her explanation for lateness seemed to shift.**

Defendants #126. Plaintiff admits to trying to end the class early on February 17, 2021. (Kimura Dec., Ex. A at 282:21-23).

**This is a professor's absolute prerogative, to end a class early, which Defendant Hsu "observed" following her actions described in Defendants #127 and #128 below. Professors do this all of the time for various reasons, which Defendants should admit to.**

**Moreover, when I realized that class had more time left for other students to listen to a certain subset of students who bullied me based on race and dominated classtime to "*speak amongst themselves*" non-academically about such things as Black presidents and Black candidates being "*sellours*", etc, I asked the students to continue until class officially came to an end.**

**Please see Defendants #4 herein.**

Defendants #127. During the February 17, 2021 class, Dr. Hsu texted Plaintiff: "I encourage you to set up right now a dynamic where you don't speak for the rest of class and let them lead themselves." (Kimura Dec., Ex. A at 312:12-313:22; Kimura Dec., Ex. T).

**Respectfully, I have described my belief as to the reason Defendant Hsu sought to "observe" my class in ECF 199 and herein in #4.**

Defendants #128. Dr. Hsu also texted Plaintiff during that class: "Great! Don't respond and ask for other students to respond." (Id.).

**Please see Defendants #127 herein.**

Defendants #129. After the February 17, 2021, Dr. Hsu spoke with Plaintiff via Zoom and debriefed that day's class for approximately thirty minutes. (Hsu Aff. ¶ 26; Kimura Dec., Ex. A at 296:4-18).

**Please see #4 herein. This is where she threatened me.**

Defendants #130. During that call, Plaintiff expressed her dissatisfaction with the free-form discussion format and requested a meeting with Dr. Blackwood. (Hsu Aff. ¶ 26).

**Please see #4 herein and #126.**

Defendants #131. On February 18, 2021, Dr. Hsu, Dr. Blackwood, and Plaintiff met via Zoom. (Hsu Aff. ¶ 27; Kimura Dec., Ex. A at 283:21-25).

**This is where I reported race-based bullying to the Defendants in the room.**

Defendants #132. During the February 18, 2021 Zoom, Plaintiff described some class sessions involving raised voices and one student waiving a book at the screen. (Hsu Aff. ¶ 28; Blackwood Aff. ¶ 10).

**Please see #4 herein.**

Defendants #133. Plaintiff stated that she would like an apology from the students, and Dr. Blackwood responded that this was very unlikely to happen. (Blackwood Aff. ¶13; Kimura Dec., Ex. U).

**This an intentional baiting and false assertion.**

Defendants #134. Dr. Blackwood suggested that Plaintiff move toward a student-centered pedagogy and away from lecturing. (Blackwood Aff. ¶ 12)

**Defendant Blackwood silenced me after reporting the race-based bullying for the entire semester.**

Defendants #135. Dr. Blackwood also suggested that Plaintiff go through a process to work with Students to create some community guidelines. (Blackwood Aff. ¶14).

**This is completely false.**

Defendants #136. The outcome of the meeting was that Plaintiff would set aside one class per week to lecture and the other class would be for student discussion. (Blackwood Aff. ¶12, Hsu Aff. ¶ 30).

**This is a misstatement. Please see #4 herein.**

Defendants #137. Plaintiff thanked Dr. Hsu and Dr. Blackwood for their time and noted she Appreciated the solution that they came up with. (Kimura Dec., Ex. V).

**This is true after expressing my concerns and leaving things positive at the end. This is part of balancing interests.**

Defendants #138. Plaintiff did not complain of race-based bullying during this conversation but characterized the issue as disrespectful and inappropriate behavior by students. (Hsu Aff. ¶ 28; Blackwood Aff. ¶¶ 10-11).

**I believe it is too late to lie at this point. I reported it and it was the reason I wanted to keep the meeting.**

Defendants #139. After the February 18, 2021 meeting, Plaintiff started to record her AMS 200 classes. (Kimura Dec., Ex. A at 104:10-105:10).

**This is true. Defendant Blackwood and I discussed my request given the new silencing imposed for the duration and my need to protect myself from the students' false statements.**

Defendants #140. After Plaintiff started recording, Plaintiff testified that she was bullied because a student kept asking for a copy of the class recordings. (Kimura Dec., Ex. A at 114:16-19; 116:9-1118:3).

**Please see #4 to #10. This is somewhat true.**

Defendants #141. After the February 18, 2021 Zoom meeting, Dr. Hsu emailed Plaintiff to confirm that Plaintiff would like Dr. Hsu to connect her with Tiffany Hamilton, Chief Diversity Officer And Associate Vice President of Diversity & Inclusion. Dr. Hsu provided Plaintiff a copy of the Draft email she intended to send to Ms. Hamilton. (Hsu Aff. ¶ 31; Hsu Aff., Ex. J).

**Please see Defendants #4 - #10.**

Defendants #142. Dr. Hsu's draft email to Ms. Hamilton stated in relevant part: "Since last week, Prof. Harte and I have been in communication about a dynamic in her class, and today we met With English department chair Sarah Blackwood. While we continue to support Prof. Harte on the Classroom level, we wanted to increase that support by making an introduction to your office." (Id.) (emphasis added).

**This is what she wrote.**

Defendants #143. Plaintiff responded to Dr. Hsu's draft email to Ms. Hamilton: "This looks good! I appreciate it. I think it's good to go whenever you are ready to send it." (Id.).

**This is correct. I thought I was going to get to report the race-bases bullying and file a complaint. Please also see my narrative on this (#4 - #10).**

Defendants #144. Plaintiff did not suggest any edits to Dr. Hsu's draft email to Ms. Hamilton. (Id.; Kimura Dec. Ex. A at 332:8-14).

**Please refer to #143.**

Defendants #145. Plaintiff thanked Dr. Hsu for drafting the draft email to Ms. Hamilton and for meeting with her the day prior. (Hsu Aff. ¶ 31; Hsu Aff., Ex. J).

**Please refer to #143.**

Defendants #146. On February 19, 2021, Dr. Hsu sent an email to Ms. Hamilton and Plaintiff connecting the two. (Hsu Aff. ¶ 32; Hsu Aff., Ex. K).

**Defendant Hsu sent the email discussed in #145.**

Defendants #147. On February 22, 2021, Ms. Hamilton emailed Plaintiff to set up a Zoom Conversation so that Ms. Hamilton could identify ways she could assist and support Plaintiff. (Hamilton Aff. ¶ 4; Hamilton Aff., Ex. A).

**Ms. Hamilton did email me to set up a Zoom Conversation. Her motives are her own.**

Defendants #148. On February 23, 2021, Dr. Hsu met with a student in Plaintiff's AMS 200 course who stated that she felt as if Plaintiff was specifically targeting and bullying her. (Hsu Aff. ¶ 33).

**This is alleged.**

Defendants #149. The student wanted to file a formal complaint against Plaintiff. (Id.).

**This is alleged.**

Defendants #150. On February 24, 2021, the student that Dr Hsu met with the previous day forwarded an email conversation between the student and Plaintiff. In the forwarded email conversation, the student had suggested implementing community guidelines, but Plaintiff was not in favor of the Suggestion. (Hsu Aff. ¶ 34; Hsu Aff., Ex. L).

**Please see Defendants #4 to #10, my narrative for the reasoning.**

Defendants #151. On February 25, 2021, Ms. Hamilton and Plaintiff met via Zoom. (Kimura Dec., Ex. A at 334:5-14; Hamilton Aff. ¶ 5).

**Please see Defendants #4 to #10.**

Defendants #152. During the February 25, 2021 meeting, Plaintiff shared details about a confrontation that took place during her AMS 200 class. (Hamilton Aff. ¶5).

This "fact" is vague. Please see Defendants #3 to #4.

Defendants #153. Plaintiff explained that students pushed back on her approach to how she talked about a particular subject matter and that they did not agree with some of her views. (Id.).

**Please see Defendants #4 to #10.**

Defendants #154. This appeared to Ms. Hamilton to be a classroom management issue and Plaintiff's Inability to manage the class. (Id.).

**Please see Defendants #4 to #10. Hamilton never stated this to me.**

Defendants #155. Ms. Hamilton asked Plaintiff if she established rules of engagement for her class and how she would feel with that being the next step. (Id.).

**Please see Defendants #4 to #10. Hamilton never stated this to me.**

Defendants #156. Ms. Hamilton sought to provide Plaintiff with tools to manage the difficult discussions that may arise in a critical race theory class. (Id.).

**Please see Defendants #4 to #10. Hamilton never stated this to me.**

Defendants #157. Plaintiff was cautiously receptive to Ms. Hamilton's idea, but it seemed to Ms. Hamilton that it would have been Plaintiff's preference to simply remove certain students from the AMS 200 class. (Id.).

