UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

WENDY ALICIA HARTE,

                    Plaintiff

                                        Case No. 1:22-cv-03820 JAV JW

                    -against

                                        REFILING OR REQUEST TO
                                        AMEND TO RE-ADD
                                        DISCRIMINATION,
                                        DEFAMATION AND
                                        HARASSMENT AND SIA
                                        BUNDOR, MARVIN KRISLOV AS
                                        DEFENDANTS

PACE UNIVERSITY, BERNADETTE BAUMANN,

SARAH BLACKWOOD, STEPHANIE HSU

                    Defendants

_____

        Respectfully, as to my original claim of Race Discrimination, Defamation and Harassment, I put forth herein the facts relevant thereto, as the accompaniment to my Refiling or, alternatively, my Motion Request to Amend to re-add these claims.

        **Herein, I provide the context of an environment from the start of my employment that was based on racial inequality, and the actions taken by the Defendants such as trickery to ensure it, and a denial of upward mobility foe Black professors within the school or anywhere. My Second Amended Complaint, and various subsequent filings, were created**

when I did not have certain pieces of evidence and particular facts that I now possess. That complaint has since been adjusted within my court filings to include the information that Defendant Pace et al. would now like to pretend had never existed. Indeed, they have asked this court, and the public at large, to not see what can now be discerned from revelations about their written and verbal interactions with students who were minors, teenagers and/or young adults, and their efforts to manipulate, bribe and/or coerce them into making false statements including involving federal civil offenses (such as Discrimination, Harassment and Retaliation) about me.

In the narrative of counsel Rebecca Kimura ("*Kimura*") and Mallory Campbell ("*Campbell*"), they used secrecy, weaponized it, including in the form of anonymity regarding the students' identities. The Defendants crucially made it impossible by design then, in 2021 and thereafter, to match which alleged student "*complaints*" and "*statements*" could be attributed to which individual student, which allowed for the actual number of students involved to be ascertained.

Particularly noticeable also was the abundance of missing information surrounding alleged in-person and/or Zoom discussions the Defendants, in their positions of authority, claimed to have engaged in with these students who they claimed registered complaints. The lack of any notes by any Defendant, as Chairperson, Program Coordinator, Human Resources official and the Federal Civil Rights investigator detailing which student claimed what and on what date and where and how the communications occurred, with the contents of the conversations detailed, is startling. It has made their version of the circumstances ever more dubious and troubling and is tantamount to a "*because we said so*" defense.

Indeed, as Defendants had engaged in a behind-the-scenes campaign against me for some time, as detailed herein, and for various reasons that they clearly do not want to be questioned about or challenged on, so too in ny Retaliation litigation have Campbell and Kimura been running a similar (and oftentimes very overt) parallel litigation alongside their stated defense the hallmark of which is disgraceful, reckless and crude innuendo.

Their repeatedly proffered insinuations appear intended to smear me with particularity and elements they clearly planned to deploy to protect themselves and compound (or perhaps eclipse) the knowingly specious claims they proffered in their court filings to present to explain their treatment of me including emails to and discussions with students, the removal of me by letter in March 2021, their false 2020/2021 Evaluation of me and their firing of me. It is because of those spurious alleged defense claims that their innuendo endeavors to be all-encompassing and forceful.

Kimura and Campbell have engaged in this parallel smear campaign by making sure to find ways to proffer to the court and the public at large particularly worded alleged but anonymous student complaints which claimed Anti-Asian sentiment and Anti-Semitism but which did not appear in any way vetted for truth, accuracy or corroboration of the alleged incidents claimed. They then floated on the docket that a

Discrimination/Retaliation/Harassment form and/or link had been sent to a student (but without any production of that email, investigation/investigatory notes originating therefrom, or any correspondence in that regard between investigator and student) to also imply the "*realness*" of the alleged federal civil rights allegations that really only were insinuations *by the Defendants* which they attempted to make appear real. I label these easily made public insinuations (indeed suggestions) in uncorroborated and anonymous student emails and empty Defendant Pace employee/investigator statements, among the many they floated, as innuendo smears but also "*wishes*".

That is, the Defendants wished had been true all of the things they floated and tried at various points to make appear true via staging in the emails amongst themselves but could not ever provide evidence for. They resorted to this maneuver, however, mixing (as a seeming methodology) these allegations using their poorly staged emails with alleged emails from "*anonymous*" students. Employing these easy, belittling tropes and then also with repetitive language (such as the heavily employed word "*fail*" in filings such as ECF 63 in the Retaliation case despite the overwhelming evidence to the contrary regarding me) has been what they wished could falsely define the circumstances and excuse their conduct. Defendant Pace et al, then, were not above anything. This included in straining to make their wishing appear true (with a laser-like focus on attempting to erode my documented and noticeable strengths) so as to gain some, or any, traction in the Retaliation case but also to have leverage against me using the public docket. It was the addition of false, unsavory content into a wholesome, inspiring, human narrative to change the subject and attempt to rewrite my story in order that I could be framed and seen differently than what the evidence shows.

Starting from the beginning of my employment in 2013 there were a spate of events which occurred in both the English Language Institute ("*ELI*") and the English department ("*English*"). In regard to that employment, for the court's information, as a baseline fact, the extent of my interactions at any time at Defendant Pace (or any institution) consisted of traveling to school, teaching my classes and then exiting the school immediately thereafter. I interacted very little with the administration or anyone at Defendant Pace in any capacity ever for the entirety of my employment there. I, myself, did not meet and had no occasion or reason to know or meet any of the responsibles at Defendant Pace University, including Former President Stephen Friedman and current President Marvin Krislov.

**(2013)**

I am a lawyer by education, a graduate of the University of Southern California Gould School of Law ("*USC*"), a highly ranked top tier law school in Los Angeles, California, who interviewed and was hired in 2013 by Brian Hickey ("*Hickey*"), Director of *ELI*, I was to teach in their summer courses program developed specifically for lawyers from other countries, law students and professionals seeking to enter Defendant Pace's LLM program at the law school. The courses

were a "*US Law and Legal Education*" (or "*Introduction to American Law*", as it was sometimes called) *course* and the "*Listening and Speaking Skills for Law*" course. Based on my education and experience, the pay rate Hickey offered was very low, a base rate. However, I accepted that amount at that time. My courses that summer were a tremendous success with strong evaluations.

**It is standard for Defendant Pace Directors, Chairpersons, and Supervisors to contact professors if there are current or upcoming classes in need of teachers. For each upcoming semester, courses are offered before or by the end of the current semester.**

**(2014)**

In 2014, Hickey did not ask me to return for the ELI summer program.

**(2015)**

In this year, Hickey contacted me to teach in the Lawyer's program. Upon receipt of his email asking if I would like to return, I asked for a higher rate. At that time, I was also speaking with both Jason Tannenbaum ("*Tannenbaum*"), supervisor for other ELI programs about teaching his courses in that department and Sid Ray ("*Ray*") from the English Department about teaching there for the first time where I also advocated for a higher rate than what she offered.

After a phone discussion on Friday, July 24, 2015, Ray emailed me to state,

"*Dear Wendy,*

*Welcome!  It was great speaking with you just now.  As promised, I am following up on our telephone interview to introduce you to the process of working & teaching at Pace, NYC.*

*Carol Dollison, cc'ed here, is our department administrative assistant and will be taking care of your paperwork. Carol:  note that Wendy is working at Pace White Plains this summer and should already be in our HR system.  She will be teaching one of our open CAP sections, CRN to be determined.*

*I have also cc'ed Gerald Greland (Jere), Director of CAP, who will acquaint you with the program and the teaching options.  Jere:  Wendy has kindly signed on for a morning LC section of CAP.  I believe the thematic options are "Matters of Life and Death" (with Philosophy) and "Future Visions: Computers . . . " (with CIS).  I have told Wendy that she can choose which of these to teach.*

*Classes begin on September 2.  I look forward to meeting you in person.  In the meantime, do not hesitate to contact me if you have any further questions.*

*With all best wishes,*

*Sid*"

_____

On Wednesday, July 29, 2015 at 15:49 p.m., I emailed Ray to discuss my pay rate. I stated, in part,

*"Thank you for your offer of $1000/credit.  I appreciate it. Based on my experience, drive and performance in Pace's ELI program and elsewhere, I was expecting, however, to be in the $1,136 range.  Would it be possible to look at a salary of $1,136/credit for this course?*
*Thank you.*
*Best regards,*
*Wendy"*

_____

That same day at 16:58 p.m., Ray provided a response to my email,

*"Hi Wendy,*

*If you're already on the books at a certain pay level, the admin will no doubt give you that.  Given your law degree and so forth, I'm sure the range you mention below is do-able or already implemented.  It's just not my call.  We take your materials upstairs and negotiate hard for the very highest amount we can get for you.  The admin. then assigns you a level.  My stock answer for all is $1,000/credit plus or minus depending on advanced degrees and years of experience."*

_____

In the middle of the aforementioned discussion with Ray and the English department, I had conversations with Tannenbaum about the classes in his program. This is where he committed the fraud. That is, on Friday, August 14, 2105 at 13:39 p.m., when he and I discussed pay rates, Tannenbaum wrote,

*"…On August 31ˢᵗ we will be launching English Language Institute White Plains 2.0 at the law school. I understand that you will be teaching downtown in the English Dept. on M/W/F.*

*ELI Westchester is looking for a T/Th Oral Skills (9-10:50am) and Conversation and Listening (11-1pm) for Fall I = 8hrs/week for seven weeks in total.  The starting rate is $40/hr. for ELI courses. We'd be happy to have you join us if you are interested."*

_____

**There were several problems with what Tamnenbaum wrote to me. First and foremost, he was never supposed to offer me a new rate to *decrease* the current rate already determined by Human Resources, offered and accepted by me. I did not know this but when I refused it for being too low, Tannenbaum framed the offer as a "*course rate*", a rate, he claimed, based on the type of course I was teaching (a course targeted to au pairs therefore considered unimportant as well as a course which did not provide any credits, as Tannenbaum stated) versus a rate based on a professor's education, work performance, and experience.**

Following this, on Tuesday, August 18, 2015 at 17:27 p.m., I followed up with Raye regarding the pay rate there. She responded,

*"Hi Wendy,*

*What is your rate with ELI?  We'll try to get you a little more. But it's a Dean's decision and it'll come probably next week.*

*Best,*

*Sid"*

_____

Ray then followed this email response on the rate in a second reply to the same email with an urgent offer of more classes. This was the diversion.

On August 19, 2015, I replied,

*"Hi Sid,*

*Thank you for your reply.  I appreciate it.*

*The adjunct rate as of the end of the summer program was $62 per hour.  The rate that I am asking for now is $71 per hour.  For your meeting with the Dean next week, I wanted to share some information that may be relevant to your decision.*

*The first is that the new rate is commensurate with my education and experience.  But, maybe more importantly to you and the Dean is that it is based on the results I consistently produce in the classroom.  The excellent performance reviews I received from Pace for the winter and summer class sessions I taught are a product of this work.*

*Brian Hickey, the ELI director, added a note to me about my work this summer that I included here, with his permission, for your reference as follows: "I wanted to congratulate you on your outstanding evaluations from your English for Lawyers students. They loved your classes and several of your students say that you empowered them by giving them more confidence in expressing themselves.  Great job! I will show you the evaluations the next time I see you."  I plan to bring the same enthusiasm and work ethic to my CAP courses.*

*Thank you, Sid.  I am looking forward to hearing your decision and meeting you in the near future.*

*Best regards,*

*Wendy"*

_____

Ray provided a different response on pay rate that day stating,

*"Wendy,*

*We try to offer about $3000 per credit--it's a bit of a different system.  I think that gets you around the $71 per hour, if you teach 40 or so hours during the semester.  That doesn't factor in grading, but that's the level we pay everybody.*

*Best,*

*Sid"*

**I believe an investigation and close scrutiny of Ray's emails, following the forty dollar ($40) offer from Tannenbaum which I refused, would reveal the actual interconnection between them.**

On September 10, 2015, I emailed Ray as I was having an issue with the payroll system which would not, for some reason, allow me to upload paperwork in order to receive paychecks, stating,

*"Hi Sid,*

*I hope this email finds you well and not too hectic at the beginning of this new semester. I stopped by your office to say hello and missed you but now there is a pressing issue involving payroll that has come up that I wanted to ask you about in the hope of resolving it as quickly as I can. There seems to be an issue uploading my information into Banner for purposes of processing checks for me. I contacted Human Resources and they were unable to pinpoint the problem on their end. I am not sure where to go now for help. Also, Carol Ann asked about my rate for this semester but this is information that I do not have either. Can you please advise me on these two matters?*

*Thank you.*

*Best regards,*

*Wendy"*

Ray answered that day,

*"Hi Wendy,*

*Thanks for reaching out to me. I'm stumped, though. This has never happened before; I would follow up with Carol who will probably have the solution. Your rate is as discussed, approx. $1000 per credit. I've cc'ed Carol here and our Dept Chair. Unless all your paperwork isn't finalized? Keep me posted.*

*Best,*

*Sid"*

*(All email correspondence above is found herein as **Exhibit "B")**.*

**Adding to the issue and lies, at some point in our telephone discussions, Ray informed me that she could not offer a higher rate than the one from the ELI department *because of "the contract".* This also was a lie and was similar to the maneuver Tannenbaum had used of finding something to blame for why he was required to offer the forty dollar ($40) number.**

**Moreover, I believe the system issue I was having was some type of signal just prior to Ray's insistence on the low number. Therefore, my rate in English *on the books* ended as being the exact same rate as that of the number in the ELI department, the lowest rate, although it was repeatedly messaged that the departments were separate operating entities. However, strangely, this was apparently not the same for Tannenbaum's extreme rate.**

Based on the problematically shifting email conversation information in all departments (as to who ultimately was making the decision about pay, what numbers were appropriate and how they paid faculty) we had been having, there was confusion, by design. Indeed, had it been appropriate to my experience, teaching performance and education in the English department, the teaching rate for me for all departments would have been much higher.

**With regard to Tannenbaum and his August email described above, when he offered me courses to teach in his program, because the number of forty dollars ($40) an hour "*starting rate*" (which as it happened he was in fact offering me), was extreme and exceptionally low, I declined his offer. Unbeknownst to me, the lowest teaching rate to be offered to anyone of any teaching level in the department *based on education, performance and experience* was forty-five dollars ($45). After I had declined the original number, as previously stated herein, Tannenbaum "*raised*" the amount to that number. However, when I again took issue with this adjusted rate and then declined it, this is when Tannenbaum stated that the number was a flat "*course rate*" which all of the professors were receiving for teaching the same courses. Because of this claim, he stated that it was all he could offer. Though hesitantly, but as long as I was not being treated differently, it was then that I accepted the offer. However, I should have been alert to the glaring problem and fact that Tannenbaum had made two (2) offers before alleging and proffering the "*course rate*" explanation for the second of the two extreme rates. In effect, Tannenbaum lied by conjuring that "*course rate*" excuse in order to induce me to accept it. This is fraud which I would not discover until later, in 2017.**

Thereafter, I worked so many classes at that time in both Tannenbaum's program and Hickey's program. Whatever they had in terms of courses, I was offered to teach and I did so at the low rates. In that department, I taught many courses and during the week, evenings and Saturday mornings on the weekends. Those classes included "*Business and Professional Communications*".

**From the start of teaching ELI classes in 2015, there were issues with my paychecks. That is, as previously stated, my pay rate on the books was sixty dollars ($60) an hour. As described in ECF 199, however, Tannenbaum had been manipulating the hours I worked so that it appeared that I was teaching different, shorter hours than I was so that the gross pay could amount to the same as if I had working the longer hours I had been teaching at the forty dollars ($40) an hour "*course rate*". In other words, respectfully, Tannenbaum shortened my actual hours worked (which are officially listed scheduled class times) and tben multiplied them by the higher rate sixty dollars ($60) rather than multiplying my actual hours by the higher rate printed on my paycheck (the rate listed for Hickey's courses and**

the English department), or multiplying my actual hours by the false **"course rate"** and printing this on the paycheck. This was problematic as it meant that somewhere in accounting, it would appear as if the actual hours at **($60)** were being paid for the officially scheduled and listed course hours when in fact Tannenbaum was paying me less off the books.

Oftentimes, as well, I did not receive paychecks on time or the amount was incorrect because of the strange calculations to make the amount match up properly or Tannenbaum and Hickey **"***forgot***"** to pay me or pay me fully. At the time, I noted these occurrences and voiced concerns. In fact, I asked Tannembaum why the **"***course rate***"** could not have been displayed on my checks, why I had to repeatedly endure the errors and issues that accompanied the imprecise process they were using. Tannenbaum claimed at the time that he did not know how to input the forty dollar **($40)** rate into the system as the other higher rate was already in place. I had no choice but to accept this answer despite my feeling that a long span of time had passed, enough for him (and Hickey) to have learned (or asked) how to work the payroll system.

In September 2015, I asked Hickey for a reference letter because the English department specifically required it. On September 10, 2015, Hickey wrote, "

*Dear Wendy,*

*Absolutely. I would be happy to write a letter of reference for you. I am going out of town tomorrow morning, but I will work on it when I get back next week.*

*I hope your Oral Skills and Conversation/Listening classes in White Plains are going well.*

*Best regards,*

*Brian*

*Brian Hickey*
*Director*
*English Language Institute*
*Pace University*
*163 William Street, 21st Floor*
*New York, NY 10038"*

---

*The reference letter Hickey wrote is attached herewith as* **Exhibit "C".**

Hickey also requested that I teach additional courses and I accepted those courses in his programs within the ELI department during the semester, as opposed to teaching only courses in his summer program.

However, beginning on October 4, 2015, I began having serious issues with my paychecks starting with the English department, and then repeatedly in the ELI department with both Hickey and Tannenbaum. The emails within the chain that I sent to Suzanne Roberts ("*Roberts*") of payroll on the 4th of October 2015 and Defendant Baumann on the 7th of October 2015 were instructive on the issues of what really was occurring and why.

Overall, it was indicative of the mechanics of a scheme, and the upfront lies are usually how they work and are maintained until they can no longer be. (**Exhibit "D"**).

(2016)

In June 1, 2016, Tannenbaum sent me an email which exemplifies what was occurring at Defendant Pace in terms of the various rates issue, which I still had not become aware of given Hickey's and Tannenbaum's email and verbal representations. That email read,

"*Hi Wendy,*

*Yes, you were paid according to the number of hours that equal your eli rate (vs. your efp rate). Because your set rate in the payment system is set at the higher rate for EFP, I have to pay you fewer hours to equal the pay for 5 hours of ELI course payment. Here is the calculation I use to pay you. $45(eli rate) X hours worked / $61.95 (efp rate). So if you worked 5 hours for eli, $45 (ELI) x 5 (hours worked) /61.95 (efp rate). = 3.65 hours paid.*

*Best,*

*Jason"* (**Exhibit "E"**)

—————————————————————————————

With this scheme in place, I frequently had difficulty in determining what courses I had been paid for and how much as Hickey and Tannenbaum were combining hours on my checks for the various classes at the various rates, labeling the courses as "*ELI*" and "*EFP*" rates in emails and verbally, a false and contrived distinction between courses in order to maintain the improper fraudulent payment structure.

There was another issue that arose in 2016. In fact, respectfully, I labeled it as the not so casual or unintentional act of cruelty towards me. That is, early in the Spring 2016 semester, in May, I had inquired of Hickey about contact information for Dr. Janet Jones ("Jones"), a professor whom I knew had worked at/was affiliated with the United Nations for quite some time. I was looking for opportunities, particularly since Hickey, to that point, had not apprised me of any new courses before the Summer Legal Program began in July 2016. Hickey provided me with the email address for Jones

Upon briefly introducing myself via email, on May 16, 2016, in a particularly worded email, Jones replied,

"*Dear Professor Harte,*

*Thank you for reaching out to me about your interest in the United Nations. I have been there in the capacity as an NGO Representative to the United Nations for several years, but I am not a United Nations employee. If you are looking for a position with the United Nations, please go to un.org because all of the job openings are listed there. You might also want to try idealist.org where some NGOs list their job openings that are related to UN work. The United Nations Association and the United Nations Foundation are also good sources. Brian has done work with Friendship Ambassadors and the UN Programs there too. He is the go to person for that.*

*As you probably know, the US is behind in its dues to the UN. Since we have finally pledged to catch up on the payments, the UN is pleased but we have not paid in full. I wonder how that will affect US citizens who apply for jobs at the UN. If you apply to the UN for a position and have a negative response, please remember this major problem – you are applying from a country that has refused to pay its dues for nearly a decade. Additionally, I think they do extensive background and security searches for people who work in this arena so expect detailed searches in New York and California.*

*Thank you for your kind and gracious email. I look forward to meeting you around ELI.*

*Good luck. Janet Jones* (**Exhibit "F"**).

_____

I had also emailed Hickey around that time in Spring 2016 to state that I would be applying for the New York Police Department's ("*NYPD*") Counterterrorism Unit Summer program. He responded, to my surprise, to say that he hoped I would teach his summer classes, two (2) of them, beginning in May which he, at that moment, had just informed me of. Because of this new information and what appeared to be a lengthy process at the NYPD, I decided to teach Hickey's new classes instead. Approximately one (1) or two (2) weeks before the classes were to scheduled to begin, Hickey cancelled one of the classes and informed me of it. This meant that one class was still on the schedule.

However, just *the day before* the second class was slated to begin, Hickey also cancelled that one. Therefore, I had no classes to teach and therefore no funds. At that time in my professional life, all monies were going towards my personal necessities and the business exclusively. There was no backup of funds available to me in the event of a cancellation of classes. Therefore, I was simply left stranded.

What I did not know and what Hickey did not notify me of, as he was supposed to, was that in a case of these types of cancellations, so close to the intended start dates of the class, I was entitled to a certain amount of compensation from Defendant Pace. Not knowing this, in a panic, I contacted Defendant Baumann (**Exhibit "G"**). She informed me of the funds I was supposed to receive but was unclear about how much that amount was supposed to be and under what particular circumstances. In other words, respectfully, based on what had occurred above, was I owed for both classes or just one class? There was no policy that Defendant Baumann or the Union sent me that allowed me to determine this.

**Therefore, when I informed Hickey of this, he claimed that he had not remembered this. He stated that he would submit the paperwork when he returned from his trip to Italy, asking me inappropriately if this was "*okay*" with me. Although I had ultimately acquiesced, upon further consideration of my predicament, I contacted Defendant Baumann to ask for another way to receive my funds. When I finally did receive a check for a very small amount of money for the cancellation, however, I had no confirmation that it was correct. Moreover, in retrospect, and as one note, besides what Hickey had claimed in emails about having courses for me in May 2016, there was no confirmation whatsoever that any classes were ever slated to run at all during that time period although Hickey had asked that I teach in place of other work I was researching for myself in that time.**

Immediately following this as I still had almost no funds, I applied for unemployment which I had just discovered I was likely entitled to. Upon completion of the paperwork, I filed with the Department of Labor ("*DOL*"). In response, Defendant Pace swiftly denied my application. I then appealed to the DOL Appeals Board. I asked Harvey Mars ("*Mars*"), the attorney for the Union of Adjunct Faculty at Pace's ("*UAFP*") to attend and represent my interests as he had done with other Union members. He refused, telling me that I was a lawyer and that I should do it myself. This was unusual and inappropriate but I did just that. I asked Mars for anything to assist such as case law since he distanced himself from helping altogether. He finally did provide a case from a petitioner to the DOL, Carl Jensen.

At the June 2016 Appeals hearing, I represented myself in person but Defendant Pace did not appear, neither in person or telephonically. Ultimately, I was successful at that hearing and was granted funds due to me. Defendant Pace had wrongfully denied my application. At the present time, I requested a copy of that 2016 decision from the DOL and continue to wait for a reply.

**(2017)**

**By chance and much to my great surprise, it was in this year, 2017, when a non-Black professor in the ELI department informed me that, in fact, the "*course rate*" Tannenbaum had stated was the reason for the extremely low rate he had offered me to teach did not exist. She remarked that no ELI professors had heard of this and none were receiving "*course rates*".  As previously stated herein, respectfully, between the years 2015 and 2017, I had worked in the ELI department with Tannenbaum's courses during the day, the evening and weekends at that low rate. Some of those courses included "*Conversation and Listening*", "*English Skills*", "*Oral Skills*", "*Business and Professional Communication*", "*Reading and Vocabulary*" and "*Grammar and Writing*". Tannenbaum and Hickey smiled at me every day, presented this friendly exterior, while they had been engaging in fraud, deceit and unequal treatment. Indeed, Hickey had been supporting Tannenbaum and I would discover Hickey's own acts for his programs in late 2017, early 2018. As the Director and Supervisor, both positions of authority, trust and professional responsibility, within the department where I taught so many courses, I felt betrayed and upset by their actions.**

I notified Bill Quinlan ("*Quinlan*"), President of the Union of Adjunct Faculty at Pace ("*UAFP*") immediately. Directly, he referred me to Moriah Olsen ("*Olsen*") of New York State United Teachers ("*NYSUT*"), the large Union that is supposed to guide and support, *by request of the Union members based on a Union member vote*, smaller Unions like the UAFP. Olsen quickly contacted Defendant Baumann and Bundor in writing and maintained contact with me on the issue (**Exhibit "H"**).