**Please see Defendants #4 to #10, where it will  indicate that this is false.**

Defendants #158. On March 1, 2021, Plaintiff emailed Ms. Hamilton and thanked her for her time the Previous week. Plaintiff also wanted to bring to Ms. Hamilton's attention the behavior of a particular student. (Hamilton Dec. ¶ 7; Hamilton Dec., Ex. C).

**This is correct.**

Defendants #159. Plaintiff contacted Ms. Hamilton on March 1, 2021, because a student had presented their facilitation and, as the host of the meeting, the student had ended the Zoom early for the entire class. (Kimura Dec., Ex. A at 355:11-22; 357:20-359:21).

**I described this incident in #9.**

Defendants #160. Plaintiff testified that it was her belief that a student ending a Zoom was an example of bullying. (Kimura Dec., Ex. A at 359:9-16; 374:20-375:3).

**I described this incident in #9.**

Defendants #161. On March 2, 2021, Dr. Hsu met with Tiffany Hamilton and Denise Santiago (Director of Multicultural Affairs) after Ms. Hamilton had met with Plaintiff. Ms. Hamilton and Ms. Santiago stated that one or both of them would like to come to the AMS 200 class to lead a Discussion to develop community guidelines. (Hsu Aff. ¶ 35; Hamilton Aff. ¶ 9).

**This is what Hamilton suggested to me.**

Defendants #162. On March 3, 2021, Ms. Hamilton responded to Plaintiff's email and informed her that Dr. Santiago would facilitate a conversation in Plaintiff's AMS 200 class to establish a Community agreement. (Hamilton Aff. ¶ 10; Hamilton Aff., Ex. C).

**I told Hamilton that she and Santiago could meet the students if they wished but that I would not be participating in that conversation.**

Defendants #163. A community agreement is a sort of agreement between the students and the Professor about behavior in the classroom. (Kimura Dec., Ex. A at 364:8-12).

**This is correct.**

Defendants #164. Ms. Hamilton also explained to Plaintiff that since she was complaining of behavior of a student, someone from Student Affairs should be looped in. (Hamilton Aff. ¶ 10; Hamilton Aff., Ex. C; Kimura Dec., Ex. A at 381 at 12-22).

Defendants #165. Plaintiff responded to Ms. Hamilton that she thought a community agreement would work well for the students but Plaintiff did not think it was appropriate for Plaintiff to be Part of the agreement. (Hamilton Aff. ¶ 11; Hamilton Aff., Ex. C).

Defendants #166. Plaintiff also informed Ms. Hamilton that she contacted the Office of Student Affairs. (Id.; Hamilton Aff. ¶ 13).

Defendants #167. In the meantime, Dr. Hsu continued to receive complaints from students in Plaintiff's AMS 200 class. (Hsu Aff. ¶ 36; Hsu Aff., Ex. M).

Defendants #168. For example, on February 22, 2021, Dr. Hsu received an email from a student requesting to meet to discuss the class dynamic in Plaintiff's AMS 200 course. (Id.).

Defendants #169. On March 3, 2021, Dr. Hsu received an email from another student requesting to meet as "something extremely concerning happened" and was "distressed" about it. (Id.).

Defendants #170. On March 3, 2021, Dr. Hsu met with a student who felt particularly targeted by Plaintiff along with four classmates for nearly two hours. (Hsu Aff. ¶ 37; Hsu Aff., Ex. N).

Defendants #171. During the Zoom, the students alleged that Plaintiff's AMS 200 class was a "hostile Learning environment." (Id.).

Defendants #172. The students requested a "full-on restructuring" of the class and to replace Plaintiff As the instructor. (Id.).

Defendants #173. After the March 3, 2021 meeting between Dr. Hsu and five students, another student that evening complained to Dr. Hsu of Plaintiff's unequal treatment of a specific student. (Hsu Aff. ¶ 38; Hsu Aff., Ex. O).

Defendants #174. The student also relayed their frustration that when asked about the Required/recommend length for the students' facilitations, a component that makes up most of their Grade, Plaintiff responded "anywhere between 5 min to a class and a half." (Id.).

Defendants #175. On March 3, 2021, another student emailed Dr. Hsu and asked to meet the next day "as something extremely concerning happened regarding [their] AMS 200 class." The student relayed that they were "quite shaken up and distressed about it." (Hsu Aff., Ex. M).

Defendants #176. On March 3, 2021, Plaintiff contacted the Office of Student Affairs office. (Smith-Bergollo Aff., Ex. A; Hamilton Aff., Ex. C; Kimura Dec., Ex. A at 377:12-19).

Defendants #177. Plaintiff stated that there was a student in her class that she could not get to "refocus" on work and kept disrupting the class. (Smith-Bergollo Aff., Ex. A).

178. Plaintiff asked that the Office of Student Affairs meet with a particular student before allowing them to return to class. (Smith-Bergollo Aff., Ex. A; Kimura Dec., Ex. A at 382:22-383:7).

Defendants #179. The Office of Student Affairs office asked for more information about what was happening. (Smith-Bergollo Aff., Ex. A).

Defendants #180. On March 4, 2021, yet another student forwarded to Dr. Hsu a troubling email they had received from Plaintiff. (Hsu Aff. ¶ 36; Hsu Aff., Ex. M).

Defendants #181. On March 4, 2021, Plaintiff detailed her complaint regarding her AMS 200 class to The Office of Student Affairs. (Smith-Bergollo Aff. ¶ 4; Smith-Bergollo Aff., Ex. A; Kimura Dec., Ex. A at 382:22-383:7).

Defendants #182. Plaintiff complained that students made "inappropriate and disrespectful Comments," such as "you can't even end your class on time or get the work done. Look we're still Here 30 minutes later." (Smith-Bergollo Aff., Ex. A).

Defendants #183. Plaintiff testified that she could not recall any other examples of inappropriate or Disrespectful comments other than if a student can't speak about violence in the chat then he is not going to send anything via the chat. (Kimura Dec., Ex. A at 386:12-387:21).

Defendants #184. Plaintiff explained that while all of the other students had "calmed down," one had not. Plaintiff complains that this particular student sends Plaintiff emails "rang[ing] in subject matter, from the class format, my syllabus, her not understanding assignment dates, etc." (SmithBergollo Aff., Ex. A).

Defendants #185. Plaintiff testified that there is not an issue with a student emailing Plaintiff about the class format, for clarification on the syllabus, or for clarification on class assignments, but that she did not believe that student needed clarification and it was a way to bully. (Kimura Dec., Ex. A at 393:5-393:21).

Defendants #186. Plaintiff testified that the student's questions about class format, the syllabus, or other similar class-related questions were not relevant to the student because the student was not affected by not getting a response. (Kimura Dec., Ex. A at 416:2-418:16).

Defendants #187. Plaintiff admits that she did not respond to all of the student's emails. (Kimura Dec., Ex. A at 395:8-14).

Defendants #188. Todd Smith-Bergollo, Associate Dean for Students, shared Plaintiff's complaint with Ms. Hamilton and Bernadette Baumann, Senior Director Employee & Labor Relations/Title IX Investigator. (Smith-Bergollo Aff., Ex. A; Smith-Bergollo Aff. ¶ 5).

Defendants #189. Mr. Smith-Bergollo emailed Plaintiff to schedule a time to meet to better understand what kind of support Plaintiff was looking for from the Office of Student Affairs. (Smith-Bergollo Aff. ¶ 7; Smith-Bergollo Aff., Ex. B; Kimura Dec., Ex. A at 398:7-16).

Defendants #190. Plaintiff explained that she wanted Mr. Smith-Bergollo to meet with a student about their behavior before the student was allowed to return to class. (Smith-Bergollo Aff. ¶ 7; Smith-Bergollo Aff., Ex. B).

Defendants #191. Plaintiff also responded that Varise Cooper, her Union representative, would like to attend the meeting between Plaintiff and Mr. Smith-Bergollo. (Id.).

Defendants #192. Mr. Smith-Bergollo explained that since the Union is involved, someone from Employee Relations should sit in and that he would have Ms. Baumann also attend. (Id.).

Defendants #193. Mr. Smith-Bergollo and Plaintiff scheduled a meeting for Thursday, March 11, 2021 with Mr. Cooper and Ms. Baumann also planning to attend. (Id.).

Defendants #194. On or around March 5, 2021, Bernard Dufresne, Executive Director of the Office Of Institutional Equity/Title IX Compliance, was brought in to discuss the issues with Plaintiff's AMS 200 class. (Dufresne Aff. ¶ 4; Dufresne Aff., Ex. A).

Defendants #195. On March 5, 2021, Dr. Hsu and Mr. Dufresne discussed via telephone the issues Surrounding Plaintiff's class, the complaints from the students, and the next steps. (Dufresne Aff. ¶ 8; Dufresne Aff., Ex. A).

Defendants #196. On March 5, 2021, Dr. Hsu sent an email to set up a meeting with herself, Mr. Dufresne, Ms. Hamilton, and a student regarding the student's complaint against Plaintiff for March 8, 2021. (Dufresne Aff. ¶ 9; Dufresne Aff., Ex. B).