**(2018)**

**In March 2018, I was in a car accident. While driving in the parking lot of PetCo with my dog, Lulu, in the car for a scheduled appointment, I was hit by a man who turned out to be an employee of Petco. The accident was deemed to be his fault. My dog suffered heart-related symptoms the following day and then died four (4) months later.**

**In the English department, and while Olsen and I were questioning what had been occurring in ELI, I had met Defendant Hsu in the course of managing and executing my teaching duties there. By that point, I had taught in the CAP program in the department with Gerald Greland ("*Greland*") as the Director as well as English 101 and 102 (*Freshman Composition and Freshman Literature*) and "*Writing in the Disciplines*" in the department. Somehow, we began discussions about teaching a "*Law and Literature*" course which would have been identical in almost every respect to the "*Disciplines*" course which I had designed to be a class which explored how legal predicaments were treated in fiction. Authors such as Sophocles, Hermann Melville, and Franz Kafka were covered, debated and professionally explored for themes, conundrums, and issues raised. My students, more often than not, showed admirable grace while analyzing interesting topics and unusual or unexpected circumstances the works, by design, brought up. This class, also, was tremendously fun, interesting and successful where I designed it as a discussion of real world implications the works delved into. As was apparent on evaluations, my rapport and facility communicating with students, as Johnson would inform me of and remark upon in my only scheduled formal observation at Defendant Pace, was one of my core strengths.**

**Defendant Hsu and I discussed the potential that I could teach another course that I would create that would use literature to chart a factual timeline of the racial history of African-Americans in the United States. Defendant Hsu asked me to create a complete syllabus for that course. I did this, with literary works to be used and the grouping of dates for specific time periods in American history relating to notable racial events. Upon doing this, I provided the syllabus to Defendant Hsu for which I was supposed to have been compensated. This did not happen. Indeed, Defendant Hsu took my syllabus and said nothing to me about it thereafter.**

At the time of the events detailed herein and when I met her, Defendant Hsu was a "*mandatory reporter*". What this means, respectfully, is that she was required to report instances of discrimination, retaliation, and/or harassment she encounters or learns of in any form to the Equal Employment Opportunity Commission ("*EEOC*") investigator at the school. It is not known what

happens if and/or when the mandatory reporter herself or himself is the person engaged in the federally prohibited conduct.

About the same time as the aforedescribed conversations with Defendant Hsu, I declined further work in Tannenbaum's ELI programs because of what I felt were unsuitable, for me, working conditions in combination with the sheer number of courses I was teaching for that program. I was working quite a lot alongside pay that was not commensurate with the level of work I produced for the program, including promotional videos and Mail Chimp surveys Tannenbaum requested. Yet, Tannenbaum would not accommodate my requests which I considered reasonable particularly because of the circumstances. When I informed Tannenbaum of my decision to not return, surprisingly, he behaved as of he had not heard me and scheduled me for a class that started almost immediately. Because of this, I felt obligated to teach it. However, I also immediately sent Tannenbaum an email indicating once again but in writing that I would not be returning so that he could not repeat what he had done.

Following a revealing email communication with Hickey and my discovery that he too was engaging in manipulations with the rate, using the same "*course rate*" verbiage for his programs as Tannenbaum did, I contacted the Union again.

On January 24, 2018, I emailed Quinlan to state,

*"Hi Mr. Quinlan,*

*This is Wendy Harte. I wanted to contact you regarding a problem in the ELI department. What is the best way to discuss the issue with you or a representative from the UAFP?*

*Thank you. look forward to speaking with you.*

*Best regards,*

*Wendy Harte"*

_____

On January 29, 2018 at 7:39:46, Harvey Mars ("Mars") sent me the Defendant Pace lie in an email when he said,

*"Wendy:*

*Just to answer your question about the part time instructor pay rate, the collective bargaining agreement only have a minimum rate of $55.00. Pace can choose at its own discretion whether it wanted to offer a course above that rate and the amount can vary from course to course.*

*Hope that this answers your question.*

*Harvey S. Mars*

*Law Office of Harvey S. Mars LLC 322 West 48th Street, 6th Floor New York, NY 10036 Phone: (212) 765-4300 'ax: (212) 765-2775*

*hsmlaborlaw@harveymarsattorney.com*"

_____

I responded to this with my own email on that day at 8:58 p.m.

Mars replied at 11:52 p.m., now cc'ing or copying Bill Quinlan on the email, to say,

"*Wendy:*

*Negotiations are coming up this year. Will make sure that this issue is on the agenda.*

*Harvey S. Mars*

*Law Office of Harvey S. Mars LLC 322 West 48th Street, 6th Floor Office (212) 765-4300 Facsimile (212) 765-2775*"

 (*The emails herein are labeled as **Exhibit "I"**).*

_____

Mars' email to me was a lie.

On April 6, 2018, Olsen contacted Defendant Baumann who referred the issue to Bundor. My concern in my communications with Olsen, Defendant Baumann and Bundor was whether I had been treated differently than other professors. It was a Discrimination inquiry (**Exhibit "J"**)

**Olsen, Bundor, Defendant Baumann and I met on May 11, 2018. Bundor agreed to create a spreadsheet which spanned the years she asked me to provide. This request was problematic. There was a potential fraud and Discrimination issue spanning years which should have pushed Human Resources to launch a full inquiry into all of the years in which I taught. It should also have included the English department to ensure across the board accuracy for my *teaching* rate, as opposed to the non-existent "*course rate*". In place of that, Defendant Pace began using tactics to limit and then later, to suppress and thereby avoid civil rights and other types of investigation including criminal.**

**Then, as of August 2018, once Hickey and the department had been reported, but for the Summer Lawyer's Program, I was effectively no longer offered any classes during the semester  in the ELI department. ELI communication simply ceased. At some point, a new director, James Stakenburg ("*Stakenburg*") had been hired and Hickey "*retired*" as I was told. Bundor, herself, did nothing but attempt to confuse the issue when she did follow back up with me on this particular aspect of the unfolding claim. Therefore, but for the remaining Summer ELI Lawyers Program, I was no longer teaching in ELI. This meant for me, in real terms, a loss of income money, a dwindling of my finances, while I was still working to live and build the dream I had envisioned for myself.**

During that period in time in 2018 as well, Stakenburg made a show of visiting my class and requesting my syllabus, which immediately felt to me like an early move towards replacement despite it facially being labeled as normal and procedural. At the same time, Stakenburg commented on my teaching in an email to me (**Exhibit "K"**).

**(2019)**

**On March 11, 2019, almost one (1) year later, Bundor finally created a spreadsheet which, she alleged, was supposed to respond to Olsen's and my inquiry. Within this document, Bundor, in effect, stated that a victim of fraud by both Tannenbaum and Hickey must remain one because she (the victim) believed the repeated fraudulent statements. Bundor encapsulated this idea in the official Defendant Pace Human Resources spreadsheet, with all its different rates including the forty-five dollar ($45) rate which Bundor labeled the "*agreed upon rate*". Those various rates, on their own, indicated a tremendous problem, but which Bundor tried to proffer as if normal or else "*agreed upon*".**

**As to the foregoing spreadsheet and approach to the issue by Defendant Pace, I believe that Bundor and Defendant Baumann thought that if they behaved as if the issues were normal, I would too and then accept what would be another fraud by doing so. In effect, Defendant Pace compounded the behavior. After multiple questions from Olsen regarding the spreadsheet, Bundor agreed to create a new one. Missing from this estimate and conversation was any mention of my rate in the English department given all of the ELI rates wherein there is only supposed to be one teaching rate for all departments. Bundor and Defendant Baumann stayed quiet.**

**As what I see now as diversion from (or worse. leverage because of) the above paragraph, Defendant Pace, Bundor and Defendant Baumann accused me for the first time of having receiving additional monies, "*overpayments*", during my years of teaching in ELI based on their "*research*" and "*spreadsheet calculation*s". I understood this to be an accusation of fraud and/or theft. I denied this allegation immediately.**

**Defendant Pace, Bundor and Defendant Baumann also generously claimed that they would not request any "*repayment*" of the funds, their alleged "*overpayments*" which they had not proved to be true in any way to that point. Making that statement then was also a sleight of hand tactic, acting as if the lie were true and then immediately building upon it to further attempt to validate and reinforce it but also put me on the defensive as now "the problem". The statement of not seeking repayment also seemed to be a Defendant Pace *suggestion* to me regarding my fraud claim about them, particularly with the added incentive of the newly made unproved claims about me.**

**On the 14th of October 2019, Bundor made the inevitable admission when she wrote to me via email about my claim of fraud by Tannenbaum and different treatment, "*There seems to have been a miscommunication about how teaching compensation for individual instructors is determined. All instructors are not paid exactly the same rate for teaching a***

**specific course. This is due to a number of factors, including the campus location of the assigned course, length of service/employment and the merit-based rate increases the instructor received while working for the University. The latter is contractually mandated and may differ from year to year…".**

**I ask the court to note that, immediately after the admission which suggests that Tannenbaum's and Hickey's actual intentional and repeated fraud over years with payroll and hours worked manipulation was a "*miscommunication*", Bundor added language of diversion regarding "*factors*" and what I believe are partially or wholly lies which an investigation of her and Defendants Baumann and Pace and the proffered spreadsheets would have revealed (*Exhibit "L"*).**

Regarding Defendant Pace's aforementioned claim, Bundor refused to provide any reliable data in order to prove their allegation. It was just because they said so and Defendant Pace, Bundor and Defendant Baumann would maintain that lie and safeguard it as a weapon to be used against me at any time they wished. It was, at previously stated, leverage and it was also a warning to me that "*You too*".

But the claim that I had received and kept overpayments was, in its entirety, a lie and a dangerous one as the start of Defendant Pace saying anything next and then acting as if what they were claiming was true, without proof and/or legitimate proof established through appropriate and untampered with channels.

Moreover, the idea that Defendant Pace was not seeking "*repayment*" was a trick in that I was supposed to react to this statement with concern and then gratitude to the Defendants. This hoped for reaction then would tacitly validate their overpayment claim and the spreadsheet all at once. Neither I nor Olsen reacted in that way to Bundor's and Defendant Baumann's claims, even though Olsen and I had still not fully grasped yet at that time in our review the truly problematic nature of what Defendant Pace, Bundor and Defendant Baumann had done in creating that wholly fictitious (attempt at covering up) spreadsheet by offering its false contents blatantly as truth.

**However, the other problem Defendant Pace had was the impending now formal Discrimination, Retaliation and Harassment claims I was going to make likely based on race and gender as I had already made informal claims of unequal treatment, retaliation after reporting and harassment, which, because I am a member of a historically disenfranchised group, created the inference of Racial Discrimination, requiring inquiry and investigation by Defendant Pace upon *any notice* of unequal treatment. To be fair in the process, Olsen and I had requested information from Defendant Baumann and Bundor as to the numbers and their explanation. What they claimed as a response was entirely unconvincing. Indeed, Bundor's and Defendant Baumann's admission contradicted the proffered spreadsheet beginning with the rate printed on it that I was told was the rate that everyone received, the lying "*course rate*".**

**At the next meeting regarding the spreadsheet in the latter months of 2019, Olsen strongly challenged everything about it, the formula used to create it and the accompanying statement claiming that I had been "*overpaid*", amongst other issues. In reviewing my communications with Olsen, she, herself, seemed not to have a full grasp of the issues, however, at the time, Bundor had difficulty explaining the spreadsheet to us. She offered to create a new one when Olsen's questions persisted. With the first spreadsheet by Defendant Baumann and Bundor arriving on March 11, 2019, the new one would not arrive for two (2) years, just before my CRES course in the Spring 2021 semester began, as will be discussed further herein.**

**On November 11, 2019, I followed up with Bundor about the loss of ELI classes in another email and what appeared to me to be retribution for having complained. Bundor stated that she would look into it but never followed up with me about it thereafter.**

**At some point in 2019, Olsen and NYSUT, were "*disaffiliated*" from the UAFP and without any notice to me of either. Apparently, the UAFP _Board members_ had conducted a "*vote*" that none of the _Union members_ realized was a vote because it looked like a survey and had the conspicuous words "*Take The Survey*" emblazoned on it within an email asking people to participate in that survey. The "*vote*" ousted NYSUT and Olsen and the members did not know, only finding out quite a long time after they were gone. That move caused an uproar amongst UAFP members and prompted the creation of a group of concerned Union members..**

**As to the fraud and spreadsheet, Quinlan, the Union president, said nothing about them to me, despite having been copied on all of the Defendant Pace and Bundor correspondence. I believe this is the reason why Quinlan transferred my case to Olsen in the beginning. If the spreadsheet did not work, Olsen could be fired. The spreadsheet problem and the discrimination and retaliation claims informally complained of could stay indefinitely on hold. For quite some time and because of the quiet way in which NYSUT and Olsen were removed, I did not realize that no one was addressing my concerns once they were gone. Quinlan is represented by Defendants and Bond, Schoeneck & King in this matter.**

**(2020)**

Prior to this year, Defendant Baumann was a mandatory reporter and the EEOC investigator. But then, Baumann switched her role away/was switched from being that investigator in 2020, which followed my initial report to her about Hickey and Tannenbaum and my concern of unequal treatment. I, therefore, had already filed a discrimination claim when I sent her my email on September 30, 2019 and various other times but she pretended that I had not. Defendant Baumann remained a mandatory reporter.

Additionally, in Summer 2020, a spate of issues arose in the ELI Lawyer's program, in June and August. They continued into Spring 2021, just before the Critical Race and Ethnicity course ("CRES") class began that Defendants wrote exclusively about in their Summary Judgment.

First, without discussing any alternative, in June 2020, LI's new coordinator Sarah Brubaker ("*Brubaker*") informed me that I would be required to teach the book-intensive "*Introduction to American Law*" course without the course textbook. Covid lockdown had begun some months earlier and the ELI office staff were at home. When she told me of this not long before the class started, I offered to arrange to pick up the book from campus myself. Brubaker stated that I was required to seek Bundor's permission. I wrote to Bundor and made the request, which she approved. I then drove to the Defendant Pace Law School during the lockdown and retrieved the book from the security guard stationed there. My actions were an indication of the book's importance to the course and to me as the professor who wanted the course to be taught properly. The class went on with no other issues until the end of the course arrived.

In July 2020, at the same time during that summer when the aforementioned American Law class began in July, Defendant Hsu emailed me suddenly to ask me if I could teach a new class in Fall 2020. I had never taught it before. It was AMS 200, the *CRES* course (**Exhibit "---"**). I accepted the class offer for the Fall 2020 semester. This was during the heart of Covid, when everyone, students and professors were all on Zoom and all classes were remote. Almost everything was closed in the country except jobs considered necessary ("*essential worker*" jobs) and, to my delight, some of my jewelry manufacturers in the Diamond District. Therefore, I also continued working outdoors, driving to New York City to work on my jewelry brand when the city was an eerie ghost town, as I tried to maintain a sense of normalcy amidst the crisis unfolding in the world.

However, in August 2020 in the ELI department, after the program had ended, and it was time for me to enter student grades, for some reason, Defendant Pace's computer grading system blocked me from doing so. I repeatedly tried inputting them but the grading issue went on for months. I contacted Brubaker immediately and, at some point during that time but early on, I requested assistance from Defendant Pace's Helpdesk or Information Technology ("*IT*").

**I did the aforementioned work of trying to fix the issue and submit grades for the Summer program into and for almost the entirety of the Fall 2020 semester while teaching the new CRES course at the same time that Defendant Hsu had offered as that Fall semester had now begun. Therefore, I was teaching online during Covid (one of the most difficult experiences for everyone, professors and students alike) and trying to identify a problem not of my own creation and not in my control. Defendant Pace's IT department employees repeatedly claimed that they could not identify the issue. Their communication with me was sporadic and elusive.**

**At a certain point when this situation continued seemingly indefinitely, concerned, I sent Brubaker all of the student grades with the hope that she would input them in for me so the students would have their grades. It was my reason for sending them to her. This action should have resolved that issue as she, Brubaker, actually had the ability to input grades**

into Defendant Pace's grading system. Yet, despite this, I still attempted to determine what the issue was and have it fixed by maintaining written communication with Defendant Pace's IT department.

**In October 2020 or thereabouts, Tiffany Hamilton ("*Hamilton*") was hited by Defendant Pace.**

In October 2020, the ELI grades had still not been entered as the grading system issue had still not been fixed by IT and I was still blocked from doing so. Brubaker, shockingly, did not submit the grades either although she could have. In a twist, however, three (*3*) grades for my class mysteriously had somehow been entered onto the system. During this time, Bundor was still working on the new spreadsheet Olsen and I had requested, following my report of being treated differently than other professors and being denied further classes in Hickey's programs. At the time, I also had not realized that the low pay rate and unequal treatment problems likely extended to the English department. I believe that Baumann and Bundor were acutely aware of this, however.

On October 15, 2020, Brubaker sent me an email "*disinviting*" me from teaching ever again in those last courses I had remaining in the ELI department, the Summer Lawyer's program. In effect, Brubaker fired me with a contrived issue which I had no control over but that she and others at Defendant Pace did. Her letter to me regarding this, however, framed the issue as if the problems were all my fault ("*Students being able to access their final grades is a vital part of our program and instructors submitting their final grades on time is a key expectation. Unfortunately, we will not be offering you any of the English for Lawyer's courses in the future*") (**Exhibit "M"**).

Stunned and upset by this turn of events, I contacted Quinlan. I also contacted Defendant Baumann on November 30, 2020 via email and requested a Human Resources Appeals hearing.

Defendant Baumann, however, did not reply. She apparently precipitated a transfer of my email addressed to her to Bundor, who then responded to me on December 1, 2020 with Defendant Baumann cc'd or copied on the communication **(Exhibit "---")**(Put my December 21, 2020 email to Bundor here).

In my response to Bundor, I discussed Brubaker's aforementioned letter informing me that I was not going to be invited back to the program because of the grades and what she had claimed were "*communication*" issues, despite the fact that she still had the grades for my class which I had sent her of my own accord that she could have entered into the system but would not. That email reply to Bundor ultimately linked the removal or firing of me from the Summer Lawyer's program with my earlier reported ELI fraud, pay rate complaints and unequal treatment claims to the teaching opportunities no longer being offered to me in the department as a result ("**Exhibit "O"**). My December 21, 2020 letter to Bundor here).

A hearing was scheduled in December 2020 with Bundor, Quinlan, Brubaker and me on the aforementioned matter. However, due to proximity to the Christmas holidays, that date was rescheduled to a date in early January 2021.

**(2021)**

In January 2021, preceding by a few weeks the start of the Spring 2021 semester, the aforementioned ELI hearing with Bundor, Quinlan, Brubaker and me, the Appeal of the firing of me from the remaining ELI program, took place. It was a contentious one as there had been various inexplicable events which had occurred. *First*, Defendant Pace's Bundor could not explain why their system was all of a sudden not allowing me to enter grades for students, and for approximately four entire (*4*) months. I was never allowed to enter grades in fact.

*Second*, because of this issue, when, early on, I had sent the grades to the coordinator, Brubaker, so that she would enter the grades in my stead *as her system was working*, she would not do so and for months until 2021. Therefore, student grades sat in her email while she demanded that I figure out the issue and input the grades when I literally could not. Defendant Pace's *Help Desk* allegedly could not do so in all of that time either. Yet, Brubaker made sure to emphatically blame me.

During the hearing, Bundor and Brubaker defended the removal of me, their "*cause*", by claiming that I had not done enough to work with their own IT department to fix the problem. They presented, then, documentation which they claimed demonstrated this. However, not only was this a clear attempt to inappropriately and unfairly place blame on me for something, but there was a great deal of information missing of the *extra* work that I had done while, at the same time, I had been teaching other courses in Fall 2020, including the new CRES course Defendant Hsu had offered.

Therefore, either Defendant Pace did not have this information but should have, did not try to determine whether more information existed from their own IT department but should have, or Defendant Pace was in possession of all of the information but pretended that they had not had it during the hearing. What became clear is that I had the evidence, which seemed to come as a surprise to them when I provided it but may not have been. When asked at the hearing why Brubaker had not entered the student grades that I had sent her so that the students would not have to suffer the alleged system's issue, Brubaker claimed that she had felt uncomfortable inputting the grades and that, because I had created them, she wanted me to enter them into the system.

Defendant Pace and Brubaker reinstated me following that hearing all while *still* trying to wrongfully blame me for something in order to refuse accepting any responsibility (blame shifting) for either what they intentionally did or for what had been their sole responsibility to fix and notify me of. That is, Brubaker focused on the general trumped up "*issue*" of "*communication*". This is despite her, as coordinator, having received the grades from me early on when I encountered the issue. Therefore, as with the fraud and my "*agreement*" to the fraudulent inducement because I believed the false claims by Tannenbaum and Hickey, Defendant Pace's modus operandi is to construct all end results as being about me doing or not doing something which implicates me fully (and is determinative of the issue) and exonerates them fully (however false) while they attempt to sound as authoritative, thereby "*official*" as well, as they can muster.

In this way and using this method, I would carry the label at Defendant Pace as problematic for "*concerns*" which could and would become the criticism to which Defendant Pace could return at any time later as proof of a problematic "*history*" whenever they needed to justify any fault they labeled me with, however false.

Thus far then, respectfully, Defendant Pace had not taken responsibility for the ELI Hickey and Tannenbaum fraud (choosing to falsely "*blame me back*" in Bundor and Defendant Baumann's initial spreadsheet). They would stay silent on what they knew about the English department and the rate issue there. Defendant Pace would thereafter not take responsibility for (or admit to) the Brubaker ELI blocked grading event in what looked to be a manufactured incident. The blame they placed on me, which was always supposed to be placed on me then, was also necessary and predictable. (**Exhibit "O"**) (Brubaker January 8 2021 letter).

**However, planted in Brubaker's email in the first paragraph was something peculiar and was likely intended to be preparatory. In the aforementioned letter that had an incorrect date of the determinative hearing which had taken place in *January 2021* just before the Spring 2021 semester commenced, Brubaker included an entire paragraph of her letter about the Collective Bargaining Agreement ("*CBA*") and "*semesters*" which is not only contradicted by other sections of that document, even if correct, but was inapplicable in this Summer program situation. It was, however, written there in a January 2021 communication, just before the Spring 2021 semester began.**

After this difficult incident which made me feel evermore vulnerable to Defendant Pace's whims, which I felt was related to my fraud/different treatment complaint to Bundor, I asked Quinlan to file a harassment complaint against Defendant Pace. I stated that I believed that Defendant Pace would try again. Quinlan replied that, since I was reinstated, I had no reason to file a claim. There were several problems with his arguments and their implications. *First*, Quinlan never once stated that he could not file a Harassment complaint as it was not within the Union's purview. He just argued instead for me not to do so. Also, *second*, Quinlan implied directly that it was acceptable for me to be in the constant position of being falsely accused of wrongdoing, removed/fired, and/or harassed if I just repeatedly filed appeals, keeping every piece of evidence associated with the event, in the likely circumstance that Defendant Pace would claim not to possess that exonerating proof. That was an untenable stance, one wholly supportive of Defendant Pace, which is strange behavior for the leader of a Union.

**On January 22, 2021, Defendant Hsu sent me an email with various professors included on it as well regarding the semester. It stated, (with certain portions highlighted by me):**

**"*Hi Minnie, Wendy, Ty, and Denolyn!***

***Thank you all for teaching in AMS another semester - with full enrollments in your class! - under these continually trying circumstances. Our first days of class are next week, and we're officially remote until at least February 8.***

*You'll also see that Blackboard is gone, and were using a new platform called Brightspace accessible at classes.pace.edu. Please know that everybody is struggling with this mid-year change, and there are tutorials online as well as an in-person session below, which I will try to have recorded in case you can't make it and would like a crash course or refresher. If you have any questions, don't hesitate to send them my Way!*

*Brightspace mini-training today at 2:30pm, led by Brian Evans (School of Education)…"*

(*Exhibit "—"*) (Harte Discovery #118).