Defendants #197. On March 5, 2021, Plaintiff emailed Dr. Blackwood singling out a particular Student in her AMS 200 class and asking to have this student sit out of her next AMS 200 class, Which appeared to Dr. Blackwood to be a punitive measure. (Hsu Aff. ¶ 39; Hsu Aff., Ex. P; Blackwood Aff. ¶ 17; Blackwood Aff., Ex. D).

Defendants #198. Dr. Blackwood forwarded to Mr. Dufresne Plaintiff's email about excluding a Student from class. (Blackwood Aff. ¶17; Blackwood Aff., Ex. D).

Defendants #199. Mr. Dufresne agreed with Dr. Blackwood that the student should not be excluded From class. (Blackwood Aff. ¶ 18; Blackwood Aff., Ex. D; Dufresne Aff. ¶¶ 10-11; Dufresne Aff., Ex. C).

Defendants #200. Dr. Hsu inquired whether to inform Human Resources about this issue of excluding A student from class, as Dr. Hsu believed this was grounds for removing Plaintiff from the Classroom, and Mr. Dufresne concurred that Human Resources should be alerted. (Dufresne Aff. ¶ 12; Dufresne Aff., Ex. C).

Defendants #201. Dr. Blackwood also forwarded Plaintiff's March 5, 2021 email that asked to Exclude a student from class to Sia Bundor and Bernadette Baumann in Human Resources. (Blackwood Aff. ¶ 19; Blackwood Aff., Ex. D).

Defendants #202. Dr. Blackwood explained that Dr. Hsu has had ongoing conversations with seven Of Plaintiff's AMS 200 students, one of whom was on the verge of filing a formal complaint of a Hostile learning environment with Mr. Dufresne. (Id.).

Defendants #203. Dr. Blackwood explained that Plaintiff had been asked numerous times to make Adjustments to her classroom management style but that Plaintiff was still inappropriately Escalating tensions. (Id.).

Defendants #204. Dr. Blackwood asked for Ms. Bundor and Ms. Baumann to advise as to how to Respond to Plaintiff and asked what their options were, including whether there were grounds for removing Plaintiff from the course at this point. (Blackwood Aff. ¶ 20; Blackwood Aff., Ex. D).

Defendants #205. Dr. Blackwood responded to Plaintiff's email and informed her that Plaintiff could Not exclude a student from attending class. (Blackwood Aff. ¶ 21; Blackwood Aff., Ex. E).

Defendants #206. On Friday, March 5, 2021, Ms. Baumann requested that either Dr. Hsu or Dr. Blackwood sit in on Plaintiff's next class on Monday, March 7, 2021, and Dr. Blackwood agreed to sit in on Plaintiff's Monday class. (Blackwood Aff. ¶ 22; Blackwood Aff., Ex. F; Baumann Aff. ¶ 5; Baumann Aff., Ex. B).

207. On March 7, 2021, Dr. Blackwood emailed Plaintiff: "Since what's not working in The classroom is going to take more time than we have to fix prior to Monday, and we don't have Grounds to remove the student, we need to implement steps that are fair to you and the class." (Blackwood Aff. ¶ 23; Blackwood Aff., Ex. G; Baumann Aff. ¶ 6; Baumann Aff., Ex. C; Kimura Dec., Ex. A at 423:12-424:9).

Defendants #208. Dr. Blackwood informed Plaintiff that she would be observing Plaintiff's class and Moderating the student presentations the next day. (Id.).

Defendants #209. Dr. Blackwood informed Plaintiff that they would be reviewing the student complaints, as well as Plaintiff's complaint, and would invite Plaintiff to a meeting to discuss Them. (Id.).

Defendants #210. While Plaintiff admits in her March 7, 2021 email that she previously agreed to Have Dr. Blackwood observe a class in the future, she protested to having Dr. Blackwood as a Permanent observer. (Blackwood Aff., Ex. G; Baumann Aff., Ex. C).

Defendants #211. Plaintiff also admitted that she was teaching the course on her phone rather than on A laptop. (Id.).

Defendants #212. On March 7, 2021, Ms. Baumann responded to Plaintiff's protest to having Dr. Blackwood observe her class, by explaining that there were students who continued to have issues in

the class and that Dr. Blackwood should sit in on the class as an interim measure until everyone can meet and figure out a long-term solution to these issues. (Baumann Aff. ¶ 8; Baumann Aff., Ex. C).

Defendants #213. Ms. Baumann also expressed concern with Plaintiff teaching on a cell phone. (Id.).

Defendants #214. On March 8, 2021, a meeting was held with Dr. Hsu, Ms. Hamilton, Mr. Dufresne, and a student regarding that student's complaints of Plaintiff. (Hamilton Aff. ¶ 18; Hamilton Aff., Ex. G; Dufresne Aff. ¶ 13; Dufresne Aff., Ex. B).

Defendants #215. After the March 8, 2021 meeting, Mr. Dufresne sent the student a complaint form that they could fill out. (Dufresne Aff. ¶ 14; Dufresne Aff., Ex. D).

Defendants #216. The student thanked Mr. Dufresne for meeting with them and listening to their concerns about Plaintiff. (Dufresne Aff. ¶ 15; Dufresne Aff., Ex. D).

Defendants #217. Just before the March 10, 2021 class, Plaintiff protested to Dr. Blackwood observing that day. (Kimura Dec., Ex. W).

Defendants #218. Dr. Blackwood responded that she had thought that until the issues were resolved it would be helpful for her to sit in on the class. (Kimura Dec., Ex. W).

Defendants #219. Plaintiff responded that while she did not agree to this arrangement, she welcomed Dr. Blackwood's presence. (Kimura Dec., Ex. W).

Defendants #220. Dr. Blackwood informed Plaintiff that she would sit in on classes on Mondays and Dr. Hsu would sit in on Wednesdays. (Kimura Dec., Ex. W).

Defendants #221. On March 8 and 10, 2021, Dr. Blackwood observed Plaintiff's AMS 200 class. (Blackwood Aff. ¶ 24; Kimura Dec., Ex. A at 454:24-455:4, 467:4-12).

Defendants #222. Both class sessions opened with extended back-and-forths between Plaintiff and a variety of students about the logistics of the class. These back-and-forths took approximately thirty minutes of class time each day (about one-third of the class). (Blackwood Aff. ¶ 24).

Defendants #223. During the March 8 and 10 classes, students were confused about deadlines, what the assignments entailed, what the guidelines were, what the reading schedule was, and how they were being graded. (Blackwood Aff. ¶ 25).

Defendants #224. At no point was Plaintiff able to point to an established and posted reading/assignment schedule. (Id.).

Defendants #225. Plaintiff instead occasionally referred students to an "Announcement" that she had posted on Classes, a web-based course management program, but the students pointed out that Plaintiff's announcements contained conflicting information from day to day and week to week. (Id.).

Defendants #226. Multiple times when a student asked for clarification about class administration, And Plaintiff responded that it was not their business and that she would only respond to questions That a student asked that were directly related to something to do with them personally. (Blackwood Aff. ¶ 26).

Defendants #227. Plaintiff testified that if a student is not affected by what they are asking, they Should not be asking. (Kimura Dec., Ex. A at 417:4-418:16).

Defendants #228. Plaintiff testified that students don't need to know about anybody else in the classAnd don't need to know how Plaintiff is running the class if it doesn't affect them. (Kimura Dec., Ex. A at 417:4-418:16).

Defendants #229. During the March 10, 2021 class, two students mentioned that they had not received Email responses from Plaintiff regarding their grades and questions about assignments and grading Rubrics. (Blackwood Aff. ¶ 27).

Defendants #230. Plaintiff responded that this was an education in "the real world" where they could not expect a person to always respond to the emails they send. (Id.).

Defendants #231. Plaintiff testified that she did not respond to all of the students' emails because it Was "overwhelming." (Kimura Dec., Ex. A at 395:8-22).

Defendants #232. Plaintiff also mentioned a blanket policy that if any student were to email her "about Class administration," they would not receive any response from her. (Blackwood Aff. ¶ 27).

Defendants #233. On March 8 and 10, 2021, after the first third of class on both days was spent on The back-and-forths between Plaintiff and students, the remainder of class both days consisted of Two students leading class discussion of assigned readings. (Blackwood Aff. ¶ 29).

Defendants #234. Dr. Blackwood observed that the students were working at a relatively high Intellectual level on their own, with little input or guidance from Plaintiff. (Id.).

Defendants #235. Plaintiff did not participate in any substantive way in any of the student-led Discussions. (Id.).

Defendants #236. During both the March 8 and 10 class sessions, Plaintiff asked for student Permission to record the class. (Blackwood Aff. ¶ 30).

Defendants #237. Students nodded their heads to being recorded, but multiple students both days Asked if they would have access to the class recordings, and Plaintiff objected. (Id.).