On January 29, 2021, the Spring 2021 semester began. The school was transitioning to a new teaching platform as indicated in Defendant Hsu's email (while still in Covid lockdown with all classes still being taught remotely), which all the professors were required to be knowledgeable about. I took the aforementioned online course which Defendant Pace had provided for that purpose.

Six (*6*) days into that semester where I was teaching three (*3*) English courses, on February 4, 2021, Bundor and Defendant Baumann finally responded to me with their alleged readjusted spreadsheet after an underlined inordinately lengthy one (*1*) year and ten (*10*) months span of time, almost two (2) entire years after the first one had been provided. (Please see Exhibit "—" Spreadsheet and email thread)

In that spreadsheet, Bundor and Defendant Baumann still attempted to divert away from Tannenbaum's and Hickey's fraud with my "*agreement*" to the fraud/theft, still accused me subtly of fraud by saying I received overpayments in my paychecks. Bundor and Defendant Baumann still had not provided the information required to support Defendant Pace's allegations when I and Olsen had provided the proof to support our claims of fraud, and requests for backpay, and proper present and future pay. What they did not say was that because there was a rate from Hickey in the system already, Tannenbaum was *not supposed to have offered me anything in terms of a lower rate* as those pay rates were based on education, performance and experience. Indeed, even as regards Hickey's offered rate, it was low itself from the beginning. The spreadsheet and narrative then were problematic still. However, this signified that I was going to file a formal Discrimination and Retaliation claim against them, requesting an investigation. The Defendants knew with high probability that this was going to occur.

As previously stated herein, respectfully, at the time when Bundor sent the second version of the spreadsheet, Olsen was no longer a Union representative. The Union spread the false rumor that she was "*incompetent*". Quinlan still refused to say anything on the matter. Indeed, even though Olsen had been scrupulous about documenting her correspondence with Defendant Pace's Bundor and Defendant Baumann, at that time, Quinlan, although copied on them all, would not engage in any written communications himself regarding it. Here, therefore, Quinlan did not question the spreadsheets or the narrative that Bundor and Defendant Baumann conjured or Defendant Pace's unproved

claims, in effect allowing them to falsely claim that a Union member had taken overpayments/engaged in fraud/theft by allegedly keeping monies. He never pursuing the monies I was actually due. Quite literally and stunningly, he did not say a word. **Exhibit "----"** **(Add Bundor January 29 2021 email + new spreadsheet here).**

Not surprisingly but glaringly absent from Bundor's "*assessment*" of the situation with alleged mathematical spreadsheet was the reason "*why*" Tannenbaum repeatedly "*misspoke*" verbally and in writing for years (and then went on to manipulate official payroll documents for all of that time). This characterization is what Bundor labeled what Tannenbaum had done in engaging in what I had referred to as fraud with Hickey's knowledge, approval and help. It was the terminology I used in requesting a response from her in my email complaint to her. Bundor did not answer why Hickey engaged in employing different rates for different classes as well in his programs.

For the court's reference, as previously stated, Defendant Baumann was the Equal Employment Opportunity Commission investigator up until 2020, and a permanent mandatory reporter. I had reported to her and Bundor in 2018 unequal treatment in the ELI department but neither did anything with this information such as launch an EEOC investigation, or provide me with the link to the complaint form or suggest and then walk over to Bernard Dufresne with me, whom I did not know existed at that time.

Less than one (1) week later from the events detailed above and receipt of spreadsheet, in Feb 2021, troubling issues began in my Critical Race and Ethnicity Class of twenty-four (*24*) students. Defendant Blackwood was the Interim Chairperson for English Department at the time. In her role as Interim Chairperson, Defendant Blackwood was a mandatory reporter.

Defendants Blackwood and Hsu reported to Defendant Baumann, who reported to Matt Renna ("*Renna*") and Krislov (from 2017). She, Defendant Baumann, was actively involved in every aspect of what occurred in Spring 2021 with my CRES, and prior to it with the ELI spreadsheet as described previously herein.

Throughout Spring 2021 as in prior semesters, I was trying as best as I could as one person against the  coordinated group of Defendants that I encountered at Defendant Pace to navigate through and past the actions taken by the Defendants which had oftentimes, if not entirely, been deceitful, full of trickery and wordplay meant to confuse and delay, threaten and divert attention away from. Defendants have repeatedly worked to negatively frame my responses and reactions to the confusion which they repeatedly sowed, the lies they repeatedly told, and the warnings, messages and thinly veiled and/or overt threats which they repeatedly conveyed to me.

However, it began with issues in the beginning of that semester in my CRES class. I encountered a problem whereby a group of students were bullying me, some directly but others participating in the periphery, to the point where everything I stated and attempted to teach became a problem for them, including the following:

a)  Some of the students, the dominant and vocal ones which crossed into bullying, took issue with my usage of the word "*tribe*". These students had been focused on engaging in hateful vitriol about White people (here in the context of the Scottish and British who had come to America to settle and had fought the Indigenous in order to take land) and how White people hated People of Color. I tried to broaden their perspective by detailing that all over the world, tribes of every race fought with each other for land and access to survival necessities, including White people (or tribes of people) against other White people (or tribes). Indeed, I pointed in the reading (which the dominant students had not read but would not allow me to properly teach) to the fact that the British and Scottish were doing the same thing to the Irish (warring over land) as to the Indigenous at the same time. In this way, I attempted to engage in a larger, more informed and nuanced discussion about Indigenous people that moved past common tropes to delve into a more complete discussion. The description using the word "*tribe*" was intended to help them process the historical context and in another way so as to create the atmosphere for more nuanced, informed discussion. Therefore, I referred to White settlers in America as a tribe of people, like any other. This should not have been problematic but those students behaved so badly about this as one of many things including by insisting the word was "*harmful*" and demanding I stop using it which I would not do. I discovered later on that Defendant Hsu used the word several times when she took over my class and encountered no issues. I made clear in Announcements (which I had to begin sending because of the growing atmosphere) so that the students knew that their views counted but that academic discussion of information whose sources had been identified would help to inform them.

b)  In the Roxanne Dunbar Ortiz reading from "*An Indigenous Peoples' History of the United States*", I tried discussing the concept of truth about the Indigenous within a landscape where they were commonly portrayed in false and negative ways by those who conquered or defeated them in war, White people. This was one of the main themes, if not the primary concept, of the essay. One student asked, upon raising his hand, if "*good people can do bad things?*" I asked what he meant. He then stated that the truth does not work against White people so violence against them was needed. He stated that truth didn't work with Martin Luther King, Jr.. He claimed the "*Dems were weak and passive*".

As I was attempting to warn that student against the use of violence by analogizing to January 6th, 2021 (also known as "The Attack on the Capitol") which had just recently occurred, and only in the sense of violence having occurred against (White) people and then arrests having been made for it, conversation about violence against White people began in the Zoom chat.

Another student was agreeing with the student who started the violence conversation by writing excitedly that violence would be a good way to "*start a conversation*". I was alarmed. The vitriol escalated when I asked for students to end conversations about violence and to not use the chat for such purposes since I could not regulate or moderate it while teaching. The student who started the conversation with the question began yelling at me and waving books at the camera when I asked him to provide sources to support his claim that truth did not work. I asked him to put the source for the information he was citing *in the chat* but yet another student jumped in to say to me belligerently that if the student who started the conversation was not allowed to use the chat to discuss violence, he would not use it to provide me with anything. This is a student talking to a professor in this manner. The student who started the conversation then informed me that I should not ask him for sources on anything he said because that is what the "*Holocaust Deniers*" did to prove the Holocaust did not happen (they asked for proof but, he claimed, when it could not be provided because everything was destroyed, those people claimed the Holocaust did not happen).

This was a harrowing episode in the classroom and I asked the aforementioned student to stop yelling at me and reiterated that specific concern later in a BrightSpace announcement. Had we been in a physical classroom when the students were behaving in this manner, I would have had the right to ask them to leave, which Varise Cooper, UAFP Vice-President would later indicate to me as well.

Regarding this conversation on common narratives about the Indigenous and portrayals of them, I posted a supplemental video on the teaching platforms' "Discussion Board" for the students (as well as other information on the African slave trade as historical details), analogizing to the same concept of negative portrayals of Black people pushed by the mainstream culture, which Dunbar Ortiz wrote of. I posted the commencement speech made by Chadwick Bosman (the now deceased star of the movie "*Black Panther*"), at Howard University where he discussed refusing to accept acting roles where he would be tasked with portraying Black people in a negative light as part of his on-screen character.

c) There were attacks on me about the group "Antifa" where, in mentioning a video I saw about them, one of the students described in this section felt that I was incorrect in how I described them and that what I had heard about them was "*propaganda*", which she conveyed belligerently. In fact, she was mistaken and I had to return to class with additional evidence to support a correct original assertion because of her chosen style of behavior which had been attacking, repeatedly accusatory and brash.

d) The Weeknd, a Canadian R & B and pop singer, actor and director of Ethiopian heritage, began the confrontations in the classroom where, on the second day, as I normally begin a class by asking students if they wanted to chat about what, if anything, they encountered in the world related to class, a student brought up that they felt the performer should make a statement against the war in Ethiopia. She claimed that it was his duty to do so because he had a "*platform*" after I asked why they felt that he was obligated. The student stated that if he did not make a statement, he should be boycotted. That is when these same dominant students became angry that I asked this and had stated that it was a "*slippery slope*" to believe that anyone should force a pop star or anyone else to say anything that they do not want to say. What would be next that the pop star would be forced to do? There was additional discussion where I was supported by another student who suggested that maybe he was embarrassed to speak up while I had suggested that perhaps his music label contract prevented him from speaking. The students did not like this, being challenged by me, asked to analyze their views or consider those perspectives of others whereby one student felt the need to step in and tell me, actually, that, as I was entitled to my perspective, they were entitled to theirs. However, asking a student to explain their reasoning in a college environment is not the same as telling them not to have that view. The students were too angry towards me constantly to understand this, seemingly.

e) There was also the colonizer/settler issue where I, again, tried broadening the perspective of the students to help them find empowering ways to have conversations on these issues in place of engaging in disempowering hateful vitriol about White people, which I was uncomfortable with and that only fed common narratives of who the victims are and who the powerful are.

f) There were issues with my discussions of the Indigenous and concepts about land. The students falsely believed that Indigenous peoples did not believe in the ownership of land or territories that were considered theirs. Students took issue with my attempt to teach on  the invention of corn and other Indigenous contributions to the world. I was repeatedly interrupted by particular students who wanted to argue everything so much so that we could not move through work in a timely manner. The students wanted the Indigenous portrayed as peace-loving, unsophisticated peoples where I tried introducing the idea that Indigenous tribes fought other Indigenous tribes as every tribe on this earth has, be it Viking, African, Mongolian. They all had concepts of land/territory. They had slaves and built empires and pyramids using captured people (I posted an article on the African slave trade and how Africans came to be sold by other Africans to White merchants). All of this was problematic for these particular

students and the cutting me off/rudely interrupting me persisted. The students, if asked, would proudly admit that they did this.

g) As part of my practice of applying the classroom work to real world circumstances, I asked how we could use truth about Indigenous people from Dunbar Ortiz against someone like Richard Spencer ("*Spencer*") (a self-proclaimed White Supremacist who travels to college campuses throughout the country in order to debate college students) and his lies about People of Color, including Black people and Jewish people who he referenced in the video I posted about him being interviewed. I told the students that I had been studying and reviewing Spencers' deceptive tactics and analogies as a grown man facing young adults and teenagers and/or minors in college auditoriums. I found that students could not successfully combat him because, in part, they were not equipped with the truth and did not know how to weaponize that truth we, as a class, were learning about. This is where the class was headed when Defendant Hsu jumped in to stop a strong and interesting educational approach.

Indeed, mine was the useful, working, modern application of knowledge, which is a hallmark in my teaching. In that vein and to that end, I posted comments on Discussion Board, asking students to review a Spencer interview video with a Black man reporter who also was incapable of combatting basic lies and maneuvers Spencer employed (after providing trigger warnings), and to indicate what they noticed about what Spencer claimed and how he did it. Defendant Hsu informed me in a rush on February 16, 2021 that students had allegedly forwarded her the video and did not want to discuss it. This is despite a student, one who later had reached out to me to see if I was okay after one particularly harrowing class, who commented on the video and said he found it interesting.
A notable point during that class was that the student who had yelled at me and waved books at me, expressed particular frustration about social media, the Instagram algorithm, and the ability to be seen and heard against someone like Spencer who I had told the class used "*memes*" on social media platforms to become famous while spreading his messages of hate. Although I tried to share with him that, with knowledge on how to so it, anyone can use memes to spread messages but of truth and not hate. Student "R" argued from his position of not knowing and what I felt was a hopelessness he shared with the other bullying students.

h) The students took issue with me asking them to refrain from saying that all white judges are white supremacists.

In one of the aforementioned classes, another student called the bullying students "*ignorant*". I heard a parent in the background whisper as she wondered to her son if the

**bullying students had not understood the point they were bullying me about. This is likely because of the intensity of the behavior they were displaying in front of her. This class session extended thirty (30) minutes after class with students attacking me and making ugly comments. In the middle of this, overwhelmed, I tried to make a joke to ease the situation I found myself in but to no avail. The intense vitriol continued with the leader of the bullying stating to me (and belligerently) that I could not even end my class on time. Beyond her statement being false and gaslighting (even if she believed it were true) given her (and others) repeated interference with class activities, it was disrespectful. I began to experience a panic attack within that after class session, which is not normal for me, and cry following it, which also is not usual for me.**

**Just after the aforementioned incident, with some being within hours of its occurrence, I received three (3) student emails from those individuals (whom I had never met before) concerned about me, and concerned about the bullies speaking for them as the bullies had been making belligerent comments to me in class about my teaching which they claimed the entire class agreed with.**

**During this time, in my efforts to quell and manage the aforementioned behavior, make requests of the students for respect of me and the other students and guide them with descriptions of appropriate conduct and communication in class, I began sending professional, detailed, pleasant but firm class announcements on BrightSpace titled "*Pep Talk*" on February 8, 2021, "*Yesterday's Class*" on February 11, 2021, and "*Final Comments on Last Class*" on February 12, 2021. As can be seen in all of them, my announcements were sent with good intentions and hope for normalcy. They too, however, made some mention of the issues occurring beyond what I have detailed above herein (Exhibit "–")**

On Wednesday, January 27, 2021, Campbell and Kimura alleged via Discovery in my present litigation that Defendant Hsu had received an email from a Pace administrator who had allegedly been contacted by a student who asked allegedly to be transferred from my class. That administrator contacted Defendant Hsu but did not share with the student that she could have done this normal process online herself with no need for any involvement of any Coordinator or administration employee.

Defendant Hsu, upon allegedly receiving the aforementioned email from the administrator, also did not impart that information either to the alleged student. In making the alleged transfer to another class, Defendant Hsu allegedly made sure to ask the student for her "*feedback*". The student then replied that she was allegedly disturbed because she claimed, allegedly, that I had told the class that the "*bashing*" of White people would not be allowed and that I targeted her, as specifically a student of Asian heritage, to describe her experiences with race *on the first day of class*. Although I, as a standard and known practice, do not allow indiscriminate attacks on any race, including the White race and therefore could have made this statement, what this student would allegedly state about her being asked such a question by me was false. The student claimed that she felt "mental distress"

about not being able to bash the White race and was concerned that I seemed protective of White people.

February 9, 2021 at 11:53 a.m., Defendant Hsu allegedly had been contacted by a student from my class.. If true and the email is valid, Defendant Hsu never informed me of it at the time or ever during that semester. That student allegedly wrote to her that he was concerned about some things.

Defendant Hsu allegedly responded to that student on February 11, 2021 at 8:40 a.m. with an email and verbiage that was strange. First, she repeated the student written language and then escalated and/or added to the level of the students' issue by suggesting another feeling ("*This sounds concerning and also painful*") Defendant Hsu also allegedly made a comment to this student about "*trying to line up a couple of other conversations that needed to happen*", which, respectfully, would require clarification at a deposition or trial as to what she meant and for what reason (*Exhibit "---"*).

That is, I had attempted to reach Defendant Hsu on both February 10, 2021 and February 11, 2021, by phone and text, indicating an urgency in needing to speak with her, in order to share with her what had been happening in my Zoom classroom and request her assistance. It was as a bullied person seeking help. Defendant Hsu had not responded to me on the 10th and had not responded before she allegedly emailed that student on the 11th. Indeed, the alleged email was allegedly sent before Defendant Hsu and I spoke on that day (the 11th) by phone where she made no mention whatsoever of either of the two (2) alleged emails she had received, one of which she solicited, as "*feedback*". I did not know they existed. When I spoke to Defendant Hsu, I ask the court to note, respectfully, that It has not been verified as to whether this meeting of the alleged student and Defendant Hsu actually took place since not only are names redacted but Campbell and Kimura provided no documentation or notes memorializing the contents of that alleged meeting/s, scheduled allegedly to occur on Friday, the 12th of February at 9:30 a.m.

On February 11, 2021 at 11:56 a.m., when Defendant Hsu and I finally had a telephone conversation, I described what had been occurring with my students. I told her that the students were upset about everything. In the one hour (1) and thirty-four (34) minute conversation we had, I shared that I asked the students to question their assumptions or beliefs in discussion with me and each other as part of analyzing and discussing the essays Defendant Hsu had provided to me accompanying her syllabus, which she had stated that I could modify. I told Defendant Hsu that the students were attacking me on everything I said and that I believed their animus was "*personal*".

Defendant Hsu stated that perhaps the classroom discourse was too intellectual. I did not believe that this was the issue but also informed her of my belief that the students would benefit from a history course as a prerequisite before taking the CRES class. Beyond the fact that other students expressed that they were enjoying the class, what was being discussed in class was appropriate subject matter, brought to life and discussed as part of the real world, an approach that students, in my experience, like, appreciate and engage with the most.

I described everything previously detailed herein and that I had sent one of my announcements to the class that weighed in on every issue going on in the class, as one of a series of announcements I sent in order to address the behavior and return some normalcy to class interactions. As this was not effective, I told Defendant Hsu that it was my reason for coming to her. My initial request of her was for her to speak with the students. I told Defendant Hsu that I wanted the students to feel seen and heard and that she had a demeanor I thought would be conducive to those conversations since I could not say anything (no matter what type of demeanor I presented to them) without particular students reacting in a way that was disruptive (ultimately interfering with the progression of class and the work), and disrespectful. Defendant Hsu did not want to meet with the students initially. She claimed, among other things, that she hated people and, in general, avoided speaking to them.

However, because of the behavior of the students that was escalating (and culminated in the after class thirty (*30*) minutes which caused me to suffer an anxiety/panic attack), which I had made clear to Defendant Hsu had been harrowing, I asked Defendant Hsu several times to involve herself in some way to help, which after refusing as previously described herein, she then finally did agree to speak, which I wanted now to make clear here.

As part of that agreement, I stated that I would send an email to the particular students but request that she review the email first to ensure the most effective tone for the best, most positive, result. It was the equivalent of another set of eyes reviewing my work. It is to be noted here, respectfully, that I did not ask Defendant Hsu *whether* I could send out an email (this or any other), or announcement to my students, as this is part and parcel of teaching, particularly online teaching. I was asking for help with the problem, if she wanted to assist. I believed and understood that Defendant Hsu grasped the gravity of the issue and would respond appropriately as time was of the essence.

Again, respectfully, within the aforementioned conversation, Defendant Hsu never mentioned any prior alleged complaints by any students or student who made any ludicrous claims that I asked any student about "*race-specific*" experiences as an Asian person in my first class discussion or any class interaction. Yet, Campbell and Kimura claimed that Defendant Hsu received such an email before I spoke with her by telephone that day. Even Campbell and Kimura do not allege, however, that Defendant Hsu ever asked me about that alleged email which she should have thought was the opportunity to do so.

Therefore, in never asking me about that alleged email, Defendant Hsu acted as if the comments were true (which is bizarre unless she wanted them to be true) with no follow up with me or corroboration of such a claim. In this way, I was not allowed to deny the accusation or ask for details of how that particular discussion took place and what language had been used in making such a request of a student. All the necessaries were prevented thereby with her silence and clear refusal to investigate. At trial, I believe Defendant Hsu should now speak in place of alleged emails. That is, this alleged student email noticeably mixes something that I would say or could have said like the CRES class is not designed to "*bash white people*" with egregious lies such as me asking a student race-

specific questions. Respectfully, to discern the real from the fake, Defendant Hsu should be the one to speak (as well as the student), not unsigned alleged electronic paper sent as "*Discovery*" as "*student complaints*" comprise a significant portion of their alleged "*concerns*" within their Summary Judgment.

Following the phone meeting with Defendant Hsu, when I sent her a short email I had written for her review, it was with the goal of introducing the students to her. I wrote,

"*Hi "Student C" and "Student E",*

*After yesterday's class, I wanted to connect you both with Stephanie Hsu, Director of AMS. I am asking that you both meet with her. This is required before being able to return to my class.*

*I have thought about your comments in class and shared my thoughts on them with Dr. Hsu. This is your opportunity to share your thoughts with her as well. Dr. Hsu is a wonderful person to talk to. I believe that sharing your feelings with her will help you feel better in general. This will help so that we all can reset and come back together better in class.*

*Thank you.*".

_____

Defendant Hsu did not respond to he aforementioned draft email within a reasonable time given the urgency of the circumstances described to her. I then, on February 12, 2021, as the professor of my CRES class who was seeking to *reset interactions* in my classroom, which is a different goal than the draft, sent certain students, five (5) of them, individual emails with thoughts I wished to communicate to them, and then I sent an announcement to the entire class. This step was completely appropriate. Moreover, I was nervous and worried about the situation and wanted to give the students enough time to process my communications before the next class meeting.

Notably, which Campbell and Kimura did not mention, those five (5) emails removed the requirement that had been in the draft version sent to Defendant Hsu that those students be required meet with her before returning to class, making it optional. Therefore, those emails were more lenient than the draft. Yet, Campbell's and Kimura's discussion of this email and the draft in their Summary Judgment attempt to leave the impression that my emails were problematic, that protecting myself and the class from bullying is problematic. In fact, those emails were part of a suite of e-messages I had sent trying as best I could to calm the students using different approaches such as and including my "*Pep Talk*" announcement and others.

As the moment had approached to be firm, unequivocal and forthright about what had been occurring towards me and in the class, I was those things. I sought respect in my classroom, discipline and control after one student who had actually been trying to comment on the work in class declared in front of what sounded like his parent on Zoom and the rest of the class, in the moment of the bullies attacking me, that the group was acting "*ignorant*".

Therefore, I had tried everything more than once including listening to the students after class. In speaking frankly to them, which is necessary at times, about their behavior and their

options, I described and included the normal option of transferring to another class if mine (with its truth and critical analysis approach) was not what those students wanted in a professor and/or adhering to standards of etiquette and decorum in a classroom environment led by me is not what they wanted to conform their behavior to.

Those students I had emailed individually seemingly and allegedly contacted Defendant Hsu on that day almost immediately. It was actually *Defendant Hsu's* multiple replies to be discussed further later herein, and which became known to me only through Discovery in 2025, that were eyebrow-raising. That is, Defendants Hsu and then Blackwood and Baumann used their positions of authority to make suggestions to young adults, teenagers and/or minors while encouraging them to spread those suggestions to the rest of the class. This is not the first or only time this has happened. Defendants' behavior is analogous to that of Gerald Greland ("*Greland*"), Director of both the "CAP" program and of the student advisors, who approached students wanting to know why my students were so complimentary about my class. He asked them if it was because I was "*easy*". Offended by this, my students returned to class and reported back to me, about what he had stated along with their reply that my class was not as Greland attempted to describe it. However, Greland's behavior was instructive here as I believe Defendant Pace used the students' advisors to suggest things about professors to drop suggestions to students as Greland did through his question. In other words, respectfully, he could have asked the "*why*" I was so liked without the additional subtle commentary.

To the aforementioned point, Johnson is the only Chairperson or Peer observation I had ever received, which I had to request, until Defendant Blackwood's "*observation*". Following the observation, Johnson asked me not to give the students as many papers as they were being assigned (which I had been marking each week). That is, students had a paper assignment a week and they flourished because of it. They also had school trips with me, as many as we could reasonably include. It was yet another highlight of my teaching freshman and upper classmen alike.