Defendants #238. Plaintiff testified that she was not providing access to the recordings to students as The records were to protect her "from lies that were being told to the administration" about her. (Kimura Dec., Ex. A at 104:10-105:10).

Defendants #239. After class on March 10, Plaintiff emailed Dr. Blackwood that Plaintiff was "pleased" with what she saw and heard once the class moved into student presentations. (Kimura Dec., Ex. W).

Defendants #240. During both class sessions, Plaintiff had the Zoom chat closed. During the March 10, 2021 class, a student asked Plaintiff to open the chat feature, but Plaintiff refused to do so. (Blackwood Aff. 31; Kimura Dec., Ex. A at 469:11-471:12).

Defendants #241. On March 8, 2021, a student emailed Dr. Hsu and Dr. Blackwood regarding Plaintiff's AMS 200 course that day. (Hsu Aff. ¶ 43; Hsu Aff., Ex. R).

Defendants #242. The student explained that there was confusion about scheduling for upcoming Class facilitations and the student had asked some questions. In response, Plaintiff was Disrespectful and asked how it affected the student. The student explained that he was supposed to Present the following Monday (March 15) but that Plaintiff had decided that day to move the Student's presentation up to the next class (March 10). The student explained that the students had been asking about the schedule regularly, but that Plaintiff was always dismissive or unresponsive. (Id.).

Defendants #243. On March 8, 2021, Plaintiff messaged her AMS 200 class and stated the class Facilitations are 5-45 minutes long, case studies are 15-20 minutes, and to disregard the syllabus if The time limits in the syllabus were different. (Kimura Dec., Ex. X).

Defendants #244. On March 9, 2021, in between these two classes, Plaintiff messaged the AMS 200 Class with class facilitation guidelines with a prescribed time of 5-45 minutes. Plaintiff also Explained that the students may ask her for their grade or assessment of their class facilitation via Email. (Kimura Dec., Ex. Y).

Defendants #245. On March 7, 2021, a student emailed Plaintiff regarding their scheduled class Facilitation the next day. As the student's flight had been diverted due to a severe medical emergency, the student would be in the midst of traveling during the scheduled facilitation time and believed that they would not be able to present the next day. (Kimura Dec., Ex. Z).

Defendants #246. Instead of responding to the student's March 7, 2021 email, on March 9, 2021, Plaintiff sent a message to her entire AMS 200 class, stating that if a student misses their class Facilitation day, they would not be able to make it up unless there was time at the end, which Seemed unlikely. Plaintiff also stated that she would resend the syllabus with the matching dates For the students' class facilitation. (Kimura Dec., Ex. AA).

Defendants #247. Following Plaintiff's March 9, 2021 message regarding missing facilitation days, The student emailed Plaintiff with Dr. Hsu copied and explained that she found Plaintiff's message "unsettling." The student explained that they never received any confirmation or a reply to their March 7, 2021 email and that the circumstances were beyond their control. The student wished to Know whether they would still be able to present their facilitation, a presentation that the student Already had prepared and that made up a significant portion of the grade. (Kimura Dec., Ex. BB).

Defendants #248. Only after the student's second email did Plaintiff finally respond directly to the Student and explained that the student could go at the end of the semester. (Kimura Dec., Ex. CC).

Defendants #249. On March 9, 2021, a student complained to Dr. Hsu that Plaintiff had announced New assignment guidelines after four students had already presented and the day before more Students present. (Hsu Aff. ¶ 44; Hsu Aff., Ex. S).

Defendants #250. On March 9, 2021, Dr. Hsu emailed Plaintiff based on emails Dr. Hsu had received From students and explained to Plaintiff the concerns she received about new presentation Guidelines posted after students had presented, and Dr. Hsu asked Plaintiff for clarification. Plaintiff would not provide Dr. Hsu with any clarification. (Hsu Aff. ¶ 45; Hsu Aff., Ex. T).

Defendants #251. On March 10, 2021, a student forwarded their email conversation with Plaintiff to Dr. Hsu. The student was concerned with Plaintiff's response and Plaintiff's grading guidelines. Dr. Hsu was concerned with Plaintiff's email and provided the email to Human Resources, Title IX office, and the Dean's office. (Kimura Dec., Ex. DD; Smith-Bergollo Aff. ¶ 9; Smith-Bergollo Aff., Ex. C).

Defendants #252. Dr. Hsu forwarded the student concern to Mr. Smith-Bergollo in advance of his Meeting with Plaintiff scheduled for March 11, 2021. (Smith-Bergollo Aff. ¶ 9; Smith-Bergollo Aff., Ex. C).

Defendants #253. On March 11, 2021, a student complained to Dr. Hsu regarding Plaintiff's treatment of the student who was not able to make their facilitation due to travel issues. (Hsu Aff. ¶ 47; Hsu Aff., Ex. U).

Defendants #254. On March 11, 2021, a student complained to Dr. Hsu regarding Plaintiff's

inequitable treatment and feeling that Plaintiff was targeting them. (Hsu Aff. ¶ 48; Hsu Aff., Ex. V).

Defendants #255. On March 11, 2021, a student complained to Dr. Hsu regarding Plaintiff's posting of new criteria and time limits for the class facilitation after several students had presented and despite the students previously requesting guidelines and criteria. (Hsu Aff. ¶ 49; Hsu Aff., Ex. W).

Defendants #256. On March 11, 2021, a meeting was held with Plaintiff, Varise Cooper (Plaintiff's Union representative), Mr. Smith-Bergollo and Ms. Baumann via Zoom. (Smith-Bergollo Aff. ¶ 10; Smith-Bergollo Aff., Ex. B, Ex. C; Baumann Aff. ¶ 13; Kimura Dec., Ex. A at 324:17-25,

402:15-403:9).

Defendants #257. The March 11, 2021 meeting ended with an agreement that Plaintiff would send emails she referenced during the meeting and possibly class video recordings. (Smith-Bergollo Aff. ¶ 10).

Defendants #258. On March 12, 2021, a student forwarded an email conversation with Plaintiff to Dr. Hsu and complained of Plaintiff's grading of their class facilitation, which Dr. Hsu forwarded to

Dr. Blackwood, Ms. Baumann, and Ms. Bundor. (Hsu Aff. ¶ 50; Hsu Aff., Ex. X; Blackwood Aff. ¶ 33; Blackwood Aff., Ex. I).

Defendants #259. In response to Plaintiff's email conversation with a student, Dr. Blackwood expressed her belief that Plaintiff had engaged in pedagogical malpractice. (Id.).

Defendants #260. In response to Plaintiff's email conversation with a student, Ms. Baumann asked Dr. Hsu to draft an email to Plaintiff to clarify her grading policies and expectations. (Id.).

Defendants #261. Ms. Baumann also noted that students who complained should be informed that Human Resources is investigating and ask for additional information to assist their investigation. (Id.).

Defendants #262. On March 12, 2021, Dr. Blackwood emailed Plaintiff regarding concerns received from students about their grades for class facilitations and changing guidelines for the assignment. (Blackwood Aff. ¶ 34; Blackwood Aff., Ex. J).

Defendants #263. In Dr. Blackwood's March 12, 2021 email to Plaintiff, she explained that it is department/program policy to grade student work within a reasonable amount of time and to use a clear and transparent grading rubric.(Id.).

Defendants #264. In Dr. Blackwood's March 12, 2021 email to Plaintiff, she also explained that grades should be posted to Classes instead of requiring students to email asking for their grade. (Id.).

Defendants #265. In Dr. Blackwood's March 12, 2021 email to Plaintiff, she also explained that guidelines should not change midway through a semester. (Id.).

Defendants #266. On March 12, 2021, Dr. Blackwood emailed Plaintiff and scheduled a Zoom meeting for March 18, 2021 to discuss the ongoing student complaints, Plaintiff's complaints regarding students, grading issues, classroom management, and pedagogy. (Blackwood Aff. ¶ 32; Blackwood Aff, Ex. H; Kimura Dec., Ex. B at 491:14-492:3).

Defendants #267. In Dr. Blackwood's March 12, 2021 email to Plaintiff, Dr. Blackwood informed Plaintiff that the March 18, 2021 meeting may lead to disciplinary action. (Id.).

Defendants #268. On March 15, 2021, Dr. Blackwood again observed Plaintiff's AMS 200 class. **(Blackwood Aff. ¶ 35).**

Defendants #269. On March 15, 2021, Plaintiff's class opened slowly with Plaintiff finishing Attendance eighteen minutes into class. (Id.).

Defendants #270. During the March 15, 2021 class, Plaintiff stated to the students that she is a "proponent of free speech" but that the free speech in the classroom had turned into "disruptive behavior" on the part of some students. (Id.).

Defendants #271. During the March 15, 2021 class, Plaintiff informed the students that going forward she would keep every student muted, except the student who was taking their turn facilitating the class discussion. (Id.).