Regarding the aforementioned student emails Defendant Hsu allegedly received on February 12, 2021, emails from those students to whom I had sent the aforementioned forthright five (5) emails, Campbell and Kimura never indicated and no item of Discovery provided information claiming that Defendant Hsu had spoken to them previously. Therefore, if only to understand what was occurring and why regarding these unexpected student emails I had sent (given that Defendant Hsu had yet to respond to the draft I sent her), Defendant Hsu did not email me or place a phone call to ask questions. In their emails to Defendant Hsu where the students provided innocuous explanations for their contact with her, where some had attached my email, they asked to meet with her.

On February 13, 2021, Student "B" contacted me asking for a Zoom meeting. She stated,

"*Hi Professor Harte!*

*I was wondering if there was any way that we can have a zoom meeting before the next class? I have something that I would like to bring to your attention concerning the events that occurred during our last class that I'm not sure you have been aware of yet.*

*Student "B"""*

---

When I saw that email on that day, I responded,

*"Hi Student "B",*

*Yes, sure. I am available between tomorrow and Wednesday. I haven't announced it yet but you will have Monday off. Please let me know when you would like to talk.*

*Best,*

*Professor Harte"*

---

On the following day, the 14ᵗʰ of February, Student "B" emailed,

*"Is Monday at 2 pm a good time?"*

---

I replied on that day,

*"Hi Student "B",*

*Sure. I'll send you a link. Talk to you then.*

*Professor Harte"*

---

On the 15ᵗʰ of February, 2021, Student "B", following up with me to ensure that we were going to meet via Zoom on Monday 15, 2021, emailed me to ask,

*"Hi Professor Harte,*

*Are we still having our meeting today?*

---

To this point, I had no idea about what Student "B" wanted to discuss but we met on Zoom. Because her emails came across as persistent, I wanted to make sure to follow through with meeting, however.

The conversation with Student "B" is when I learned of the race problem and other commente made by the bullying students. Student "B", I learned, actually and valiantly spent a great

deal of time and effort trying to convince the student bullies to stop, <u>including with the writing of lengthy messages, "*paragraphs*" as she stated, in the group chat</u>. This was and is evidence Defendants could have reviewed. Campbell and Kimura did not produce these communications or ever indicated that Defendants ever requested them.

Student "B" also stated that she felt as if she had been sitting in a different classroom from them or having a completely different experience from them and tried to explain to them where or why they were, as she felt, wrong. They stated to her that while they respected her opinion, they were going to continue the bullying conduct. They committed to doing so and had made written and/or verbal statements about me being "*Insecure about her ("my") Blackness which is why she teaches ("I teach") at a "PWI" or "predominantly White Institution*" as they claimed Defendant Pace to be, and that I was a "*Black Conservative*". One stated that she was "*disappointed in her ("my") West Indian heritage*". My California license status was discussed negatively as they had apparently researched me on the internet (where the information is always true), which is a bizarre thing for students to do which to me demonstrates a certain level of animus.

Following the meeting and what I could discern from our conversation, because of how upset she was following her unsuccessful efforts to convince the bullies herself which is why, feeling helpless, she turned to me to report it as her next option, on that day, I emailed Student "B" and stated,

"*Hi Student "B",*

*I wanted to thank you for talking with me today.*

*I was thinking about our conversation. First, it was nice of you that you wanted me to know. It's one of the marks of a good person. It was also courageous of you to have shared it with me.*

*What worries me is that you sounded like you felt frustrated? Helpless a bit with what's going on?*

*If yes, please don't worry. Everything will be okay. I want you to have an amazing college experience. So, enjoy your time. I will be okay. Thank you again for thinking of me! See you in class.*

*Best regards,*

*Professor Harte*"

_____

Student "B" replied,

"*Hi Professor Hart,*

*I definitely felt a bit frustrated about the situation just because it happened so unexpectedly and I expected more out of my classmates, but I do feel better after our conversation! I just wanted to let you know what was going on because I know that if the roles were reversed I would want someone to tell me too. I really enjoy your class so far and I can't wait to see what else I can learn throughout this semester. See you in class!*

*Student "B""* (See Exhibit --(Plaintiff's Discovery #173)).

_____

Based on what I was experiencing in the classroom, observing her demeanor and listening to what she stated, I believed Student "B" and wanted an investigation by Defendant Pace into race-based bullying. This is why I would then report it in the following days of that week to Defendant Blackwood.

On Monday, February 15, 2021, at 2:11 p.m., regarding the aforementioned emails from those students whom I had emailed, Defendant Hsu wrote what I have described as eyebrow-raising emails in response. Therein she encouraged young adults, teenagers and/or minors who typically would rely on adults in positions of authority such as the Defendants, whom I had introduced to them to Defendant Hsu via email as such, to lie about me and particularly on federal civil issues. She did this by engaging heavily in suggestion (and comparison to herself) as to "*distress*" which she had "*no doubt*" that the students were feeling based *on her own alleged* "*traumatic*" experience in her alleged "*Black Studies*" class although the class she asked me to teach both times was a "*Race and Critical Studies*" course. She then lied to the student again, implying that whatever "*pervasive*" "*problem*" that she was referring to I was in agreement with and so much so as to have decided to change or "*shift*" my class structure. Defendant Hsu introduced the idea of "*antiracist*" course offerings at Defendant Pace before she launched into accusations targeted directly at me when she claimed that, beyond alleged "*misunderstandings*" which she implied that I apparently had, I was also engaged in the "*misuse of power*" to "*deform what should be an antiracist space*". Defendant Hsu then "*sympathized*" with the student, overly so, by analogizing to "*my own*" as in her own "*college Black studies class*", which she inappropriately brought up yet again to now suggest that the "*Black woman professor*" mistreated her in being "*shouted down*" for inquiring about "*Aunt Jemima*" (a term commonly regarded as a slur, and offensive caricature of Black women as subservient, obedient and loyal, contented servants) and seeing nothing problematic about the Aunt Jemima "*image*" (or something else) but "*innocently*" bringing that question up to the students in this situation, while describing herself as "*leading class discussion*" as was a part of my class structure.

Defendant Hsu also used an array of manipulative as friendly language directed at this (and other) young adult/teenager or possibly minor to seemingly and troublingly convey what was actually false sympathy with verbiage such as "*thank you*", *forgive me*", "*I'm sorry*", "*I'm grateful*", "*<u>share with me</u>*", "*I believe you in advance*", "*what's happening is terrible*", "*my request of you is to <u>share</u> the difficult work…<u>with me</u>*", "*It also means being open to the metacritical lessons that <u>we</u> can <u>we</u> learn…*", "*…for <u>you and me</u> to talk after Wednesday's class, so <u>we can</u>…*", "*I hope my tone makes you feel free to email back…*" where she appeared also to be simultaneously <u>asking</u> the students for something that <u>she</u> was suggesting. Regarding this, Defendant Hsu stated, "*<u>What I'm asking you to share with me</u>, therefore, is the <u>metacritical problem that I know is evident</u>: when misunderstandings and even <u>misuse of power deform what should be an antiracist space</u>.*"

Throughout these analogies to a "*Black woman professor*" and a limited in scope "*Black Studies class*", Defendant Hsu refers to me disrespectfully for the circumstances and in context as "*Prof. Harte*" but refers to herself as a "*critical race/ethnicity studies scholar and activist*" (suggesting expertise and experience) in close proximity to which she also used the correct name of the class for the first time, and intentionally. She then signed this heavily suggestive and manipulative email with "*Stephanie*" (Exhibit "*AuntJemimaEmail*")

What was as troubling as well for me was the false insinuation, if not direct statement, that I had agreed with the contents of the very email she was writing to the student ("*I've had earlier conversations with Prof. Harte and other folks in your class, so I know that the problem has been pervasive. Prof. Harte really wants to turn around the dynamic, and she believes that shifting to a discussion-based class mode as soon as possible…*"). Therefore, Hsu repurposed my phone call to her asking for help into one in which I was somehow reprimanded and had agreed to alter my class so that she could state the lies that she did to students *while* seeking false complaints about me.

**Indeed, Defendant Hsu knew that I had contacted her due to urgent conditions to speak about student bullying, which there is never an excuse for as students have options including withdrawing from a class if they do not want a Black professor who to them is "*insecure about her Blackness*" as they said, for example. Moreover, Defendant Hsu indicated within her email that she had _spoken to other folks in the class._ To date, the Defendants have not identified to whom she was referring.**

Notably, the aforementioned email was a communication which Defendant Hsu never once shared with me at any point in time. Indeed, Campbell and Kimura, in their response to my Second Amended Complaint, never mentioned these crucial emails. They were only revealed during production in this matter in 2025. In their Summary Judgment, Defendants again have tried to erase them or pretend it was not created and disseminated by Defendant Hsu with the knowledge and consent of Defendant Blackwood, waiting perhaps to see if I would include them, as I have.

The aforementioned emails were sent to students before Defendant Hsu sent me an email approximately thirty-two (32) hours later, the next evening at 9:52 p.m. on Tuesday, February 16, 2021. That email was a display of tactics but started with her fully approving of the aforementioned draft. Indeed, Defendant Hsu stated, "*Hi Wendy! I thought this draft was great…*" While she had been sending out the suggestive emails to students asking for what would be uncorroborated Discrimination, and Harassment complaints (the "*shouted down*" analogy) against me,  Defendant Hsu sent me her insincere apology for not responding to that draft for almost six (6) days (" *I apologize for not sending that support right away!  I know that another email ultimately went out, which I appreciate for its honesty...*") (Exhibit ---).

Defendant Hsu launched into a series of uncorroborated and general statements which suggested urgency and seriousness which she then coupled with her dramatic change to my class format whereby and so that I was silenced ("*However, I've been contacted at this point by 8 students, and I just wanted to emphasize that I think a discussion-based class format is the way to go immediately…*", "*…and if the*

*class dynamic is <u>flipped</u> in terms of <u>who is doing the talking</u>, then I think they'll begin to let down their resistance.  <u>If you can assume the role of a listener </u>in tomorrow's class, then I think you'll hear an opening for change.*")

Following this, Defendant Hsu wrote a complete lie which, in order to pretend as if to substantiate it and receive agreement, she used the "*as discussed*" as preface.  She wrote, "*As we talked about on the phone, too, your critical thinking provocations can be softened a bit…*" Therefore, at the same time that she falsely reframed the tenor and meaning of aspects of our telephone conversation (shifting verbiage from "*too intellectual*" to "*critical thinking provocations*"), she was also subtly accusing me of provoking the students. This implied that I was the problem and was experiencing the results of that alleged behavior. Defendant Hsu was reshaping conversations to fit a particular narrative.

Several other disingenuous statements made to me by Defendant Hsu after her "*Aunt Jemima*" "*Black woman professor*" "*Black Studies class*" "*shouted down by the Black Woman professor*" emails to students included "*if you can find a way to feel safe around them again and then project that safety, and even offer it especially to those you've warned*" and "*I'm still making appointments…and asking them to invest in a discussion-based class format…*", and "*Thank you for being willing to try <u>something new (again)</u>.*") However, by this time, Defendant Hsu already had informed students that I had agreed to switch my class.

Defendant Hsu made certain to include within her email to me that she was changing my class and silencing me as "*our last chance to keep this class intact as it is.*"  This sentence was the attempt to provide the pretext in writing as Defendant Hsu strategically worked to have me acquiesce to my own suppression. Yet, Defendant Hsu behaved as if the students had not engaged in the bullying which had caused me to send them emails but focused on whatever alleged response they had to being reprimanded, if any, while she deftly switched the narrative to student "*grievances*" against me exclusively. Campbell and Kimura have not argued that this "*reason*" Defendant Hsu provided in this paragraph was the same one for why she sent the "*Aunt Jemima*" to students in order to procure uncorroborated and/or false complaints.

On **February 16, 2021** at 11:59 p.m., I responded to Defendant Hsu's email where I spoke frankly to her about what her email contained. Notably, I did four (4) things: -I brought up the subject of students who had been upset at what had been going on, students who enjoyed my class, -I brought up the student who informed me of the race-based nature of the student bullying ("*…She was upset. What they were saying was pretty vicious, if what she related was accurate.*"), -I raised the violence (against White people) discussion issue, and -I asked for a meeting with other people ("*…I would like to request another meeting with you (should there be other people there via Zoom?) to discuss moving forward in this class…*"). Therefore, not only had I decided that Defendant Hsu's email was a problem but I had asked for others to be there, also because I had intended to raise the anti-Black race-based bullying issue. I was planning on asking for an investigation but, at that moment, Defendant Hsu appeared to me to be an inappropriate person to speak with given her email with its lying and its silencing of me.

On **February 17, 2021** at 10:55 a.m., in her reply, Defendant Hsu ignored the various crucial elements of my lengthy email to her as described above, labeling it all-encompassingly and generally as an "*update*". However, she began responding to details in it. That is, what became clear later, upon

review of this communication during this litigation process, was Defendant Hsu's obvious concern that I was going to make a Discrimination complaint in the next meeting with her and others (Defendant Blackwood is who Defendant Hsu chose) by alleging that she had spoken to the students *already* regarding "*anti-Black racism*". This part of her email stated, "*I've definitely broached the subject of anti-Black racism with the students I've talked to, and I believe that they're aware of the potential impact on you, and there's a lot of distress about it.  In practical terms, we need to deescalate the tension, and I think that allowing them to control more of the discussion topics in class -- reducing the professor v. student opposition -- is the way to do that.*" Because I had not brought up racism to her during any of our telephone conversations, and had not noticed it at the time she sent this email, when I did first see it, my first thought was that Defendant Hsu in fact had detected racial animus in her communications with students. This may be true but what I know for certain is that she also encouraged, amongst the students, animus, including of the racial type. More than this, however, she was attempting in that email on February 16, 2021, to shut me down, and shut me up as she had anticipated a race or Discrimination claim on the horizon.

It is noticeable then, in that aforementioned email paragraph by Defendant Hsu, when she protected herself from having to prove her allegation of having spoken to students by saying that these supposed anti-racism conversations took place in person or on Zoom, making it about her credibility. This would also mean that there is no written proof that conversations of this nature occurred except to have students make appearances as witnesses in this case, which they have blocked. Campbell and Kimura did not produce or identify either, to my knowledge, any emails, letters, notes, Zoom or phone logs with, to, or from students reflecting Defendant Hsu's alleged conversations on anti-Black racism and their "*distress*" in that regard.

However, finally, and importantly as part of a pattern of behavior spanning departments at Defendant Pace, making it thereby systemic, Defendant Hsu hastened in the next sentence following her alleged "*anti-Black racism*" efforts to link *management* of it with the silencing of me. Given that Defendant Hsu in all likelihood was lying, this was the equivalent of asking me to agree, or attempting to trick me into agreeing, to my own suppression and based on that lie (Exhibit "–").

On **February 17, 2021**, Defendant Hsu asked to observe my class. She asked me not to discuss Spencer as she alleged that he was distressing to the students. Although I agreed not to do so (made this concession) to maintain a positive relationship with the English department coordinator with whom I had been having written disagreements that day and who had taken a forceful position in silencing me, I note here that what Spencer had stated repugnantly about Jewish and Black people in his videos was no more vitriolic than what the *students* were saying openly in class about White people *with* their peers, White students, in the room. In fact, Spencer did not advocate for violence in any video I showed but the students did this against White people. Regarding that, I would not allow it and regarding Spencer, as the professor, I was teaching students how to *counter* his falsehoods with the facts we were gleaning from the assigned readings. Yet, the students allegedly complained about Spencer. Defendant Hsu then made him the issue and thereby my choice of materials as professor which Campbell and Kimura decided they wanted to push as the narrative in

their Motion as "*controversial*". I would state here that Defendant Hsu's Aunt Jemima email and conversations more appropriately fit that label.

During that class Defendant Hsu observed, without my consent she first unmuted her microphone and responded to a question which happened to be from one of the leaders of the race-based bullying. I was appalled. Defendant Hsu then went further and took the wholly violative, intrusive, and disrespectful step of texting me on my personal cell phone number twice, while I was managing my class, to tell me to stop talking to the students. That is, at 14:05 p.m., Defendant Hsu sent me a text which stated, "*Hi! I encourage you to set up right now a dynamic where you don't speak for the rest of the class and let them lead themselves.*"

She sent another text on my phone at 14:16 p.m. which stated, "*Great. Don't respond and ask for other students to respond*".

I was upset by Defendant Hsu's degrading and unauthorized outreach to me, and misuse of my personal information. Defendant Hsu did not have my consent to use my phone number to text me teaching instructions ever. I certainly did not ask her to do this and she did not request permission to do such a thing while, at the same time, she deployed the "*Hi*" with exclamation point to denote friendliness and divert from the offensiveness of what she was actually doing. I never responded to Defendant Hsu with agreement or anything else, which was my signal to her indicating my feelings about what she had done and what boundaries she had crossed. I realize now this behavior was likely planned.

**That is, because Defendant Hsu was a coordinator in the department and was aware of boundaries, appropriateness in her dealings with professors, what these messages truly likely represented then, beyond suppression, was desperation so as to prevent exposure of the contents of the emails that she had just sent to the students asking for complaints (and for them to spread the word) which she told them she would never challenge for accuracy or truthfulness. Indeed, Defendant Hsu knew of the propensity of certain students to become aggressive or belligerent and the possibility not only that it could happen again in the first class since I had sent my emails to individuals and class announcement, but that it could very easily occur right in front of her, in her presence, thereby potentially revealing her inducements to them. By that time, students had been asked by her to lie, in effect, about me and spy on me for the duration, and create alleged false and malicious federal civil rights complaints against me by feeding them ideas of that nature.**

**Also notable was the alleged student emails that Defendant Hsu initially had received that went from innocuous in the beginning to venomous over time under Defendant Hsu, Defendant Blackwood and Defendant Baumann's tutelage and coaching. Given the circumstances described herein thus far, to discern what are real emails from what might be or are fake concerns or fake communications, I respectfully ask for a trial on Discrimination and Defamation where everyone can testify, and the reasoning for actions can be detailed.**

**Indeed, what I would later discover is that students had recorded my classes and that Defendant Baumann, among other Defendants and individuals, had received them. It is not known whether these recordings were audio or video recordings or both, or how many students did this. However, given what Defendant Hsu asked of them already by February 18, 2021, it is a likelihood that she asked students to record the class as well and/or knew from the time when they began recording that students were doing this without my knowledge or consent. Students may be allowed to record a class or class only after seeking permission for an accommodation (because of a learning disability for example) through official channels and the professor is notified in writing of it and the reasons for it. Certainly, the Defendants accepted student recordings but provided no discovery of those recordings or the emails where they told students not to do this which is something an administrator would put in writing given the seriousness of what they were doing.**

To my point about Defendant Hsu's likely concerns about exposure, on February 17, 2021, immediately after the class which Defendant Hsu observed, she met with me on Zoom in what was a contentious meeting. I stated that the unguided student conversations were not intellectual particularly and including their conversation about forty-fourth (44th) President of the United States Barack Obama ("*Obama*") and former candidate for President of the United States Kamala Harris ("*Harris*") as "*sellouts*" who never did anything for Black people. I told Defendant Hsu that I felt the students, the same bullying students, were making reference to me with those comments, which Defendant Hsu vehemently denied. I was not aware of her Aunt Jemima email at the time.

In that meeting, I also shared that I felt the conversation was so unacademic, problematic and substantively lacking that I accidentally revealed that inner thought by mistakenly ending the class twenty minutes early. Campbell and Kimura have made a grand show of this although it is a normal part of teaching to possibly end a class early. In that case, it was a mistake in one (1) class. However, they chose to focus on this in order to divert from what is clear Defendant Hsu was actually trying to do that day by sending those texts.

Finally I repeated my request to speak with Defendant Blackwood about the class, the bullying occurring against me, and the new class structure Defendant Hsu, and Defendant Blackwood, had imposed on a trial basis.

In response, Defendant Hsu told me, unequivocally, to drop my complaint of student bullying, and that I was the problem. Even though her statement was quite literally true in terms of the issue being my race, Defendant Hsu made sure to clarify that element of her comment by stating to me, "*It's you. You asked them for their opinion. It's too much.*" Notably, this is not what she claimed to students in her emails to them.

**Defendant Hsu continued by stating to me in the aforementioned meeting that it was also the atmosphere or "*energy*" that I had created in the class that was being reflected back to me by the students. Therefore, according to Defendant Hsu, everything was my fault. I was taken aback and I disagreed. I did not believe that I, or my teaching in general, was the issue, or that it was the issue during the February 17, 2021 class day that she**

**observed, as I had said almost nothing to the students per Defendant Hsu's, Defendant Blackwood's, and Defendant Baumann's specific classroom "*suggestion*". I also refused to drop my complaint, and insisted on keeping the meeting with Defendant Blackwood, which Defendant Hsu continued to attempt to push me to cancel.**

**Kimura's and Campbell's approach to the particular set of events leading to the meeting in letters, especially as to who asked for it to occur, to this court and my deposition was telling. The possibility or probability that I was planning to report conduct that would have needed to be investigated as racism or Discrimination under the EEOC was also a reason for Defendant Hsu to wish to avoid a Defendant Blackwood meeting.**

When I refused the second time that Defendant Hsu told me to drop the complaint, she threatened me that if I did not drop it, there would be consequences. Defendant Hsu stated, "*Drop the complaint or students will boycott and teachers will be expelled…but we haven't gotten there yet*".

Stunned, I was told, in effect, to shut up, endure racism, and call that teaching at Defendant Pace…or else be expelled by Hsu who not only knew about the racism going on but was instrumental in encouraging it. She had every reason to threaten me, which the Defendants also erased from their Motion after trying to explain it unsuccessfully in an early court filing. Defendant Hsu was trying to prevent me from the Discrimination report she believed that I was going to file. However, to be clear, I would not cancel the meeting.

On February 18, 2021, I met with Defendant Blackwood and Defendant Hsu on Zoom. At the meeting, I spoke first and shared with Defendant Blackwood that there was race-based, anti-Black bullying occurring towards me. I provided the details of what had been occurring. I informed Defendant Blackwood that a group of CRES students, led by the leaders, had been meeting outside of class, and had been making race-based, anti-Black statements about me. I stated that this was behind the in-class bullying. I also stated that I had learned this information from a student on February 15, 2021 who had been present when the statements were made against me and I repeated the statements made to that student by the bullying students. More than this, Student "—" had written proof in the form of chat messages between her and the bullying students. Through all of this, those students had committed to her that they would continue to bully me.

**Defendant Blackwood, noticeably, did not ever ask me for the student's identity, and therefore did not contact that student as part of any measures to discover more than what they already knew, or to investigate. Student "---" confirmed to me in the year 2023 that no one from Defendant Pace had ever discovered her identity through any conversation with the other students in the class or contacted her as part of any investigation (which Defendant Baumann later on March 19, 2021, in what appears to be a staged email, had expressed that they _wanted_ to do). Indeed, Defendant Blackwood showed no surprise, no dismay, no emotion whatsoever at what I had informed them of. In fact, she acted as if I had not said anything. Defendant Hsu did not repeat what she had stated in her February 16, 2021 email to me about "*race-based, anti-Black*" bullying that she allegedly talked to students about.**

**Indeed, Defendant Blackwood ignored my complaint of race bullying in that February 18, 2021 meeting completely. What she did, instead however, was to begin talking about what she labeled "*breakdowns*", and she tried not to stop. Defendant Blackwood did this while behaving as if everything she had stated regarding my class having a breakdown was true and correct, to which I did not agree. Crucially, while doing this, Defendant Blackwood seamlessly *increased the amount of time I would be silenced in the classroom to the entire semester*. It was not a temporary "*experiment*" but a full punishment.**

About this silencing, to make it appear to be a good thing and not what it actually was and was meant to signal, Defendant Blackwood stated that not speaking is what she, and Defendant Hsu, did (voluntarily) in their classes when there was a "*breakdown*" and that I worked too hard. I, however, voiced my concerns about her entire description, including because of student evaluations at the end of the semester.

Therefore, in that meeting, one thing I did was ask Defendant Blackwood about recording my classes, which I asked if I could conduct two (2) more of in light of the now permanent silencing requirement and my concern for the students I felt were affected by all that had already transpired. I indicated that I would record my lectures on each day of those upcoming days that I had planned to teach in the class. There would be no interaction with students during those lectures, although my standard approach would have been to engage in conversations with them. I would record the classes for my safety (because of the race-based bullying taking place). I would then allow students to have no contact with me and speak amongst themselves about the work on the next day following each of those two (2) lectures. Defendant Blackwood agreed to this request although she would state falsely later that, somehow, in the middle of silencing me, she was the one who suggested that I conduct two more lectures and that I should record them.

However, once those two (2) lectures ended, and the twenty-four (*24*) individual student facilitations (interactive class presentations on and analysis of an essay I assigned) began, I was not to have any substantive interaction, dialogue, or engagement with the students for the remainder of the semester, pursuant to Defendant Blackwood's requirement to not speak to the students.