Defendants #272. During the March 15, 2021 class, Plaintiff explained that if a student wanted to respond to the questions by the facilitator, they had to send a chat message to Plaintiff who would then ask the question for them. (Id.).

Defendants #273. Dr. Blackwood was troubled by Plaintiff's announcement during the March 15, 2021 class, and intervened in the chat to Plaintiff, noting that muting students in a discussion-based classroom was highly unusual. (Id.).

Defendants #274. During the March 15, 2021 class, the student scheduled to facilitate class discussions stated that they were not sure they could do the assigned facilitation under these new conditions. (Blackwood Aff. ¶ 36).

Defendants #275. During the March 15, 2021 class, this student described planning and preparing for a discussion with peers, not one that would get routed through Plaintiff. (Id.).

Defendants #276. During the March 15, 2021 class, Plaintiff eventually relented and unmuted Everyone. Class then began – at this point nearly thirty minutes into the class. (Id.).

Defendants #277. At the end of the March 15, 2021 class, students asked Plaintiff many questions about the assigned "case studies" that were next, and Plaintiff described a vague assignment to Connect one of the readings to "something contemporary." (Id.).

Defendants #278. During the March 15, 2021 class, students seemed unclear about the assignment but were unsure where to look for further detail. (Id.).

Defendants #279. On March 15, 2021, a student emailed Plaintiff concerned about their new Scheduled date for their class facilitation as the student had a conflict with this date. The student relayed that they could do their presentation the class before or the class after. (Kimura Dec., Ex. EE).

Defendants #280. On March 16, 2021, Mr. Smith-Bergollo emailed Ms. Baumann and noted that his Office had not received any supporting documents or videos from Plaintiff. (Smith-Bergollo Aff. ¶ 11; Smith-Bergollo Aff., Ex. D).

Defendants #281. Ms. Baumann responded to Mr. Smith-Bergollo's March 16, 2021 email and noted That since the March 11, 2021 meeting, several more student complaints had come in. Ms. Baumann also noted that she had also not received anything from Plaintiff. (Id.).

Defendants #282. On March 17, 2021, Ms. Baumann drafted talking points for the meeting with Plaintiff scheduled for March 18. (Baumann Aff. ¶ 15; Baumann Aff., Ex. I).

Defendants #283. The draft talking points were sent to Dr. Hsu, Dr. Blackwood, and Ms. Bundor. (Id.).

Defendants #284. On March 17, 2021, both Dr. Blackwood and Dr. Hsu provided their thoughts and Edits to the draft talking points. (Baumann Aff. ¶ 16; Baumann Aff., Ex. J).

Defendants #285. Ms. Baumann incorporated the edits to the document and sent around a final version of the talking points for the March 18, 2021 meeting with Plaintiff. (Id.).

Defendants #286. On March 18, 2021, a meeting was held between Plaintiff, Dr. Hsu, Dr. Blackwood, Mr. Cooper, and Ms. Baumann. During this meeting, complaints by students regarding Plaintiff were discussed, including Plaintiff's targeting of a particular student, students being confused about the syllabus, classes not starting on time, and ending classes early. (Kimura Dec., Ex. B at 492:11-494:14; Baumann Aff. ¶ 17; Hsu Aff. ¶ 54; Blackwood Aff. ¶ 38).

Defendants #287. During the March 18, 2021 meeting, Dr. Hsu and Dr. Blackwood discussed with Plaintiff their observations of Plaintiff's class and conveyed their pedagogical concerns as well as the complaints from students. (Id.).

**Based on Defendants #1 to #13, this was a ruse and a con.**

Defendants #288. During the March 18, 2021 meeting, the topic of removing Plaintiff from her AMS 200 class was discussed. (Hsu Aff. ¶ 54; Kimura Dec., Ex. B at 495:18-496:11, 499:3-9).

**As the video demonstrated, language was used to suggest removal and then brought up more directly by Cooper in the end, which garnered a quick reply from Defendant Blackwood, all of which was much to my astonishment.**

Defendants #289. At this point, however, the decision had not yet been made on whether to remove Plaintiff from her AMS 200 course. (Baumann Aff. ¶ 17; Hsu Aff. ¶ 54; Blackwood Aff. 38).

**This is a lie. Indeed, Defendants had been working in Discrimination, Retaliation and Harassment claims including since Defendant Hsu's "Aunt Jemima" email, which Campbell and Kimura have not explained but I expect they will attempt to in reply to this response.**

Defendants #290. On March 18, 2021, after the meeting, Ms. Baumann emailed Plaintiff and Mr. Cooper and asked them to provide any follow-up materials, such as emails, class recordings, or text messages that Plaintiff wanted Human Resources to review by 5:00 p.m. on March 22, 2021. (Baumann Aff. ¶ 18; Baumann Aff., Ex. K).

**Any** *"follow-up materials"* **Defendants were allegedly seeking should have been *in addition*, supplemental, to the thorough investigation they were tasked in launching. In fact, what Defendants claimed they needed from me should have been unnecessary if they had done what was required. They would have found many students who were enjoying my class and did not like what was happening. That is why they did not ask. Indeed, one student related to me that, during one episode of the bad behavior in class, she allowed her roommate to see the Zoom screen, showing it to her in disgust. The roommate commented that "***it was***

*ridiculous***". Witnesses at trial would reveal that sentiment from others in the class as I already have provided to this court in the form of four (4) students.**

**Moreover, for their part and as the evidence shows, Defendants made allegations which they have not yet substantiated including verified number of openly identified students who allegedly contacted them, identified student emails with names visible matched with their email complaints. Notably, Defendants never interviewed any of the other nineteen (19) plus students in the class who had not allegedly complained. That was their job but Defendant Baumann's email again tried putting the onus on me so that they could blame me, thereby diverting attention from what they were actually trying to accomplish. This**

**But, it is evident as to why Defendants would never do the above in terms of a proper investigation, including because of the Defendant Hsu writings, given their entire goal was to find a way to fire me that appeared legitimate. That plan backfired.**

Defendants #291. On March 19, 2021, a student in Plaintiff's AMS 200 class (and in her ENG 110 Class) emailed Plaintiff. (Blackwood Aff. ¶ 40; Blackwood Aff., Ex. L; Hsu Aff. ¶ 56; Hsu Aff., Ex. AA).

Defendants #292. The student apologized for her poor attendance, not passing assignments, and Falling behind in their classes and noted that they did enjoy Plaintiff's class. (Id.).

**In addition to the fact that this student is close in number to the actual number of students the Defendants claimed had complained (and legitimately), please see Defendants #289 to #291.**

**Moreover, Defendants' ask of me to canvas my class requesting they share with me whether they "*enjoy*" my class and "*want you to keep going*", as Defendant Baumann stated in the March 18, 2021, was intended to be degrading and something I likely would not do and could not know how to approach doing. In other words, respectfully, Defendants did not expect a reply and then used that non-reply to imply noncompliance.**

 **Regarding the emails I had received from three (3) of the twenty-four (*24*) students who contacted me to say that - the bullying students did not speak for him, -they were sorry for the behavior of their classmates, -they hoped I was okay and -despite agreeing with a point one of the bullies was making, disagreed with their behavior towards me,t Defendants would have assembled that information along with other "*materials*" such as the all-important and revelatory student group chat writings, had they investigated. Campbell and Kimura never produced these student writings.**

Defendants #293. Plaintiff forwarded this email to Ms. Baumann, Dr. Blackwood, Dr. Hsu, and Mr. Cooper as an example of at least one person who enjoyed Plaintiff's class. (Id.).

**Please see Defendants #289 to #292.**

Defendants #294. Plaintiff did not provide Pace University with any other supporting evidence or Documentation as a follow up to the March 18, 2022 meeting. (Id.).

**Please see Defendants #289 to #292.**

Defendants #295. While Plaintiff had recordings of her AMS 200 class, Plaintiff did not provide these Recordings to Pace University. (Kimura Dec., Ex. A at 105: 11-15).

**Please see Defendants #289 to #292. In addition, Defendants were apparently in receipt of video recordings of my class they may have requested the students create. Defendants did not produce those videos during Production and did not indicate how Defendant Baumann came to receive them, what was on them, which students provided them and how many they received. Moreover, Defendants Hsu and Blackwood observed six (6) classes whereby they witnessed behavior they encouraged, particularly false complaints which I proved as such at the March 18, 2021 meeting, which videos I provided herewith to this court.**

Defendants #296. While Plaintiff admits that it would have been helpful for Pace to have the Recordings and that Pace (specifically Todd Smith-Bergollo) asked Plaintiff for recordings, Plaintiff did not provide them. (Kimura Dec., Ex. A at 107:22-108:25).