The only clue that I, at the time, believed that Defendant Blackwood had given that she understood my claim of racism was her statement to me that I would be introduced to Tiffany Hamilton, ("*Hamilton*"), through Defendant Hsu. But, Hamilton, for her part, was only Defendant Pace's "*Chief Diversity Coordinator*" and "*Associate VP for Diversity and Inclusion*". She had been hired just five (5) months prior *(in approximately October 2020)* to any of the events detailed in this federal complaint and was not the EEOC investigator. In other words, respectfully, because they could not prevent me from having the meeting and reporting the race-based bullying problem, Defendant Blackwood was prepared to divert me and only make it appear as if she was addressing my race-based bullying report.

For her part in the meeting on the other troubling issues and her alleged student meetings, Defendant Hsu confirmed that conversations between students about engaging in violence towards White people had taken place in the classroom, and stated that the student who initiated the

comment admitted to it. Although I had expressed an overall  alarm about these comments, Defendant Hsu took the view that she did not believe that "*the school was in any danger*" from the student. However, with that response, I noticed that she did not seem concerned about the racist discourse in the classroom about White people in front of not just White people but other racial groups and others who would be adversely affected by such negative vitriol, or the potential of harm to White people outside of the school from a student, or any others in agreement with him, advocating for violence against them. Defendant Hsu's approach was cavalier and reckless. Moreover, she did not indicate ever that she told him of the inappropriateness and danger of what he was advocating for.

Defendant Hsu also claimed that the first three (3) students who contacted her for meetings after my aforementioned February 12, 2021 emails to individuals and the class announcement were the ones I had identified as the leaders of the race-based bullying students who both spoke for the class as they claimed to me, and encouraged the rest of the class to join them using the group chat, as they had attempted to do there with Student "--".

## **STUDENT VIDEO RECORDINGS OF MY CLASS DISSEMINATED TO THE DEFENDANTS**

At some point during the time period following the February 18, 2021 meeting and unbeknownst to me, Defendant Baumann had, apparently, received video recordings made by the students in my class of my class and stated this directly in emails to the Dean Todd Smith-Bergollo ("*Smith-Bergollo*"). These recordings were made without my knowledge or consent. The Defendants may have asked the students to do take these recordings. Seemingly and from her email, Defendants asked for and/or received the files willingly from the students. Not only were these recordings made as a means to harass me but also to send the message that the suddenly aggrieved students had reason to protect themselves *too*. This move looked to be a tactic which attempted to avoid permitting me to be the sole victim in the situation, the attempt at creating false parity with video recordings no party informed me of, student or Defendant. The Defendants have still not produced these recordings.

Kimura and Campbell tried diverting attention from the Defendants' aforementioned receipt of recordings issue in order to focus on the alleged *necessity* of students receiving my class recordings for studying and review purposes. There are several issues with this. First, I began recording as a means to *protect myself* from race-based bullying. The leaders of the bullying, with the explicit help, I believe, of the Defendants (or vice-versa), tried to distort and diminish that goal by turning around and demanding those very recordings, as though they were not the individuals whom I was protecting myself from with them. By Campbell and Kimura questioning me in the deposition in the manner they did, they showed themselves, in a classic example, to be happy to turn victim into villain and vice versa.

Moreover, because there are no tests, or quizzes, the students did not need to record, and specifically, *without my knowledge and consent.* Finally, if needing recordings were for studying or reviewing purposes as Campbell tried to push, the question is why the students were disseminating these videos they recorded to Defendant Baumann and others at Defendant Pace (**Exhibit "Student Recordings"**)

Defendants, as the adults and officials in the administration, never informed me that students, teenagers and young adults who can take these videos and use them for any purpose, including posting them online, dispersing them, manipulating them, and myriad other things, were recording. They never identified who had recorded videos, when, why and what became of them, particularly given that I was being summarily and repeatedly bullied by one particular student for *my* recordings. That student also happened to be one of the leaders of the race-based bullying and the person Defendant Hsu would physically accompany to the EEOC office to complain that I had discriminated and retaliated against her, and on whose account Defendant Blackwood, unbeknownst to me at the time, would send an email to the EEOC investigator claiming I was engaging in retaliation. Apparently then, in receiving videos, spying using teenagers and/or young adults, Defendants were seeking evidence against me to fit a narrative. I ask now if the videos Defendant Baumann received corroborated the claims of yelling and mistreatment found in the student complaints they had been receiving at the same time.

As previously mentioned herein, Defendant Blackwood referred me to Hamilton. Defendant Blackwood indicated to me that she would have *Defendant Hsu* connect me to her . This was strange in hindsight as Defendant Blackwood could just as easily have sent me the email herself or just provided me with Hamilton's name, email and number in the Zoom meeting. But Defendant Blackwood's referral was planned and this email specifically to be sent to me from *Defendant Hsu* was for a reason

That is, unbeknownst to me, the Defendants were engaged in creating dual or multiple scenarios using vague language in emails meant to look like one thing to one person and yet another thing which the Defendants could say that it meant. It was deception, one of various maneuvers, which allowed the Defendants to control the narrative of the email and thereby attempt to control the narrative surrounding the February 18, 2021 meeting. The email, which she sent to me on February 19, 2021, noticeably left out explicit race-based bullying language and the complaint which I made (Add email here).

**The use of Defendant Hsu by Defendant Blackwood to send the email (wherein she labeled the issue as a "*dynamic*") was pivotal because of the specific context, particularly the situation I was in at Defendant Pace. That is, Defendant Hsu and I just had a contentious meeting the day before and email and phone discussions where she had silenced me over my disagreement the same day, texted me inappropriately and without my consent on my phone in that day, claimed I was the cause of everything concerning the student bullying, and most crucially, threatened me to drop my complaint and cancel the February 18, 2021 meeting because students would boycott and teachers would be expelled.**

In place of dropping it, I had insisted upon the meeting with Defendant Blackwood, and despite that threat, so that I could report the race-based bullying. Prior to all of this was as explained in October 2020 through January 2021 whereby I lost the remaining classes I had in the ELI department for speaking up and reporting being treated differently than other professors. Defendant Blackwood too had silenced me for the entire semester after I had reported the race-based bullying to her. Therefore, I was legitimately feeling as if I was walking on eggshells at Defendant Pace. So much for me was at stake while at the same time I attempted to advocate for myself, just as those brave students in my CRES had done for me already.

Additionally, when Defendant Hsu sent me this "*referral*" email for my "*approval*", it was a strange act particularly because Defendant Hsu had literally been forcing every situation regarding me to bend to her will up to that point as seen in her February 16, 2021 emails to me, which I had to accept with the exception to this being my insistence on the February 18, 2021 meeting. The Defendants had predicted then that, if written in a certain way and *sent by Defendant Hsu*, I would capitulate to avoid another conflict with her as the Coordinator, which I did.

Moreover, upon reviewing the aforementioned email and noticing the strange "*dynamic*" language, I chose intentionally not to parse words since I believed I was getting help for the race-based bullying (as I was being referred to Hamilton) after all that had occurred with the students to that point. It can be seen by my reply email that I am overly nice and overly thankful and that was my reason why. I was choosing my battles with my bosses, negotiating the terrain amidst the pressure occurring with both Defendants and the students. In light of Campbell and Kimura leaning heavily on that particular event, it is critical to say that the circumstances under which agreement is given indeed matter and the Defendants not only knew that but chose the circumstances maneuvering for that particular result.

This aforementioned pattern of lying, or engaging in deception to secure agreement and if neither works, then forcing it while looking for ways to be able to proclaim that agreement had been willingly given and with full knowledge is a recurring one at Defendant Pace which has had serious consequences for victims of it as I would continue the weighing and balancing of my interests, ever more so after February 18, 2021.

As to the word "*dynamic,* in fact, Defendant Hsu had been employing that particular word to make it mean different things in various scenarios. She used that word in her first written replies to students in her "*Aunt Jemima*" emails on February 15, 2021, according to Defendants, in a sentence where she was lying to the student about a problem with me ("*Prof. Harte really wants to turn around the dynamic, and she believes that shifting to a discussion-based class mode…*"). In this context, she employed that word in reference to me being problematic in troubling ways, about which she implied falsely that I had agreed.

Defendant Hsu used that word again in her email to me on *February 16, 2021* to say, "*They seem extremely engaged and opinionated, and if the class <u>dynamic</u> is flipped in terms of who is doing the talking, then I think they'll begin to let down their resistance. If you can assume the role of a listener in tomorrow's class, then I think you'll hear an opening for change.*" This contradicts her prior usage of the word in context.

On *February 17, 2021*, Defendant Hsu texted me to state, "*Hi! I encourage you to set up right now a dynamic where you don't speak for the rest of the class…*"

On *February 19, 2021*, in an email with Defendant Blackwood copied, Defendant Hsu wrote to Hamilton (which she asked my approval on), "*Since last week, Prof. Harte and I have been in communication about a <u>dynamic</u> in her class, and yesterday we met with English department chair Sarah Blackwood. While we continue to support Prof. Harte…*" As a note here, the "*communication*" that Defendant Hsu referenced since the week before never once referred to me as being racist or anything else that Defendant Hsu had already stated to students in her aforementioned multiple February 15 emails to them.

However, when she employed the word "*dynamic*" in a *March 4, 2021* email to a student, Defendant Hsu wrote, "*I apologize again for the undue stress to you and everyone in the class…but the faculty and admin who are now involved are learning a lot about how to name, identify, and prevent this kind of dynamic, especially in classes offering an antiracist curriculum.*" This response by Defendant Hsu and usage of the word was in response to an alleged email by a student accusing me of unfairness, discrimination and retaliation.

What Defendant Hsu then did, with maximum amounts of deceit, was two things: First, Defendant Hsu had suggested to the student in the March 4, 2021 email, not only that I had been sent to Hamilton because of this "*dynamic*" as punishment but, second. in asking and receiving my "*approval*" to the letter on February 17, 2021 that had the same word "*dynamic*" in it, Defendant Hsu had turned the February 18, 2021 meeting with Defendant Blackwood where I went to report student anti-Black race-based bullying against me into an open censure or reprimand of me meeting. In addition to this falsehood, Defendant Hsu turned the meeting where I was silenced by Defendant Blackwood for reporting that specific form of bullying into a reprimand and referral to Hamilton based in me now suddenly being the discriminatory, harassing and retaliatory professor towards the students. This meant that when I approved the Defendant Hsu's email, it was based on a con meant to signify and have me appear to have agreed to the aforementioned false characterization of myself and the meeting. The request for agreement by Defendant Blackwood and Defendant Hsu was a trick (Exhibit "Dynamic").

It appears that Defendants Blackwood and Hsu had been prepared then with this "referral" using Defendant Hsu if I did make a race-based or Discrimination claim. "*Approval*" was important because they had planned to and fashioned an email that could look like it was not about the race-based bullying I had reported and thought I was

receiving "*support*" on, a word Defendant Blackwood strategically employed at the meeting and in Defendant Hsu's email. The final thing the email did was ensure that I meet with Hamilton so that it could be spun later to students (and to this court) as me having been sent to her or someone in administration because I was a problem in terms of Discrimination and Harassment towards students, particularly, while still appearing to me as help for the race-based bullying. To this point, in the aforementioned March 4, 2021 email, Defendant Hsu wrote to that student as well, "*At the same time, I know that the Chief Diversity Officer for the university, Tiffany Hamilton, has been looped in and has held a meeting with Prof. Harte, so the situation is still evolving – and getting close to resolution*". This is the level of the deceit deployed by Plaintiffs and the mechanics of it.

Following the February 18, 2021 meeting, Defendant Blackwood did not follow up with me in any way or send one email communication for almost three (3) weeks. She was completely silent. I believe Defendant Blackwood was avoiding communication with me at all so that I would not put the contents of the February 18, 2021 meeting in writing, including and especially my race-based bullying complaint. She only broke that silence when I contacted her via email after involving the Dean of Students, as will be detailed further herein.

### TIFFANY HAMILTON

Once in communication with Hamilton, after several email communications to arrange a date and time to meet, I met with her via Zoom on *February 25, 2021*.

In the first Hamilton meeting, I explained to her that the "*dynamic*" to which Defendant Hsu referred in her email to her was race-based, anti-Black bullying by students against me. This is what I had reported to Defendant Blackwood with Defendant Hsu in attendance. This is the reason why I believed I had been sent.

Then, in that meeting, I described the particulars of what had been taking place with the students. Hamilton expressed consternation, shock, and concern about what she heard me detail about the students' behavior towards me. She then stated that the students needed to be spoken with ("*Oh no. The students need to be talked to*"). We agreed to discuss the issue further at a later date when she would contact me again.

However, after my conversation with her, I attempted to reach Hamilton by email several times for approximately nine (9) days to follow up. When Hamilton finally responded, she apologized for the delay, and ultimately *suggested* that I establish a "*Community Agreement*" with the students, a document which she then sent to me via email. This was a toned down, a different and muted response, compared to Hamilton's original reaction, and I was surprised.

After reading the document, I declined to participate. The "*Agreement*" did not address race-based, anti-Black bullying specifically, appeared to place the professor and the

student on equal footing, and seemed to place me, in this case, in a position of responsibility for the students' conduct towards me. Given my documented efforts to calm the behavior of a subset of students who had been attempting to dominate, interfere with and disrupt an entire class because of their problem with my "*Blackness*", this was untenable.  Therefore, I stated to Hamilton that the students would benefit from such an agreement amongst themselves. As far as I could determine, that was a start. I also stated that I would bring it to the attention of the students, which I did in the following class session. However, I was looking to make a formal Discrimination complaint and have it addressed.

The second and next suggestion by Hamilton was for her, and other University officials, to have a meeting with the students to establish that "*Community Agreement*", or a guide regarding student conduct. Although not directly addressing racism, this suggestion would have been a better step in the right direction. However, this meeting never took place. Respectfully, Campbell and Kimura made an issue of my refusal to participate in a suggestion that did not take my claims of racism into account and had no component for it on the form but have not addressed why Hamilton, with Denise Santiago, did not have the meeting with the students as the suggestion I did agree to. Had I agreed to their Community Guidelines meeting, I would have been unwittingly agreeing to the underlying false narrative about myself which Defendant Blackwood and her subordinate Defendant Hsu had been circulating.

On *March 3, 2021,* after yet another disturbing incident with Student "--" occurring in my class[1], which I reported to Hamilton as being part of the race,-based bullying, she abruptly, and to my surprise, claimed that she could not assist me further. This is because I should never have been sent to her as this was never her job. Hamilton referred me to Dean Todd Smith-Bergollo ("*Smith-Bergollo*"), the interim Senior Associate Dean for Students at Defendant Pace although she should have sent me to Dufresne, the secret everyone was keeping.

Hamilton provided no reason or explanation for her actions. Similar to how I was given the order to be silent by the Defendants and make no complaint about what was happening to me by Defendant Hsu directly, Hamilton, even though upset, dropped it. She had also spoken with Denise Santiago, Director of the Multicultural Affairs office, and Rachel Carpenter, Interim University Dean for Students, two other Pace administration members. However, notably, during the time that Hamilton and I had been in contact, she told me that, at some point after I met with her via Zoom but before she referred me to Smith-Bergollo, she had spoken with *Defendant Hsu* at least twice. I did

---

[1] The student took advantage of an opportunity to engage in unacceptable behavior upon accepting an offer I made for her to use particular Brightspace functionality only I had access to in order to enhance her presentation. After I made her the "*host*" of the Zoom session, she never used the functionality for her presentation but used it to end my class session early. When I emailed her about it directly after she did this, she did not respond with an explanation, or apology. She did not reply to my email at all.

not know why Defendant Hsu was having conversations with Hamilton when I had been referred to her.

**In fact, I would learn through Discovery that Defendant Hsu was arranging meetings between her, students and Hamilton over claims that I had been discriminating and retaliating against the students during the same time I had been in discussion with Hamilton. <u>Those students were then directed by Hamilton to the EEOC investigator while I was sent to Smith-Bergollo.</u> Hamilton never shared this with me. I was diverted again then.. In fact, Defendant Hsu was instrumental in arranging meetings with a student and Hamilton and then the student (and her friends in the class) and Bernard Dufresne, accompanying her to the eventual meeting with him about me allegedly to discuss allegations of me discriminating against her, with Defendant Blackwood's knowledge, instruction and consent based on her own subsequent email to Dufresne regarding me.**

**To this point, during all of those maneuverings behind the scenes to frame me, there had been no email or other contact that Defendant Hsu (or Defendant Blackwood as previously stated) had with me. I believe that she did not want to risk that I would put the race-based bullying report I had made in writing to them, which would have been more than a likelihood.**


### DEAN OF STUDENTS TODD SMITH-BERGOLLO

On **March 3, 2021**, I contacted Smith-Bergollo's office via email, based on Hamilton's referral. I communicated with Edith Arenas-Rivera ("*Arenas-Rivera*"). She asked me via email to inform her of what the issues were so that she could share them with Smith-Bergollo. In an email on March 4, 2021, I detailed the events which had occurred during that semester, information which included the race-based, anti-Black bullying, and hostile work environment I had described to Defendants Blackwood and Hsu, and Hamilton ("*She said Student "P" stated in a group chat that I was "insecure about my blackness which is why I was teaching at a predominantly white institution", that I was a "black conservative", that she was "disappointed in my Guyanese heritage" because of what she believes are my views*) .

**I needed help with Student "--", in particular. She was the oldest of the group of bullies, I believed, who had been attempting to convince the other students, the entire class, to engage in the bullying of me based on my race. She made repeated statements to me in front of the class and in emails to me that when she made statements, complaints, was speaking for the class, and/or claimed that her classmates would agree with her.**

**Arenas-Rivera forwarded my email to Smith-Bergollo, a mandatory reporter, who then emailed me directly. never reported my race bullying claims to Bernard Dufresne, as he was required to do and though my email was clearly written as I had been vocalizing my complaint before this. In fact, he, like Defendants Blackwood and Hsu to whom I had reported before him, pretended that I had not said them. He did not ask me about it or**

inquire as to whether I had spoken with Dufresne. Instead, he asked what *I wanted him to do* regarding the email at large that I had sent. What he did not ask is whether I would like to file a formal complaint with Dufresne. He should have provided me with Dufresne's contact details in addition to his reporting of it (Exhibit "–"). One action Smith-Bergollo took, however, was to forward my email to Defendant Baumann.

The third (3ʳᵈ) response Smith-Bergollo had was to agree that Student "--'s" conduct warranted intervention from his office. He not only stated to me via email that he would speak with her, but he apologized to me for what had been happening. He made no issue of me asking Student "--" to speak with him before returning to class. As the court may recall, Defendant Hsu found no issue with this request of a student either in the aforementioned draft letter I had sent her on February 11, 2021 which had contained this verbiage. Indeed, on February 16, 2021, she had responded to say that she thought the language was "*great*".

Smith-Bergollo asked, and I, agreed to meet via Zoom so that he could understand further, as he claimed. However, one comment he made that I did not understand was the statement that what I described to him, as well as the problem itself, had "*layers*".

What eventually shed light on the aforementioned comment by Smith-Bergollo is when I learned through Discovery that both Defendant Baumann and Defendant Hsu had been in contact with Smith-Bergollo about me at or before the time Hamilton had referred me to him. Smith-Bergollo did not mention this in our conversations.

Smith-Bergollo stated he would meet Student "--" but stated he would "await Student --'s outreach". He also stated that he was unable to meet her before the next class but did not state that her missing a class would be problematic. I also did not believe this was a concern as students are permitted three (3) absences in a class which also has no exams.

In reply to Smith-Bergollo as well, I stated that I did not believe Student "–" would contact him as she had not responded to me in any way. I asked him if he could instead communicate first with her. Then, I wanted to take some time in order to determine how to approach her productively as my emails indicate. I had wanted to figure a way so that Student "—" would not feel attacked since her previous reactions seemed to me to be disproportionate and angry. This display in 2021 of concern for Student "--" despite her behavior is inconsistent with Campbell and Kimura's narrative regarding that student, the leader of the bullying students based on my race, and the other students.

On *March 5, 2021 at 4:30 p.m.*, I emailed Defendant Blackwood in what had been the first communication between us since the February 18, 2021 meeting where I had reported the race-based bullying (Campbell and Kimura have not produced one email sent from Defendant Blackwood to me after I complained in that meeting). Therein, I updated her, informing her that I had contacted the Dean, Smith-Bergollo, regarding the latest in the behavior of Student "--". Also, in this email, I referred indirectly to Defendant Hsu's threat

towards me by referencing Defendant Hsu's language on "*boycotting*" used in that threat which I brought up related to the concern I had upon learning that Defendant Hsu contacting Hamilton without my knowledge, and for some unknown reason.

Later on *March 5, 2021 at 5:57 p.m.,* Defendant Blackwood replied to me in a noticeably short, vague and evasive communication to state regarding what I had stated about Student "---", that "…no, *you cannot ask a student not to attend class*". To be clear, respectfully, not only had Defendant Hsu already found that language of asking a student to speak to someone before returning to class to be fine, but Smith-Bergollo had identified no issue with my request of the student either. To be sure, I had not asked for Student "--" to be *removed* from the class, or to not attend, but to be *spoken* to before attending the next class, as part of urgent efforts to address her inappropriate, race-based bullying behavior. I immediately made that clear to Defendant Blackwood via email, to correct this piece of narrative that made up part of the wordplay/switching that Defendant Blackwood started engaging in with me the moment she commenced any communications with me after the February 18, 2021 meeting (Exhibit "Update and Response").

However, it should be noted that removing a student who is openly and admittedly harassing a professor for being Black, and recruiting other students, the class, to do the same, is absolutely a possible ground for removal. It is grounds for suspension and/or expulsion. Defendants never once discussed this aspect with me, their policy on Discrimination, but turned the situation around on me immediately.

That is, Defendant Blackwood did not address Student "--"'s behavior whatsoever, and noticeably did not even mention it but focused on heightening her efforts against me, in preparation for Defendants' next and planned move, the threat of an upcoming meeting using self-protective but inappropriate verbiage such as "*cause*"  ("*We may have cause for further meetings next week after you get a chance to meet with the Dean for Students office*"). This was further retribution for my insistence on the February 18, 2021 meeting by, again, blaming me, turning the tables, as Defendant Hsu had been attempting to do.

After having asked the advice of a personal source om the matter almost immediately that day who had indicated that she would not have asked the student to miss a class, but having forgotten that Defendant Hsu had already given her approval on this type of step in her February 16, 2021 email and Smith-Bergollo had found no issue with it, I stated to Defendant Blackwood on March 5, 2021 at 6:12 p.m. that I understood that I "*cannot ask a student not to attend class before speaking to an advisor or Dean. I also understand that I have other options but these I do not want to avail myself of. I would rather (which is why I was in a hurry) have Student "—" speak with someone before Monday's class so that there is an understanding before she attends class that day as to conduct. It seems that Todd is not available to speak with Student "—" before our meeting on Tuesday.*"

I said this despite the lack of issue taken about my detailed request about Student P potentially missing a class from Smith-Bergollo but also from Defendant Baumann whom

the Dean of Students had forwarded my email to. In fact, a professor can ask a student who had engaged in the behavior Student P had demonstrated to speak with their advisor or the Dean to set the parameters for the treatment of me, especially in light of her comments on my race. Respectfully, Defendant Blackwood should be required to explain, testify as to why she made the inaccurate statement that she did, which formed the basis of her "*cause*" remark in her email. Respectfully, this Defendant Blackwood example of trying to sound official and right in her criticism of appropriate behavior defines the case Defendants have attempted to build against me, have proffered to this court, and as seen particularly in their Motion.

Unbeknownst to me and immediately following the aforementioned email communication, Defendant Blackwood took one shocking action as follows: -On March 5, 2021 at 5:03 p.m. thirty-three (33) minutes after receiving my email, she forwarded it to Dufresne, whom she had never met if the contents of that correspondence are to be considered truthful, seeking apparently a federal claim of Retaliation against me. In her narrative seeking that charge, she claimed that my email did not "*make sense*" but apparently it was intelligible enough for her to believe a student was being retaliated against and then to seek that charge. Indeed, in retrospect, Defendant Blackwood's silencing of me would have been inconsistent with sending me to anyone for help including the EEOC investigator to report anything.

Dufresne, who I did not know existed and had not been referred to although I had made various reports of Discrimination to various Mandatory Reporters (all of the Defendants) at various times, responded to Defendant Blackwood on March 5, 2021 at 5:12 p.m. and left Defendant Blackwood with her "*instinct*" that I had targeted Student "—" unlike what he likely would have determined about the students and the Defendants had he conducted a legitimate Discrimination and Harassment investigation into the race-based bullying.