**Respectfully, again, Defendants continue to attempt to blur and deflect away from their intent and their actions with the students (minors, teenagers and/or young adults) in support of that intent to state that I should have sent them videos I made as protection against the lies being stated by the students, which after February 12, 2021, I would learn that the Defendants actively petitioned the students for and solicited from them. In effect, Defendants wanted me to prove the students were not doing what they had asked the students to do.**

Defendants #297. Plaintiff testified that she did not provide Mr. Smith-Bergollo with the recordings because he had asked for recordings of student bullying, and Plaintiff admits she did not have any Recordings of student bullying. (Kimura Dec., Ex. A at 108:10-109:12).

**This is not the same as student bullying not having occurred. The Defendants, in shuttling a student or students to Dufresne noticeably did not request potentially damning student group chat messages but they did receive videos themselves. Apparently, in that student group chat, Student "P" was bragging about how she was able to get Defendant Blackwood to sit in on my classes as an observer following that students' bullying behavior of ending my class session early and not providing any reason for it or communicating with me at all regarding what she did. The court may recall that Defendant Blackwood and Defendant Baumann, made a show of deception, including claiming false agreement by me using Cooper whom Campbell and Kimura of Bond, Schoeneck &King represent or represented in this litigation, and made a show of force to begin those observations of my class, which became permanent.**

Defendants #298. On March 19, 2021, Ms. Bauman and Ms. Bundor explained that they would be reaching out to any student in Plaintiff's AMS 200 class who had not made complaints, as part of their investigation of the issues brought forward by the complaining students and Plaintiff's Complaint. (Baumann Aff. ¶ 19; Baumann Aff., Ex. L; Hsu Aff. ¶ 57; Hsu Aff., Ex. BB; Blackwood Aff. ¶ 41; Blackwood Aff., Ex. M).

**Defendants Baumann and Ms. Bundor did not do this. I was not provided with the results of any investigation the Defendants have alleged conducting, an inquiry that would be against their interests in protecting themselves from their own scrutiny (and those of others) of their own indefensible conduct. In other words, respectfully, the Defendants would be tasked with reprimanding, sanctioning, themselves for conduct they willfully engaged in.**

 Please see Defendants #289 to #298.

Defendants #299. On March 22, 2021, Dr. Hsu observed Plaintiff's AMS 200 course. (Hsu Aff. ¶ 58).

Defendants #300. On March 22, 2021, Plaintiff lectured for the entire time as the student who was assigned to facilitate the class had notified Plaintiff that she was dropping the course. (Id.).

**I taught my class on that date, which is an analysis of the work and discussion with students.**

**Defendants have not provided the reason the student dropped the class. One student dropped my course because she had, suddenly, to care for her loved ones. I know because I asked her and provided that email correspondence to the Defendants. However, they would have known this via their own investigation, which, should they now present, must include the identity of the students, including first and last names.**

Defendants #301. On March 22, 2021, there were also eight students absent from class that day. (Id.).

**I cannot provide confirmation of this at this time. However, Defendant Hsu's claim that she was attempting to keep the class intact can never justify Defendants #1- 13 herein. Indeed, Defendants #1- 13 herein provide the proof that this, in fact, was not the reason. Moreover, any implication that the absences were related to me (and not to the bragging race-based bullies who had dominated the class, or the discomfort students may have felt and distancing from Defendants' conduct behind the scenes they may have decided was best for them) should be examined and then labeled as a ploy.**

Defendants #302. On March 22, 2021, Dr. Blackwood asked Human Resources for their anticipated Timeline to complete their investigation, as she would like to have all available material needed to Make the decision on whether to remove Plaintiff before the next scheduled class on March 24, 2021. (Blackwood Aff. ¶ 42; Blackwood Aff., Ex. M; Baumann Aff. ¶ 20; Baumann Aff., Ex. L).

**This is the attempt to appear as if Defendants, including Defendant Baumann and Bundor and other employees at Defendant Pace were functioning legitimately and not as a coordinated unit supporting and covering for each other as they engaged in troubling conduct using young adults, teenagers and/or minors.**

Defendants #303. Ms. Baumann responded that she and Ms. Bundor had reached out to approximately Six of Plaintiff's AMS 200 students since Friday and would be meeting with one last student the Next day. Ms. Baumann believed that she could give Human Resources' final Recommendations/options on Wednesday, March 24, 2021. (Blackwood Aff. ¶ 43; Blackwood Aff., Ex. N; Baumann Aff. ¶ 21; Baumann Aff., Ex. M).

**Please see Defendants #289 to #302.**

Defendants #304. On March 23, 2021, Ms. Baumann inquired of Dr. Blackwood and Dr. Hsu as to whether having Dr. Hsu co-teach with Plaintiff for the remainder of the semester was an option That could work. (Blackwood Aff. ¶ 44; Blackwood Aff., Ex. M; Baumann Aff. ¶ 22; Baumann Aff., Ex. L; Hsu Aff. ¶ 59; Hsu Aff., Ex. BB).

**Please see Defendants #289 to #302. This email formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #305. Dr. Hsu responded that since Plaintiff was resistant to having her joining the class Already, she was not sure this would be possible. (Id.).

**Please see Defendants #289 to #302. This email formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #306. Dr. Blackwood did not think co-teaching was a viable option pedagogically and that it would expose Dr. Hsu to a problematic workplace environment. (Id.).

**Please see Defendants #289 to #302. This email formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #307. On March 23, 2021, Human Resources communicated to Dr. Blackwood that they were comfortable with the employment aspects of removing Plaintiff from class. (Blackwood Aff. ¶ 45; Baumann Aff. ¶ 23).

**Please see Defendants #289 to #302. This email formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #308. Dr Blackwood then sat down and reviewed the student interviews, notes from the Observations of Plaintiff's classes, and everything that had been done in the past month to try to Support Plaintiff. (Blackwood Aff. ¶ 45).

**Please see Defendants #289 to #302. This email formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #309. Based on her review, Dr. Blackwood made the final academic decision to remove Plaintiff from the course, and that she would be paid out for the semester. (Id.).

**Please see Defendants #289 to #302. This email formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #310. On March 26, 2021, Dr. Blackwood, Ms. Bundor, Ms. Baumann, and Dr. Hsu Strategized regarding the contents of a letter to be sent to Plaintiff removing her from her AMS 200 course with pay. (Blackwood Aff. ¶ 46; Baumann Aff. ¶ 24; Baumann Aff., Ex. N).

**Please see Defendants #289 to #302. This email formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #311. On March 26, 2021, Dr. Blackwood sent a letter to Plaintiff notifying her that she would be removed from the AMS 200 course for the Spring 2021 semester with pay. Plaintiff's Removal was effective the same day. (Blackwood Aff. ¶¶ 47-49; Blackwood Aff., Ex. O; Baumann Aff. ¶ 25; Baumann Aff., Ex. O; Kimura Dec., Ex. B at 499:22-500:1).

**Please see Defendants #289 to #302. This email and letter telling me that I could not challenge it in any way, including in court, formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #312. The letter noted that the removal was a result of certain pedagogical and Administrative failures. (Id.).

**Please see Defendants #289 to #302. This letter telling me that I could not challenge it in any way, including in court, formed part of an orchestrated set of emails designed for a moment like this.**

Defendants #313. The first bullet point in the removal letter provides that Plaintiff "grad[ed] students based on standards that were not distributed in advance. Specifically, one syllabus was posted the week of February 2, 2021, another syllabus was posted the week of March 15, 2021." (Id.).

**The syllabus was reviewed with students on the first day of class. Defendants have not yet indicated what occurred on the first day of class. Even their submitted alleged student complaint indicated that explanations were occurring on the first day. Those explanations were the syllabus.**

**The next question Defendants have yet answered is what the syllabus had to do with removal in the moment. At the time of removal, the syllabi had been received by the students. This is the equivalent of trying to fill a letter for purposes of bloating, substantiating justification for their action.**

Defendants #314. Plaintiff admits that a syllabus was not provided to students until the week of February 2, 2021 and that the standards were not distributed to students in writing before that date. (Kimura Dec., Ex. B at 505:1-22).

**A written syllabus was not provided on the first day. Defendants have not indicated how many professors did not submit their syllabi on the first day and why this minor issue would warrant removal.**

**Moreover, Defendants Hsu and Blackwood were tasked with collecting all syllabi beforehand and reviewing them before the first day for errors. This indicates that errors can occur and Defendants are tasked with finding them before the semester begins. They did not do that in Spring 2021. Nor have they indicated to the court that they collected syllabi from the faculty and provided feedback in the event there were mistakes, which can occur as in any document.**

Defendants #315. The second bullet point in the removal letter provides that Plaintiff "request[ed] that students email you individually in order to receive a grade." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

**Grades for student facilitations are recorded in my gradebook and then posted for all following the completion of all facilitations, all work, for the entire class. If, however, a student wanted to know their grade beforehand, I offered that they could ask me via email. Normally, in an in-person class, students availed themselves of this option following an individual presentation and we then would discuss their work and the grade after class, before all class presentations were completed. It was a courtesy. In this Zoom class, I let them know that they could email me, since Zoom after class is usually not private, until grades were posted for everyone. Defendant Blackwood would later then label my offer to the students as me asking them to enter into an "*email relationship*" with me. They also villainized, found an issue, with something very normal.**

**Defendants never asked me about this moreover because they did not want to know the answer or have the explanation that I provided here. They exclusively relied, allegedly, on students. This is a pattern the Defendants engaged in throughout Spring 2021 so that they could appear falsely outraged, concerned and hopefully justified in wrongful actions in this instance.**

Defendants #316. Plaintiff admitted that she directed students to email her for their grade on their Class facilitation assignment. (Kimura Dec., Ex. B at 506:8-507:17).