However, on the other hand, of note, *had* Dufresne in fact determined that an investigation was necessary based on a student complaint, it would have required that he contact *me*, thereby revealing his existence, which would have allowed me to file the federal civil rights claims I had sought to file since 2018 by reporting the multiple instances of behavior described herein. Defendants had been trying to prevent this. What this all indicates to me is that this suite of email communications between Defendant Blackwood and Dufresne, as I have suspected about many other emails which Campbell and Kimura produced amongst the Defendants (or those between them which have emails from me or between me and students forwarded with them) were staged for court viewing. Defendant Blackwood's "*concern*" about me was staged. The conversation between her and Dufresne was likely staged. What adds to this idea is how quickly Defendant Blackwood dropped her claim about me once Dufresne responded to her, despite likely having received or seen the full version of events that I had sent to Smith-Bergollo who had forwarded it to Defendant Baumann which she could have sent to Dufresne at some point thereafter. Either it was

staged or Defendant Blackwood was being duplicitous with Dufresne about what she knew or had access to about the situation. Her behavior was made worse by the behind the scenes complaints Defendants had been actively soliciting from the students, especially Student "--" which I had not known about at the time. She was engaging in a double effort using both the students in their voices as if the complaints were independent of her when they were not, and she was using herself as Chairperson as if a neutral authority figure.

As to what specifically Defendant Blackwood claimed not to understand regarding the event with Student "--", she, the student who had been engaged in bullying me and speaking for the class, encouraging and advocating for it in group chats with her classmates, had engaged in yet another bullying act. To explain, despite her pattern of conduct towards me, I had offered Student "--" the ability to use Brightspace to enhance her facilitation with a presentation component, if she wanted. It was a gesture of kindness towards her, which I constantly state as the counter to Defendants' habitual and compulsive framing of everything I have done towards the students, and Student "--" and the other leaders particularly, as bad and intentionally malicious.

To my offer, Student "--" responded that she wanted to have that Brightspace host functionality. I then allowed her to be host. Student "--" never used the presentation function but, instead, ended the class before my class session and work had been completed for that day as I had announced at the beginning of the class that I was also meeting with a student after class. During this time was normally when students asked me questions. But Student "—" knocked everyone from the site, even though I had requested and reminded her several times to return me to host and she made a movement, on screen, as if she had done so. I emailed Student "--" immediately, asking for an explanation and her advisor's information so that we could all sit down and talk but Student "--" never responded at all ever to say anything about what she did. I am certain, however, that she contacted the Defendants although they produced no email that I have seen indicating this. All of the foregoing, Defendant Blackwood claimed she did not understand in her email to Dufresne where she also pretended she did not know. Student "--" attended the next class session and still made no reference or gave any explanation

Instead of asking me for details if she allegedly did not have enough information, or the minutiae, as presented herein as I had sent her a summary version, Blackwood emailed the EEOC investigator to seek a finding of Retaliation against me, using the summary version of my email. It was a bizarre act particularly since either she likely knew, as stated herein, or could have known what had occurred by contacting me directly or Smith-Bergollo. Before she emailed Dufresne, it is not known whether she had spoken to Smith-Bergollo to ascertain what he knew that made him believe that Student "P" indeed needed to be spoken to. Finally, was it fair to ask a student to be spoken to by the school who had been disrespectful, angry and belligerent towards me, defending another students' call to use violence against White people by being disrespectful towards me as the professor, spreading hate about me as Black person and recruiting others to do the same but stating

that she was speaking for the class in any event, repeatedly bullying and badgering me about receiving the class recordings I was forced to make of myself in the classroom because of her and others' antagonistic behavior and falsehoods about me transmitted to the school (but then claiming she wanted the recordings of me for schoolwork), I believe it was, even if Defendant Blackwood, with her conflict of interest, claimed that it was not.

Indeed, both Defendants Blackwood and Hsu each had contacted Dufresne at different points, unbeknownst to me at the time, in order to voice their own alleged concerns that I had been retaliating against Student --. When Defendant Hsu (as Program Manager who, had begun suggesting early to students that I discriminate but never apparently broached the subject with Dufresne then about her alleged concerns)  had urged Student "—" in writing to go quickly to Dufresne *first* to get her side in about the alleged retaliation by me, she offered to and then accompanied that student physically to his office for this meeting, apparently.

Promptly, and within less than 47 hours after those comments by Dufresne to her regarding any retaliating by me, Defendant Blackwood, with Defendant Baumann as her support, insisted upon "observing" my class. That is, on Sunday, March 7, 2021 at 11:03 a.m., Defendant Blackwood sent me an email, with very particular wording from the start, forcing her way into my classroom. She invoked Cooper, who was supposed to be in the role of my Union advocate but who was never authorized to speak in my place) to say that I had "*agreed*" to her being in my classroom as an "*observer*". She also proffered her alleged reason for this. She wrote,

"*Dear Wendy,*

   *Since what's not working in the classroom is going to take more time than we have to fix prior to Monday, and we don't have grounds to remove the student, we need to implement steps that are fair to you and the class.   This Monday, I will add myself as an observer to your Zoom class. I will moderate the presentations scheduled for Monday, in order to avoid any IT/logistical issues and be an observer in the class moving forward…*

*Bernadette from Employee Relations spoke with Varise yesterday, and it's our understanding that this is mutually agreeable solution.  Varise also added that you would be in agreement with teaching the class from a laptop or desktop, so that the Zoom/IT suggestions he made can be implemented.*"

---

First, as to this email, not only had I not asked for the student to be *removed* but it appeared that Defendant Blackwood had, in fact, discovered what had actually occurred with Student "--" in my classroom, or should have by that point. Yet, Defendant Blackwood did not return to Dufresne with my full email explanation to Smith-Bergollo which also had the race-based bullying claim I had been making at every meeting beginning on February 18, 2021 within it.

Moreover, respectfully, next to the aforementioned falsehood by Defendant Blackwood was the subtle point of blame (for using my phone for class (since my working computer was not cooperating during that time)) along with the computer loan offer, which Defendants could have made much sooner because they were likely aware that all meetings I had with them during that time had been via cellphone.

Because of the statements by Defendant Blackwood and the phrasing she employed which concerned me, I was again feeling particularly aware that I was walking on eggshells, attempting to balance standing up for myself/protecting myself with giving as much grace as possible to the Chairperson to attempt to maintain a positive relationship. The Defendants understand very clearly this point because they have been intentionally leveraging their positions towards me from the beginning, using specific wording choices in emails to me and in meetings, to make the point.

Therefore, when I responded to Defendant Blackwood, to deny her claims and ultimately state that I did not require an observer, I began with friendlier language to start than she had employed and I did so with some language that was not completely accurate, which the Defendants know, but Campbell and Kimura chose to pounce on to knowingly use a lie emanating from a need to save my job. Specifically, when I stated, "*You and I agreed during our meeting that you would observe a class in the future. Now would be about the time you thought observing would be useful. I agreed with you that this would be a good and welcome approach.*", both Defendant Blackwood and I knew that this was not the case.

That is, Defendant Blackwood was supposed to, on her own, check in on the class two (2) weeks after the February 18, 2021 meeting where I reported the race-based issue but she never did this. She stayed completely silent the entire time. However, almost three (3) weeks later, and after she had attempted to seek a Retaliation claim against me with Dufresne, she responded on a Sunday (to an email I had sent to her to apprise her about the Student "---" and Smith-Bergollo situation), to now insist upon observing my class, using agreement she alleged I gave to Cooper. It appeared, then, that not even she believed she was checking in given the Cooper element. As stated, however, I was trying to show her grace as someone fighting in all of these ways to save my job which, particularly because it was as important as it was for various reasons, I could see was in jeopardy again.

When I sent this email where I had disagreed with the permanent observation component ("*However, there was never a discussion about permanent observation of my class that I have had with anyone*"), among others, it was Defendant Baumann who jumped into the conversation to flank me with lies and a form of group intimidation that attempted to heighten the issue for purposes which included pressuring me and forcing the observations. She claimed, "*While I absolutely respect your experience of the class, I believe, based on my conversations with Sarah and Stephanie, that there are students who*

*continue to have issues in the class.   I also understand that you have asked very recently to have a student removed from the class…"*

This group intimidation included the use of my own Union representative. In her email, that is, Defendant Baumann repeated the Cooper lie even though I had just denied it within an email she was copied on and then forced the situation using her position in Human Resources to "*suggest*". Defendant Baumann stated, "*My understanding when I spoke with Varise (and I apologize sincerely to you and Varise if I misunderstood) was that an observer would be fine with you. If that is not the case, or I misunderstood, I suggest having Sarah sit in as an interim measure…*"

Even though I responded to Defendant Baumann's email in a lengthy reply to continue the conversation and dispute the various false claims she made including the permanent observing, Defendant Blackwood attended class to observe on March 8, 2021, which corrects the date listed in ECF 199. I sent her the Zoom link to attend. In that class, Student "--", one of the leaders of the race-based bullying, was scheduled to finish her facilitation, which she went on to do although still complaining about not being allowed two class sessions to facilitate. This was also the student who had cut off my class the session before.

However, before this, during the beginning of class when I respond to questions, two (2) of the three (3) leaders of the race-based bullying called out to accuse me of never answering their emails. First, one student made the false accusations and then the other student jumped in to say to me that "*Yeah. She's not answering our emails. It's disrespectful. Someone has to say something about it*". That he used the word "*She*" meant that he was speaking to Defendant Blackwood about me, lying, right in front of my face. It was a revelatory moment among many.

I denied the aforementioned student claims immediately, requesting that one of the students resend the email she claimed I had not responded to, in the event that I had not seen it. The student did, in fact, send the email and when I responded to her hat I had replied and she then sarcastically agreed, I asked why she had stated what she had (the lie) in front of Defendant Blackwood. She did not reply. (Exhibit---). I had also emailed Defendant Blackwood to state that I felt the students were being performative because she was there.

On the next class day, March 10, 2021, I was surprised to see Defendant Blackwood in my Zoom classroom again as I had not sent her the link. I do not know how she received that Zoom link for that day's class. When she, as the rest of the class, arrived, the chat *between the students* was muted which meant that they could use the chat but only to speak with me, and the audio was muted except for the day's facilitator. I explained that I was concerned by the behavior dominating the class and that it needed to cease. The student, meanwhile, was upset but respectful and earnest in asking me to unmute the audio because

he wanted to engage verbally with his classmates directly while performing the main objective of their first assigned task which was to *analyze their essay*.

I had informed that student during the aforementioned situation that he could ask questions and that I would provide him with responses from his classmates. He did not want to do this.. As one note, this same student had also belligerently argued with me at the beginning of class prior to this that the facilitation was supposed to be about "*facilitating conversation*" because of <u>the name of the assignment</u> and not about analyzing essays, which he claimed I had not told the students to do. It was a lie but one that had seemed to me in the moment to have come from behind the scenes conversations with the Defendants who had been helping the students to create issues and controversy not from subject matter anymore or as in the beginning of the semester but now from assignment descriptions, scheduling and the syllabus.

As it turned out, the aforementioned student was also one of the students described three (3) paragraphs above who had called me disrespectful for not answering his emails although he had never sent me even one email communication ever in that semester. With all of this, I decided that I would speak with them and negotiate their behavior in the classroom yet again.

I spoke for about five (5) to seven (7) minutes whole all were muted (except via chat to me) and shared with them that I was a proponent of free speech and that I wanted them to express themselves but that they could not engage in bullying me any longer. I also tried to discuss some concerning things I heard in Student "—"'s facilitation (who had just ended hers) about White people ("*Barbara Ann from Kentucky*" and "*Sarah*" comments which had been used as a means to signify White names or *Whiteness*).

As I was speaking, Defendant Blackwood inappropriately began using the chat function to speak to me during the class. She accused me of class pedagogy issues for muting the class (although Cooper had advised me to do so, stating that the functionality was there and available for such purposes which information was also located on Defendant Pace's website). She also took issue with me broaching the subject of the aforedescribed language employed in that student's presentation that had stereotyped White people, in my view and in the view of a White student who had expressed her discomfort via email about speaking generally in the class because of the prevailing bullying anti-White vitriol.

Indeed, Defendant Blackwood made a point at that moment in the chat of forbidding me to speak of that presentation she immediately assumed was that of Student "—" whom she had just gone to Dufresne about ("*Please also refrain from addressing Student --'s presentation directly*"). Upon me explaining the context, as I was then required to do using the Zoom chat function in the middle of class, Defendant Blackwood, in attempting to actually override a teenager's feelings with regard to what she was hearing discussed about her race (White) in the classroom, and my judgment as a professional, "*chatted*" back to me, "I*f a student complained, you can send them to me or Stephanie.*

*Assuming you are referring to "Student --'s" presentation, which I observed, absolutely nothing about it was objectionable. I am happy to pedagogically intervene with any student who may have complained as their complaint is stemming from a misunderstanding of some of the intellectual bedrock of the field of critical race and ethnicity studies"* Exhibit "—".

At that time, Defendant Blackwood had not mentioned that she had been seeking a retaliation finding against me regarding that Student "—", which her chat message to me and description of and response to the White student's complaint would conveniently aid.

Defendant Hsu would add herself onto my specific Brightspace teaching platform, marked as having occurred on March 12, 2021, without my knowledge or my consent, using the pretext of complaints from students she had in actuality solicited for "*complaints*" (after she had finally agreed to speak with students following her repeated refusal to do so during our February 11, 2021 conversation), in order to find reasons to accuse, discover issues and blame. I only happened to learn of Defendant Hsu's act during that semester as she never divulged having done this.

Despite all of the aforementioned steps taken by Defendants Hsu, Blackwood and Baumann following the February 18, 2025 meeting to secure a civil rights filing against me, no report or formal or informal complaint to Dufresne of any kind, written or otherwise, was ever produced in this lawsuit as having been filed against me for any acts of discrimination, retaliation or harassment even though an actual student and Defendant Hsu met in person with Dufresne seeking and pressing for a finding of such a violation/s.

As a note here, Campbell and Kimura have made a different suggestion regarding that one instance of muting the chat which also appeared in both or either the Removal letter and the evaluation by Defendant Blackwood I refused to sign. Additionally, Cooper, the Union representative who the Defendants through Bond, Schoeneck & King represented and/or still represent in this litigation, told me to mute the chat to "*take back control of the class*". He also told me to record as a protection strategy.

Following the aforedescribed March 10, 2021 class session, I emailed Defendant Blackwood asking about her presence in my Zoom class. She replied that she thought I had agreed. But, in fact, I had not done so, explicitly. I had sent an email back to Defendant Baumann which she chose to ignore, even though I had not realized this is what she had done, despite my understanding that the professor must ask for an observer and give permission (which is why the Defendants both used Cooper for "agreement"). Defendant Baumann had chosen not to respond to me or to defend what were false statements, but to procure somehow the Zoom link only I can create and disseminate in order for Defendant Blackwood to "*observe*". In effect, as one note here, Defendants Blackwood and Baumann, by invoking Cooper repeatedly, were *telling* me that I had agreed.

During this time, Defendant Blackwood accused me falsely via email about "changing" the very basic facilitation assignment following the four (4) students who had already facilitated a discussion of an essay after they analyzed it for main points and themes. "Complaints" like these were apparently coming from the same complaining students who I had initially reported for race-based bullying. They claimed that I had never informed them about what the facilitation entailed. Then, after I provided it as the more detailed writing on Brightspace, they claimed to me and then Defendant Blackwood that I had changed it. So the students knew what I stated initially as the first lie and then they lied as Defendants Hsu, Blackwood and Baumann had asked for and coached them to do. This issue landed on either or both the Removal letter and evaluation.

Also back on March 7, 2021, at 11:52 p.m., Smith-Bergollo indicated that he had asked for Defendant Baumann to attend our meeting, as he had stated that he had "*checked in*" with her earlier, because I had asked for Cooper's attendance at the meeting. However, Defendant Baumann could or would not meet until Thursday, March 11, 2021, which meant that, if Student P was not to attend class before speaking to Smith-Bergollo, she would have missed two (2) classes based on my Defendant Baumann's inability to meet sooner.

### MARCH 11, 2021 MEETING

On March 11, 2021, I met with Smith-Bergollo, Defendant Baumann, and Cooper. I related all of the details contained herein to this point including the race-based bullying for which I was seeking an investigation. I complained that Defendants Hsu and Blackwood were treating me differently than other professors including themselves. In that regard, I described the content in Defendant Hsu's class materials which she provided to me to use as containing pornographic content unsuitable for young students. I reported Defendant Hsu's threat, and the initial and then subsequently more severe Defendant Blackwood silencing of me following my report to her of the race-based bullying.

At this meeting, Smith-Bergollo, who had agreed to meet with Student "--", now decided he wanted to receive video evidence of bullying. He did not ask nor had I remembered to mention the emails from students asking if I was okay. This information Defendants should have had at that point from any true investigation and interviewing of the class. Defendant Baumann deceitfully asked me at one point if I considered Defendant Hsu's words ("*Drop the complaint or students will boycott and teachers will be expelled but we're not there yet*") a threat, words which I had already labeled as a threat in the meeting.

The meeting ended where Smith-Bergollo now was not going to speak to Student "--", not even to ascertain facts about the issue from her point of view, unless and until he received video evidence from me of bullying. Defendant Baumann made no further comments in that meeting. In my Retaliation case, I learned that Defendant Hsu allegedly

had contacted and sent Smith-Bergollo alleged emails from the student allegedly telling the students' version of events prior to the Match 11, 2021 meeting.

There are three (3) issues with Defendant Hsu's behavior from the previous paragraph. *Firstly*, I contacted the student to understand why she behaved in the way she did but received no reply. Apparently, however, she contacted Defendant Hsu who, instead of contacting me to inform me of what the student claimed, sneakily went to Smith-Bergollo. This behavior goes beyond unprofessional to preemptive interference and cover up. Until today, Defendants never stated what the student claimed. *Secondly*, Smith-Bergollo did not inform me of Defendant Hsu's (and likely Defendant Blackwood's) contact with him prior to the meeting), which he should have divulged. *Thirdly*, I complained in detail to Smith-Bergollo and Defendant Baumann about both Defendants Hsu and Blackwood regarding conduct deserving of investigation and it seemingly went away as if I had never made that complaint. But, that is one of the reasons this lawsuit and the attention it will garner foe these facts, exists. Indeed, the next day's email from Defendant Blackwood and Defendant Baumann (in the shadows as it were) highlight the issue.

Almost immediately on **March 12, 2021**, Defendant Blackwood sent me an email requiring me to attend a meeting where she stated, "*We will be meeting to discuss ongoing student complaints, your complaints regarding students, grading issues, classroom management and pedagogy. Please note that this meeting may lead to disciplinary action.*"

The aforementioned email was a part of the culmination of the efforts of the Defendants the entire time. It also appeared to be a reaction to the meeting, where I had reported the race-based bullying again but now with the preface to that report (Defendant Hsu's silencing, observation, accusations and threat) and the aftermath in terms of Defendant Blackwood's permanent silencing. I also had complained that the Defendants, among other things, were treating me differently than other professors, including themselves.

### MARCH 18, 2021 MEETING

On March 18, 2021 Defendant Blackwood, Defendant Hsu, Defendant Baumann, Cooper and I met on Zoom for the meeting. A portion of the meeting in transcript form, which much if not all of which contradicts Kimura and Campbell's Motion claims, is as follows:

20:59 Defendant Blackwood*: "Um, one other, I forgot to mention it in going through the supports, um, was that we also, I can't, I don't think I mentioned this but, um, after the meeting between Wendy, Stephanie and I, we connected her with Tiffany Hamilton, um, as another form of support that we, that we provided, um, because we thought that that office, um, you know, if, if, the meeting with us didn't, you know, feel like, if she didn't feel like that addressed concerns, we wanted to make sure that, that, um, it was clear that, that, there were multiple kind of offices that are available at Pace for support, for different, for different aspects of teaching and employment."*

21:41 Defendant Hsu: "*And then I met with Tiffany and Denise Santiago and OLMA, um, to hear their recommendations and what they conveyed to me was that they wanted to lead a Community Guidelines session,*

*um, in the class, in, in Professor Harte's class. Then, when I followed up with them, they had postponed that, and deferred that act, action, so I did also follow up on that administrative level of support...from the, from the Chief Diversity Officer who is, as we all know, parallel to the Provost.*"

22:19 Defendant Baumann: "*Varise, I just wanted to interject in...cause, I think when I spoke to you, it was probably late at night, when we were first, we were both being informed about these things. I thought that a meeting with the class and Tiffany had happened. I just want to verify that didn't happen. Oh, you're on mute.*"

22:35 Cooper: "*I muted myself to sneeze. Yes, I'm clear on the order. I know that it didn't happen.*"

22:42 Defendant Baumann: "*Okay.*"

22:43 Defendant Hsu: *Also, just, uh, in all of my student communications and conversations, and the first time I talked to a student, I have acknowledged that it is our job to really think about what anti-racist action means in the context of this class, and I specifically mentioned anti-black racism, and all of us being very vigilant about it. So, I, I, do believe that I asked the students to really think about their comportment in that framework. So, um, I also believed that I didn't pull punches with them, in other words, about what was going on.*

Later in the meeting, in speaking to Defendant Baumann, I stated:

*Me: Well, I mean, in that meeting with, with you and Todd, I was asked to send you the information, and within less than 24 hours, I received an email from Sarah saying that everyone wanted to come, uh, and talk with me, uh, and that, about all these concerns, and that, um, you know, disciplinary action might be, uh, warranted. Um, less than 24 hours, I don't consider that reasonable, uh, to... So, so, I, I, so, in other words, I didn't understand how there could be even a discussion about disciplinary action, disciplinary action, when you had not seen any of the evidence from, from my side, any of the supporting emails or documents from my side...*

*Cooper: Um, I'll answer that. I'll answer that. The language on disciplinary action is, it's normal. That has to go out to every, every communication that comes from HR. So it wasn't aimed directly towards you, Wendy. Um..*

*Me: I think that, I think that's a hard thing to, to, to hear, you know, uh, in the moment of these things happening. But, I certainly think that..*

*Cooper: I didn't, I didn't say anything because it's regular. So, I didn't, I'll take responsibility for that. If you had brought it up, I would've told you that's normal language for correspondence from the HR department in this situation (Second admission about Defendant Blackwood email).*

*Me: Right, but they wanted to, they wanted to address concerns without having heard anything that I said less than 24 hours later. That was problematic for me.*

*Defendant Baumann: So, I don't think that Todd put a deadline on when you could send him any follow up information. So, in my mind, you're still free to send him anything you want him to independently review. That's (Me: Mmm hmm.) fine. This meeting today does not preclude you from sending anything to Todd.*

*Me: Right. I guess what I'm saying is that there was no information that you had had from your side before sending the email to me about concerns that you had about changing syllabi and, you know, all these other issues.*

*Defendant Baumann: Well, that's what this meeting is for (Me: Right but I guess I'm saying is that...) is to discuss those issues. It's, it's not to begin, you know, an email exchange where we, you know, all five of us debated over email. It's to set up a meeting to discuss the topics at hand."*

Exhibit ("—") "videos links". **Respectfully, I would like to provide the court with the originals of these videos, should these claim be reinstated.**

**During that meeting, at 13:48 p.m. or 1:38 p.m., Cooper texted me to say, "*I'm defending you. Slow down*".**

**Given what I have already shared herein, respectfully, the meeting's contents, which video links I have provided here, speak for themselves as to what its intent was and what attempts at silencing, the forcing of new false narratives and my agreement to them, misdirection with the piling on of new accusations regarding lecturing instead of allowing for a seminar format, attempting to humiliate me by requiring me to canvas my class in order to determine which students wanted me to "*keep going*", inserting subtle hints about things that "*did not happen*" and being sent to Hamilton about matters related to "*employment*". Defendants allegedly learned that Cooper directed me to mute the class but that action, which Defendant Blackwood described bizarrely as a "*blanket mute*" landed on the letter that would be used to remove me from teaching the class over a week later.**

**The above-detailed events were the mark of lowness seen repeatedly in audio and video recordings, emails, papers and/or court filings, and behind the scenes behavior.  The homework the Defendants engaged in to prepare to execute all these actions is clear. For example, after working intentionally to smear me to the students for over a month in emails, during in-person meetings, on Zoom and in the classroom, the Defendants imposed the demeaning condition upon me on March 18, 2021 of requiring me to go to that class of students to find those who still "*enjoyed*" my class. It was a dare.**

**Moreover, not only should I not have been required to do such a thing as the above directive, which other non-Black professors were not required to do following meetings which might lead to "*disciplinary action*", but the answer clearly would not have mattered. The Defendants were determined as to what they wanted and prepared and worked to have occur. Worse, one gets the sense that the Defendants felt pride in these maneuvers, some of which played off of, or were a corollary to, earlier low machinations. The meeting demonstrated only some of these efforts.**

**The meeting was provided in five (5) segments which is how I was able to record it. My phone's video storage only allowed for a certain amount of recording space per each recording. Any delay between videos was only in seconds so as to restart the recording. Two videos, therefore, were approximately thirty (30) minutes each and the others were approximately five (5) to six (6) minutes each. Please excuse the visuals in the video, namely my foot in a yellow and black Mickey Mouse sock.**

Also in that video, I raised the anti-Black race-based bullying and my request for investigation yet again.