**Please see Defendants #315 herein.**

Defendants #317. Plaintiff admitted that there were four students who presented and she only gave Grades to the two people who asked her for a grade. (Kimura Dec. Ex. B at 523:3-524:5).

**Defendants have worded this statement intentionally to be inflammatory and misleading. It is a pattern. However, respectfully, please see Defendants #315.**

Defendants #318. The third bullet point in the removal letter provides that Plaintiff did "not utilize Provost recommendations with regards to 'early assessment' practices, specifically, ensuring that All students are assessed by the third week of the semester." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

**This is a *recommendation* which Defendants seem to converting to a requirement for me. It also purposefully ignores the issues happening in the class as if the class was functioning normally and the race-based bullying that was occurring was not. It also does not account for whether that is possible given the number of facilitations to complete. This is a red herring.**

Defendants #319. Plaintiff admits that she did not follow the Provost recommendations with regards to "early assessment." (Kimura Dec., Ex. B at 507:18-508:10).

**Please see Defendants #318 herein.**

Defendants #320. The fourth bullet point in the removal letter provides that "Specific and clear assignment descriptions and requirements were not provided, in writing, on the syllabi, for students to consult" and the fifth bullet point in the removal letter provided that "Presentations were listed On the syllabi as 'facilitation day' with no description as to what this entails." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

**Defendants relied heavily in their removal letter on the <u>written syllabus</u> as if the teaching platform <u>Brightspace</u> they had switched to that semester was not crucial for communication and curing syllabi errors. Indeed, Defendant Hsu's syllabus that she used and those of other professors she forwarded to me indicated that they were "*subject to change*". Verbiage like this is employed on syllabi to fix errors and to adapt the syllabus to changing or unforeseen circumstances.**

**They also disingenuously and blatantly pretend that verbal communication carries no weight in terms of communicating information to students.**

Defendants #321. Plaintiff admitted that the syllabus ultimately provided to students had an error in It as the requirements for the class facilitation day provided that it consisted of a "ten-minute case Study" which was not accurate. (Kimura Dec., Ex. A at 62:10-64:23).

**I stated this as a fact during my class, in the March 18, 2021 meeting and in the deposition. I fixed the error well before removal.**

Defendants #322. The fifth bullet point in the removal letter also provided that "Some students were arbitrarily asked to prepare presentation with less than 48-hour notice. There was no schedule Given to students in advance and adhered to consistently." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

**This is false. The language of arbitrariness is meant to point to something outside of the workings of my class. Defendants also used "and" language to attach something true and something false. That is, there was a schedule given but, due to students changing their days to facilitate and other events, the schedule required organic and in the moment adjustments.**

Defendants #323. Plaintiff admits that the schedule was not adhered to consistently. (Kimura Dec., Ex. B at 510:4-511:8).

**Please see Defendants #322 herein for the clarification of what is manipulative language herein. It is the deceptive blaming me for the bullying against me.**

Defendants #324. The sixth bullet point in the removal letter stated: "Failure to utilize effective Classroom management skills." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

Defendants #325. Dr. Blackwood and Dr. Hsu observed Plaintiff's AMS 200 class on several Occasions and noticed Plaintiff's lack of classroom management skills and disorganization. (Hsu Aff. ¶ 24; Blackwood Aff. ¶¶ 24-28).

Defendants #326. The seventh bullet point in the removal letter provided: "Class time management: A significant amount of class time was spent addressing student confusion over assessment Practices and assignment prompts." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

Defendants #327. Plaintiff admitted that students were confused in her class. (Kimura Dec., Ex. B at 513:15-16).

Defendants #328. Plaintiff admitted that sometimes it would take fifteen minutes, sometimes twenty, And sometimes thirty minutes to resolve the students' confusion in class. (Kimura Dec., Ex. B at 513:17-515:11).

Defendants #329. Plaintiff also admitted that it was "[p]retty much most of the classes" in between February 17 and March 18, 2021 that there was class time spent on trying to resolve student confusion. (Kimura Dec., Ex. B at 515:12-516:13).

Defendants #330. Dr. Blackwood observed several of Plaintiff's classes and noted that the first third of class was spent with extended back-and-forths between Plaintiff and students about the logistics Of class. (Blackwood Aff. ¶¶ 24-25, 35-36).

Defendants #331. The eighth bullet point of the removal letter provided that Plaintiff "Chang[ed] assigned reading schedule throughout the semester. Not giving reasonable notice, regarding changes in reading schedules. Student presentations are based on readings. The presentations are a significant portion of the students' grades. Students did not have the advance notice necessary to Adequately prepare materials related to their presentations." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

Defendants #332. Plaintiff admits that she changed the assigned reading schedule throughout the Semester. (Kimura Dec., Ex. B at 516:17-20).

Defendants #333. Plaintiff admits that the presentation schedule changed and that students were told to be prepared to present at any time as the schedule could change. (Kimura Dec., Ex. B at 517:16-518:7).

**This typical statement of fact by the Defendants is key and to their case.**

**The students were provided with their reading assignments (to analyze) at or near the beginning of the semester. They were told to do their work upfront (the sole reading they had of the two (*2*) assignments they had to do *for the entire semester*, and be prepared to present earlier (upon review of the work they had done earlier) if the schedule changed because a student had to miss their presentation due to unforeseen circumstances, which occurred. This was established and no student complained to me at the time when that structure was established. Defendants never contacted me about this either from alleged complaining students. Defendants never proffered how they would have regulated the matter but, for their purposes, found a problem to write about here.**

**In addition, students were being used by the Defendants by this time. I had suspected during this time that student absences which required me to change the schedule were not genuine. The students could provide witness testimony regarding this.**

Defendants #334. Plaintiff admits that if a student was scheduled on Wednesday but the student who was supposed to present on Monday was not available, the student scheduled for Wednesday would have to present earlier. (Kimura Dec., Ex. B at 518:8-17).

Please see Defendants #333.

Defendants #335. The ninth bullet point of the removal letter described "Conflicts between learning objectives described on the syllabi ('valuing diverse claims to knowledge') and specific classroom practices, including blocking the student's full use of the chat function on Zoom, muting the chat and attempting to mute verbal communication functionality for all students during class time." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

**Please see Defendants #5 to #10**

Defendants #336. Plaintiff admits that she sometimes blocked the students from using the chat Function on Zoom. (Kimura Dec., Ex. B at 519:8-11).

**Please see Defendants #5 to #10**

Defendants #337. Dr. Blackwood also observed a class in which Plaintiff informed the class that all Students would be muted except for the student facilitating the class discussion. (Blackwood Aff.).

**Please see Defendants #5 to #10**

Defendants #338. The last bullet point of the removal letter provided "Inadequate assessment of Students' work, that did not provide the level of analysis and criticism needed to assist student Development and improvement. For example, evaluating a 45-minute student presentation, with a

Single sentence email, as opposed to a thorough pedagogical assessment." (Blackwood Aff., Ex. O; Baumann Aff., Ex. O).

**Please see Defendants #5 to #10**

Defendants #339. In response to a student's request for a grade on their class facilitation, Plaintiff Responded: "A-. Except for the comments I brought to your attention (there was also one other that I did not mention regarding referring to illegal immigrants using the name 'Jose'), I thought you Made some good points and seemed prepared." (Kimura Dec., Ex. FF).

**Please see Defendants #5 to #10**

Defendants #340. Plaintiff was paid for the remainder of the semester in her AMS 200 class. (Blackwood Aff., Ex. O; Baumann Aff., Ex. O; Kimura Dec., Ex. B at 530:16-23).

**The question, respectfully,  is what Defendants were actually trying to pay me for. To this point following removal to the end of the semester when I received an offer, I had not been referred to Dufresne and had not ever been told of his existence or provided any link or formal complaint forms as the student had, despite my ongoing wish to report Discrimination, Harassment and Retaliation.**

**I was blocked from doing so by the mandatory reporters.**

Defendants #341. On March 27, 2021, Dr. Hsu informed the AMS 200 class that Plaintiff would no Longer be teaching it and that Dr. Hsu would be stepping in. (Hsu Aff. ¶ 61; Hsu Aff., Ex. CC).