**REMOVAL**

On *March 29, 2021*, Defendant Blackwood sent me her Removal letter removing me from teaching my course using the baseless complaints and allegations the Defendants had been attempting to gather during the whole of the semester. Defendant Blackwood, Defendant Baumann, and Human Resources invoked the "CBA" and included language telling me that I could not challenge their removal in any way. I was thereby removed from teaching my class and replaced by Defendant Hsu who had threatened me on February 17, 2021.

I began experiencing new anaphylaxic shock reactions to specific foods I had been eating, causing my throat to close around this time. I was aware of the stress I had been under and was in a state of panic. To that point, leading up to this reaction, I had been having other symptoms for which I visited a dermatologist and Ear, Nose and Throat ("*ENT*") doctors. These doctors had been pointing me to stress as the cause of the various issues I was experiencing. They told I had to reduce it. To that end and in a panic, I began therapy with Board Certified psychologist Dr. Melissa Kresch who ultimately diagnosed me with Adjustment Disorder with mixed anxiety, and depression.

In their Motion, Defendants listed their statements in their Removal letter as "*bullet points*" to which I provide my answer as follows:

-"*The first bullet point in the removal letter provides that Plaintiff "grad[ed] students based on standards that were not distributed in advance. Specifically, one syllabus was posted the week of February 2, 2021, another syllabus was posted the week of March 15, 2021.*"

The syllabus was reviewed with students on the first day of class. Defendants did not indicate what occurred on the first day of class for this reason. Even their submitted alleged student complaint indicated that explanations had occurred on the first day. Those explanations were the syllabus.

A "*written*" syllabus was not provided on the first day. However, Defendants have not indicated how many professors did not submit their syllabi on the first day and why this minor occurrence, which they relied heavily upon, would then warrant removal.

Moreover, Defendants Hsu and Blackwood were tasked with collecting all syllabi beforehand and reviewing them before the first day for errors. This indicates that errors can occur and Defendants are tasked with finding them before the semester begins. They did not do that in Spring 2021. Nor have they indicated to the court that they collected syllabi from the faculty and provided feedback in the event there were mistakes, which can occur as in any document.

The next question Defendants have yet answered is what the syllabus had to do with removal in the moment. At the time of removal and much before it, the syllabi had been received by the students. Therefore, this "*issue*" actually constitutes the attempt to fill a removal letter for purposes of bloating, and substantiating or justifying their illegitimate actions.

- *The second bullet point in the removal letter provides that Plaintiff "request[ed] that students email you individually in order to receive a grade."*

Grades for student facilitations are recorded in my gradebook and then posted for all students following the completion of all facilitations/presentations for the entire class. If, however, a student wanted to know their grade beforehand, I offered that they could ask me via email. In an in-person class, students availed themselves of this option all the time following an individual presentation where, after the class, the student and I would discuss their work in that presentation and the grade. This would occur before all class presentations were completed. It was a courtesy.

In this Zoom class, I let the students know that they could email me, since Zoom after class is usually not private, until grades were posted for everyone. Defendant Blackwood would later characterize my offer to the students as me asking them to enter into an "*email relationship*" with me, which is bizarre language to use. It was the attempt to villainize perfectly acceptable teaching choices and find an issue with something very normal. Defendant Blackwood and Defendant Baumann made sure never to ask me about this until the "*disciplinary*" meeting of March 18, 2021 where, it was clear, they did not want me to speak.

Defendants never asked me about this because they did not want to know the answer or have the explanation that I provided here. This is a pattern the Defendants engaged in throughout Spring 2021 so that they could appear falsely outraged, concerned and hopefully justified in wrongful actions in this instance.

- "*The third bullet point in the removal letter provides that Plaintiff did "not utilize Provost recommendations with regards to 'early assessment' practices, specifically, ensuring that all students are assessed by the third week of the semester."*

This is a *recommendation* which Defendants seem to have converted into a requirement for me. It also purposefully ignores the issues happening in the class as if the class was functioning normally and the race-based bullying that was occurring was not. It also does not account for whether this was possible given the number of facilitations to complete. Respectfully, this is another red herring and filler.

- *The fourth bullet point in the removal letter provides that "Specific and clear assignment descriptions and requirements were not provided, in writing, on the syllabi, for students to*

*consult" and the fifth bullet point in the removal letter provided that "Presentations were listed On the syllabi as 'facilitation day' with no description as to what this entails."*

Defendants relied heavily in their removal letter on the written syllabus as if the teaching platform Brightspace the school had switched to that semester was not crucial for communication and curing syllabi errors. Indeed, Defendant Hsu's syllabus which she used and those syllabi of other professors that she had forwarded to me indicated that they were "*subject to change*". Verbiage like this is employed on syllabi to fix errors and to adapt the syllabus to changing or unforeseen circumstances.

Defendants also disingenuously and blatantly pretend that verbal communication carries no weight in terms of providing information to students.

- *The fifth bullet point in the removal letter also provided that "Some students were arbitrarily asked to prepare presentation with less than 48-hour notice. There was no schedule given to students in advance and adhered to consistently."*

This is false. Moreover, the language of "*arbitrariness*" is meant to point to something else when the presentations in question were those from the race-based bullying students who were of various ethnicities which I was allegedly accused via innuendo of discriminating against.

Defendants also used "*and*" language to complicate the issue by attaching something true (there was a schedule provided) to something false (due to *students* changing their days to facilitate and other events such as the intentional and coordinated question-bombing (which Defendant Blackwood would label as "*confusion*" and which she and the other Defendants encouraged) occurring before facilitations began which took up the class's time, the schedule required organic and in the moment adjustments. Therefore, within this "*bullet point*" is gaslighting.

- "*The sixth bullet point in the removal letter stated: "Failure to utilize effective Classroom management skills."*

"*Failure*" has been a theme Kimura and Campbell sought to impress upon any reader of their filings, particularly, as stated previously herein, in ECF #63 and ECF #65 (with their particularly chosen legal cases), despite all of the evidence of my accomplishments which contradict this. Additionally, it is gaslighting given their directive to me to be silent while using the students to disrupt and lie while repeatedly "*siding*" with those students while finding fault with acceptable techniques I used to attempt classroom management.

- "*The seventh bullet point in the removal letter provided: "Class time management: A significant amount of class time was spent addressing student confusion over assessment Practices and assignment prompts."*

Please see the previous response in Defendants' point number six (6) herein.

-"*The eighth bullet point of the removal letter provided that Plaintiff "Chang[ed] assigned reading schedule throughout the semester. Not giving reasonable notice, regarding changes in reading schedules. Student presentations are based on readings. The presentations are a significant portion of the students' grades. Students did not have the advance notice necessary to adequately prepare materials related to their presentations.*"

These are lies and also repetition of Defendants' number five (5). This is also a typical statement of "*fact*", with all of its vagueness anchored in student anonymity, by the Defendants and has been the cornerstone to their "*defense*".

The students were provided with their reading assignments (to analyze) near the beginning of the semester. They were told to do their work upfront (the sole reading they had of the two (2) assignments they had to do for the entire semester, and be prepared to present earlier) if the schedule changed because a student had to miss their presentation due to unforeseen circumstances, which occurred. This was established and no student complained to me at the time when that structure was established. Defendants never contacted me about this either from alleged complaining students. Defendants never proffered how they would have regulated the matter but, for their purposes, found a problem to write about here.

In addition, students were being used by the Defendants by this time. Students began arguing with me requiring me to reiterate what they had been told from the beginning which was to prepare early (when they received their assignment) and then review their work and notes before they had to do their five (5) to forty-five (45) minute facilitation. I had suspected during this time that student issues and/or absences which required me to change the schedule were not genuine. The students could provide witness testimony regarding this.

-"*The ninth bullet point of the removal letter described "Conflicts between learning objectives described on the syllabi ('valuing diverse claims to knowledge') and specific classroom practices, including blocking the student's full use of the chat function on Zoom, muting the chat and attempting to mute verbal communication functionality for all students during class time.*"

The problem Defendants have revolves around the bullying based on race and how that changes "*classroom practices*". Defendants attempt to falsely link my classroom practices to suppression. It is deceitful trickery. The "muting" was already explained herein in Defendants' "*classroom management*" point in their removal letter.

When I brought up the issue with Campbell during the second deposition that the "*bullet points*" were also repetitive, her fast reply was to tell me to, in so many words, "*stick to whether they were true*". However, even that defense was problematic as detailed herein.

-"*The last bullet point of the removal letter provided "Inadequate assessment of Students' work, that did not provide the level of analysis and criticism needed to assist student development and improvement. For example, evaluating a 45-minute student presentation, with a single sentence email, as opposed to a thorough pedagogical assessment.*"

This is a made up Removal Letter space filler that sought to create a rule in the writing of it but which lacked substance as to what that new rules' measures actually consisted of while using vague, institutional-sounding language to appear official.

Whether I provided feedback in emails to students, which I did, is the operative analysis. Complaining that this still was not enough was evidence of the typical and constant haranguing that was taking place, none of which occurred when Defendant Hsu took over the class and provided no feedback and simply gave high grades to students who had not work and/or who had stopped attending class.

## STUDENT RECORDINGS AFTER REMOVAL

In April 2021 as well, there was something unusual regarding Brightspace. Once and although Defendant Hsu began teaching my class, I realized at some point that I still had access to the course for some reason on the platform. This was not supposed to be possible. With that access maintained, which I happened to discover at some point before the semester ended, I saw videos Defendant Hsu took of the remaining classes which she had disseminated to the students. Defendant Hsu discussed me and made highly inappropriate statements. She lied about evaluations, guiding the students to not write anything about her since, as she claimed, they would not affect her salary. As a note, a lack of evaluations from students for Defendant Hsu would be preventative of them documenting anything she, Defendant Blackwood. Defendant Baumann, Hamilton and Dufresne, among others, had stated to them about me during the semester.

Regarding the aforementioned discussion, which potentially I was meant to see, Defendant Hsu told students that the evaluations that they wrote about her would not affect her salary because she had tenure but the ones written about me would go in my file and "*follow*" me. I continue to maintain the question as to whether Defendants can alter evaluations or even create evaluations from scratch as well.

The first half of her statement was not only false but prohibited as against Defendant Pace policy to sway evaluations. She stated to them that she wanted them to know where "*your (their) labor is going to have its impact*". Predictably, one student simply wrote the word "*racist*" on a student evaluation. These evaluations also came after Defendant Hsu referred to the "*meta*" nature of the students' experience in my CRES class.

With regard to the aforementioned conversation referred to above between Defendant Hsu and the class, which occurred on the last day of class for the semester, April 26, 2021, during the

first six minutes, Defendant Hsu said, "*Our class experience together, I really think, you know, your class experience this, and I'll say it again, it's been a real world learning experience. Um, everything you all felt and heard this semester is part of how we all are going to transform and do differently and, um, hopefully preventatively, to really keep our community together, um such as it is here at Pace but I want to, you know affirm that this whole, this is really meta for you all this semester and so thank you for continuing the conversation.*

*Um, I want us also to be able to bring in examples of "blackfishing" you want to talk about today, and I also have another little bit of evidence to show, um, about, um, a tenured professor who also had been called out for pos--, for, for letting people assume that she's black. So, what this is about today, I think, is I would like us to start with watching come clips, really acknowledging our feelings and the, and the impact of um, these sorts of racial identities and performances in the public space and then we can complicate with the reading. So, I really want you to, you know, trust your emotions the way you have all, you know, all along, and use that as the seed for knowledge. So, where do we go, how do you make sense of the truth that you feel*".

During the last two (2) minutes of that same final class, Defendant Hsu, in wrapping up the class, stated, "*I appreciate. You all have made this semester possible. And you've done something, and created something unforgettable together. So, thank you for persevering and everybody stay in touch*".  During this statement, she intertwined, clasped her fingers, to suggest union and/or togetherness.

At the aforementioned statements, Student --, one of the leaders of the race-based bullying I had identified, standing, offered to the class, "*If anybody needs me and they want to fight some more racist professors at Pace, I'm graduating but y'all all have my number. I will be contactable*". Within one (1) or two (2) seconds thereafter, Defendant Hsu, who was in a mask but appeared to be smiling, waved happily and close up into the camera.  (Exhibit "—") (Add class video snippet link here.

During her time after having taken over my class, Defendant Hsu discussed with the students that I had been paid fully for the semester, which was absolutely none of their business and was unethical, but did indicate the cloaeness of the interactions that she had been engaging in with the students to have said such a thing publicly, easily, and nonchalantly, about another professor. She also indicated that, given that I had been paid by Defendant Pace, "*at least fiscally, there's not inequity*", alluding to, as an admission, statement of hubris and follow through of her promise if I did not drop the complaint, the treatment that I had received at her hands and that of the other Defendants.

Approximately fifteen (15) minutes into this last class, however, was a particularly troubling, revelatory discussion of "*Blackness*". That is, as part of a discussion on "*Blackfishing*" ("*the act of someone who is not Black pretending to be Black*"), a dubious concept that I do not subscribe to, and after watching a Rachel Dolezal Netflix trailer (Ms. Dolezal is the White woman working at the NAACP who identifies as Black, one student, "Student --" commented, "*I didn't hear what she explained. Wasn't she like, "Oh, I was born white but, like I was around, basically, born white but I was around literally Black people. I feel like I Am Black.*" Another student then stated, "*You know what irks me, like fucking Awkwafina adopting her blaccent to get popular and then dropping it.* [Another student, "*The Asian woman*"] *She's an Asian film sta*r…."

Student -- replied, "*She adopted a blaccent?*"

Student --- then stated, "*Yeah, then she dropped it. She was like, "Oh, I'm from Queens. Of course I have an accent…" But she's from like Flushing. Where is she picking up that fucking accent?*"

For the court's reference, a "blaccent" is defined variously as "a *distinctive manner of speech, pitch or tone, particular to African American urban inner city yout*h", "*A manner of speaking indicative of the stereotypical African American (or someone trying to sound as such)*, "*Accent for White people who sound like Black people*". It is described by some as a "*performance (of Blackness) that can be flipped to off like a switch*".

**Defendant Hsu who, as previously stated, had made the hand gesture of intertwining her fingers together, clasping them as if symbolizing union, also thanked students for what they had "*created*" together. She discussed the importance of staying together. It should be noted here that Defendant Pace changed the class structure and made it a one day a week class instead of two days as I had been teaching it. I learned and saw from Brightspace logs that students had stopped coming to her class or doing any work yet Defendant Hsu submitted high grades for everyone.**

On **May 1, 2021**, the semester ended at Defendant Pace after I completed teaching the other two (2) courses I had been assigned. No Defendant was ever in touch with me or made an offer to me for the next semester. I had been fired, increasing my angst and stress.

On **June 7, 2021**, in applying to the DOL, unusually, I was sent to a company called "ID.me", as I had been "*flagged*". This meant I could not apply for unemployment unless and until I registered with them. I could not reach ID.me for months, until October 2021.

On **June 9, 2021** at 5:06 p.m., I sent a follow up request to Bundor requesting the relevant additional information needed in order to interpret and verify her spreadsheets. I required all of the official course sections I taught including with actual scheduled hours taught, actual scheduled start and end times. She did not immediately respond.

On **June 11, 2021** at 7:39 p.m., Defendant Blackwood sent me a published negative teaching evaluation. Please note that the UAFP's CBA with Defendant Pace indicated that any negative evaluation gave the school the right to refuse to offer a professor any future work ("*Reappointments may be terminated at any time based on an evaluation(s) as per Article XIII of less than satisfactory*). Quinlan had also informed me in a phone discussion that any negative evaluation of a professor, a *"two" (2) or under out of "five" (5)*, signified that the professor had been fired by the school.

Defendant Blackwood's published evaluation of me consisted almost entirely of intentionally false statements by her, with a one "1" out of a possible five "5" rating for my teaching from her. This negative evaluation, my first one (1) ever, came at a time, and in a semester, when I had made my first complaint ever about bullying and race-based, anti-Black racism at Defendant Pace, and to Defendant Blackwood, and Defendant Hsu, in the English department, and was openly threatened. This all immediately followed my discovery and the complaint of fraud, retaliation, and different

treatment with request for restitution from the ELI department. All of these departments were run and managed tightly by Defendant Pace's Human Resources and they all worked and coordinated with each other.

In previous semesters, I received excellent evaluations, including a "5" out of a possible "5" in one semester, which the past chairperson, Johnson, described as "*stellar*", and "*rare*". Johnson, who was the only person to observe me ever, once, during one (1) semester, in the entire time that I had been teaching at Defendant Pace, described her review of my class in absolutely glowing terms as she stated, among other things, that I "*was doing the work of the University.*" Because of the circumstances under which Defendant Blackwood observed and her motivation for doing, I do not consider her visits to be an official, true formal observation.

Also, Defendant Blackwood used knowingly false CRES student evaluations, and knowing false student complaints, which she helped them manufacture, in order to fill out her negative evaluation of me. Notably, one of the students in the CRES class labeled me as "*racist*", as previously noted herein. Defendant Blackwood read this statement and made no mention of it in her own evaluation of me, even though such a statement would have mandated that an investigation was conducted into the reason for such a statement by a student. It is, in fact, telling that Defendant Blackwood said nothing on this, and she made no mention of it anywhere in writing to me. This is because not only did Defendant Blackwood knew it to be a lie, along with everything else that the anti-Black CRES students in the class stated or surmised about me under her and Defendant Hsu's guidance and suggestion but that Dufresne could not be involved as it would reveal his existence.

DISCORD

Upon receiving the June 2021 evaluation email, following the end of the semester with no job offer, there was verbal discord between me and Defendant Blackwood via email. That is, I was stressed (I had been diagnosed with Adjustment Disorder with Anxiety and Depression by that time and was having physical symptoms including Insomnia) and I knew (and importantly she knew) that she was lying again, making provably false statements which would change such as claims made in her emails to me that my "*class started late*", which can be proved as false as Zoom has timestamps, to "*class facilitations started late and because the students were very confused*". Therefore, a class's start time was specially defined by her for me in this situation as when student facilitations began. Answering questions, which I did at the beginning of each class was not considered as the start of a class suddenly. Defendant Blackwood was making up rules and issues. That she and Defendants Hsu and Baumann has encouraged student confusion added exponentially to the problematic nature of her claims on the evaluation and in her emails to me.

Defendant Blackwood lied as well about giving me any guidance throughout the semester for "*issues*" she claimed I had. Campbell and Kimura offered no evidence of this. A lie that Defendant Blackwood approached me with as id true which she, in the same email, offered "advice" on could not be considered that or any "*guidance*".

Defendant Blackwood also stated on the evaluation that I did not use Brightspace except Campbell and Kimura proffered to this court and during what had been deposition 1 so many of my announcements to the class which Defendant Hsu stated in an email amounted to more than twenty (20).

Defendant Blackwood additionally claimed that I did not email students, was "*uncommunicative*". This was also a lie. In fact, Campbell and Kimura proffered emails I had written and sent to students, as well, in their exhibits. Whether they liked (or not) how I chose to deal with a student who apologized in writing, for example, after being openly and proudly belligerent in multiple classes before and after her apology email and then proceeded to inform me that I could not tell the class "*no*" in that email is simply their issue but not one that would or should have been used to remove and taint a professor's reputation (as it constituted a disciplinary action which entities such as the United Nations (the *"UN"*) ask specifically about on their application) or fire a professor in the context of this semester or any other. Defendant Blackwood took issue with me not completing an *optional* self-evaluation but used it against me on the observation as if it were mandatory.

Indeed, Defendant Blackwood wrote an evaluation for the year when Defendant Pace had previously announced that they were not including the year 2020 because it was the first semester everyone was in quarantine because of Covid-19 for a first full semester. The students were having a terrible time adapting and it was tremendously difficult for everyone but Defendant Blackwood counted that semester and the student evaluations against me but not other professors.

Defendant Blackwood's evaluation was never meant to be true. It was meant to demonstrate to me what the Defendant Pace could do, as with the reverse fraud. They could fire me and then blatantly lie to defend that firing. That combined with the fraud and Defendant Blackwood's "instincts" on allegedly targeting a student for retaliation, rumors of me being racist and discriminatory created and spread by the Defendants and then the students all together tell a false story of Defendants' making.

When I would not sign the evaluatiom, Defendant Baumann sent out a department or university-wide announcement saying that signing evaluations was just an acknowledgement of receipt. My experience was that signing an evaluation was agreement. Therefore, I still would not sign it.

On **June 11, 2021** at 9:58, I sent another email reminder to Bundor about critical data I requested to verify her spreadsheets.

On **June 12, 2021** at 11:07, ELI's Brubaker contacted me to cancel one (1) of two (2) classes I was to teach in the Summer Lawyer's Program "*due to low enrollment*", the first time since 2015, which I informed her of. In that case and because of my suspicions about the cancellation, and what it meant, at some point before the course began, I informed her that I would not accept it. Brubaker never contacted since then.

On **June 14, 2021** at 3:14, Bundor responded to my June 11 email to indicate that she received it and would provide an update.

On **June 16, 2021** at 4:06, Bundor sent a document that would not allow transparency in calculating her spreadsheet.

At **10:32 a.m. on the 30th of June**, Bundor denied ultimately my requests for complete and full information so as to verify her claims that I had kept alleged overpayments. I did not know then

that, even on its face, the spreadsheet, with all of the different rates for courses (instead of one teaching rate) in both Hickey's and Tannenbaum's classes was problematic. Bundor did not indicate that she knew this about her and Defendant Baumann's spreadsheets. Missing also was the issue now visible with the English department rate which they were scrupulous in not bringing to my attention either.

### SUMMER OF 2021

In the summer of 2021, I engaged in a plethora of activities with other concerned Union members targeted at the Union's behavior and lack of response to serious issues occurring at Defendant Pace. I was upset with the manner in which events had transpired during the Spring semester at Defendant Pace. We requested transparency regarding matters such as the removal of NYSUT, the payments the Board was making to itself which appeared to contravene the dictates of the Union Constitution, a full independent audit of their records, which they had not ever done although the Constitution required one every year. I discussed my plans to contact the EEOC regarding what had happened to me at Defendant Pace.

### DEFENDANT BLACKWOOD AUGUST 2021 COMMUNICATION

In August 2021, Defendant Blackwood contacted me with what Kimura and Campbell have labeled an "*offer*". After my firing, however, this was an attempted rehire. However, it was also something else untenable, the radical change in terms and conditions and it was a form of coercion and bribe. Defendant Pace was sending a message about who they wanted me to know had power and control. At that time when Defendant Blackwood contacted me via email, still no mention had been made about Dufresne and for this reason. It was not an offer in the traditional and legal sense of the word then. Most blatantly, I could not make requests for Discrimination, Harassment, and/or Retaliation. It was an open secret now that I would not be allowed to make those claims. Indeed, hanging over my head, and what would "*follow*" me was the removal, the evaluation, the claims by students of racism and retaliation. Indeed, there was no mention by Defendant Blackwood of Dufresne after my report to her, Defendant Hsu, Hamilton, Defendant Baumann, and Smith-Bergollo, including in writing.

There was no discussion of a teaching rate commensurate with experience, like other professors. In fact, while they could not decrease the rate, the number of classes offered, and the level, was to inform me that I was starting over at Defendant Pace and should accept that. I was not constructively fired, which I stated in error. The blatantly false evaluation *after firing* was to inform me of the *reason* for the firing which they had orchestrated the entire time, including by using young adults, teenagers and/or minors.