Defendants #342. On March 30, 2021, Dr. Hsu reached out to a student who previously dropped Plaintiff's AMS 200 course and invited them to rejoin. The student stated they "would love to Rejoin the class for the rest of the semester." (Id.).

Defendants #343. Plaintiff asked that the Union file a grievance with respect to her removal from her AMS 200 class. (Kimura Dec., Ex. B at 501:16-503:14).

Defendants #344. The Union did not file a grievance related to Plaintiff's removal from her AMS 200Class, as she was paid for the semester so the removal was not challengeable. (Kimura Dec., Ex. B At 503:13-20).

Plaintiff's Evaluation

Defendants #345. On June 11, 2021, Plaintiff received her adjunct evaluation for the academic year 2020-2021. (Kimura Dec., Ex. GG).

Defendants #346. On a scale of 1-5 with 1 being "does not meet expectations" and 5 being "exceeds Expectations with distinction," Plaintiff was rated a 1 in three of the four categories and a 2 in the Remaining category. (Kimura Dec., Ex. HH).

Defendants #347. With respect to instructional delivery, Plaintiff received a 1 rating with the Assessment that Plaintiff was late to classes, rarely prepared, the syllabus was not ready at Semester's start, and Plaintiff did not use Classes/Blackboard. (Kimura Dec., Ex. HH).

Defendants #348. With respect to instructional design, Plaintiff received a 1 rating with the Assessment that the syllabus was not ready at the semester's start, it was confusing, grading was Unclear and uneven across the classes taught. (Kimura Dec., Ex. HH).

Defendants #349. With respect to course management, Plaintiff received a 1 rating with the Assessment that the class was disorganized, assignments not well-paced, and she often cuts down Class time. (Kimura Dec., Ex. HH).

Defendants #350. With respect to availability and guidance to students, Plaintiff received a 2 rating With the assessment that Plaintiff was uncommunicative. (Kimura Dec., Ex. HH).

Defendants #351. On June 11, 2021, Plaintiff stated that she disagreed with the evaluation and would Not be signing it. (Kimura Dec., Ex. II).

Defendants #352. On June 14, 2021, Plaintiff requested "access to the information" used in making the determinations in the evaluation. (Kimura Dec., Ex. II).

Defendants #353. On June 28, 2021, Dr. Blackwood asked for clarification on what specific Information Plaintiff was looking for. (Kimura Dec., Ex. II).

Defendants #354. After Plaintiff's clarification, on July 16, 2021, Dr. Blackwood explained that the Evaluation was based on Plaintiff's performance in four classes. Dr. Blackwood explained that the Review process involves reviewing student evaluations, conducting observations, reviewing Whether offered recommendation for improvement and enhanced teaching performance had been Implemented. Dr. Blackwood also noted that she typically reviews a submitted self-evaluation but That Plaintiff failed to submit one. (Kimura Dec., Ex. II).

Summer 2021 – ELI

Defendants #355. During Summer 2021, Plaintiff was originally offered two courses in Pace University's ELI program. (Kimura Dec., Ex. A at 148:4-15).

Defendants #356. One of the two courses was cancelled due to low enrollment. (Kimura Dec., Ex. A At 148:16-149:5).

Defendants #357. Prior to 2021, Plaintiff had classes cancelled due to low enrollment. (Kimura Dec., Ex. A at 149:6-150:6; Kimura Dec., Ex. B at 532:8-533:4).

Defendants #358. Plaintiff did not accept the other course offered for the Summer 2021 ELI program. (Kimura Dec., Ex. B at 531:19-532:7).

Fall 2021 Semester

Defendants #359. On August 12, 2021, Dr. Blackwood offered Plaintiff an English 110 Composition Course for the Fall 2021 semester. Plaintiff did not respond to this email. (Kimura Dec., Ex. A at 147:12-148:3; Blackwood Aff. ¶ 52; Blackwood Aff., Ex. P).

Defendants #360. On August 17, 2021, Dr. Blackwood again inquired as to whether Plaintiff wanted To teach an English 110 Composition course for the Fall 2021 semester. Plaintiff did not respond To this email. (Blackwood Aff. ¶ 53; Blackwood Aff., Ex. P).

Defendants #361. On August 20, 2021, Dr. Blackwood asked Plaintiff a third time whether she Wanted to teach an English 110 Composition course for the Fall 2021 semester. (Blackwood Aff. ¶ 54; Blackwood Aff., Ex. P).

Defendants #362. On August 23, 2021, Plaintiff asked Dr. Blackwood why she received one class for The Fall 2021 semester as opposed to two or three. (Blackwood Aff. ¶ 55; Blackwood Aff., Ex. P).

Defendants #363. On August 23, 2021, Dr. Blackwood informed Plaintiff that the scheduling process Is complex and that the section Dr. Blackwood offered her was the only one available to Plaintiff At that time. Dr. Blackwood again asked if the course she offered would work for Plaintiff, and Plaintiff did not respond to this email. (Blackwood Aff. ¶ 57; Blackwood Aff., Ex. P).).

Plaintiff's Internal and External Complaint

Defendants #364. On December 21, 2021, Plaintiff emailed Matt Renna, Vice President of Human Resources at Pace University, to file a formal complaint of discrimination, intimidation, retaliation, And harassment against Dr. Hsu, Dr. Blackwood, and Ms. Baumann. Plaintiff also informed Mr. Renna that she had filed a Charge with the Equal Employment Opportunity Commission. (Dufresne Aff. ¶ 18; Dufresne Aff., Ex. E).

Defendants #365. Mr. Renna forwarded Plaintiff's December 21, 2021 email to Mr. Dufresne. (Id.).

Defendants #366. On December 22, 2021, Mr. Dufresne emailed Plaintiff and informed Plaintiff that If she is interested in filing an internal complaint, she could use Pace University's online reporting System. Mr. Dufresne also attached the relevant policies that may be applicable. (Dufresne Aff. ¶ 19; Dufresne Aff., Ex. F).

Defendants #367. Plaintiff filed her internal complaint with Pace University on December 24, 2021 at which time the University was closed. (Dufresne Aff. ¶ 20).

Defendants #368. On January 4, 2022, when Pace re-opened, Mr. Dufresne confirmed receipt of Plaintiff's internal complaint and asked Plaintiff if she would be interested in having a discussion With Mr. Dufresne regarding her report. (Dufresne Aff. ¶ 21; Dufresne Aff., Ex. G).

Defendants #369. Mr. Dufresne conducted two intake meetings with Plaintiff regarding her internal Complaint. (Dufresne Aff. ¶ 22; Dufresne Aff., Ex. H).

112

Defendants #370. Following Mr. Dufresne's conversations with Plaintiff, it was unclear to him what Plaintiff was alleging. (Dufresne Aff. ¶ 23).

Defendants #371. On January 21, 2022, Mr. Dufresne provided Plaintiff with a timeline of the events As described by Plaintiff and asked her to confirm the timeline and/or make any edits if there was Anything inaccurate. (Dufresne Aff. ¶25; Dufresne Aff., Ex. I).

Defendants #372. On January 21, 2022, Mr. Dufresne also sought clarification regarding what Plaintiff was alleging. (Id.).

Defendants #373. Instead of providing more information to Mr. Dufresne about her internal complaint, on January 24, 2022, Plaintiff brought up an unrelated ELI claim. (Dufresne Aff. ¶ 26; Dufresne Aff., Ex. I).

Defendants #374. On January 25, 2022, Mr. Dufresne asked Plaintiff if her ELI claim was related to The previous concerns she expressed. (Dufresne Aff. ¶ 27; Dufresne Aff., Ex. I).

Defendants #375. In response, Plaintiff stated: "In this and the other behavior I have apprised you of and behavior I have not yet shared, there is a running pattern and practice of disrespect, lawlessness, and deceit towards me. It adds up to discrimination, harassment, and Retaliation/hostile work environment against me, a black person and a woman." (Dufresne Aff. ¶ 28; Dufresne Aff., Ex. I).

Defendants #376. In her January 26, 2022 email, Plaintiff proceeded to describe in detail an unrelated Issue from several years prior. (Dufresne Aff. ¶ 29; Dufresne Aff., Ex. I).

Defendants #377. After a few additional back-and-forth emails between Plaintiff and Mr. Dufresne, Plaintiff did not provide further clarification regarding her complaint and stopped responding to Mr. Dufresne's communications. (Dufresne Aff. ¶ 30). Plaintiff's Other Employment.

Defendants #378. While employed by Pace University, Plaintiff also worked for York College within The City University of New York ("CUNY") system. (Kimura Dec., Ex. A at 44:21-45:17).

Defendants #379. Plaintiff started working for York College in 2017 or 2018. (Kimura Dec., Ex. A at 45:18-21).

Defendants #380. While employed by Pace University, Plaintiff also started her own business, SEBR. (Kimura Dec., Ex. A. 45:22-46:6).

Dated: April 10, 2026

_____/s/_____

Wendy Alicia Harte