After firing, there were new terms and conditions, a new understanding whereby students could be used against me as "*anonymous*"evaluations could be. Observations could simply happen and the Defendants could lie. The branding of me therefore was important because I could not work with this new reputation and record. Accepting the job offer after firing was securing agreement for Defendant Pace that everything that happened was okay. There was also the element of being trapped at Defendant Pace because of the

ugly tenor of the false branding of me by them as a fraudster/thief, racist (Anti-Semite, Anti-Asian especially), retaliator and harasser which even in my Retaliation case, they have publicly offered with direct knowledge of its falsity, and their role in why those claims existed at all. They seemed ready to say make these claims to anyone, from another teaching institution to a workplace like the United Nations. Knowing what this meant, I did not respond to Defendant Blackwood, intent on contacting a federal agency, EEOC and the NLRB, first.

To be fair even after she had sent me an evaluation where she lied egregiously, I responded to ask Defendant Blackwood why I was offered one class (the first-level first semester Freshman 101 course). She responded via email that there were a lot of "*moving parts*".

For the court's reference, on its application form, the United Nations asks that an applicant state any "*disciplinary actions*" taken against them at former places of employment.

Also, following 2021, Mercy College (*Mercy*") offered me a teaching position as did a CUNY school other than York College ("York"). Beyond the low salary Mercy offered, which Kristin Keckler ("Keckler") claimed was based on the Union and would not therefore discuss ("*We pay 3000K per 15-week course. Our adjunct instructors are unionized so this is non-negotiable by the departments*"), both required me to be in-person and therefore receive a vaccination if I wanted to work. I would not do this. At that time, I was seeking five (5) courses, which is what I was teaching at Defendant Pace (three (3) courses) and York College (two (2)), when the events of the Spring semester occurred.

**The EEOC**

In August 2021 also, I contacted the federal Equal Employment Opportunity Commission in order to file a complaint against Defendant Pace. I filled out the intake form and submitted it.

The electronic system notified me within a few days that I needed to schedule an appointment, which I then did. The earliest appointment the system could provide was December 21, 2021.

In between filling out the intake form and actually speaking with the EEOC, I contacted the National Labor Relations Board (the "*NLRB*"). The highlight of my interactions there was senior investigator Ruth Weinreb ("*Weinreb*") directing me to drop the NLRB complaint against Defendant Pace, which I did because she told me that they "*don't do that her*e". I never would have had I known the truth.

Following closely the events above was the new release of information from the Union's Mars that Defendant Pace and Dufresne were actually the entity and individual to consult about filing all of the civil rights claims I had been seeking to make against Defendant Pace for months and even years.

**On December 21, 2021, four (4) months later when my appointment finally arrived, I spoke by phone with investigator Krista Jolivette ("*Jolivette*"). I reported much of what is in this filing *regarding the Spring 2021* semester because she asked me for the latest occurrence of issues. The next day, she asked me to sign the Charge she had written.**

**Please note that, since my filing of the form to the court which the EEOC had represented was, in fact, the original one I submitted, in 2025, the EEOC, much to my surprise, forwarded me two (2) different Intake forms, claiming to be the form that I had submitted to them originally. That was problematic and the EEOC could provide no legitimate reason for this.**

**When the EEOC contacted Defendant Pace in December 2021, Defendant Baumann was the EEOC contact. Upon receiving notice, Defendant Baumann gave the position to Dufresne who became the new contact in her place.**

When I finally met Dufresne, he sent me a link that would not work. He then sent me another where I was able to submit the complaint form. Following this, I spent time emailing him and meeting him over Zoom twice for a lengthy amount of time so as to explain what had occurred. However, after months, Dufresne still pretended that he dis not understand the above details I have provided herein for both ELI and the English department. But, he was actually doing something else (as I believe he already knew about it). First and foremost, Dufresne was directly informing me, via "*confusion*", that the ELI matter was to be considered separate from the English department matter (and that the departments were separate). This indicates that he likely knew that the events likely had some relationship, if not being totally connected.

Moreover, Dufresne, a lawyer, then admitted that he understood both claims -treating me differently than other professors who are non-Black/White, which raised inference of classic race discrimination) regarding pay rates, using multiple pay rates, and -treating me differently, discriminating, retaliating, harassment to do first with the race-based bullying claim.

Second, in his confusion, Dufresne happened to write a rendition of events and a timeline which happened to remove the damaging aspects, the liability by Defendant Pace, from my claim and reordered events to protect Defendant Pace. It may have been suggestion, particularly since it was clear that all Defendants did everything they could to keep me from meeting him. In asking me to review his timeline, I chose to provide him with a writing in my own words that I wrote that reached to the heart of my claims.

Moreover, it is true that I was very stressed and anxious by the time I reached Dufresne, particularly with all of the other strange occurrences taking place during that time as well (Plaintiff's Discovery #115).

Dufresne could have investigated and gotten all of the information that I had in terms of emails to and from students, to and from the Defendants but he chose to pretend and produced nothing, incredibly, while asking for additional meetings.

Cooper was represented by the Defendants in this litigation, by Campbell and Kimura, Bond, Schoeneck & King.

This statement is irrelevant to the issues raised by Defendants behavior in this case including in light of my claims of unequal treatment, Discrimination, Retaliation and Harassment, their history of systemic racism and admission thereof, and my eight (8) years of employment at Defendant Pace until being fired in May 2021.

This statement is irrelevant to the issues raised by Defendants behavior in this case including in light of my claims of unequal treatment, Discrimination, Retaliation and Harassment, their history of systemic racism and admission thereof, and my eight (8) years of employment at Defendant Pace until being fired in May 2021.

This statement is irrelevant to the issues raised by Defendants behavior in this case including in light of my claims of unequal treatment, Discrimination, Retaliation and Harassment, their history of systemic racism and admission thereof, and my eight (8) years of employment at Defendant Pace until being fired in May 2021.

### **EVALUATIONS**

First, the Defendants should indicate whether they can adjust, modify, add, delete or in any way edit or tamper with the "anonymous" student evaluations which are the core and foundation of their process of evaluating professors and which they are using substantially in the Retaliation aspect of this case as proof. As previously indicated, prior to what Defendant Blackwood would allege was an observation, I had only received one (1) which I had to request in six (6) years in the English Department. The ELI department never provided any peer reviews in seven (7) years. Defendants have notice through their system that I have never reviewed student evaluations. That is because I have believed them to be inappropriate indicators of the professors' teaching ability. That is, if you are a thorough and hard working professor, good evaluations are difficult to receive. This has caused professors to not give a lot of intensive work for fear of the bad student review/evaluation, which determines if they work again and how much they work. Therefore, you can trust the good ones. Defendants have no interest in adding those. Indeed, the Defendants included none of these comments in their Summary Judgment although I have received a "3" or above out of "5" consistently and the elusive "5" out of "5" once .

"Bad" comments are easier to get and the bad ones are the ones Defendants have interest in using as a means to control.  Still, in a system that relies on "*anonymity*" that Defendant Pace ultimately controls and can manipulate, those must be verified as real. Defendant Pace has not done that here.

Indeed, students, in the form of affidavits also, noticeably are not available. Their identities have not been available either. Yet, they are the lifeblood of their case. I would like to subpoena

those whose alleged emails and alleged verbal statements the Defendants have relied upon and put forth and used to engage in smears of me.

Finally, noticeably, the Defendants never discussed problems with evaluations with me at any time. I was not provided with any notice whatsoever of problems or asked if the evaluations were even true.


## DEFENDANTS' BEHAVIOR IN PERSPECTIVE, TREATMENT OF ME COMPARATIVE TO NON-BLACK FACULTY

Regarding the Defendants' behavior towards me during and after the Spring 2021 semester in comparison to their approach to other non-Black professors, I detail herein the ways in which Defendants instigated, manipulated, coerced and/or bribed the students, some or all of whom I had reported for bullying me based on race, actively denied me access to the Discrimination, Harassment and Retaliation Complaint and Investigation system via their silence, diversions, set-ups and cover ups, and treated me differently than other (non-Black) professors

In fact, respectfully, in a real, fact-based, appropriate comparison to non-Black faculty, Professor Bob Cline ("*Cline*"), Amy Schwartzreich ("*Schwartzreich*"), and Professor Kat Wildish ("*Wildish*") among several other professors compiled in a list by students, non-Black professors in the Musical Theatre Department, had been accused by students of poor to no teaching, and/or inappropriate and limited subject matter, and/or not taking student voices into account or giving platform to them, and various and similar issues as listed in the removal letter sent to me by Defendants, and many were accused of racism by those same students, and over a length of time. The students provided various forms of evidence to Defendant Pace of their complaints. The offenses were, undeniably, actionable through various forms of serious censure by Defendants including, possibly, removal and termination. Despite those student complaints, Cline is still a "*proud faculty member*" at Defendant Pace today.

In fact, in the case of Cline, in place of the pretext as cover for Defendants' behaviors of Discrimination, Harassment and Retaliation towards black professors, used in my case where I was also the victim of racism in the form of student behavior and complaints as the offenses against me instead of an actual alleged offender, Defendant Pace went to the trouble of bringing in from within the school a new individual as the "*instructor*" for the students who complained about him (a person who was not, significantly, a professor). Those students who complained were given the option of whom they wanted to be taught by, Cline, as he was to remain the professor no matter what, or the individual whom Defendant Pace had brought in to "*teach*".

This is to what extent Defendant Pace was committed to caring for and protecting this non-Black professor, his job position, his stature, his future, and his dignity, a professor who had been accused so completely of denying some of the students the same opportunities in the classroom and exposure to diverse work material as their classmates, poor teaching and no teaching of some, and

myriad other teaching issues, and because of racism. Those actions by Defendant Pace for Cline were in place of taking any of the actions visited upon me, based originally on the accusations of students, notably individuals not motivated by racial animus towards him. Schwartzreich had not only been accused of poor teaching, and the other issues as Cline had, but she too was accused of racism by students as a professor and a program director. As director, she had been accused of promoting racially discriminatory practices for use by other faculty that she had supervisory responsibility over in the program.

Defendant Pace fully stood behind the actions of Schwartzreich, even when they were informed that she was engaging in racial discrimination as well as intentionally poor teaching and other misconduct. In fact, in the midst of the problems students of color were having with her, she was promoted. Although in August 2020, she announced that she was voluntarily removing herself, she nevertheless maintained a role in various programs, and still had influence over the programs and students.

Her untarnished (by employer reprimand) legacy continued until the end of the Spring semester 2021, the semester in which I was discriminated against Cline, Schwartzreich, and others were professors as I was. They were required to have a syllabus, which they could adjust or change if an error had been made and any other time when we deemed it necessary. They assigned homework and other assignments, for a grade if desired. They were required as a normal part of their responsibilities to provide feedback to students for the work done. They provided instruction, asked for responses from students when appropriate, and regulated any conversations that ensued. They communicated with students on the teaching platform that Defendant Pace was using at the time. They provided a final grade to students, and feedback before this if applicable. Yet, respectfully, in the face of similar "*student complaints*" as Defendants have declared were the reason for their behavior towards me, and of those "*issues*" Defendants could state had emanated from the forced observations spanning five (5) or more classes which also coincidentally mirrored the student complaints, other non-Black professors, including Cline and Schwartzreich, were not silenced, were not threatened while using ready-made, pre-planned and built in pretext as in the case of what Defendant Hsu stated to me as a threat.

Cline, Schwartzreich and other non-Black professors were not observed by force, intimidated, and publicly demeaned in the classroom multiple times under pretext. They were not subjected to harassing probes renamed for cover as a "*meeting*" where "*disciplinary action*" might be taken, in order to determine what pretext could be used in their removal. Cline and others were not asked to engage with students in ways that made them uncomfortable, and their choices with regard to the students were respected, and not used against them. They were not removed, provided with a fabricated evaluation that was negative in every aspect, or fired, as I was. Defendant Pace did not terminate or attempt to terminate Cline, Schwartzreich and others after being made aware of their deliberate and actual patterns of behavior brought to their attention via student complaints.

The forced observations, deceitfully presented initially by Defendant Blackwood as a means to "help" me so that she could prevent stating that the genesis was student complaints, it should be

noted, were imposed by Defendants to purposely attempt to falsely transform any analysis of their observation "results" to ones that went beyond the realm of reactions to student complaints not just as a way to validate those supposed findings, but as a means to preempt the present comparison.

In their attempts to intentionally turn me into a bad actor, and even if it were actually the case, Defendants still did not treat me as they did Cline, Schartzreich, Wildish and other professors compiled on the list by students with complaints about them. The allegations by students against the aforementioned professors and others, moreover, formed a part of several "*Verified Complaint*" filings by those students intended for the City of New York Commission on Human Rights, one of which by former student Leilani Carr, prepared by her attorney Andre Travieso, was included as an exhibit with my Second Amended Complaint, dated April 14, 2023. The removal letter was one of the results of all of the false accusations that preceded it. In fact, those accusations, from the beginning, exhibited a pervasive relied upon pattern and practice of intentionally accusing me falsely as a Black professor of everything, and then attempting to make me work to prove them false. The difference with the removal letter itself was that it was created by Defendants with the idea that, with pay, it did not matter as to the integrity of it or whether it was discriminatory/retaliatory, if I could be convinced that removals could never be challenged under any circumstance, which would inappropriately make it exempt from federal law. This pattern and the push to convince this court that such a practice is valid.

To be clear, respectfully, I have stated herein and in my Second Amended Complaint that Defendants trumped up false, discriminatory, harassing and retaliatory claims against me because I am a Black professor who came to the school's attention because I complained about race-based bullying of me. Defendants have claimed differently. No professor is perfect, even at his or her best. I was not in the Spring 2021 semester. However, even were their pretext genuine, Defendants' claims would still not be sufficient as non-Black professors accused of identical, similar and worse allegations were treated better, well and with dignity, as a matter of fact.

Moreover, Defendants' actions in my case were a refusal to follow their official Title VII policy on Discrimination, Harassment and Retaliation provided herein, as detailed in their Faculty Handbook with regard to complaints about activities motivated by racial animus, stereotypes, and/or bias.

## MY LUXURY JEWELRY BRAND, "SEBR, INC."

SEBR has a logo with the brands' letters encircled by two snakes, which symbolize wisdom and protection. In 2013 or 2014, when I was not teaching at any school, I decided to start designing jewelry of my own (suggested to me by a sharp, empowering person in Los Angeles long before then) to be made in high quality materials such as 18k gold, 20k gold, 22k gold, and 24k gold. It was a thought at that time which turned into something amazing which was only getting better with time, attention and funding.

To be clear, respectfully, m brand was in the  idea stage in 2013 and 2014. I had to consider how and when and what, asking questions and taking risks to learn such as visiting the rough and tough Diamond District as often as possible to sit, watch and learn.

For years, those ideas I had and drawings I began to sketch for jewelry pieces had to be developed persistently and methodically into something, in different spheres, to make it what it was in 2021. And, I did this by myself, hiring independent contractors and employees en route, using the money I worked for as a professor (who taught classes) to build as most entrepreneurs do, starting with Research and Development ("R&D"), which is where my money was spent for years until each collection piece was made, tested in fine materials and then finalized.

I built the brand from nothing and in my childhood bedroom. That was the story I wanted to tell young girls and young women, particularly, bout how to do it yourself truly and win. I created the valuable trademarks, the image, the story of the brand which focuses on women and girls who have options because either they simply have them and/or they make them, all while betting fully on themselves, their skills and abilities, talents and strengths to build something entirely theirs and having sprung from their own dreams and then efforts. That was and is truly something to be proud of. We needed more of those stories because they are exciting, and scary and legendary but too often missing from the narrative about women. Too often, the stories about women in business are cliched and unimaginative. What I was sharing in my Instagram stories, which I had to stop doing at a certain point when I realized it might have been used to track my movements, was real life, gritty, fun, luxury and hard work. There was a market and thirst amongst young women looking for reality-based inspiration for that type of story. Beautiful jewelry, fun photoshoots and collaborations with business owners all over NYC only added to the story. The learning curve was extreme. Everywhere I turned in running my brand there was something else to absorb. I learned, for instance, to withhold smiling in the Diamond District as it is seen as weakness amongst the tough guys who create jewelry. What I learned, I taught to others and via Instagram. Despite the dwindling of my teaching funds at Defendant Pace and therefore the stress, I continued to build my brand to what it was in 2021.

Solely owned and operated and jewelry designed by a Black Woman entrepreneur (which is a rarity), artist and professor (which I enjoyed doing as well), as previously stated, my jewelry was made in 18k gold, 22k gold, and 24k gold, original, stamped with our trademark, with pieces made exclusively in New York's Diamond District (most solid, top quality with fancy colored and certified diamonds on the horizon). This endeavor was funded and fueled personally through sacrifice. Therefore, the "luxury" is the sushi and the veggie juices and the solid pieces but the power is doing what you want, how you want, when you want and deciding what you will sacrifice and how to get there with honor, integrity and style. This is different than being a cliché, thinking like one or having cliché understandings about "luxury" and the world and people and products. I believe that when one who has lived in various ways and seen the various landscapes truly understands, they understand. One of those sacrifices was to stay living at home in a suburban Designated Historic Residential District replete with deer, wild turkeys, beautiful hawks and bunnies, which I was willing to do for a time.

The brand's value is wrapped up in, amongst other things, its original designs, its trademarks (Name, logo and LOVE's design) and its potential.

Instagram - @sebrny

Facebook (which I do not use anymore)- @sebrnyco.

My Activities to build this brand which could be viewed instantly on "Stories" on Instagram included:

1) A Dinner Event at "Coco J'Adore" Meatpacking District with a 5 course menu, and in person Kenzi Henna hand tattoos, with Vogue Editor in attendance, a Daily Beast writer in attendance, and other Influencer coverage.

2) Photoshoots with various photographers onsite at Garber's Hardware, the Brooklyn Bridge, the Sanctuary Hotel, Saks Fifth Avenue NYC, D'Angelico's Guitars, Jackson Hole,  Barn Joo Restaurant, Washington Square Park, Time Square, New York Public Library, Harry's Restaurant Financial District, Lord & Taylor, and other locations. I scouted Range Rover shoots and other types of locations, all of which entailed negotiating business deals, contracts, managing projects and people, connecting with other professionals, business owners and models.

3) Jewelry-only photography shoots

4) I built a website, authored a well-received blog discussing advice I received from talented people and experts. There was the SEBR Newsletter and App.

5) Models – Kaitlyn Jackson (now seen in movies like "American Clay", "Mickey's Slayhouse", Wedergeburt, Uptown Girlz, and beauty products in Big Box stores (i.e. Ulta) nationwide such as "Inked", Amber (former Ms. USA contestant), Isabel, Gabrielle, Natalie Cavalcante, Catherine, Adrianna, Brooke, and others. All models received clothing they wore on shoot and/or jewelry in addition to monetary compensation as my commitment was to better treatment of models starting with my brand.

6) Employees/Independent Contractors – Spencer Eagleton and Ro Dumas (both Defendant Pace students), FIT students (Lexi, (Gabriella), Brittany, Adrianna)

7) Freelance Photographers

8) Influencers – Lucette Romy, Ava Dash wanted to work with us but I could not do this financially. It was a missed opportunity (@ava_dash on Instagram, avadash.com, Next Gen NYC t.v. show)

9) I created a Script for a film in collaboration with Professional Scriptwriter Aaron hired by me- Instrumental music secured, location scouting and inquiry– Playland, Jay Estate, GlassHouse The Hamptons, and other locations, actor search and discussion

10) Community Service:

-Donations of baby booties during and after Covid to Children's Hospitals in NY – New York Presbyterian, New Rochelle, NYU Langone Children's Hospital.

-Westchester Humane Society Collaboration on SEBR's Instagram for Animal/Dog and Cat Adoptions – I made short music videos/images + music to help get animals adopted.

11) I commissioned a Commercial Realtor (Andrew) to find Store location search in the Meatpacking District, NYC.

12) I did a personal Apartment search in Meatpacking District (RockRose, Hudson St., Jane or Bank Street) near the potential store locations.

13) I was a Fashion Institute of Technology Guest speaker on Entrepreneurship as part of the building of my personal brand.

14) Artwork Commissions – Eleeza

15) I was in talks with PR representatives for publicity and product placement in movies, songs, and rap songs and for New York Fashion Week presence and representation.

16) I conduced a great deal of Celebrity Outreach and had discussions about a Special Collection for luxury department stores like Nordstrom.

17) I had Collaboration Discussions with fellow women entrepreneurs like Amina Muaddi.

18) I created branded cashmere blend Socks with my logo and my own art drawings, all made in Italy, and 100% silk scarves handmade and embroidered here in the United States with my trademark "LOVE" design.

19) I created an investment Offer at almost wholesale prices on SEBR's LOVE Gold Bars to potential jewelry buyers and advertised it for a time – Gold has since doubled and is on track for tripling in price. This would have been amazing from the perspective of any would have been young buyer.

My know how about what to do when it comes to my business came largely from my work experience, including being a model, filming (a commercial which aired in Finland), going on auditions, being signed to an agency until I left Los Angeles, exposure to industry people, celebrities, as well as jewelry designers and other entrepreneurs (seeing their approaches), my legal experience working for a technology start-up called "*Dynamic Networks*" including upon graduation from law school at USC Gould, my experience as a fundraiser for the Museum of Contemporary Arts ("MOCA") where I was part of an exclusive group of people who helped organize and support thrilling events like that of the opening for the famous artist Murakami and the first comprehensive exhibition of his work, a widely celebrated show which began in Los Angeles at the MOCA, the museum which also produced his book @MURAKAMI.

I also regularly attended high-end or luxury events such as the Lexus Concept Car event at a Beverly Hills mansion, sponsored by Frette and other luxury vendors. It, this exposure and influence on me, beyond my life of travel, exploration and other studies, outside of these particular experiences, all informed my approach to my brand.

As stated previously, I did my best to show this process on Instagram, in Stories as I started to realize that there was a genuine desire by mostly young people to see how to make their way, the struggles being a part of it (and the point of it) as well as the luxury aspects, veggie juices, fashion shoots.

I started working on the Whitney Museum early on but needed the infrastructure I had and was continuing to augment in 2021 to become/have the brand become a Foundations/Patron of the Arts.

The focus of the brand was empowerment of women. Leading by example on refusing to do things in the easy ways in order to gain the pride, invaluable experience and strength from doing it the hard way. The result is that the products of your efforts are all yours, to which no one can stake a claim. It is the American Dream. It was central to my concept that I build the brand from scratch by working and using funds I earned as opposed to relying on others or even having a business partner. It became about the effort and the struggle as desirable so one could truly call what she built her own. That's the legend.

The brand was exciting. The jewelry was exciting and different. The message was exciting and resonated with young women and men, people everywhere. In the Diamond District people wished me well although there was what I semi-jokingly referred to as the "pizza girl" problem. That is, for various reasons which I have been told, frankly, by Diamond District people relate to being Black, a woman and appearing young, people did not believe I owned the business in an industry dominated surprisingly enough by older men. Television has a lot to do with people's ideas and perceptions about "owners" and "ownership", I believe also. Therefore, oftentimes, I was pegged as the delivery girl (jewelry runner) or the pizza girl. But, anonymity was a good thing and I prized my privacy in general, even using a pseudonym, a nickname given to me a long time ago by a dear friend, as one protective measure. As long as my work was being done, I did not care who anyone (with their limiting ideas) believed I was. Indeed, I built a brand this way, quietly but effectively managing the environment, adapting to what truly is its own universe of mores, customs, ways of doing business, languages, systems. I made sure to learn, to sit and to watch, make acquaintances, and thereby secure referrals to the best people (a huge aspect of the business since most Diamond District people only work amongst and with family given the high value merchandise and the need to trust).

In sum, "light", in the form of news publicity or any other media at this juncture or prior to it, does not help me. It could hurt me personally, putting me and my family at personal risk because of the exposure. Therefore, bringing attention to this case, as I have worked to do, indeed exposes me in ways and about things and information which I have sought to protect all of this time and prior to this lawsuit. The Defendants know this. But, I realized early on that it would be a necessary step given the magnitude of what Defendant Pace and others have been doing. That is, light is what they require.

And everything I built, I was doing while my salary continued to dwindle as Defendants worked very hard to disenfranchise me in one department after another. Then Defendants attempted it thereafter.

Respectfully, the court inquired of me at a conference as to whether I had made any sales in 2021 to 2025. My response was "no". The key point, however, is that I would have made sales during this time period. In five years, what I could have and would have done is too much to

84

fathom, is overwhelming and part of the cause of the emotional and physical distress associated with this case. The loss associated with that time after surviving as much as I did, outlasting what I did, building despite the dwindling of funds and what happened to me instead has been difficult to accept. Defendants implied, if not directly stated, self-servingly that my personal story was exaggerated. Beyond fudging my family's summer vacations a bit, what I shared has not even come close to detailing the full measure of it.

Dated: May 9, 2026

_____/s/_____

Dr. Wendy Alicia Harte